## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| TRADEINVEST ASSET MANAGEMENT COMPANY (BVI) LTD., FIRST OCEAN ENTERPRISES SA, and TECHVIEW INVESTMENTS LTD., <br><br> Plaintiffs, <br><br> -against- <br><br> WILLIAM "BEAU" WRIGLEY, JR., JAMES HOLMES, JAMES WHITCOMB, SH PARENT INC. d/b/a PARALLEL, SURTERRA HOLDINGS INC., GREEN HEALTH ENDEAVORS, LLC, PE FUND LP, and ROBERT "JAKE" BERGMANN, <br><br> Defendants. | Case No. _____ <br><br> **COMPLAINT** <br><br> <u>**JURY TRIAL DEMANDED**</u> |

Plaintiffs TradeInvest Asset Management Company (BVI) Ltd. ("**TradeInvest**"), First Ocean Enterprises SA ("**First Ocean**," and with TradeInvest, the "**SAFE Plaintiffs**"), and Techview Investments Ltd. ("**Techview**"), by and through their attorneys, Quinn Emanuel Urquhart & Sullivan, LLP, for their Complaint against Defendants William "Beau" Wrigley, Jr. ("**Wrigley**"), James "Jay" Holmes ("**Holmes**"), James Whitcomb ("**Whitcomb**"), SH Parent Inc. d/b/a Parallel ("**Parallel**"), Surterra Holdings Inc. ("**Surterra**," together with Parallel, the "**Company**," and with Wrigley, Holmes, and Whitcomb, the "**Securities Defendants**"), Green Health Endeavors, LLC ("**Green Health**"), PE Fund LP ("**PE Fund**"), and Robert "Jake" Bergmann ("**Bergmann**,"), allege as follows:

## **NATURE OF THE ACTION**

1.     This is an action against Beau Wrigley, Jr., scion of the Wrigley fortune, and associated individuals and entities, for committing federal securities fraud in violation of Section 10(b) of the 1934 Securities Exchange Act, and SEC Rule 10b-5 (among other violations).

2.     Wrigley, the Chairman of the Company and its CEO during the relevant period, along with the other Securities Defendants, fraudulently induced the SAFE Plaintiffs, by means of myriad misrepresentations and omissions about the Company's true financial condition, to invest ████████ in a so-called "SAFE"—a Simple Agreement for Future Equity—issued by the Company.  Wrigley and the Securities Defendants initially portrayed the SAFE as a way to ██████████████████████████████████████████████████ ██████████████████████████████████████████████████ ██████████████████████████████████████████████████ ██████████████████████████████████████████████████ ████████████████████

3.     In reality, however, the SAFE was ████████████. Wrigley and his co-Defendants were secretly just trying to keep the Company from ████████████████████ ███. Indeed, among many other things, Wrigley and the other Securities Defendants failed to inform the SAFE Plaintiffs on September 27, 2021—the day the SAFE Plaintiffs funded their ████ ███████ investment—that the Company was about to ████████████████████████ ████████████████████ beginning *just three days later*.

4.     Following several months of discussions, Wrigley and the other Securities Defendants were responsible for, among others, the following catalogue of misrepresentations and omissions to induce the SAFE Plaintiffs to provide the Company with ████████:

a.      That as of September 27, 2021—the day the SAFE Plaintiffs released their ██████████ from escrow—the Company was on the precipice of (i) █████████████████████ ████████████████████████████████, (ii) ███████████████████████████████████ ██████████████████████████████████ by Wrigley's "family office," Defendant PE Fund (the "**PE Fund Note**") (PE Fund also held ████████ of the Company's ██████████ in senior debt);

b.      That as of September 27, 2021, the Company also was █████████████ ████████████████████████████ notes issued by Defendant Green Health (the "**Green Health Notes**")—a *different* Wrigley family office;

c.      That, before Wrigley and his co-Defendants would move the SAFE Plaintiffs' money out from escrow, ████████████████████████████████████████; yet the Securities Defendants took the SAFE Plaintiffs' funds on September 27, 2021 despite ███████████████████████;

d.      That, on June 30, 2021, PE Fund and the Company ████████████████ ███████████████ by entering into the PE Fund Note on terms, devised by Wrigley, that would make a loan shark jealous;

e.      That the ██████████ SAFE investment would be used to ██████████ █████████████████████████████████████████████████████, when the Securities Defendants actually ████████████████████████ (including Wrigley's own PE Fund) and would not ████████████████████████████; and

f.      That the Company's performance was actually ███████████████████ ████████████████████████████████████████, making inconceivable the

assurances ███████████████████████, especially in light of the ████████████

██████████████████████████████████████████.

5.    Wrigley's intent to defraud the SAFE Plaintiffs is evident from his own extreme

reluctance to throw good money after bad by committing even a tiny portion of his famous fortune

to the SAFE.   Wrigley initially agreed to put █████████████████ only after the SAFE

Plaintiffs insisted that he also have some "skin in the game."   Then Wrigley ignored this promise,

and the SAFE closed without Wrigley's investment and far short of its promised ████████

████████████.   The SAFE Plaintiffs did not discover Wrigley's failure until nearly two months

later, when it learned that the SAFE investment had never reached the promised █████████.   To

avoid further scrutiny of the investment and Wrigley's and his co-Defendants' conduct, Wrigley

quickly made up the shortfall of █████████████.   All the while, however, the Company had

quietly ██████████████████████ to pay back part of Wrigley's PE Fund Note, which

means that while Wrigley was out soliciting ███████████, he was actually ***taking*** ████████

███████████████.

6.    The Securities Defendants' ███████████████████████████████, and

their willingness to make misrepresentations and omissions to obtain it, was a direct result of

Wrigley's profligate leadership.   By the summer of 2021, Wrigley had burdened the Company

with enormous amounts of debt, and it ███████████████████████████████████████.

By the end of June 2021, as discussed above, the Company had incurred ████████████████

in debt, a portion of which—the PE Fund Note—███████████████████████████████

██████████████████████████████   Added to this was the Company's ██████████████

█████████—due, in part, to an industry-wide decline and, in part, to Wrigley's incompetence as

CEO—which meant the Company would ███████████████████████████████ ██████ .

7.       In fact, the Company artificially ███████████████████████████ in order to take the SAFE Plaintiffs' money, only to ██████ just weeks later, and ███████████████ thereafter.  The side-by-side comparison of ████████████████████ shown to the SAFE Plaintiffs pre-closing and post-closing is nothing short of staggering:

| ██████████████ | August 2021 | October 2021 | January 2022 |
|---|---|---|---|
| █████████████ | ████████ | ████████ | ████████ |
| | | | |
| █████████████ | ████████ | ████████ | ████████ |

8.       In other words, the Company ████████████████████████████ ███████████████████████████ , between the month before the Securities Defendants took the SAFE Plaintiffs' money and just three months after.  The sheer ██████████ ███████████████████████████████████—which they used for purposes of marketing the SAFE to the SAFE Plaintiffs—lacked any reasonable basis.

9.       Still, during the summer of 2021, Wrigley and the Securities Defendants were aiming to put all of the above behind them through acquisition by special purpose acquisition company ("**SPAC**") Ceres Acquisition Corp. ("**Ceres**"), which at the time was backed by music industry mogul Scott "Scooter" Braun.  So, at that point, Wrigley and the other Securities Defendants pitched ██████████████████████████████████████ .  But by August 2021, the original SPAC transaction value of ███████████████████████████████ ██████ , and, regardless, Wrigley understood that the Company's ████████████████████ ███████████████████████████ .  He therefore let the SPAC transaction die on the vine (or even orchestrated it so the transaction would never close).

10.     To keep investors on the hook even after the SPAC had dissipated, Wrigley and the Securities Defendants pivoted (█████████████████████████████████████████ ███████) to claiming that the Company was worth considerably more ███████████████ ████████, and would obtain much greater value █████████████████. So, the story now was that the Company needed ████████████████████████████████ Holmes and Whitcomb supported this storyline by telling the SAFE Plaintiffs that cannabis industry players were lighting up their phones ██████████████████████████████.

11.     The SAFE Plaintiffs prudently inquired ████████████████████████████████ ████████████████████████████████████—by which time the Company expressed extreme confidence that it would ██████████████████████████. The Company claimed ████████ SAFE funds would be enough, and the funds would be used to ████████ ███████████████████████████████████████████████████████████████ ████████.

12.     On the basis of these misrepresentations, ████████████████████████████ █████████████████████████ on September 27, 2021, the SAFE Plaintiffs advanced ████████ in SAFE financing to the Company.

13.     In fact, the Securities Defendants had no basis to represent that the SAFE would ██████████████████████████████—or even █████████████████. ████████████ ███████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████ ████████████████████████████████.

14.     In November 2021, having backed himself into a corner, Wrigley resigned as CEO and his PE Fund, in its capacity as holder of ███████████ of the Company's senior notes (███ ███████████████████ of the PE Fund Note), sent ██████████████████ to the Company. The junior creditors ████████████████████████████████████████████████ ████████████████████████ under the Junior Note (which ██████████████████ the Senior Notes).  And beginning in December 2021, the SAFE Plaintiffs began to learn the extent to which the Securities Defendants had misrepresented ████████████████████ the nature of the SAFE Plaintiffs' investment.

15.     The misconduct described above, and detailed herein, entitles the SAFE Plaintiffs to rescission of their investment with attendant costs, fees and other expenses, including fees and expenses for enforcing their rights.  Indeed, although the Company participates in the comparatively new industry of legal cannabis, and the investment at issue is a relatively new and novel security, the Securities Defendants still committed good old-fashioned securities fraud.

16.     Separately, Techview, as a holder of the Company's Senior Notes (as defined below), is entitled to invalidation of the Green Health Notes, the Bergmann Debts, and the PE Fund Note as voidable transactions under applicable Georgia law.

**PARTIES**

17.     Plaintiff TradeInvest Asset Management Company (BVI) Ltd. is a BVI registered company.  TradeInvest invested ███ million in the SAFE.

18.     Plaintiff First Ocean Enterprises SA is a Cypriot entity, with its principal place of business in Nicosia, Cyprus.  First Ocean invested ██ million in the SAFE.

19.     Non-party PSQ Capital ("**PSQ**") serves as the investment adviser to First Ocean and TradeInvest.

20.     Plaintiff Techview Investments Ltd. is a BVI registered company.  Techview holds ███████ of the Company's Senior Notes and ██████ of the Company's Series D Preferred Stock.

21.     Defendant Parallel, a Delaware corporation, is a holding company that focuses on the development, production, and sale of cannabis products, oils, and extracts through subsidiaries, including in the State of Florida.  Its principal place of business is in Georgia.

22.     Defendant Surterra Holdings Inc. is a Delaware corporation with its principal place of business in Georgia and a registered agent in Florida.  Parallel and Surterra are referred to herein as the "Company."

23.     Defendant PE Fund, a Delaware limited partnership, is a holder of ███████ in the Company's Senior Notes and the holder of the PE Fund Note.  PE Fund is an investment vehicle within Wrigley's family office, and is controlled by Wrigley out of West Palm Beach, Florida.

24.     Defendant Green Health, a Delaware limited liability company, is a ████████████ ████████████████████████.  Green Health is an investment vehicle within Wrigley's family office, and is controlled by Wrigley out of West Palm Beach, Florida.

25.     Defendant Wrigley initially invested in the Company in 2017 and assumed day-to-day operations as Chairman and CEO in late 2018.  Wrigley resigned as CEO effective November 19, 2021 when it became clear the Company would be ███████████████████████████ ████████████████ under the Note Purchase Agreement (described below).  He continues to serve as Chairman of the Company.  Wrigley controlled Green Health and PE Fund at all relevant times.  Upon information and belief, Wrigley resides in West Palm Beach, Florida.

26.     Defendant Holmes was a director at Parallel from September 2017 through November 2021, as well as its Chief Strategy Officer from January 2019 through December 2021. Upon information and belief, Holmes resides in Florida.

27.     Defendant Whitcomb was the Company's Chief Development Officer until November 19, 2021, when he replaced Wrigley as CEO.  Upon information and belief, Whitcomb resides in Florida.

28.     Robert "Jake" Bergmann was a founder of Parallel and its first CEO, until he was replaced by Wrigley.  On information and belief, Bergmann resides in Florida.

## JURISDICTION AND VENUE

29.     This Court has jurisdiction over this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1331 and has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367(a).

30.     Venue is proper in this District pursuant to Section 27 of the Exchange Act, and 28 U.S.C. § 1391.

31.     The court has personal jurisdiction over Defendants because, on information and belief, Defendants Wrigley, Holmes, and Whitcomb reside in Florida, all Defendants regularly conduct business in the State of Florida, and because they transacted business relating to the causes of action alleged herein within the State of Florida, and/or committed tortious acts in the State of Florida, and/or committed tortious acts causing injury to persons or property in the State of Florida.

## FACTUAL BACKGROUND

### I.   THE COMPANY'S CAPITAL STRUCTURE

32.   As alleged above, Wrigley assumed control of the Company in late 2018.  Almost immediately after doing so, he began to saddle the Company with substantial amounts of debt and other obligations.

#### A.   The Senior Notes

33.   The most senior tranche of the Company's capital structure is ███████ in aggregate ███ Senior Notes due ███████████ (the "**Senior Notes**") (plus interest as well as potentially ████████ in pre-payment penalties).  The Company incurred these obligations in October 2018, almost immediately after Wrigley effectively assumed full control of the Company as Chairman and CEO.

34.   The Senior Notes were issued pursuant to, and are governed by, a Note Purchase Agreement, by and among the Company and holders of the Senior Notes, dated October 16, 2018.

35.   The Senior Notes are secured by first priority liens on, and security interests in, substantially all the assets of the Company, as well as each of its direct and indirect subsidiaries, pursuant to Section 3.01 of a Guarantee and Collateral Agreement dated October 16, 2018.

36.   PE Fund—which, again, Wrigley controls—holds ██████████ of the Senior Notes, and is therefore their majority holder.

37.   Techview holds ████████ in original principal amount (setting aside overdue interest, default interest, penalties, and reimbursable expenses), and is thus a minority holder of Senior Notes.  Techview also holds ████████ of the Company's Series D Preferred Stock.

38.   Beginning in or around June 2021, and continuing past September 2021, the Company █████████████████████████ in multiple ways.  In particular, the Company issued the PE Fund Note on June 30, 2021 to ████████████████████████████

██████████████████, only to breach ████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

██████████████████████████████████

39.     Defendants did not, however, disclose ████████████ to the SAFE Plaintiffs until after the Company took and used their ████████████ in SAFE investment funds.

**B.     The Junior Note**

40.     The Company's second-largest debt obligation, which is junior to the Senior Notes, is ████████████ of junior secured debt issued on May 7, 2021 (the "**Junior Note**") to SAF Group ("**SAF**") (plus interest as well as potentially ████████████ in pre-payment penalties).  SAF Group is an alternative investment management firm based in Canada.

41.     The Company used the Junior Note to refinance seller financing provided by the sellers of New England Treatment Access ("**NETA**").  NETA is a cannabis facility that Parallel acquired in 2019.  The Junior Note carries an annual non-default interest rate of ████%.

**C.     The Green Health Endeavors, LLC Convertible Secured Notes ("Green Health Notes")**

42.     The Company also appears to ████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

██████████████████████████████████████.

43.     ████████████████████████████████ Wrigley was Chairman and CEO of the Company and *also* the Chairman and CEO of Green Health.  He was therefore hopelessly

conflicted, as he served effectively as both ████████████████████████████ ████████████, and got to choose which side got the best deal.

44.     Wrigley chose Green Health. ███████████████████████████████ ████████████████████████████ enrich Wrigley and gouge the Company's stockholders. Specifically, under the terms of ██████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████, and would convert into that amount of preferred stock.  To rub salt in the wound Wrigley inflicted on all existing stockholders, this sham amount of █████████████ ████████████████████████████████████████████████████████—including Techview's ████████████ of Series D preferred stock.

45.     Upon information and belief, the Company conducted no arm's length negotiation over the financing terms of the ████████████████, and failed to explore other financing options that might offer better terms.  In fact, Wrigley's lieutenant, Holmes, represented ████████████ in the transaction, while also serving in his capacities as director and Chief Strategy Officer for the Company, and it is unclear who—if anyone—played the part of Company representative in the sham negotiations.  Holmes' positions at the two companies had one main feature in common: both reported directly to Wrigley.  In other words, both principal (Wrigley) and agent (Holmes) were hopelessly conflicted in negotiating the ████████████████.

46.     Plaintiffs do not have full insight into the specific uses of the proceeds from the ████████████████.  But it appears that Wrigley would periodically █████████████████████ ████████████████████████████████████████████████████████████████

████████████████████████████████████████████.   The  nature  of  these

investments as "debt" is highly suspect.

47.     For example, ████████████████████████ to the Company in January 2021,

and took a ████████████████████████.   ████████████████████████████████████████

████████████ on  the  sweetheart  terms  described  above.   On information and belief, the  ██

████████████████████████████████████████████ (described below).

48.     The total amount of approximately ████████████ advanced under the ████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████ if Wrigley preferred the ████████ option—a decision he could

wait until the last minute to make, depending on the Company's prospects as observed from the

C-suite.  (Although the ████████████████████████, it reflects Wrigley's intent

to provide for himself a minimum return of ████ on the short-term advance of funds).

49.     Remarkably, the fact that the ████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████.   Apparently realizing that fact, the Company also entered into

an ████████████████████████████████████████, pursuant to which the

Company  purportedly  ████████████████████████████████.   No information

about those ████████████████ has ever been disclosed.  Upon information and belief, the ████████

████████████████████████.

50.    But Wrigley's ███████ machinations were far from over.  On the same date

as the ████████████—████████—the Company substituted the ████████████

████████████████████████████████████████████████████████████████████

████████████████████ Clearly an after-thought cleanup effort, the Company now

inserted preconditions to the ███████████—albeit ceremonial ones—on the approval of ████

██████, including approval of (i) a majority of disinterested directors; (ii) a majority of

"Unaffiliated Directors," pursuant to the requirements of Section 8(w) of the Company's

Stockholders Agreement; (iii) a majority of independent directors of SH Parent, pursuant to

Section 10.2 of the NPA; (iv) the Required Holders, as defined in the NPA (*i.e.*, PE Fund, which

was Wrigley); and (v) a majority of Company minority stockholders.  The Company's and

Wrigley's failure to require similar approvals and authorizations for previous iterations of the

████████████ was never explained, and the idea that one could fairly seek approvals of

██████████████████████, or else the Company will face ██████████████████

██████████████, is patently absurd.

51.    As a whole, the ████████████ were a sweetheart deal for Wrigley, negotiated

by him and his lieutenant, Holmes.  Upon information and belief, Wrigley had no expectation that

the nominal "debt" obligation would ever be repaid—indeed, the maturity windows ████████

████████████████████████████████████████████████.  Rather,

Wrigley intended to benefit from the relatively quick ██████████████████████ into a

tranche of preferred stock that was, remarkably, ***senior*** to every other existing tranche and so

jumped to the front of the liquidation line, ahead of all other preferred stockholders, including the

██████████ of Series D Preferred Stock held by Techview.

52.     Furthermore, there was no justification for the conversion to take place at an extortionate ████████████████████████████████████████████████████████ ████████████ would be fictionally treated as a staggering ████████████████████ ████████████████████████████████████. Upon information and belief, that figure was devised by, and for the benefit of, Wrigley.

**D.     The Bergmann Debts**

53.     Defendant Robert "Jake" Bergmann was a founder of Parallel and its first CEO. Wrigley succeeded Bergmann, who stepped down as CEO on November 5, 2018.

54.     A dispute between Bergmann and the Company arose over the value of Bergmann's common stock.  To resolve the dispute, and disregarding that Bergmann's interests should have been junior to all of the Company's debt and Preferred Stock obligations described herein, the Company entered into the Bergmann Settlement in or around January 2021.

55.     Under the Bergmann Settlement, the Company agreed to pay Bergmann ████ ████████████████████████████████████████████████████████ On or about January 8, 2021, the Company made an ████████████████████████. As noted above, upon information and belief, the Company did not ████████████████████████████ ██████████████████████████████████.

56.     Around the same time, the Company obligated itself to pay ████████████ ████████ by:

        a.     Obligating itself ████████████████████████████████████

████████████████████████████████████████████████████████████ was denominated a "second payment," rather than a promissory note or other debt instrument.  The Bergmann Settlement also carried the express understanding that the "second

payment" would increase to █████████████████████████████████████████
████████ ;

      b.    Issuing the ████████████████████████████████████████
████████████████████████████████████████████████████ .

57.    Defendants did not disclose the Company's subsequent ███████████████

obligations under the Bergmann Debts, before the Company took the SAFE Plaintiffs' █████████

with the goal of converting the funds into equity, which would come behind all debts.

**E.**    ██████████████████████████████████████████████
██████████████████████████████████

58.    On information and belief, as of June 30, 2021, and consistent with the Company's

████████████████████████████████████████████████████████████ to make

the ████████████████████████████████████████████████████████

████████████████ It follows that the Company was also likely █████████████████████

█████████████████████████████████████████ due June 30, 2021.

59.    To make up for ██████████████████, Wrigley turned to PE Fund, of which his

namesake family office is the General Partner.  Wrigley caused PE Fund █████████████████████

to the Company in exchange for the PE Fund Note, which would then need to be repaid within ██

███████ .  The PE Fund Note transaction also included an unexplained (and inexplicable) ████

███████████████████████ which would be added to the balance due at maturity on a ████████

█████████████████████████████████

60.    Defendants failed to disclose that the PE Fund Note ██████████████████ the

Junior Note, which then █████████████ the Senior Notes.

61.    ███████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

███████

62.     For reasons similar to the Green Health Notes, the PE Fund Note transaction was a conflicted transaction, orchestrated by Wrigley, acting on both sides, for the benefit of his own entity.  In particular, it appears the funds advanced in connection with the PE Fund Note ████████ ███████████████████████████████████████████████████████.  In other words, while the Company was beginning ███████████████, the PE Fund Note was used to ████████████████████████████████████ the residual value of the Company after *every* holder of debt and preferred stock was paid in full.

**F.      Other Potential Debt Obligations**

63.     Finally, upon information and belief, there is up to ███████████ of consideration that the Company owes in connection with its 2021 deal to acquire certain operations of Windy City Cannabis ("**Windy City**"), an Illinois-based cannabis dispensary.

64.     On information and belief, Wrigley recklessly entered into the Windy City acquisition knowing the Company ███████████████████, in an effort to bolster the prospects of closing the SPAC by expanding the Company's geographic footprint and augmenting the Company's EBITDA.  Windy City is now ████████████████████████████████ ██████████████████████████████ Wrigley claimed to be seeking.  On information and belief, the Windy City transaction is awaiting regulatory approval from the State of Illinois, which might be granted in the first or second quarter of 2022—though such approval still will not ██████████████████████████████████████.

**G.      Parallel's Remaining Capital Structure**

65.     As of the date hereof, the total remaining invested capital was structured as follows:

a.      Approximately ██████ invested through SAFE securities that the Company is holding in cash or has transferred to operating subsidiaries; if not rescinded prior to conversion, the SAFE was to be converted into Series EE Preferred Stock on December 31, 2021. TradeInvest rescinded its SAFE investment on December 30, 2021 (which rescission is disputed by the Company).

b.      ██████ in aggregate Series E Preferred Stock;

c.      ██████ in aggregate Series D Preferred Stock (of which Techview holds ██████); and

d.      Certain additional interests of Preferred and Common Stock that are junior to the Series EE, Series E, and Series D Preferred Stock.

## II.      THE SECURITIES DEFENDANTS SOLICIT ██████ IN SAFE FUNDING FROM THE SAFE PLAINTIFFS THROUGH MISREPRESENTATIONS AND OMISSIONS

66.      The SAFE Plaintiffs began discussing the SAFE investment with the Securities Defendants in earnest in or around July 2021.  Between then and September 27, 2021, when the SAFE Plaintiffs funded their ██████ SAFE investment, the Securities Defendants offered a litany of false and misleading statements and omissions concerning matters critical to the SAFE investment and the Company's finances.  Each of these was made intentionally, to induce the SAFE Plaintiffs to supply the Company with critically-needed capital against a false picture of the Company's financial condition, and contrary to federal and state anti-fraud securities laws, as well as common-law fraud principles.

---

[1] This figure reflects the value of the SAFE investment—including ██████ ██████ (discussed below)—after conversion to Series EE Preferred Stock of the Company.

A. **The Securities Defendants Initially Claim The SAFE** ███████████
████████████████████████████

67. On or about July 22, 2021, Trip McCoy, Director of Private Investments at PSQ (which, as noted above, served as investment adviser to the SAFE Plaintiffs), joined a Zoom call with Holmes and Whitcomb. During the call, Holmes and Whitcomb explained that ████████ ████████████████████████████, and that the Company was looking to ███████████ ████████████████████████. At this point, Holmes' and Whitcomb's story was that the additional funds would ████████████████████████████ ██████████████████████. Because the Company ████████████████████ the SAFE proceeds ████████████████ other investors, these statements concerning the use of the SAFE proceeds were false and misleading.

68. McCoy held additional Zoom calls with Holmes and Whitcomb on July 26, 2021, in which Holmes and Whitcomb informed McCoy that the Company's board of directors had ████████████████████████ of the SAFE ██████████; and on July 30, 2021 and August 2, 2021, in which the ████████████████████████████ ██████. The Securities Defendants even represented to McCoy that the ██████████████ ████████████████████████████████████.

69. At no time during these communications concerning the Company and its prospects did Holmes or Whitcomb disclose:

a. ████████████████████████████████ ████;

b. The purpose of the PE Fund Note, or that its issuance ██████ the Junior Note, which in turn ██████████ the Senior Notes; or

      c.     That the Company had no ███████████████████████████████, including the Senior and Junior Note, the ███████████████████████ ████████████████████████.

70.     On August 4, 2021, Holmes provided to Plaintiffs the initial draft of the SAFE instrument, as well as a presentation titled "███████████████████████████████ ███████████████████████████████." The ███████ presentation outlined the proposed SPAC transaction with Ceres and provided ████████████████████████████████ ███████████████████████████. In particular, consistent with Holmes' and Whitcomb's representations concerning the purposes of the SAFE financing, the presentation claimed that the Company "████████████████████████████████████ ██████████████████████████████ This presentation was likewise false and misleading because the Company intended to use the SAFE proceeds to attempt to ██████████████████████████████, rather than for ████████████████ ████████.

71.     The same presentation also ██████████████████████████████ would be ████████, and its ████████████████ would be ███████████. But in October 2021, shortly after the Securities Defendants took the SAFE Plaintiffs' funds, the Company revised those ██████████████████████████████ respectively, and again in early January by █████████████████████████████ alone:

| ████████████ | August 2021 | October 2021 | January 2022 |
|---|---|---|---|
| █████████ | ████████ | ████████ | ████████ |
| | | | |
| █████████ | ████████ | ████████ | ████████ |

In just the three months *after* the SAFE Plaintiffs provided their funds, the Company had ██████ ███████████████████████████████████████████████████████████ The August 2021 ████████ were therefore false and misleading, and lacked any reasonable basis.

72.     On an August 5, 2021 Zoom, McCoy explained to Holmes and Whitcomb—not for the first time—that the SAFE Plaintiffs would commit funds to the SAFE only if the SAFE Plaintiffs were confident that (i) the Company had significant SAFE and PIPE commitments already in hand, and (ii) the funds raised in connection with the SAFE would be ██████████ ███████████████████. Holmes and Whitcomb responded that the Company had ██████ █████████████████████████████.

**B.     The Securities Defendants Begin Pivoting To The Claim That The SAFE Would Be ███████████████████████████████████████████**

73.     Notably, at or around this time, McCoy also raised with the Company that he had heard *from others*—not from the Company—that the SPAC might not close.  When confronted, Holmes and Whitcomb conceded that the pending transaction might not be consummated. Pivoting to the new storyline, and despite knowing ███████████████████████ were completely unrealistic, they claimed the SPAC valuation was too low, the SPAC market was in decline, and the public shares would in any case be relatively illiquid because they would be listed on a Canadian exchange.  Instead, they explained on the August 5, 2021 call that ████████████ ███████████████████████████████████████████████████████████ ████████████████████████.

74.     These assertions were all false and misleading.  In fact, Holmes and Whitcomb had no reasonable basis to claim █████████████████████████████████.  They were merely spinning a new yarn to █████████████████ under false and fraudulent pretenses. Further, as of that date, the Company ███████████████████ it assured the SAFE Plaintiffs that

it had, and ultimately closed the SAFE and took the SAFE Plaintiffs' money ███████████ ████████████████████████████████████████████████████.

75.     On August 9, 2021, Company counsel transmitted to Plaintiffs the latest SAFE documentation.   Notably, as discussed below, the SAFE included risk "warnings" ███████ ██████████████ that were misleading because the "risks" they identified had in fact already materialized.

76.     On August 16, 2021, Holmes transmitted to Plaintiffs ███████████████████ ████████████████ in relation to the SPAC acquisition (even though they were already laying the groundwork to induce the SAFE investment regardless of the SPAC).   The document was titled █████████████████████████████████████████████.   It indicated, among other things, that the █████████████████████████████████████████████ ████████████████████████████████████████████████.   Plaintiff learned, months later, that this, too, was a misrepresentation about the Company's ███████████ ████████████████████.   As the Company disclosed in December 2021, and so far as Plaintiffs are aware, the █████████████████████████████████████████████ ██████████, which means that, contrary to the SAFE Plaintiffs' understanding based on the disclosed conversion date of the Green Health Notes, the SAFE would *not* be senior to the obligations under the Green Health Notes, since they had *not* █████████████████████████████████.

77.     During an August 22, 2021 Zoom call with Holmes and potentially Whitcomb as well, and in light of the SAFE Plaintiffs' understanding that the chances of consummating the SPAC transaction were diminishing, McCoy underscored more urgently that the SAFE Plaintiffs were interested in a SAFE investment solely if Defendants could provide reasonable assurance that the Company had █████████████████████████████████████████████████

██ . Holmes again stated that ████████ would be sufficient, and ████████████████

████████████████████████████████████ . Holmes similarly

lacked any reasonable basis to make that statement, given the Company's ████████████

████████████████████████████████████ . This

statement was therefore knowingly false when made.

78.     In further support of their new story that the Company would ████████████

████████████ , in or around this same time, the Securities Defendants transmitted to McCoy a

████████████████████████████████████████

████████████████████ . For the most part, ████████████████████████

████████████████████ , premised   upon   ████████████████████████

contemporaneously   disclosed   to   the   SAFE   Plaintiffs.   Although   the   Company   indicated ██

████████████████ , it was part and parcel of the same misrepresentation that the Company

was ████████████████████ and therefore had a reasonable expectation of ██

████████████████████████████████████████

████████████████████████ . Indeed, Holmes and

Whitcomb were also representing to McCoy around this time that their phones were "lighting up"

with ████████████████████████████████ .

79.     On the same call, McCoy sought further assurance that at least ████████ would

be invested in the SAFE alongside the SAFE Plaintiffs' proposed ████████ commitment (for a

total of ████████ , which was the amount ████████████████████████ ). Holmes and

Whitcomb had raised, during the course of these discussions, that Wrigley ████████████████

████████████████████████████████████ from

outside investors, though they indicated that ████████████████████████

███████████████████████████████████████████). These statements were false in light of the fact that the Company closed the SAFE, and took the SAFE Plaintiffs' ███████, despite its failure ████████████████████████████ that the SAFE Plaintiffs repeatedly stated was a prerequisite to their commitment.

80.     On August 30, 2021, Whitcomb sent McCoy an e-mail concerning closing the SAFE transaction.  He indicated—again falsely—that ██████████████████████████ ██████████████████████████████████████████████████████████████ ████████████████████████ In fact, Defendants knew, or were reckless in not knowing, they would have to ████████████████, including the SAFE Plaintiffs' ███████, in order to ████████████████—regardless of the ██████████████████ that Defendants had repeatedly assured the SAFE Plaintiffs the Company would have.

81.     On a September 2, 2021, Zoom call with Holmes and Whitcomb, Defendants reviewed ████████████████████████████████████████████████. Defendants again indicated—again with no reasonable basis—that ███████████████████ █████████████████████████████. They made this plain misrepresentation because the SAFE Plaintiffs, particularly through McCoy, again sought assurance that the Company would not ████████████████████████████████. Holmes and Whitcomb noted that the Company might conceivably need to ████████████████████ ████████████████████████████████████████████████████████████████ ██████████████████████████.

82.     Holmes and Whitcomb also again indicated, in or around this time, in direct communications with McCoy, that ████████████████████████████████████ ████████████████████—which, as noted above, was false—and also that the Company

██████████████████████████████████████████, and therefore ████████████

████████████████████████████████. In fact, during this same time period,

the Company continued to emphasize that ███████████████████████████████

████████████ the SAFE Plaintiffs ███████████████████████████, including:

████████████████████████████████████████████████

████████████████████████████████

████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████

e.   ███████████████████████████████████

83.   At no time during these detailed discussions about the use of proceeds did

Defendants mention that the SAFE proceeds would ██████████████████████████████

████████████, which was a misleading omission totally inconsistent with ████████████

████████ (presumably for exactly that reason) that also rendered false the Company's statements

about ██████████████████████.

84.   On September 7, 2021, Whitcomb continued to provide assurances that the SAFE

████████████████████████. He e-mailed McCoy indicating ████████████████

████████████████████████████████████████████████████

██████████████████████████████████ The Company's plan, according to

Whitcomb, was to "receive[] signed SAFE notes today and tomorrow and hold those in escrow

until signed documents for all ████████████ come in and then release the escrow and fund this

week." He added that he believed a ████████████████████████████████████ before

the end of the month.  On September 14, 2021, Whitcomb noted in another e-mail that they "had

several other signatures come in so at this point [we] are targeting a Monday [September 20, 2021]

close / funding."  These statements were knowingly false when made, as the Company ██████████

████████████████████████████████████████████.

85.     On September 20, 2021, Whitcomb asked McCoy via e-mail to "send us your

signed SAFE agreement and signed PIPE termination agreement, Ceres is doing the same, and

[Greenberg Traurig, escrow agent] will not release any of those signatures from escrow until we

have everything that we need to close. *Your signature is completely meaningless while being held*

*in escrow until all signatures are received, so you have zero obligation until all signatures are*

*received*."  This statement was also false and misleading because, regardless of whether or not █

████████████████████████████ that the Company had promised to the SAFE Plaintiffs, the

Company intended to close the SAFE investment in order to access the SAFE Plaintiffs' money to

████████████████████████████.

86.     On September 27, 2021, the SAFE Plaintiffs, in reliance on the Company's and its

officers' and directors' misrepresentations and omissions, consented to the release of their SAFE

documents from escrow, and funded their ██████████ commitment.  In particular, it was the

Securities Defendants' misrepresentations that the preconditions for releasing the SAFE Plaintiffs'

signatures from escrow and closing their ██████████ investment—████████████████████

████████████████████████████—that induced the SAFE Plaintiffs to give final permission

to release their signatures and funds.  Even setting aside the Securities Defendants' steady

drumbeat of other misrepresentations and omissions, inducing the SAFE Plaintiffs to release ██

██████ on ***knowingly false pretenses*** entitles the SAFE Plaintiffs to rescission of their ████████

investment.

## III.   THE SAFE INSTRUMENT THAT THE SAFE PLAINTIFFS EXECUTED ALSO CONTAINED MISREPRESENTATIONS

87.    SAFE stands for "Simple Agreement for Future Equity."  A SAFE is a relatively

new type of security under which, depending upon the terms of the individual instrument, an

investor's cash investment generally converts to equity in the issuing company under conditions

specified in the SAFE.  They are often issued to provide a company with bridge financing until it

can complete an additional capital raise or a sale of the company, and will often convert to equity

upon the occurrence of that future, specified event.

88.    The SAFE Plaintiffs entered into the SAFE security with SH Parent, which was

executed "on or about September 27, 2021."  Whitcomb executed the SAFE on behalf of SH Parent

in his capacities as its Chief Development Officer and Secretary.

### A.    The Conversion Terms

89.    The SAFE provided that it would convert to equity upon the occurrence of certain

specified events:

a.    *First*, the SAFE would convert to shares of certain preferred stock, referred

to in the SAFE as SAFE Preferred Stock, upon an Equity Financing (as defined in the SAFE) of

at least ██████.  SAFE ¶ 1(a).

b.    *Second*, the SAFE would convert to shares of Series EE Preferred Stock,

upon a Liquidity Event, which the SAFE defined as a change in control of SH Parent, or the closing

of the SPAC transaction.  *Id.* ¶ 1(b).

      c.    *Third*, the SAFE would convert to shares of Series EE Preferred stock upon a Dissolution Event, which the SAFE defined as including termination of the Company's operations, assignment of its assets to creditors, or its liquidation. *Id.* ¶ 1(c).

      d.    *Finally*, the SAFE provided that, if none of the foregoing events had occurred by December 31, 2021, the SAFE would (after obtaining certain approvals and authorizations) "automatically and immediately convert into the number of shares of Series EE Preferred Stock equal to the Deemed Series EE Purchase Amount divided by the Series EE Preferred Stock Price." *Id.* ¶ 1(d).

**B.    The SAFE's Ineffective Attempts to Disclaim Liability**

90.    The SAFE also contains certain provisions that purport to limit the liability of SH Parent and its officers and directors.  For instance, the SAFE represents that the investor "has had an opportunity to ask questions of and receive answers from representatives of the Company concerning the investment in this [SAFE] and the securities to be acquired by the Investor hereunder." *Id.* ¶ 4(c).  As detailed herein, although the SAFE Plaintiffs had the opportunity to ask questions, Defendants failed to provide truthful, complete, non-fraudulent answers.

91.    Although the SAFE Plaintiffs noted their "knowledge and experience in financial and business matters," *id.*, and that they had attempted to conduct responsible and adequate due diligence before investing, *id.*, any investor, regardless of sophistication, will be thwarted in their efforts to conduct sufficient diligence by misleading and fraudulent misrepresentations and omissions.

92.    Similarly, the generic, blanket provision that "no representations or warranties have been made to the Investor other than pursuant to Section 3 [of the SAFE] and that the Investor has not relied upon any representation or warranty in making or confirming [its] investment other than pursuant to Section 3," *id.* ¶ 4(c), is ineffective, and cannot relieve the Securities Defendants of

their basic legal (not to mention ethical) responsibilities to provide true and complete information and disclosures.  Notably, the SAFE expressly provides that TradeInvest or First Ocean "acknowledges that it is not relying upon any person, ***other than the Company and its officers and directors***, in making its investment or decision to invest in the Company."  *Id.* ¶ 4(e).

C.     **The SAFE Included Incomplete and Misleading Risk Factors**

93.     The SAFE also included a list of general warnings, most of which concerned the Company's business operations, rather than the Company's capital structure.  Regardless, none of these could have sufficiently apprised the SAFE Plaintiffs that the Company would simply ***misrepresent*** ████████, including by omitting that ███████████████████████ ████████████████████████████████████████████████ which if honestly revealed would have stopped the SAFE Plaintiffs from investing ████████ in the SAFE. Indeed, the Company misleadingly warned that there could be "no assurance" ████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████

The foregoing warning was, in other words, at best a misleading and impermissible half-truth.

94.     Similarly, the Company's "warning" that ████████████████████████ ████████████████████████████████████████████████ ████████████████████ was incomplete and misleading because it failed to address not only that the Company ████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████.

95.     The risks and problems that the Company warned about in general terms had already materialized in the specific form █████████████████████████████████████ ████████████████████████████, and such warnings were therefore fraudulent and misleading.

## IV.    THREE DAYS AFTER THE SAFE PLAINTIFFS FUND THE SAFE, THE COMPANY ████████████████████████████████████

96.     On September 30, 2021—*three days after* the SAFE Plaintiffs funded their ████ ████ investment—the Company ███████████████████████████████████████ ███████████████████████████████████████████████████ ████████████████████.  The Company thus knew, but did not disclose, that based on ██ ███████████████████ during the diligence period it was about to ██████████████ ████████████████████████, and therefore failed to disclose material information necessary to, among other things, make statements about ████████████████████ ████████████████████████ the SAFE, not misleading.

97.     On November 29, 2021, PE Fund—███████████████████████████ ███████████████████████████████—in its capacity as the "Required Holder" for the Senior Notes, notified the Company that, as of September 30, 2021, ████████████ ███████████████████████████████████████.  Specifically, PE Fund notified the Company that it ██████████████████████████████████████████ ███████████████████████████████████████████████████ ████████████████████████████.  Upon information and belief, including the Company's knowledge of its obligations under the Senior and Junior Notes and the timing of those obligations, the Company was aware as of September 27, 2021—the date the SAFE Plaintiffs funded their ████ ████ SAFE investment—that the Company would ████████████████████████.

98.     On December 16, 2021, the Company received ███████████████ ████████████████████████████████████████████████████ ████████████████████████████████ from Talladega LP, the Administrative Agent and Collateral Agent for the Junior Note holders.  The Junior Lien Notice informed the Company that ████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████

99.     ████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ Upon information and belief, including the Company's knowledge of its obligations under the Senior and Junior Notes and the timing of those obligations, and the Company's knowledge that it had incurred the obligations under the PE Fund Note (and had not disclosed the effect of those obligations to investors), the Company was aware as of September 27, 2021—the date the SAFE Plaintiffs funded their ███████ SAFE investment—that the Company would ███████ ██████ just days later.

100.    Further, although the foregoing ███████████ did not raise the issue, as of September 27, 2021, the Company also knew that its ████████████████████████ ████████████████████████████—and that the Company had no way to meet █ ████████████████████████████████████████████████

███████.  To the contrary, the Securities Defendants had disclosed that the ██████████████ ███████████████████████ by the time the SAFE funding had closed—which was false.

101.    Notably, on October 1, 2021, the Company sent an e-mail, on behalf of Wrigley, to the Company's investors explaining that the Company was no longer pursuing the SPAC transaction.  Among other things, he noted that the Company would "focus on alternative financing avenues to pursue a vast array of growth opportunities," and that, the Company had "just raised and closed a significant initial equity financing through the private markets," referring to the SAFE.

102.    What this e-mail omitted was Wrigley's extreme resistance—██████████████ ███████████████████████—to put up any of his own funds to support the SAFE.  As part of the SAFE negotiations, McCoy conveyed to Holmes and Whitcomb that it was important to the SAFE Plaintiffs that Wrigley also have invested in the SAFE.  Holmes and Whitcomb represented that Wrigley would agree to commit ██████.  But, as the SAFE Plaintiffs learned nearly two months later, Wrigley invested *nothing* in the SAFE—which also revealed that the Securities Defendants had closed the SAFE and called the SAFE Plaintiffs' money ██████████████ ███████████████ that they promised they would reach before calling the SAFE Plaintiffs' █████████.

103.    Upon this discovery, in order to avoid additional discussion or scrutiny of the Company's deteriorating condition, Wrigley finally (and quickly) invested his own personal funds in late November 2021, though now he had to make up ███████████████████████ to reach the previously ████████████—a fact wholly inconsistent with being fully, if not over-subscribed in late September.  But Wrigley failed to truly maintain even that level of investment commitment to the SAFE.  As the SAFE Plaintiffs learned in January 2022, the

Company had used ██████████████████████████████████████████████████

██████████████.  In other words, Wrigley invested ████████████ in the Company from one

pocket (to artificially make it appear ████████████████████████), but had taken ████████████

to put in another pocket.  Consequently, even with Wrigley's post-closing SAFE advance, the

Company never had ████████████████████████████, because Wrigley simply round-

tripped ████████████ to an entity that he controlled, for his own benefit.

**DEFENDANTS MISREPRESENTATIONS FINALLY COME TO LIGHT**

**I.      THE COMPANY REVEALS NUMEROUS** ████████████████████████████
████████████████████████████████████████

104.    On December 1, 2021—just two months after the SAFE Plaintiffs funded their ██

██ SAFE investment—the Company revealed more previously undisclosed facts that

completely altered the landscape of the investment.

105.    During a Zoom call that day with Perella Weinberg Partners ("**PWP**")—one of the

Company's financial advisors in connection with ████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████

106.    This same disclosure also made clear that, contrary to the Company's repeated

portrayals, the ████████████████████████████████████████████████

████████████████████████.  Indeed, ████████████████████████████████████.

Defendants, with full knowledge of ████████████████████████████████████

████████████████████, as well as the truth behind their ████████████████████████████

████████████, had no reasonable basis to claim that the SAFE would ████████████████████

████████████, and indeed knew (or were reckless in not knowing) it could not.

107.    During the same call, PWP disclosed for the first time ███████████████

████████████ █ ███████████████████████████████████████████████████

█████████████████████████████—just *three days* after the SAFE Plaintiffs were

induced to provide the Company with ███████████.

108.    In a December 7, 2021 text message, McCoy expressed to Whitcomb that he was

(justifiably) "astounded" that the Company had █████████████████████████████

█████████████████████████████████████ McCoy asked where the funds had

gone.  Whitcomb attempted to deflect ███████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

███████

109.    Whitcomb further conceded in the same message exchange that "Beau and Jay have

some explaining to do to you as I mentioned in our last call."  Whitcomb here was referring to two

issues: (i) that Wrigley initially failed to fund his SAFE commitment, yet had taken the SAFE

Plaintiffs' ███████████ without █████████████████████████; and (ii) that neither Holmes

(nor anyone else) had disclosed that Holmes had negotiated ████████████████ from both

sides of the transaction.

110.    At Plaintiffs' request, on December 8, PWP granted Plaintiffs access to PWP's data

room for the first time.  The first document posted ███████████████████████████

████████████████████████████████████████████████████████████████

███████████████.  This ███████████ inconsistent with the ███████████ provided to the SAFE

Plaintiffs to induce the SAFE investment, that the █████████████████████████.  The

SAFE Plaintiffs would not have advanced funds to be converted into equity had they know that equity would be repaid in liquidation ***behind*** the ███████████. Knowing how obvious such a concern would be to any investor, the Company had previously ████████████████████ ████████████████████████████████████████████ ██████████████████████ the SAFE investment's conversion.

## II.   THE COMPANY REVEALS THAT IT TOOK THE SAFE PLAINTIFFS' MONEY EVEN THOUGH THE SAFE ███████████████████████ ██████████████████

111.   During a November 18, 2021 Zoom call with McCoy, Wrigley, Holmes, and Whitcomb, Wrigley (who had just resigned as CEO) let slip that he had never funded his SAFE commitment.  During a call the same day, McCoy expressed appropriate shock to Holmes at this failure to abide by the Company's repeated representations that Wrigley would commit funds ***and*** that the SAFE would not close without ██████████████████████. Indeed, Defendants had told the SAFE Plaintiffs that their signatures were "***meaningless***" and would ***not*** be released until the promised ██████████████████████. These statements were made precisely to induce the SAFE Plaintiffs to fund.  On November 22, 2021, Wrigley hurriedly funded his SAFE commitment, and had to commit ████████████████████████ ██████.

## III.   THE COMPANY REVEALS THE SAFE FUNDS WERE ██████████████████ ████████████████████

112.   On January 24, 2022, the PWP data room was updated with another revealing chart:



113.    Without  fanfare,  the  Company  yet  again  disclosed  another  set  of  astounding misrepresentations.  Defendants, through PWP and the above chart, admitted that ████████ ██████████████████████████████████████████████, as opposed to ████████ █████████████████████ that Defendants had represented all along.

114.    The same chart even revealed that the Company had used ███████████████ ████████████████████████████████, meaning Wrigley actually round-tripped ████████ his own SAFE commitment ***back to himself***.

115.    The implications of the foregoing are disturbing for another reason.  The practice of raising funds under false pretenses, ███████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ███████████████████, is the essence of a Ponzi scheme.  It is therefore particularly important that Plaintiffs take discovery from the Defendants to determine the full scale of the underlying scheme, as well as to be able to inform other investors (and potentially relevant authorities) so that all parties involved have the best chance to recover the funds they provided to the Company.

## JUSTIFIABLE RELIANCE

116.   The SAFE Plaintiffs believed and relied upon the false and misleading representations described above when entering into the SAFE investment.   But for the misrepresentations and omissions committed by the Securities Defendants concerning the Company's ███████████████████ SAFE investment, that the SAFE investment would ██████████████████████████████, and the intended use of the SAFE proceeds, the SAFE Plaintiffs would not have agreed to enter into the SAFE.

117.   The SAFE Plaintiffs justifiably relied upon these misrepresentations and omissions about the Company and the SAFE.  As officers of the Company, Wrigley, Holmes, and Whitcomb were uniquely situated to know and understand the full picture of the Company's finances and prospects, as well as how much had been raised for the SAFE and how the Company would use those proceeds.  Nonetheless, the Securities Defendants deliberately made the misrepresentations and omissions detailed above.  The SAFE Plaintiffs, by contrast, were not in a position to know the non-public, undisclosed information about the Company's obligations, including existing, undisclosed ██████████.

## SUMMARY OF SCIENTER ALLEGATIONS

118.   It is clear from the foregoing allegations that the Securities Defendants made numerous misrepresentations and omissions about the Company, its capital structure, and the SAFE investment, while in possession of undisclosed facts that were contrary to their representations, or necessary to make their representations complete and not misleading.  The Securities Defendants therefore made these alleged misstatements knowingly and intentionally to induce the SAFE Plaintiffs to provide ██████████ for the SAFE, and intended that the SAFE Plaintiffs rely on them.

119.     The Securities Defendants had both motive and opportunity to deceive the SAFE

Plaintiffs.  As officers of the Company, they stood to gain from successfully raising tens of millions

of dollars with the SAFE, particularly because the SAFE required no expenditure in interest or

repaid principal on the part of the Company.  Further, Wrigley in particular stood to gain because

the SAFE ████████████████████████████████████████████████████████████

████████████████ —████████████████████—could be satisfied.  And the ████████████

chart above shows that the SAFE proceeds were ████████████████████████—which

benefited Wrigley personally.  Indeed, this also means that, even though Wrigley invested ████

████████████████████████████.

## **LOSS CAUSATION**

120.     The SAFE Plaintiffs have been deprived of, and lost, at least ██████████ in

connection with the SAFE.  In particular, Defendants' misrepresentations and omissions caused

the SAFE Plaintiffs to commit ██████████ to the SAFE, which they would not have committed

had the SAFE Plaintiffs known the truth that was revealed shortly afterward.

121.     Furthermore, it was Defendants' misrepresentations and omissions that caused the

SAFE Plaintiffs' losses, as absent those misrepresentations and omissions, the SAFE Plaintiffs

would still be in possession of the ██████████ of which they were deprived.

## **FIRST CAUSE OF ACTION**
### **For Violations of §10(b) of the Securities Exchange Act of 1934 and Rule 10b-5**
### **(Against the Securities Defendants)**

122.     The SAFE Plaintiffs repeat and reallege each and every allegation above as if fully

set forth herein.

123.     The SAFE Plaintiffs bring this cause of action against the Securities Defendants for

violation of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated

thereunder.

124.     Between July and September 2021, inclusive, the Securities Defendants made the various false and materially misleading statements specified above, which they knew or recklessly disregarded were misleading because they misrepresented or omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading.

125.     The Securities Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon the SAFE Plaintiffs related to the SAFE.

126.     As a direct and proximate result of the Securities Defendants' wrongful conduct, the SAFE Plaintiffs suffered damages in connection with the SAFE.  In reliance on the Securities Defendants' misstatements and omissions, the SAFE Plaintiffs committed ███████ to the SAFE.  The SAFE Plaintiffs would not have provided those funds for the SAFE if they had been aware of the misstatements and omissions made by the Securities Defendants.  The SAFE Plaintiffs did not know, and could not in the exercise of reasonable diligence have known, of the Securities Defendants' misrepresentations and omissions.  These same misrepresentations and omissions caused the SAFE Plaintiffs' losses.

127.     By virtue of the conduct alleged herein, the Securities Defendants have each violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, and are liable to the SAFE Plaintiffs for damages in an amount to be determined at trial, but not less than ██ ███ .

## SECOND CAUSE OF ACTION
### For Violations of Section 20(a) of the Securities Exchange Act of 1934
### (Against Wrigley, Holmes, and Whitcomb)

128.    The SAFE Plaintiffs  repeat and reallege the  allegations in Paragraphs 1-121 as if fully set forth herein.

129.    The SAFE Plaintiffs bring this cause of action against Wrigley, Holmes, and Whitcomb for violations of Section 20(a) of the Exchange Act, 15 U.S.C. § 78(a).

130.    In their positions as officers and directors of the Company, Wrigley, Holmes, and Whitcomb were controlling persons of the Company within the meaning of Section 20(a) of the Exchange Act.  By reason of their positions of control and authority as officers and/or directors of the Company, Wrigley, Holmes, and Whitcomb had the power and authority to cause the Company to engage in the conduct complained of herein.  These Defendants were able to, and did, control, directly and indirectly, the decision-making of the Company, including the misstatements and omissions made by and on behalf of the Company.

131.    Furthermore, Wrigley, Holmes, and Whitcomb, as alleged above, had significant day-to-day involvement in the operations of the Company and in particular the transactions at issue here, and are therefore culpable participants in the alleged misconduct.  They participated in calls, written communications, and other aspects of the transactions that were responsible for inducing the SAFE Plaintiffs to invest ███████ in the SAFE.

132.    As a result, Wrigley, Holmes, and Whitcomb were control persons of the Company within the meaning of Section 20(a) of the Exchange Act.

133.    The Company committed violations of Section 10(b) of the Exchange Act.

134.    By reason of the foregoing, Wrigley, Holmes, and Whitcomb violated Section 20(a) of the Exchange Act, 15 U.S.C. § 78(a), and are liable to the SAFE Plaintiffs.

**THIRD CAUSE OF ACTION**
**For Violation of Georgia Uniform Securities Act of 2008 (Blue Sky Laws)**
**Ga. Code Ann., § 10-5-58**
**(Against the Securities Defendants)**

135.     The SAFE Plaintiffs repeat and reallege the allegations in Paragraphs 1-121 as if fully set forth herein.

136.     Upon information and belief, the Securities Defendants negotiated significant portions of the SAFE investment within, from, and/or directed into the state of Georgia, and executed the SAFE in Georgia, as evidenced by, among other things, the address under Whitcomb's signature on the SAFE itself, which is in Atlanta, Georgia.  The Securities Defendants were therefore subject to, and required to comply with, the requirements of the Georgia Uniform Securities Act of 2008.

137.     The SAFE Plaintiffs bring this cause of action under Section 10-5-58 of the Georgia Code against the Securities Defendants.  The SAFE Plaintiffs are not required under this cause of action to allege that the Securities Defendants acted with scienter or fraudulent intent, as these are not elements of a claim under Section 10-5-58(c).

138.     During discussions concerning the SAFE, the Securities Defendants made the false and materially misleading statements specified above, and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

139.     The Securities Defendants did not disclose the concealed information described above to the SAFE Plaintiffs.  Rather, the SAFE Plaintiffs first learned that information beginning in November and December 2021, two to three months after providing their SAFE investments to the Securities Defendants.  The SAFE Plaintiffs did not know, and could not in the exercise of reasonable diligence have known, of the Securities Defendants' misrepresentations and omissions.

140.     But for the Securities Defendants' misrepresentations and omissions, the SAFE Plaintiffs would not have invested in the SAFE.  As a direct and proximate result of the Securities Defendants' wrongful conduct, upon which the SAFE Plaintiffs did rely, the SAFE Plaintiffs have suffered damages in connection with the SAFE.

141.     By virtue of the conduct alleged herein, the Securities Defendants have each violated § 10-5-58 of the Georgia Code, and are liable to the SAFE Plaintiffs for damages in an amount to be determined at trial, but not less than ▮▮▮▮▮▮.  The Securities Defendants are also entitled to rescission of the SAFE investment, along with interest, expenses, fees, and costs associated with the investment and recovery thereon.

## FOURTH CAUSE OF ACTION
### For Violation of Georgia Uniform Securities Act of 2008 (Blue Sky Laws)
### Ga. Code Ann., § 10-5-58(g)
### (Against Wrigley, Holmes, and Whitcomb)

142.     The SAFE Plaintiffs repeat and reallege the allegations in Paragraphs 1-121 as if fully set forth herein.

143.     The SAFE Plaintiffs bring this cause of action pursuant to Section 10-5-58(g) of the Georgia Code against Wrigley, Holmes, and Whitcomb.  The SAFE Plaintiffs are not required to allege that Wrigley, Holmes, and Whitcomb acted with scienter or fraudulent intent.

144.     As directors, executive officers, and/or "persons" who directly or indirectly control the Company, Wrigley, Holmes, and Whitcomb are liable jointly and severally with and to the same extent as the Company under Section 10-5-58(g) of the Georgia Code.

145.     By reason of their positions of control and authority as officers and/or directors of the Company, Wrigley, Holmes, and Whitcomb had the power and authority to cause the Company to engage in the conduct complained of herein.  These Defendants were able to, and did, control,

directly and indirectly, the decision-making of the Company, including the statements made to the representatives of the SAFE Plaintiffs.

146.     Wrigley, Holmes, and Whitcomb, in their capacities as officers and/or directors of the Company, participated in and materially aided the misstatements and omissions set forth above. Wrigley, Holmes, and Whitcomb had direct and supervisory involvement in the SAFE investment and in procuring funds related thereto, and had the ability to influence and direct and did so influence and direct the activities of the Company in its violations of Section 58 of the Georgia Uniform Securities Act of 2008.

147.     As set forth above, the Securities Defendants violated Section 58 of the Georgia Uniform Securities Act of 2008.  By virtue of their positions as controlling persons, executive officers and directors, and as a result of their aforesaid conduct and culpable participation, Wrigley, Holmes, and Whitcomb are liable pursuant to Section 58(g) of the Georgia Uniform Securities Act of 2008, jointly and severally with, and to the same extent as the Company is to the SAFE Plaintiffs.

148.     By reason of the foregoing, Wrigley, Holmes, and Whitcomb violated Section 58(g) of the Georgia Uniform Securities Act of 2008, Georgia Code § 10-5-58(g), and are liable to the SAFE Plaintiffs.

**FIFTH CAUSE OF ACTION**
**For Common Law Fraud / Fraudulent Inducement**
**(Against the Securities Defendants)**

149.     The SAFE Plaintiffs repeat and reallege the allegations in Paragraphs 1-121 as if fully set forth herein.

150.     The SAFE Plaintiffs bring this cause of action against the Securities Defendants.

151.     Each of the Securities Defendants made, authorized, or caused the misrepresentations or omissions at issue, which are summarized above.

152.    The misrepresentations and omissions set forth above were fraudulent and material.

153.    Each of the Securities Defendants knew or recklessly disregarded that their representations and omissions were false and/or misleading at the time they were made.  Each of the Securities Defendants made the misleading statements with an intent to defraud the SAFE Plaintiffs, as detailed above.

154.    The Securities Defendants had reason to expect that the SAFE Plaintiffs would rely on such representations and intended that their misleading statements and omissions would fraudulently induce the SAFE Plaintiffs to invest ██████████ in the SAFE.

155.    The SAFE Plaintiffs justifiably relied on the Defendants' misrepresentations and omissions, as detailed above.  The SAFE Plaintiffs did not know, and could not in the exercise of reasonable diligence have known, of the Securities Defendants' misrepresentations and omissions.

156.    Had the SAFE Plaintiffs known the facts regarding the SAFE and the Company, they would not have invested in the SAFE.

157.    As a direct and proximate result of the Securities Defendants' false representations and omissions, the SAFE Plaintiffs have suffered damages in an amount to be proven at trial, but no less than ██████████.

### SIXTH CAUSE OF ACTION
**For Violation of the Georgia Uniform Voidable Transactions Act, Ga. Code Ann., § 18-2-74 (Against All Defendants)**

158.    Plaintiffs repeat and reallege the allegations in Paragraphs 1-121 as if fully set forth herein.

159.    Techview, as holder of ██████████ of the Senior Notes, brings this cause of action against all Defendants to void the obligations incurred, and transactions made, pursuant to the Green Health Notes, Bergmann Debts, and the PE Fund Note.

160.   The obligations incurred and transfers made by the Company to Green Health and PE Fund, evidenced by the Green Health Notes and PE Fund Note, are voidable because the obligations were incurred and transfers were made with intent to hinder, delay, or defraud the Company's other creditors, including Techview, as holder of █████████ of the Senior Notes.

161.   The Bergmann Debts are voidable because those obligations, and any transfers made pursuant thereto, were incurred or made with intent to hinder, delay, or defraud the Company's other creditors, including Techview, as holder of █████████ of the Senior Notes.

162.   As alleged, among other badges of fraud:

a.   The Green Health and PE Fund Notes constituted transfers to Company insiders, namely Wrigley, via entities that he controlled;

b.   None of the Green Health Notes, nor either the PE Fund Note or the Bergmann Debts, were timely submitted for the approval of the Company's independent directors and its stockholders with full and fair disclosure;

c.   The Company was ███████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ██████████████████;

d.   The transfers were each made, or obligations incurred, shortly after substantial debts were incurred; and

e.   The terms of the Green Health and PE Fund Notes were the result of hopelessly conflicted transactions in which the terms were unfavorable to the Company and very favorable to Wrigley.

163.    Further, as alleged herein, neither Green Health nor PE Fund provided reasonably equivalent value to the Company in exchange for any transfers made pursuant thereto, nor did the Company receive reasonably equivalent value from Bergmann in exchange for the Company's commitments or transfers made pursuant to the Bergmann Debts.

164.    Consequently, the obligations incurred in relation to, and transfers made pursuant to, the Green Health Notes and PE Fund Note, and the Bergmann Debts, should be voided.

## PRAYER FOR RELIEF

WHEREFORE Plaintiffs pray for relief as follows:

1.    An award in favor of the SAFE Plaintiffs against the Securities Defendants, jointly and severally, in an amount to be proven at trial, but no less than ███████; and/or rescission of the SAFE Plaintiffs' SAFE investments along with attendant fees, costs, and expenses, and such other and further relief as the Court may deem just and proper;

2.    Invalidation of the Green Health Notes and PE Fund Note, and the Bergmann Debts, and rescission of the respective transactions evidenced by those notes or instruments;

3.    All other relief the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury on all issues so triable.

DATED:    Miami, Florida          QUINN EMANUEL URQUHART &
          March 8, 2022            SULLIVAN, LLP

                                   By: */s/ John O'Sullivan*
                                        John O'Sullivan
                                        Fla. Bar No. 143154
                                        2601 South Bayshore Dr.
                                        Suite 1550
                                        Miami, FL 33133
                                        Telephone: (305) 402-4880
                                        Fax: (305) 901-2975
                                        johnosullivan@quinnemanuel.co
                                        m Bar No. 143154

-and-

Michael B. Carlinsky (*pro hac vice forthcoming*)
Susheel Kirpalani (*pro hac vice forthcoming*)
Jacob J. Waldman (*pro hac vice forthcoming*)
51 Madison Avenue, 22nd Floor
New York, New York  10010-1601
Telephone:  (212) 849-7000
Fax:  (212) 849-7100
michaelcarlinsky@quinnemanuel.com
susheelkirpalani@quinnemanuel.com
jacobwaldman@quinnemanuel.com

*Attorneys for Plaintiffs*