**IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
West Palm Beach Division**

TRADEINVEST ASSET MANAGEMENT
COMPANY (BVI) LTD., FIRST OCEAN
ENTERPRISES SA, and TECHVIEW
INVESTMENTS, LTD.,

      Plaintiffs,

v.                                   Case No.  9:22-cv-80360

WILLIAM "BEAU" WRIGLEY, JR.,
JAMES HOLMES, JAMES WHITCOMB,
SH PARENT INC.  d/b/a PARALLEL,
SURTERRA HOLDINGS, INC., GREEN
HEALTH ENDEAVORS, LLC, PE FUND
LP, and ROBERT "JAKE" BERGMANN,

      Defendants.

_____

**DEFENDANTS' COMBINED MOTION TO DISMISS
<u>PLAINTIFFS' COMPLAINT (D.E. 59) AND MEMORANDUM OF LAW IN SUPPORT</u>**

## TABLE OF CONTENTS

**Page**

I.   INTRODUCTION ........................................................................................................ 1

II.  BACKGROUND ......................................................................................................... 4

   A.  Allegations Regarding the Company's Debt Obligations ................................... 5

      1.  The Company's Secured Senior and Junior Debt ........................................ 5

      2.  The Green Health and PE Fund Notes ........................................................ 5

   B.  The SAFE Investments ....................................................................................... 6

      1.  The Company's Alleged Representations to the SAFE Plaintiffs .................... 7

      2.  The SAFE Plaintiffs Execute the SAFE Agreement and Represent and Warrant that They Were Not Relying on Any of Defendants' Statements. ........................................... 9

      3.  The Company Elects to Use a Portion of the SAFE Investment to Pay Down Company Debt. ........................................................................................... 10

      4.  The SAFE Plaintiffs' Attempted Rescission of the SAFE Agreement. ........................ 10

   C.  The Bergmann Debts ........................................................................................ 11

III. LEGAL STANDARD .............................................................................................. 12

IV.  ARGUMENT ........................................................................................................... 13

   A.  The Fraud Claims (Counts I-V) Must Be Dismissed Because Plaintiffs Fail to Plead Any Actionable Misrepresentations. ........................................................ 13

      1.  Plaintiffs Fail to Adequately Allege a Material Misrepresentation Based on the Company's Financial Projections. ........................................................ 14

         a.  Counts I, III, and V fail to allege that the financial projections were false or misleading. ........................................................................ 14

         b.  The Company's financial projections are protected by the "bespeaks caution" doctrine. ........................................................................... 15

      2.  Plaintiffs Fail to Adequately Allege a Material Misrepresentation Based on Assertions that the SAFE Funding Would be a "Bridge" to a Merger or Acquisition. ........................ 17

      3.  Plaintiffs Fail to Adequately Allege a Fraud Claim Based On Alleged Misrepresentations Regarding the Amount of SAFE Funding Secured. ........................ 18

      4.  Plaintiffs Fail to Adequately Allege a Material Omission as to Terms and Negotiation History of Certain Company Debt. ........................................... 20

      5.  Plaintiffs Fail to Adequately Plead a Material Omission as to Alleged Defaults. .......... 22

B.   The Fraud Claims (Counts I-V) Must Also be Dismissed Because Plaintiffs Fail to Adequately Allege Reliance. ............................................................................ 24

1.   Plaintiffs' Reliance Allegations Do Not Satisfy Rule 9(b). ............................... 24

2.   Plaintiffs' Allegations of Reasonable Reliance are Foreclosed by the SAFE Agreement's Non-Reliance Clause. .................................................................... 26

a.   The Non-Reliance Clause Bars Plaintiffs' Securities Fraud Claims. ......................... 27

b.   The Non-Reliance Clause Also Bars Plaintiffs' Common Law Fraud Claim. ........... 29

C.   The Fraud Claims (Counts I-V) Must Also Be Dismissed Because Plaintiffs Fail to Allege a Strong Inference of Scienter. ............................................................... 31

1.   Plaintiffs Fail To Adequately Allege Scienter As To Their Federal Securities Law And Georgia Securities Law Claims. ......................................................... 32

a.   Plaintiffs' conclusory scienter allegations are deficient. ............................................ 33

b.   Plaintiffs' scienter allegations against Whitcomb fail to meet the formidable requirements of scienter under both the PSLRA and the Georgia Securities Act. ..... 35

c.   Plaintiffs' scienter allegations against Wrigley fail to satisfy either the PSLRA or the Georgia Securities Act. ................................................................................................ 36

d.   Plaintiffs' scienter allegations against Holmes fail to satisfy either the PSLRA or the Georgia Securities Act. ............................................................................................. 37

e.   Plaintiffs fail to raise a strong inference of scienter against the Company under both the PSLRA and the Georgia Securities Act. ............................................................... 38

2.   Plaintiffs Fail To Adequately Allege Scienter As To Their Common Law Fraud Claim Under Florida Law. ................................................................................... 39

D.   Plaintiffs Fail To Adequately Allege Control Liability Against the Individual Securities Defendants. ...................................................................................................................... 39

E.   Techview's Sixth Cause of Action for Violation of GUVTA Fails. ................................. 42

1.   The Court Lacks Subject-Matter Jurisdiction. ................................................... 43

2.   Whitcomb, Holmes, and Wrigley are Not Proper Defendants to a GUVTA Claim Because They Neither Transferred Nor Received Assets. .............................. 44

3.   Techview Fails to Adequately Allege Standing as to the Challenged Obligations. ........ 44

4.   Techview Has Failed to Adequately Allege Actual Fraudulent Intent as to the Challenged Transfers. ......................................................................................... 45

5.   The GUVTA Claim Relating to the Bergmann Debts Should Be Dismissed Under the *Rooker-Feldman* Doctrine. ......................................................................... 46

6.   Plaintiffs Fail To Allege A Constructive Fraud Theory As to the Bergmann Debts. ..... 49

V.   CONCLUSION ................................................................................................................ 50

ii

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Abry Partners V, L.P. v. F & W Acquisition LLC*,
  891 A.2d 1032 (Del. Ch. 2006)..................................................................30

*Affiliati Network, Inc. v. Wanamaker*,
  847 F. App'x 583 (11th Cir. 2021) ..............................................................25

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)...................................................................................12

*Atlanta Fiberglass USA, LLC v. KPI, Co.*,
  911 F. Supp. 2d 1247 (N.D. Ga. 2012) ........................................................44

*Balooshi v. GVP Glob. Corp.*,
  2022 WL 576819 (Del. Super. Ct. Feb. 25, 2022).........................................48

*Bankers Life Ins. Co. v. Credit Suisse First Boston Corp.*,
  2008 WL 1817294 (M.D. Fla. Apr. 22, 2008)...............................................39

*Barron v. Lampley*,
  2015 WL 12591006 (N.D. Ga. June 22, 2015)..............................................40

*Basic Inc. v. Levinson*,
  485 U.S. 224 (1988).............................................................................22, 23

*Beranger v. Harris*,
  2021 WL 4254940 (N.D. Ga. Feb. 12, 2021) ........................24, 29, 33, 34

*Billington v. Ginn-La Pine Island, Ltd., LLLP*,
  192 So. 3d 77 (Fla. 5th DCA 2016) ............................................................25

*Brophy v. Jiangbo Pharms. Inc.*,
  781 F.3d 1296 (11th Cir. 2015) ...........................................................32, 33

*Brown v. J.P. Turner & Co.*,
  2011 WL 1882522 (N.D. Ga. May 17, 2011)................................................33

*Bryant v. Avado Brands, Inc.*,
  187 F.3d 1271 (11th Cir. 1999) .....................................................15, 32, 34

*Butler v. Yusem*,
  44 So. 3d 102 (Fla. 2010)...................................................................24, 39

*Carter v. DeKalb Cty., Ga.,*
    521 F. App'x 725 (11th Cir. 2013) ........................................................................37

*Carvelli v. Ocwen Fin. Corp.,*
    934 F.3d 1307 (11th Cir. 2019) ...........................................................................13

*Carvelli v. Ocwen Financial Corp.,*
    2018 WL 4941110 (S.D. Fla. Apr. 30, 2018), *aff'd*, 934 F.3d 1307 (11th Cir.
    2019) .....................................................................................................................17

*Casale v. Tillman,*
    558 F.3d 1258 (11th Cir. 2009) ...........................................................................47

*City of Philadelphia v. Fleming Cos., Inc.,*
    264 F.3d 1245 (10th Cir. 2001) ...........................................................................34

*City Pension Fund for Firefighters & Police Officers in City of Miami Beach v.*
    *Aracruz Cellulose S.A.,*
    41 F. Supp. 3d 1369 (S.D. Fla. 2011) .............................................................35, 37

*Cole v. Health Mgmt. Assocs., Inc.,*
    2009 WL 2713178 (M.D. Fla. July 17, 2009) .....................................................24

*Creative Am. Educ., LLC v. Learning Experience Sys., LLC,*
    2015 WL 2218847 (S.D. Fla. May 11, 2015), *aff'd*, 668 F. App'x 883 (11th
    Cir. 2016) .............................................................................................................31

*Curry v. TD Ameritrade, Inc.,*
    662 F. App'x 769 (11th Cir. 2016) (Georgia statute's control liability
    provisions are "nearly identical to the federal statute") ...................................40

*Cutsforth v. Renschler,*
    235 F. Supp. 2d 1216 (M.D. Fla. 2002) ..............................................................22

*D.C. Ct. of Appeals v. Feldman,*
    460 U.S. 462 (1983) .............................................................................................46

*Diverse Power, Inc. v. City of LaGrange,*
    934 F.3d 1270 (11th Cir. 2019) .......................................................................12, 50

*Dixon v. Allergan USA, Inc.,*
    2015 WL 12915671 (S.D. Fla. May 28, 2015) .................................................12, 13

*Eclipse Med., Inc. v. Am. Hydro-Surgical Instruments, Inc.,*
    262 F. Supp. 2d 1334 (S.D. Fla. 1999), *aff'd*, 235 F.3d 1344 (11th Cir. 2000).....................17

*Ehlert v. Singer,*
    245 F.3d 1313 (11th Cir. 2001) ...........................................................................16

*Feeney v. Mego Mortg. Corp.*,
    45 F. Supp. 2d 1356 (N.D. Ga. 1999) ..................................................................................35

*Fernandez v. WebSingularity, Inc.*,
    681 S.E.2d 717 (Ga. Ct. App. 2009) ...................................................................................29

*Fernau v. Enchante Beauty Prod., Inc.*,
    2020 WL 5371297 (S.D. Fla. Mar. 11, 2020) ........................................................24, 26, 39

*FindWhat Investor Grp.. v. FindWhat.com*,
    658 F.3d 1282 (11th Cir. 2011) ..........................................................................14, 23, 31, 38

*First Union Brokerage v. Milos*,
    717 F. Supp. 1519 (S.D. Fla. 1989), *aff'd*, 997 F.2d 835 (11th Cir. 1993)....................2, 22, 24

*Fla. Holding 4800, LLC v. Lauderhill Mall Inv., LLC*,
    317 So. 3d 121 (Fla. 4th DCA 2021) ...................................................................................31

*In re Galectin Therapeutics, Inc. Sec. Litig.*,
    843 F.3d 1257 (11th Cir. 2016) ............................................................................................23

*Garcia v. Santa Maria Resort, Inc.*,
    528 F. Supp. 2d 1283 (S.D. Fla. 2007) ....................................................................17, 27, 28

*Gardner v. Bay Area Credit Servs., LLC*,
    2015 WL 12838995 (M.D. Fla. June 26, 2015).....................................................................21

*Garfield v. NDC Health Corp.*,
    466 F.3d 1255 (11th Cir. 2006) ............................................................................................34

*GCA Strategic Inv. Fund, Ltd. v. Joseph Charles & Assoc., Inc.*,
    537 S.E.2d 677 (Ga. Ct. App. 2000).....................................................................................33

*Gochnauer v. A.G. Edwards & Sons, Inc.*,
    810 F.2d 1042 (11th Cir. 1987) ............................................................................................24

*Goodman ex rel. Goodman v. Sipos*,
    259 F.3d 1327 (11th Cir. 2001) ............................................................................................47

*Great Lakes Chem. Corp. v. Pharmacia Corp.*,
    788 A.2d 544 (Del. Ch. 2001)...............................................................................................30

*In re Greenlane Holdings, Inc. Sec. Litig.*,
    511 F. Supp. 3d 1283 (S.D. Fla. 2021) .................................................................................15

*GunBroker.com, LLC v. Tenor Cap. Partners, LLC*,
    2022 WL 103719 (N.D. Ga. Jan. 11, 2022)..........................................................................29

*H-M Wexford LLC v. Encorp, Inc.*,
    832 A.2d 129 (Del. Ch. 2003) ................................................................30

*Hall v. Coram Healthcare Corp.*,
    157 F.3d 1286 (11th Cir. 1998) .....................................................27, 28

*Hanley v. Savannah Bank & Tr. Co.*,
    68 S.E.2d 581 (Ga. 1952) ......................................................................49

*Horsley v. Feldt*,
    304 F.3d 1125 (11th Cir. 2002) .........................................................2, 10

*Hubbard v. BankAtlantic Bancorp, Inc.*,
    625 F. Supp. 2d 1267 (S.D. Fla. 2008) ...................................................4

*Hudson v. Delta Air Lines*
    90 F.3d 451 (11th Cir. 1996) .................................................................43

*Instituto De Prevision Militar v. Merrill Lynch*,
    546 F.3d 1340 (11th Cir. 2008) .............................................................13

*Jackson Inv. Grp., LLC v. Thomas*,
    325 F. Supp. 3d 1334 (N.D. Ga. 2017) ................................................35

*Kadel v. Flood*,
    427 F. App'x 778 (11th Cir. 2011) ........................................................22

*Keogler v. Krasnoff*,
    601 S.E.2d 788 (Ga. Ct. App. 2004) ....................................................33

*Khanimov v. St. Tropez II, LLC*,
    2009 WL 10667414 (S.D. Fla. July 1, 2009) .......................................28

*Kipperman v. Onex Corp.*,
    2007 WL 2872463 (N.D. Ga. Sept. 26, 2007) .....................................46

*In re KLX, Inc. Sec. Litig.*,
    232 F. Supp. 3d 1269 (S.D. Fla. 2017) ...................................15, 19, 34

*Korth v. Luther*,
    935 N.W.2d 220 (Neb. 2019) ................................................................45

*La Pesca Grande Charters, Inc. v. Moran*,
    704 So. 2d 710 (Fla. 5th DCA 1998) ....................................................31

*Laperriere v. Vesta Ins. Grp., Inc.*,
    526 F.3d 715 (11th Cir. 2008) ..............................................................42

*Lichtman v. Litvin Law Firm P.C.*,
    2014 WL 1230724 (S.D. Fla. Mar. 25, 2014)...........................................................44

*Magnum Constr. Mgmt., LLC v. WSP USA Sols., Inc.*,
    522 F. Supp. 3d 1202 (S.D. Fla. 2021) ...................................................................25

*In re Marine Energy Sys. Corp.*,
    299 F. App'x 222 (4th Cir. 2008) ....................................................................30, 31

*McDonald v. Alan Bush Brokerage Co.*,
    863 F.2d 809 (11th Cir. 1989) .................................................................................32

*Meason v. Gilbert*,
    226 S.E.2d 49 (Ga. 1976)........................................................................................29

*Mejia v. Jurich*,
    781 So.2d 1175 (Fla. 3d DCA 2001) ......................................................................18

*Miyahira v. Vitacost.com, Inc.*,
    2011 WL 13136262 (S.D. Fla. Dec. 8, 2011) .........................................................22

*Mizzaro v. Home Depot, Inc.*,
    544 F.3d 1230 (11th Cir. 2008) ........................................................13, 33, 38, 40

*Mulvaney v. GEO Grp., Inc.*,
    237 F. Supp. 3d 1308 (S.D. Fla. 2017) .............................................................38, 40

*OFI Asset Mgmt. v. Cooper Tire & Rubber*,
    834 F.3d 481 (3d Cir. 2016).....................................................................................19

*Palmer v. Hosp. Auth. of Randolph Cnty.*,
    22 F.3d 1559 (11th Cir. 1994) .................................................................................44

*Panter v. Marshall Field & Co.*,
    646 F.2d 271 (7th Cir. 1981) ...................................................................................22

*Parker v. State of Fla. Bd. of Regents*,
    724 So. 2d 163 (Fla. 1st DCA 1998) .......................................................................39

*Patel v. Patel*,
    761 F. Supp. 2d 1375 (N.D. Ga. 2011)..............................................................33, 40

*Phillips v. Scientific-Atlanta, Inc.*,
    374 F.3d 1015 (11th Cir. 2004) ........................................................................31, 37

*Raab v. General Physics Corp.*,
    4 F.3d 286 (4th Cir. 2003) .......................................................................................14

*RES-GA YPL, LLC v. Rowland*,
　798 S.E.2d 315 (Ga. Ct. App. 2017) ................................................................44

*Rissman v. Rissman*,
　213 F.3d 381 (7th Cir. 2000) .........................................................................27

*Rosenzweig v. Azurix Corp.*,
　332 F.3d 854 (5th Cir. 2003) .........................................................................15

*In re Sahlen & Assocs., Inc. Sec. Litig.*,
　773 F. Supp. 342 (S.D. Fla. 1991) ..................................................................24

*Saltzberg v. TM Sterling/Austin Assocs., Ltd.*,
　45 F.3d 399 (11th Cir. 1995) .........................................................................18

*Santa Fe Indus., Inc. v. Green*,
　430 U.S. 462 (1977)........................................................................................21

*Scala v. Eisai, Inc.*,
　2021 WL 5935588 (M.D. Fla. Dec. 14, 2021).................................................25

*Ruderman ex rel. Schwartz v. Washington Nat'l Ins. Co.*,
　2010 WL 11505859 (S.D. Fla. Aug. 27, 2010)................................................50

*In re Sci. Atlanta, Inc. Sec. Litig.*,
　754 F. Supp. 2d 1339 (N.D. Ga. 2010) ...........................................................16

*Scott v. Vantage Corp.*,
　845 F. App'x 170 (3d Cir. 2021) ....................................................................40

*SEC v. Merch. Capital, LLC*,
　483 F.3d 747 (11th Cir. 2007) ..........................................................14, 15, 23

*Siegel v. LePore*,
　234 F.3d 1163 (11th Cir. 2000) .....................................................................47

*In re Smith Barney Transfer Agent Litig.*,
　884 F. Supp. 2d 152 (S.D.N.Y. 2012)..............................................................41

*In re Smith Gardner Sec. Litig.*,
　214 F. Supp. 2d 1291 (S.D. Fla. 2002) ...........................................................36

*Southland Secs. Corp. v. INSpire Ins. Sols., Inc.*,
　365 F.3d 353 (5th Cir. 2004) .........................................................................38

*Speaker v. U.S. Dep't of Health and Human Servs. Centers for Disease Control
　and Prevention*,
　623 F.3d 1371 (11th Cir. 2010) .....................................................................11

*Spitz v. Prudential-Bache Sec., Inc.*,
  549 So. 2d 777 (Fla. 4th DCA 1989) ..................................................................18

*Staley v. Ledbetter*,
  837 F.2d 1016 (11th Cir. 1988) .........................................................................47

*Starr v. Robinson*,
  351 S.E.2d 238 (Ga. Ct. App. 1986) ..................................................................48

*Steel Co. v. Citizens for a Better Env't*,
  523 U.S. 83 (1998)..............................................................................................44

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007)............................................................................................33

*Thompson v. RelationServe Media, Inc.*,
  610 F.3d 628 (11th Cir. 2010) ......................................................................28, 31

*In re Thorlton*,
  2020 WL 6019696 (Bankr. M.D. Fla. Sept. 23, 2020) .......................................47

*Thorpe v. Inv. Walter Mgmt., Corp.*,
  2014 WL 11961964 (S.D. Fla. Dec. 23, 2014)....................................................33

*Tippens v. Round Island Plantation L.L.C.*,
  2009 WL 2365347 (S.D. Fla. July 31, 2009).......................................................41

*Trilogy Properties LLC v. SB Hotel Assocs. LLC*,
  2010 WL 7411912 (S.D. Fla. Dec. 23, 2010)......................................................28

*In re United Telecommunications, Inc., Sec. Litig.*,
  781 F. Supp. 696 (D. Kan. 1991)........................................................................22

*Value Health Sols. Inc. v. Pharm. Rsch. Assocs., Inc.*,
  2019 WL 6049988 (N.C. Super. Sept. 6, 2019)..................................................30

*W. Coast Roofing & Waterproofing, Inc. v. Johns Manville, Inc.*,
  287 F. App'x 81 (11th Cir. 2008) .......................................................................12

*Wadlington v. Cont'l Med. Servs., Inc.*,
  907 So.2d 631 (Fla. 4th DCA 2005) ...................................................................18

*Weaver v. Opera Tower, LLC*,
  2008 WL 4145520 (S.D. Fla. Aug. 1, 2008)........................................................31

*Weiland v. Palm Beach Cnty. Sheriff's Off.*,
  792 F.3d 1313 (11th Cir. 2015) ..........................................................................32

*Whitesell Corp. v. Whirlpool Corp.*,
 2009 WL 3270265 (W.D. Mich. Oct. 5, 2009) ............................................................29

*Wilding v. DNC Servs. Corp.*,
 941 F.3d 1116 (11th Cir. 2019) ...................................................................................25

*Wisthle Inv. Grp., LLC v. CR Hancock Bridge, LLC*,
 2009 WL 10670165 (M.D. Fla. Apr. 3, 2009) .............................................................31

*Yuanxiao Feng v. Walsh*,
 2020 WL 5822420 (S.D. Fla. Sept. 14, 2020) .............................................................32

*Zimmerman v. Matson Money, Inc.*,
 2021 WL 6113659 (N.D. Ga. June 9, 2021) ...........................................................40, 41

**Statutes**

8 Del. C. § 262 ......................................................................................................................11

15 U.S.C. § 78u–4(b)(1)(B) ..................................................................................................22

15 U.S.C. § 78u–5 .................................................................................................................15

15 U.S.C. § 78u-4(b)(1) ........................................................................................................13

15 U.S.C. § 78u-4(b)(2) ...................................................................................................13, 32

15 U.S.C. § 78u-4(b)(3)(A) .............................................................................................31, 38

28 U.S.C. § 1367(c) ..............................................................................................................44

Ga. Code § 10-5-12(a)(2) ......................................................................................................33

Ga. Code § 10-5-50 ...............................................................................................................24

Ga. Code § 10-5-58(b) ..........................................................................................................40

Ga. Code § 10-5-58(g) .....................................................................................................39, 40

Ga. Code § 10-5-58(g)(4) ......................................................................................................41

Ga. Code § 13-3-45 ...............................................................................................................48

Ga. Code § 18-2-74 ..........................................................................................................42, 46

Ga. Code § 18-2-74(a)(1) ......................................................................................................45

Ga. Code § 18-2-74(a)(2) ......................................................................................................49

Ga. Code § 18-2-75 ...................................................................................................49

**Other Authorities**

17 C.F.R. § 240.10b-5 ...................................................................................23, 32, 33

17 C.F.R. § 240.10b-5(b) ...................................................................................18, 23

Fed. R. Civ. P. 9(b) ............................................................................................. *passim*

Fed. R. Civ. P. 12(b)(6) ...........................................................................................1, 12

Fed. R. Civ. P. 12(h)(3) ...............................................................................................43

S.D. Fla. L.R. 7.1 .........................................................................................................1

Defendants William "Beau" Wrigley, Jr., James Holmes, James Whitcomb, SH Parent Inc. d/b/a Parallel ("Parallel"), Surterra Holdings, Inc. ("Surterra," together with Parallel, the "Company"), Green Health Endeavors, LLC ("Green Health"), PE Fund LP ("PE Fund"), and Robert "Jake" Bergmann, by and through their respective undersigned counsel, and pursuant to Federal Rule of Civil Procedure 12(b)(6) and Rule 7.1 of the Local Rules of the Southern District of Florida, hereby move to dismiss Plaintiffs' TradeInvest Asset Management Company (BVI) LTD ("TradeInvest"), First Ocean Enterprises SA ("First Ocean," and with TradeInvest, the "SAFE Plaintiffs"), and Techview Investments, LTD ("Techview") Complaint (D.E. 59) (the "Complaint") against Defendants, and in support thereof, state as follows:

## I.   __INTRODUCTION__

This is not a case of fraud but of disappointed investors.  Plaintiffs are sophisticated investors in Parallel, a privately-held cannabis company.  In their sweeping 164-paragraph Complaint, Plaintiffs take issue with the management of the business and assert various scandalous (and fictional) allegations of mismanagement and self-dealing.  Although Plaintiffs take great liberties with the facts, it is no secret that the Company has suffered a series of financial setbacks recently, making it difficult for it to maintain its operations and service its debts.

Unhappy with the performance of their investment, Plaintiffs have concocted a federal securities fraud action, accusing the Company and certain of its current and former officers of violating federal and state law by fraudulently inducing the SAFE Plaintiffs to make a $25 million investment in the Company.  Plaintiffs assert these claims solely to try to circumvent the widely known payment waterfall (including with respect to secured and unsecured tranches of debt).  They also make these claims despite the absence of *any* actionable misrepresentations by Defendants— let alone misrepresentations amounting to federal securities fraud.  To stake such claims, Plaintiffs

1

must also be able to allege the element of reasonable reliance, an impossibility here given the SAFE Plaintiffs' representation and warranty in the SAFE Agreement that they had conducted their own due diligence to their satisfaction and *were not relying on any statements outside the Simple Agreement for Future Equity* (**"SAFE Agreement"**) *itself*.[1]

Notably, the SAFE Plaintiffs demand $25 million *or more* in damages, reflecting a return of their entire investment in the Company, and then some.  But an investor may not invest equity in an enterprise, wait to see how it performs, and *then* demand its money back if performance falls short of expectations.  The SAFE Plaintiffs are sophisticated parties that understood the risk of their SAFE investment, especially in the highly volatile cannabis industry.  In fact, Plaintiffs admit that they were provided with detailed risk factors (the "Risk Factors") before they signed on the dotted line, many of which expressly undermine the alleged "misrepresentations" on which the SAFE Plaintiffs purportedly relied.  For multiple reasons, the SAFE Plaintiffs' fraud claims under the federal Securities Exchange Act, the Georgia Uniform Securities Act, and common law all fail.

First, Plaintiffs cannot point to any actionable misrepresentation by Defendants—certainly not to the standard required under the Private Securities Litigation Reform Act ("PSLRA") for federal securities fraud claims.  Rather, the Complaint is a classic shotgun pleading that fails to identify which allegations support which claims and what alleged wrongdoing each Defendant committed.  For example, Plaintiffs accuse Defendants of engaging in fraud by providing financial projections that ended up being too optimistic.  But not only do Plaintiffs fail to offer any plausible allegations that Defendants knew these projections were erroneous when they were provided to

---

[1] Plaintiffs curiously chose not to attach the SAFE Agreement to their Complaint.  Nevertheless, the Court may consider that agreement on this motion because it is referenced and quoted throughout the Complaint and because it is "central to" Plaintiffs' claim of fraudulent inducement. *Horsley v. Feldt*, 304 F.3d 1125, 1134-35 (11th Cir. 2002).

potential investors, but these projections are also forward-looking statements, protected by the bespeaks caution doctrine and the PSLRA. Likewise, the allegation that Defendants misrepresented *how* the Company would use Plaintiffs' investment is simply not plausible given the express disclosures in the Risk Factors stating that the Company had broad discretion in using the funds. And Plaintiffs' allegation that Defendants misrepresented that the Company had $50 million committed to the SAFE is belied by Plaintiffs' own allegations that Wrigley had committed to make up any shortfall up to $50 million, a commitment that Plaintiffs admit he fulfilled. Finally, Plaintiffs' repeated references to alleged conflicts of interest in the Company's negotiation of certain debt instruments and their vague allegations that Defendants should have disclosed certain future defaults under those instruments do not amount to an actionable fraud claim.

<u>Second</u>, Plaintiffs cannot establish that the SAFE Plaintiffs actually relied on any misrepresentation, much less that such reliance was reasonable or justifiable. Not only does the Complaint fail to allege reliance with particularity under Rule 9(b), but any allegations of reliance are also foreclosed by the SAFE Plaintiffs' express representation in the SAFE Agreement that they were *not* relying on any representations other than the limited representations made by the Company in the SAFE Agreement itself. Whether under the federal securities laws, Georgia securities laws, or common law, a party to a contract cannot promise that he is not relying on a statement and then later turn around and file a complaint alleging the exact opposite.

<u>Third</u>, Plaintiffs have not made the required heightened showing of scienter. Plaintiffs' "motive and opportunity" allegations are insufficient under Eleventh Circuit law and suggest nothing more than Defendants wanting the Company to succeed. The Complaint's scienter allegations also lack any particularity and fail to adequately distinguish between Defendants Wrigley, Holmes, or Whitcomb (collectively, the "Individual Securities Defendants").

3

Fourth, Plaintiffs' control person claims (Counts II and IV) fail because Plaintiffs do not adequately allege a primary violation of securities law, and because Plaintiffs' allegations of "control" against the Individual Securities Defendants are conclusory and premised almost exclusively on their position as officers, which is insufficient to establish secondary liability.

Equally flawed is Plaintiff Techview's sole claim under Georgia's Uniform Voidable Transactions Act ("GUVTA"). As a threshold matter, the Court lacks subject matter jurisdiction to adjudicate this state law claim. Even if the Court had jurisdiction, the Individual Securities Defendants are improper parties under the statute. And, as to the other Defendants, Plaintiffs have not demonstrated any injury-in-fact to challenge the obligations incurred, and their conclusory allegations of purported badges of fraud fall short of the heightened pleading standard required to challenge any transfers made. Nor have Plaintiffs demonstrated that the alleged transfers were made for inadequate consideration. Finally, the Court should abstain from adjudicating this action under the *Rooker-Feldman* doctrine because it implicates a Delaware judgment and a pending action in Delaware Superior Court.

For the foregoing reasons, Defendants respectfully request the Court dismiss Plaintiffs' Complaint in its entirety. Moreover, because any amendment would be futile, the Complaint should be dismissed with prejudice.

## II.   **BACKGROUND**[2]

Parallel is a multistate cannabis company incorporated in Delaware and headquartered in Georgia. (Compl. ¶ 21.) The SAFE Plaintiffs are sophisticated offshore investment funds

---

[2] The facts outlined in this Motion are based on the allegations in the Complaint and the documents incorporated therein. *See Hubbard v. BankAtlantic Bancorp, Inc.*, 625 F. Supp. 2d 1267, 1279 (S.D. Fla. 2008) ("[W]here a complaint alleges violations of securities laws, the court may consider certain other materials, such as documents incorporated by reference into the complaint and matters of which a court may take judicial notice.").

managed by investment adviser, and non-party, PSQ Capital. (*Id*. ¶¶ 17-19.) As explained below, the SAFE Plaintiffs invested a combined $25 million in the Company for a security that ultimately converted to Series EE preferred stock. Plaintiff Techview is a minority holder of the Company's Series D Preferred Stock and a minority holder of the Senior Notes (defined below).

      **A.**      <u>**Allegations Regarding the Company's Debt Obligations**</u>

      **1.**      <u>The Company's Secured Senior and Junior Debt</u>

The Company has multiple tranches of outstanding secured debt, including approximately $165.5 million in principal amount of 10% Senior Notes (the "Senior Notes") issued on October 16, 2018 and due October 16, 2028. (Compl. ¶ 33.) Plaintiff Techview holds $10 million of principal of the Senior Notes and Defendant PE Fund holds $91.2 million. (*Id*. ¶¶ 36, 37.) The Senior Notes are governed by a Note Purchase Agreement dated October 16, 2018. (*Id*. ¶ 34.) The Company also has $145 million of junior secured debt (the "Junior Note") with an annual non-default interest rate of 14.24% issued on May 7, 2021 to a creditor who is not a party to this action. (*Id*. ¶¶ 40-41.)

      **2.**      <u>The Green Health and PE Fund Notes</u>

According to Plaintiffs, the Company "appears to owe" approximately $54 million on $44.3 million in convertible notes to Green Health (the "Green Health Notes"). (Compl. ¶ 42.) The Green Health Notes bear non-default payment-in-kind (PIK) interest at 16% annually with an original May 1, 2021 maturity date. (*Id*.) The Green Health Notes may convert into equity at a multiple of 2.5, such that the face value of the amount of converted debt would convert into 2.5 times as much equity. (*Id*. ¶ 44.) Plaintiffs allege that Wrigley was conflicted when the Company negotiated the convertible debt deal with Green Health because he was the CEO and Chairman of both entities and because his "lieutenant," Defendant Holmes, represented Green Health in the transaction while also serving as an officer of the Company. (*Id*. ¶¶ 43-45.) Plaintiffs, most of

whom were not Company shareholders when the Green Health Notes were negotiated, accuse Wrigley of favoring Green Health in the negotiation. (*Id*.) Plaintiffs label the negotiated 16% interest rate and 2.5 conversion rate as "extortionate" and "usurious," and fault the Company for failing to explore other financing options that might offer better terms. (*Id*. ¶¶ 44-46.) Plaintiffs assert that Wrigley had "no expectation" that the Green Health Notes would ever be repaid, and speculate that Green Health lent the funds under the Green Health Notes solely for the purpose of converting the notes to senior equity. (*Id*. ¶ 51.)[3]

Plaintiffs also allege that the Company issued a $13.5 million note to PE Fund (the "PE Fund Note") which bore an annual interest rate of 16% (which Plaintiffs call "exorbitant") and included an allegedly unexplained $2.5 million transaction fee. (*Id*. ¶ 59.) Plaintiffs make similar allegations to the Green Health Note about Wrigley's "conflicted" status in negotiating the PE Fund Note, and allege that Wrigley was improperly interested in both sides of the transaction. (*Id*. ¶ 62.) Plaintiffs also allege that the funds lent to the Company under the PE Fund Note were used to pay Defendant Bergmann (discussed below). (*Id*. ¶ 61.)

## B.   The SAFE Investments

The SAFE Plaintiffs' federal and state securities and common law fraud claims are each premised on their combined $25 million investment in the Company through the SAFE Agreement. (*See* Declaration of Neal Marder ("Marder Decl."), Exs. A, B.)

---

[3] On May 7, 2021, the Company and Green Health amended and restated the outstanding amount owed under the Green Health Notes on the same terms. (*Id*. ¶ 48.) Although Plaintiffs allege that the amended and restated Green Health Notes were "already in default upon execution" because they bore a May 1, 2021 maturity date, Plaintiffs acknowledge that the parties simultaneously executed a forbearance agreement waiving the default. (*Id*. ¶ 49.)

1.      The Company's Alleged Representations to the SAFE Plaintiffs

Beginning in approximately July 2021, the SAFE Plaintiffs began discussing a potential investment with the Securities Defendants.  (Compl. ¶ 66.)  As originally envisioned, the SAFE would serve as a bridge to provide the Company with a source of capital until an anticipated SPAC transaction could be consummated that would result in the Company being publicly traded.  (*Id*. ¶ 67.)  On an initial Zoom call, Defendants Whitcomb and Holmes allegedly discussed with the SAFE Plaintiffs' investment advisor potential valuations of the Company in the anticipated SPAC transaction.  (*Id*. ¶¶ 67-68.)

On August 4, 2021, Holmes allegedly provided the SAFE Plaintiffs with an initial draft of the SAFE Agreement along with a presentation called "August 2021 Company Overview: Parallel/Ceres Acquisition Corp. SPAC Transaction."  (*Id*. ¶ 70; Marder Decl., Ex. D.)  Plaintiffs allege that the presentation stated that the Company "anticipates raising a $50 million SAFE to fund capex plan through SPAC closing (this will be non-dilutive to PIPE and SPAC investors)." (Compl. ¶ 70.)   What Plaintiffs fail to mention is that this statement contained a disclaimer specifically indicating that this was a "forward-looking statement" which "involve[d] known and unknown risks, uncertainties and other factors that may cause the actual results, performance or achievements to be materially different from those expressed or implied by the forward-looking statements."  (Marder Decl., Ex. D at 3, 9.)  The presentation also included certain financial projections of the Company's projected 2022 net revenue and EBITDA, which Plaintiffs allege were revised downward two months later in October 2021 and then again in January 2022. (Compl. ¶ 71; Marder Decl., Ex. D at 9, 10, 40.)  Even though these projections were also labeled as forward-looking statements, Plaintiffs allege that the subsequent downward revision is evidence of fraud.  (Compl. ¶ 71.)

The next day, on August 5, 2021, Holmes and Whitcomb allegedly disclosed to the SAFE Plaintiffs' investment advisor that the SPAC transaction might not close, and, in that event, the SAFE funding would be used to bridge the Company's capital needs until a private sale could be consummated.  (*Id*. ¶ 73.)  Holmes and Whitcomb later allegedly stated that the SAFE investment would last the Company through the second quarter of 2022.  (*Id*. ¶ 81.)  Plaintiffs allege that these statements were false and misleading and that Holmes and Whitcomb "had no reasonable basis to claim the SAFE would bridge the Company until a private sale."  (*Id*. ¶ 74.)  Plaintiffs also accuse Defendants of omitting that the SAFE investment would be used to pay down the Company's debts, as opposed to being used for operational purposes.  (*Id*. ¶ 83.)

On August 16, 2021, Holmes allegedly transmitted to the SAFE Plaintiffs an Excel file entitled "Project Cereal Cap Table Analysis."  (*Id*. ¶ 76.)  Plaintiffs allege that this spreadsheet was misleading because it stated that the Green Health Note would convert to $135 million in equity and did not specifically note that this conversion was at the option of Green Health and that Green Health could elect to keep the investment as debt.  (*Id*.)  Not only does this allegation ignore the fact that the pro forma ownership percentages on this spreadsheet were conditioned on the SPAC transaction's consummation, but it also undercuts Plaintiffs' theory that the Green Health Note was *not* bona fide debt but was instead a ruse to allow Wrigley "to benefit from the relatively quick conversion of the Green Health Notes into a tranche of preferred stock[.]"  (*Id*. ¶ 51.)

On August 22, 2021, the SAFE Plaintiffs' investment advisor allegedly requested assurance from Holmes and Whitcomb that the total SAFE investment would be at least $50 million (*i.e.*, $25 million on top of the SAFE Plaintiffs' anticipated $25 million).  (*Id*. ¶ 79.)  While Holmes and Whitcomb allegedly provided this assurance, they also disclosed that Wrigley might serve as a "backstop" if necessary to bring the total SAFE investment to $50 million.  (*Id*.)

2.      The SAFE Plaintiffs Execute the SAFE Agreement and Represent and
Warrant that They Were Not Relying on Any of Defendants' Statements.

On September 27, 2021, the SAFE Plaintiffs released their signed SAFE Agreement from
escrow and funded the $25 million investment.  (Compl. ¶ 86.)  Plaintiffs allege that the SAFE
Plaintiffs did so in reliance on Defendants' statements that the Company had $50 million in total
SAFE investments.  (*Id*.)  Plaintiffs allege that the Company's statement that it had $50 million in
SAFE investments was a misrepresentation because Wrigley's $10.5 million SAFE investment
was not formally made until November 2021, despite it being "commit[ted]" months earlier.  (*Id*.
¶ 102.)

The SAFE Agreement contained various representations and warranties from each party.
SH Parent, Inc. represented and warranted in Section 3 of the SAFE Agreement that (1) it was duly
organized and in good standing; (2) it had the power to execute the SAFE Agreement; (3) the
SAFE Agreement was not unlawful, nor would it cause any debt to accelerate or cause the creation
of a lien; and (4) that no special consents were required in the performance of the SAFE.  (*See*
Marder Decl. Exs., A, B at § 3.)  Plaintiffs do not allege that any of the representations in Section
3 were false or misleading.

The SAFE Plaintiffs likewise made representations and warranties under the SAFE
Agreement.  Relevant here, the SAFE Plaintiffs represented that: "no representations or warranties
have been made to the Investor other than pursuant to Section 3 hereof and that *the Investor has
not relied upon any representation or warranty in making or confirming the Investor's investment*
other than pursuant to Section 3 hereof."  (Marder Decl., Exs. A, B at § 4(c) (emphasis added).)[4]
The SAFE Plaintiffs also acknowledged that the Company was relying on the SAFE Plaintiffs'

---

[4] This is a common representation in sophisticated investment documentation, with which the
Plaintiffs should be well versed given their trade.

representations and warranties, including the representation and warranty that the SAFE Plaintiffs

were not relying on any statements other than those in Section 3.  (*Id*. § 4(d).)

      In connection with the SAFE Agreement, the Company also provided the Risk Factors to

the SAFE Plaintiffs.  (Compl. ¶ 93; Marder Decl., Ex. C.)[5]  The Risk Factors, which spanned 18

pages, disclosed, among other things, that the Company had nearly $350 million in debt that could

negatively impact the Company's operations, that management would have "broad discretion with

respect to the application of net proceeds" from the SAFE investment, and that "[t]here can be no

assurances" that the Company would be acquired in a SPAC transaction.  (*Id.*)

         3.     The Company Elects to Use a Portion of the SAFE Investment to Pay
               Down Company Debt.

      Plaintiffs allege that, in January 2022, the Company data room was updated with a chart

that purportedly revealed that the Company had used some of the SAFE Investment funds to make

contractually required payments under Company debt, including to PE Fund.  (Compl. ¶¶ 112-

114.)  Plaintiffs allege that the Company's use of its funds to pay down its debt was fraudulent and

amounted to a "Ponzi scheme."  (*Id.* ¶ 115.)  Plaintiffs allege this even though the SAFE Agreement

says nothing about how the Company must use the proceeds of the SAFE Investments and even

though the Risk Factors expressly disclosed that Company management would have discretion to

use the funds as it saw fit.

         4.     The SAFE Plaintiffs' Attempted Rescission of the SAFE Agreement.

      On December 30, 2021, Plaintiff TradeInvest allegedly "rescinded" its SAFE investment.

(Compl. ¶ 65(a).)  The Complaint lacks any detail on how this alleged rescission took place, nor

---

[5] Because the Complaint expressly references and relies on these risk disclosures, (Compl. ¶¶ 75,
93-95), they are necessarily incorporated by reference.  *Horsley*, 304 F.3d at 1134-35.

does it allege that First Ocean attempted to rescind its SAFE investment.  Notably, neither TradeInvest nor First Ocean asserts a cause of action for rescission in the Complaint.

### C.    The Bergmann Debts

Plaintiffs allege that Bergmann and the Company had a dispute over the value of Bergmann's stock.  (Compl. ¶ 54.)  That dispute arose after Bergmann objected to a merger the Company carried out, and in October 2019, Bergmann filed a petition for appraisal of his Company common stock in the Delaware Court of Chancery (the "Bergmann Litigation").  (Marder Decl., Ex. E (Petition).)[6]  In his appraisal suit, Bergmann sought valuation as to 1.25 million shares of the Company's common stock.  (*Id.* ¶ 15; Compl. ¶ 55.)[7]  After more than a year of litigation, Bergmann and the Company reached a settlement agreement effective January 1, 2021 (the "Bergmann Settlement").  (Compl. ¶ 54; *see* Marder Decl., Ex. F (Docket Report) (reflecting more than a year of litigation and discovery).)  The parties agreed that Bergmann would dismiss the Bergmann Litigation in exchange for the payments in the settlement agreement and the promissory note executed contemporaneously therewith.  (Marder Decl., Ex. G (Stipulation and Order Staying Action); Marder Decl., Ex. H (Bergmann Promissory Note); *see also* Compl. ¶¶ 54-56.)

---

[6] Though the Complaint vaguely references a dispute and a settlement between Bergmann and the Company, Plaintiffs avoid explicit reference to the Bergmann Litigation, perhaps because of the complications discussed below that result from seeking to set aside debts that are part of a legal settlement and led to the dismissal of Bergmann's Delaware-law claims with prejudice.  So that this Court can understand the full context of the Bergmann Debts—and the harms that would flow from voiding them—Defendants have included with this Motion certain public filings made in Delaware state court.  Though not attached to the Complaint, this Court may properly consider these exhibits on a motion to dismiss because they are central to Plaintiffs' Count VI and because their authenticity cannot be challenged.  *Speaker v. U.S. Dep't of Health and Human Servs. Centers for Disease Control and Prevention*, 623 F.3d 1371, 1379 (11th Cir. 2010).

[7] Under Delaware law, certain mergers give rise to appraisal rights whereby objecting shareholders can force a company to purchase their stock at the fair market value at the time of the merger.  8 Del. C. § 262.  Appraisal suits are essentially damages actions where the only question at trial is the proper valuation of the stock.

The Company has allegedly made two payments under that agreement, a January 8, 2021 $6 million payment and a June 30, 2021 $16 million payment, the latter of which was purportedly financed through the PE Fund Note.  (*Id.*)  Following the June 30, 2021 payment, the Delaware Court of Chancery entered a final dismissal with prejudice in Bergmann's appraisal case.  (Marder Decl., Ex. I (Stipulation and Order of Dismissal with Prejudice).)  On March 1, 2022, Bergmann filed suit against the Company in Delaware Superior Court alleging that the Company had failed to make the next payment due under the Bergmann Promissory Note and seeking entry of judgment on the remaining amounts due under the Bergmann Promissory Note.  (Marder Decl., Ex. J (Letter Notice of Entry of Judgment).)  That case is currently pending in Delaware Superior Court. (Marder Decl., Ex. K (Docket Report).)

## III.   LEGAL STANDARD

Under Rule 12(b)(6), a complaint must be dismissed unless it alleges sufficient facts to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The court need not accept legal conclusions couched as factual allegations. *Diverse Power, Inc. v. City of LaGrange*, 934 F.3d 1270, 1273 (11th Cir. 2019).  Nor is it sufficient for a plaintiff to merely parrot the statutory elements of a claim.  *Id.*

When a complaint alleges fraud, "a party must state with particularity the circumstances constituting [the] fraud."  Fed. R. Civ. P. 9(b).  "The Rule's particularity requirement is not satisfied by 'conclusory allegations that certain statements were fraudulent; it requires that a complaint plead facts giving rise to an inference of fraud.'"  *Dixon v. Allergan USA, Inc.*, 2015 WL 12915671, at *3 (S.D. Fla. May 28, 2015) (quoting *W. Coast Roofing & Waterproofing, Inc. v. Johns Manville, Inc.*, 287 F. App'x 81, 86 (11th Cir. 2008)).  This requires the complaint to state "(1) precisely what statements were made in what documents or oral representations or what omissions were made, and (2) the time and place of each such statement and the person responsible

12

for making (or, in the case of omissions, not making) same, and (3) the content of such statements and the manner in which they misled the plaintiff, and (4) what the defendants obtained as a consequence of the fraud." *Id.* at *4 (quoting *Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230, 1237 (11th Cir. 2008)). In other words, the plaintiff must "plead the who, what, when, where, and how" of the alleged fraud. *Mizzaro*, 544 F.3d at 1237.

Plaintiffs' federal securities law claims are subject to a "triple-layered pleading standard," consisting of not only the notice pleading standard and Rule 9(b) but also "the special fraud pleading requirements imposed by the [PSLRA]." *Carvelli v. Ocwen Fin. Corp.*, 934 F.3d 1307, 1317-18 (11th Cir. 2019). Under the PSLRA, falsity allegations must not only "specify each statement alleged to have been misleading" but also "the reason or reasons why the statement is misleading." 15 U.S.C. § 78u-4(b)(1). The PSLRA also requires, with respect to each act or omission alleged, that the complaint "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Id*. § 78u- 4(b)(2).

## IV.   **ARGUMENT**

### A.   **The Fraud Claims (Counts I-V) Must Be Dismissed Because Plaintiffs Fail to Plead Any Actionable Misrepresentations.**

Plaintiffs' fraud claims under federal securities law, Georgia securities law, and common law all fail for lack of any actionable misrepresentation or omissions. For the reasons explained below, Plaintiffs' "allegations about the material misrepresentations or omissions [fail to] state with particularity the circumstances constituting fraud[,]" as required under Rule 9(b). *Instituto De Prevision Militar v. Merrill Lynch*, 546 F.3d 1340, 1352 (11th Cir. 2008). Plaintiffs likewise fail to "specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading[,]" 15 U.S.C. § 78u-4(b)(1), as required by the PSLRA.

13

      1.    <u>Plaintiffs Fail to Adequately Allege a Material Misrepresentation Based on the Company's Financial Projections.</u>

Plaintiffs allege that the Securities Defendants[8] "artificially maintained a strong financial appearance in order to take the SAFE Plaintiffs' money, only to slash it just weeks later, and even more drastically thereafter." (Compl. ¶ 7.) Specifically, Plaintiffs allege that, in an August 2021 presentation, the Company projected its revenue for 2022 would be $618 million, and its adjusted EBITDA would be $167 million, but that, in October 2021, the Company revised the projections by approximately 20% and 40%, respectively, and again in early January 2022 by about 25% and 45% off the October 2021 projections. (*Id.* ¶ 71; *see* Marder Decl., Ex. D at 9, 40.) In Plaintiffs' view, the Company's August 2021 projections "were therefore false and misleading," "lacked any reasonable basis," and "were an inflated fantasy." (Compl. ¶¶ 8, 13, 71.) Plaintiffs' claims fail because the projections (1) were not false or misleading when made and (2) are protected by the bespeaks caution doctrine.

      *a.*    *Counts I, III, and V fail to allege that the financial projections were false or misleading.*

Predictions of performance that are not worded as guarantees, like those in the Company's August 2021 presentation, are not actionable. *See FindWhat Investor Grp.. v. FindWhat.com*, 658 F.3d 1282, 1304 (11th Cir. 2011) ("Statements regarding future performance are actionable only if 'they are worded as guarantees or are supported by specific statements of fact or if the speaker does not genuinely or reasonably believe them.'" (quoting *SEC v. Merch. Capital, LLC*, 483 F.3d 747, 767 (11th Cir. 2007)); *see also Raab v. General Physics Corp.*, 4 F.3d 286, 290 (4th Cir. 2003).

Moreover, Plaintiffs fail to allege a single specific contemporaneous fact existing when the financial projections were made that would have shown that the estimates were in fact unattainable

---

[8] All capitalized terms not defined herein shall have the meaning ascribed in the Complaint.

and therefore *false when made*.  (Compl. ¶¶ 6-8, 13, 71.)  Instead, Plaintiffs simply speculate that because the Company later revised downward its projections following the SAFE investment, that the original projections *must* have been "false and misleading, and lack[ing] any reasonable basis." (*Id.* ¶ 71.)  That an earlier prediction may prove incorrect in hindsight does not establish that the prediction was false when it was made.  *See In re KLX, Inc. Sec. Litig.*, 232 F. Supp. 3d 1269, 1275 (S.D. Fla. 2017) (statement is actionable under Section 10(b) only if it is misleading "in the light of the facts existing at the time of the statement") (citations omitted).  This is not a case where Plaintiffs have alleged facts demonstrating that Defendants possessed information that did not support Defendants' opinions as articulated to investors.  Nor is "temporal proximity" between the statement and the downward revision sufficient to survive a motion to dismiss.  *In re Greenlane Holdings, Inc. Sec. Litig.*, 511 F. Supp. 3d 1283, 1312 (S.D. Fla. 2021).

Plaintiffs also fail to allege that any of the Company's *historical* financial data was inaccurate.  *See Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 869 (5th Cir. 2003) (stating that "a company's expressions of confidence in its management or business are not actionable" and noting that plaintiffs failed to allege "that any of the historical representations in [a central] press release were false").  For these reasons, the Court should dismiss Counts I, III, and V.

> b.   The Company's financial projections are protected by the "bespeaks caution" doctrine.

The Company's projections of revenue and earnings for fiscal year 2022 are also forward-looking statements that were "rendered immaterial by the accompanying cautionary language" under the judicially-created bespeaks caution doctrine.  *Merch. Cap.*, 483 F.3d at 767.[9]  Plaintiffs

---

[9] The bespeaks caution doctrine has a coextensive statutory equivalent in the PSLRA's Safe Harbor.  *See Merch. Cap.*, 483 F.3d at 767 n.18 (citing 15 U.S.C. § 78u–5); *see also Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1276 (11th Cir. 1999).  "[C]ourts have frequently interpreted the PSLRA Safe Harbor using 'bespeaks caution' decisions and standards as precedent, especially

complain that the Company's "relatively poor recent performance" was attributed, in part, "to an industry-wide decline," which ultimately resulted in the Company "fall[ing] far short of its own contemporaneous rosy projections." (Compl. ¶ 6.)  But the presentation containing the projections disclosed that those projections, along with other forward-looking statements, "involve known and unknown risks, uncertainties and other factors that may cause the actual results, performance or achievements to be materially different from those expressed or implied by the forward-looking statements." (Marder Decl., Ex. D at 3).)  Indeed, the August 2021 presentation made clear to Plaintiffs the specific factors that could cause the Company's revenue and earnings to differ materially from the financial projections.  (*Id.* at 3-4.)  The Company warned investors (including Plaintiffs) of "the risks of downturns and the possibility of rapid change in the highly competitive industry in which Parallel operates," as well as "the risk that Parallel and its current and future collaborators are unable to successfully develop and commercialize Parallel's products, brands or services, or experience significant delays in doing so," "risks inherent in businesses related to the agricultural industry," and "competition in the Florida and Massachusetts markets [that] may cause Parallel's business in such states to further decline below previously stated estimates." (*Id.*)  Under the bespeaks caution doctrine, these explicit cautionary warnings about the very risks that Plaintiffs allege came to pass render the Company's financial projections immaterial as a matter of law.  *See Ehlert v. Singer*, 245 F.3d 1313, 1320 (11th Cir. 2001) (finding cautionary language adequate where it was "closely related to the specific warning which plaintiffs assert should have been

---

as regards the safe harbor's 'cautionary statement' provision." *In re Sci. Atlanta, Inc. Sec. Litig.*, 754 F. Supp. 2d 1339, 1351 n.6 (N.D. Ga. 2010), *aff'd sub nom. Phillips v. Sci.-Atlanta, Inc.*, 489 F. App'x 339 (11th Cir. 2012) (citing cases).

given"); *see also Carvelli v. Ocwen Financial Corp.*, 2018 WL 4941110, at *5 (S.D. Fla. Apr. 30, 2018), *aff'd*, 934 F.3d 1307 (11th Cir. 2019) (statements concerning future economic performance "provided sufficient cautionary language to alert a reasonable investor, when making investment decisions, not to rely on [its] forward-looking representations" by listing "the many factors that could affect whether [the company's] actual results would diverge from [its] expectations"); *Garcia v. Santa Maria Resort, Inc.*, 528 F. Supp. 2d 1283, 1294 (S.D. Fla. 2007) ("predictions as to the future of the real estate market . . . cannot form the basis for a federal securities law claim" when "accompanied by explicit cautionary statements," including that purchaser shall have "no expectation of investment potential or deriv[e] any profit").

2.     Plaintiffs Fail to Adequately Allege a Material Misrepresentation Based on Assertions that the SAFE Funding Would be a "Bridge" to a Merger or Acquisition.

Plaintiffs next allege that Defendants promised the SAFE Plaintiffs that the funds raised by the SAFE would constitute "'bridge' capital to fund the Company's capital projects and operating expenses until the SPAC could close," when in reality "the Company actually intended to use the SAFE proceeds to pay looming debt obligations to other investors."  (Compl. ¶ 67.)

But the Risk Factors that the Company provided to Plaintiffs in connection with the SAFE Agreement *expressly disclosed* that "***[t]here can be no assurances that the SPAC Closing will occur***," and that the Company "***will have broad discretion in the use of the Company's cash, cash equivalents, and investments***."  (Marder Decl., Ex. C at 1-2 (emphasis in original).)  "Florida courts have made clear that no action for fraud in the inducement will lie where the alleged fraud contradicts the subsequent written contract."  *Eclipse Med., Inc. v. Am. Hydro-Surgical Instruments, Inc.*, 262 F. Supp. 2d 1334, 1342 (S.D. Fla. 1999), *aff'd*, 235 F.3d 1344 (11th Cir. 2000).  Here, even if Defendants had previously informed the SAFE Plaintiffs that the Company would use their investment to bridge the Company's operational expenses until a SPAC was

17

consummated, that statement would not be a material misrepresentation given the Company's disclosed cautionary language to the contrary. *Saltzberg v. TM Sterling/Austin Assocs., Ltd.*, 45 F.3d 399, 400 (11th Cir. 1995) ("When an offering document's projections are accompanied by meaningful cautionary statements and specific warnings of the risks involved, that language may be sufficient to render the alleged omissions or misrepresentations immaterial as a matter of law.").

Moreover, under both federal and Florida law, a misrepresentation must concern a statement of material *fact*. 17 C.F.R. § 240.10b-5(b); *Spitz v. Prudential-Bache Sec., Inc.*, 549 So. 2d 777, 778 (Fla. 4th DCA 1989). "[A]n action for fraud generally may not be predicated on . . . promises of future action, but rather must be based on a statement concerning a past or existing fact." *Mejia v. Jurich*, 781 So.2d 1175, 1177 (Fla. 3d DCA 2001). The only exception to this well-settled rule is "where the promise to perform a material matter in the future is made without any intention of performing . . . ." *Wadlington v. Cont'l Med. Servs., Inc.*, 907 So.2d 631, 632 (Fla. 4th DCA 2005). Thus, absent plausible and particularized allegations that Defendants *never intended* to use the SAFE investment for operational purposes (which the Complaint lacks), Plaintiffs' fraud theory regarding the SAFE being a "bridge" fails for this reason as well.

3. Plaintiffs Fail to Adequately Allege a Fraud Claim Based On Alleged Misrepresentations Regarding the Amount of SAFE Funding Secured

Plaintiffs further allege that Defendants misrepresented that they had secured $50 million total in SAFE funding, consisting of Plaintiffs' $25 million and an additional $25 million of funds. (Compl. ¶¶ 79, 111.) This allegation fails, however, because Plaintiffs acknowledge that Defendants' statement was *true*, given that ultimately $50 million in SAFE funding was received. (*Id*. (alleging that, on November 22, 2021, Wrigley provided $10.5 million in funding to the SAFE, thereby closing the shortfall needed for the SAFE to receive $50 million in funding).) Indeed, this fulfilled Wrigley's alleged promise to "commit $5 million" after Plaintiffs "insisted that he also

18

have some 'skin in the game.'" (*Id.* ¶¶ 5, 102.)  Moreover, as the Complaint alleges, the possibility that Wrigley himself would need to make up the difference was expressly disclosed to and admitted by Plaintiffs.  (*See id*. ¶ 79 ("Holmes and Whitcomb had raised, during the course of these discussions, that Wrigley might also serve as a backstop in the event that the Company was unable to obtain $50 million in commitments from outside investors[.]").)

Plaintiffs nonetheless complain that the "Securities Defendants took the SAFE Plaintiffs' funds on September 27, 2021," falling "short of its promised $50 million investment level" until November 2021, when Wrigley "made up the shortfall of more than $10 million." (Compl. ¶¶ 4(c), 5, 79, 102.)  But again, as Plaintiffs admit, Defendants *did* fulfill the "promised $50 million investment level." (*Id.* ¶¶5, 111.)  And nowhere do Plaintiffs allege that the "promised $50 million investment level" *was not a certainty* when Plaintiffs' investment was disbursed from escrow. (*Id.*)  Instead, Plaintiffs conclusorily assert that Defendants somehow misled them that the $50 million in funding "was a prerequisite to [Plaintiffs'] commitment" because the $50 million was *not formally in the SAFE account*. (*Id.* ¶ 79.)  Although Plaintiffs are entitled to their facts at the motion-to-dismiss phase, they are not entitled to mischaracterizations.  *See In re KLX, Inc. Sec. Litig.*, 232 F. Supp. 3d at 1276.  And, even if Plaintiffs were to allege that Defendants specifically promised that there was $50 million in actual funds in the SAFE's account, Plaintiffs fail to allege that this two-month delay in funding was material or caused loss.  *See OFI Asset Mgmt. v. Cooper Tire & Rubber*, 834 F.3d 481, 499 (3d Cir. 2016) ("One purpose of the [PSLRA] is to prevent disappointed investors from treating every imprecise statement during a transaction as an invitation to file a lawsuit.").

Plaintiffs further allege that "even with Wrigley's post-closing SAFE advance, the Company never had $50 million in capital to bridge to 2Q22, because Wrigley simply round-

tripped $3 million to an entity that he controlled, for his own benefit."  (Compl. ¶ 103.)  In particular, Plaintiffs allege that "the Company had used $3 million of the SAFE proceeds to make a payment back to Wrigley under the PE Fund Note" and that therefore, "Wrigley invested $10.5 million in the Company from one pocket (to artificially make it appear there was $50 million raised), but had taken $3 million back to put in another pocket."  (*Id.*)  But these allegations, at best, represent nothing more than Plaintiffs' dissatisfaction over how the Company *used* the money that Wrigley invested; indeed, Plaintiffs acknowledge that this $3 million was used to make a contractually required payment with respect to existing Company debt.  As explained above, Plaintiffs cannot premise a fraud claim based on the manner in which the Company used the funds from the SAFE, especially in light of the Risk Factors' disclosure expressly stating that management had "broad discretion" to use those funds.  (Marder Decl., Ex. C at 2.)

4.    Plaintiffs Fail to Adequately Allege a Material Omission as to Terms and Negotiation History of Certain Company Debt.

Plaintiffs make various allegations relating to the Company's negotiation of two debt deals—the PE Fund Notes and the Green Health Notes.  But nothing in Plaintiffs' allegations amounts to fraud.

For example, Plaintiffs allege that the Company "conducted no arm's length negotiation over the financing terms of the Green Health Notes, and failed to explore other financing options that might offer better terms."  (Compl. ¶ 45.)  Plaintiffs further allege that the terms of the Green Health Notes (which were subordinated to over $300 million of senior debt) were unfair to the Company because they carried 16% interest rates and were convertible to equity at a 2.5 rate.  (*Id.* ¶¶ 42, 44.)  Plaintiffs also attempt to allege some wrongdoing based on the fact that one of the Green Health Notes was issued with a maturity date prior to the date the notes were executed (*id.*

¶ 49), though this allegation is easily explained by the fact that the Company and Green Health issued a forbearance agreement that same day (*id*.).[10]

Likewise, Plaintiffs allege that the Company negotiated notes with PE Fund that contained an allegedly misguided "transaction fee" and an "exorbitant" 16% interest rate.  (Compl. ¶ 59.) Plaintiffs further allege that it was a "conflicted transaction," with Wrigley appearing on both sides of the transaction.  (*Id*. ¶ 62.)  The Complaint also alleges that the Company improperly used the PE Fund Notes to pay Bergmann as required under the terms of a settlement agreement, purportedly allowing Bergmann to "jump the line of priority" above holders of debt and preferred stock.  (*Id*.)

What these various allegations all have in common is that they concern the Company's management and business decisions, not fraudulent misstatements or omissions.  Thus, to the extent that Plaintiffs claim that these debt deals were improvidently negotiated, the result of corporate mismanagement or conflicted transactions, or bore commercially unfavorable terms, such a claim implicates, at most, fiduciary duties, and is insufficient to create Section 10(b) liability.  *Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 476 (1977) (a "breach of fiduciary duty by majority stockholders" does not constitute a violation of section 10(b) absent any allegations of misrepresentation or nondisclosure).  Nor can Plaintiffs convert a breach of fiduciary duty claim into a fraud claim by simply alleging a "failure to disclose possible corporate mismanagement."

---

[10] Plaintiffs' allegations with respect to the Green Health Notes are also contradictory.  On the one hand, Plaintiffs assert that Defendants engaged in fraud because "Wrigley had no expectation that the nominal 'debt' obligation would ever be repaid" and that the Green Health Notes were a sham to allow Green Health "to benefit from the relatively quick conversion of the Green Health Notes." (Compl. ¶ 51.)  But later in the Complaint, Plaintiffs accuse Defendants of allegedly concealing the fact that the Green Health Notes had *not* converted and were still debt.  (*Id*. ¶ 110.)  Plaintiffs cannot benefit from "confusing and contradictory" allegations.  *Gardner v. Bay Area Credit Servs., LLC*, 2015 WL 12838995, at *2 (M.D. Fla. June 26, 2015).

*Cutsforth v. Renschler*, 235 F. Supp. 2d 1216, 1242 (M.D. Fla. 2002); *Panter v. Marshall Field & Co.*, 646 F.2d 271, 288 (7th Cir. 1981); *In re United Telecommunications, Inc., Sec. Litig.*, 781 F. Supp. 696, 699 (D. Kan. 1991).[11]

        5.      <u>Plaintiffs Fail to Adequately Plead a Material Omission as to Alleged Defaults.</u>

Plaintiffs also attempt to assert an omission theory of liability based on Defendants' purported failure to disclose that the Company "was about to incur numerous additional defaults on its outstanding obligations." (Compl. ¶ 96.) This theory lacks merit for three independent reasons.

*First*, Plaintiffs fail to allege that any statement was *false when made*. The crux of Plaintiffs' omission theory is that, while negotiating the SAFE Agreement with Plaintiffs, the Individual Securities Defendants *knew* that the Company would default on certain debts. (*Id.* ¶ 99.) But this conclusion, which is based on "information and belief," is supported by no *particularized* facts, which is fatal to Plaintiffs' omission claim. *See Kadel v. Flood*, 427 F. App'x 778, 779 (11th Cir. 2011) (when "an allegation regarding the . . . omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed") (quoting 15 U.S.C. § 78u–4(b)(1)(B)). What remains is an impermissible theory of fraud-by-hindsight: that Defendants should have known that the Company would default on certain loans at some point in the future. *See Miyahira v. Vitacost.com, Inc.*, 2011 WL 13136262, at *12 (S.D. Fla. Dec. 8, 2011).

*Second*, Plaintiffs fail to allege facts showing that the omissions concerning the possibility of default were "misleading as to a material fact." *Basic Inc. v. Levinson*, 485 U.S. 224, 238 (1988).

---

[11] It is not surprising that Plaintiffs make these fiduciary duty-type arguments. Plaintiffs admit that they are concerned about these transactions not because of how they impact their status as SAFE investors (the proper subject of this action), but based on certain Plaintiffs' status as holders of "*existing* tranches of equity" (Compl. ¶ 44.)

Determining materiality in the securities fraud context "depends on the significance the reasonable investor would place on the withheld or misrepresented information." *Id.* at 240. The Complaint says little about the nature of the purported defaults; Plaintiffs instead merely allege that if the defaults were "honestly revealed," it "would have stopped [them] from investing $25 million in the SAFE." (Compl. ¶ 93.) Although Plaintiffs make this conclusory assertion of materiality, they fail to allege what the securities laws demand of them: concrete facts demonstrating that a reasonable investor "would attach importance to the fact . . . omitted in determining his course of action." *Merch. Cap.*, 483 F.3d at 766 (internal quotations omitted). For this reason, Plaintiffs' omission claim cannot stand.

*Third*, the alleged omission is inactionable because Plaintiffs did not have a duty to disclose it. Significantly, "[s]ilence, absent a duty to disclose, is not misleading under Rule 10b-5." *In re Galectin Therapeutics, Inc. Sec. Litig.*, 843 F.3d 1257, 1274 (11th Cir. 2016) (quoting *Basic*, 485 U.S. at 239 n.17). Indeed, "[s]ection 10(b) of the Exchange Act and Rule 10b-5(b) do not create an affirmative duty to disclose any and all material information." *Id.* Rather, a party must disclose only those facts "necessary in order to make[] statements made, in the light of the circumstances under which they were made, not misleading." *FindWhat Investor Grp.*, 658 F.3d at 1308 (quoting 17 C.F.R. § 240.10b-5(b)). Plaintiffs insist that the Securities Defendants' failure to disclose the defaults rendered the statements in the Risk Factors misleading. (Compl. ¶ 95.) In Plaintiffs' view, the Company's warnings that "there could be 'no assurance' that additional financing will be available to the Company . . . as applicable, on favorable terms or at all," and that "[t]he Company's debt could have important consequences to the Company" were rendered misleading by the failure to disclose the alleged defaults. (*Id.* ¶¶ 93-94.) But these statements in no way would suggest to a reasonable investor—and certainly not a sophisticated investor like the SAFE Plaintiffs—that a

23

default could not occur in the future.  These allegations thus do not create a duty to disclose.  *See*

*Cole v. Health Mgmt. Assocs., Inc.*, 2009 WL 2713178, at *5, *8 (M.D. Fla. July 17, 2009).

**B.**     **The Fraud Claims (Counts I-V) Must Also be Dismissed Because Plaintiffs Fail to Adequately Allege Reliance.**

Counts I-V also fail for the independent reason that Plaintiffs fail to adequately allege

reasonable or justifiable reliance on the Securities Defendants' alleged misrepresentations—a

necessary prerequisite under the federal securities law, Georgia securities law, and common law.

*Gochnauer v. A.G. Edwards & Sons, Inc.*, 810 F.2d 1042, 1047 (11th Cir. 1987) (reasonable

reliance element of Section 10(b) claim); *First Union Brokerage v. Milos*, 717 F. Supp. 1519, 1525

(S.D. Fla. 1989), *aff'd*, 997 F.2d 835 (11th Cir. 1993) (justifiable or reasonable reliance are

elements of 10(b) and common-law fraud claims); *Beranger v. Harris*, 2021 WL 4254940, at *4

(N.D. Ga. Feb. 12, 2021) (same as to Ga. Code § 10-5-50).

1.     Plaintiffs' Reliance Allegations Do Not Satisfy Rule 9(b).

"For each fraud claim, Plaintiffs must plead, with the specificity Rule 9(b) requires, 'actual

reliance' on a particular misrepresentation or omission that was 'justifiable,' *i.e.*, that Plaintiffs

could not discover the truth through their own reasonable diligence." *Fernau v. Enchante Beauty*

*Prod., Inc.*, 2020 WL 5371297, at *4 (S.D. Fla. Mar. 11, 2020) (citing *In re Sahlen & Assocs., Inc.*

*Sec. Litig.*, 773 F. Supp. 342, 352, 371 (S.D. Fla. 1991);  *HCM High Yield Opportunity Fund, LP*

*v. Skandinaviska Enskilda Banken AB*, 2001 WL 36186526, at *11 (S.D. Fla. Dec. 14, 2001)),

*report and recommendation adopted in relevant part*, 2020 WL 2569300 (S.D. Fla. May 21,

2020), *aff'd,* 847 F. App'x 612 (11th Cir. 2021).[12]

---

[12] In 2010, the Florida Supreme Court stated that "justifiable reliance" is not an element of a common law fraud claim.  *Butler v. Yusem*, 44 So. 3d 102, 105 (Fla. 2010).  However, state and federal courts post-*Butler* have continued to recognize that a fraud plaintiff must allege that he or she had a "right to rely" upon the representation and that such reliance was reasonable.  *See, e.g.*,

The Complaint's conclusory allegations fail woefully to meet this standard.  Plaintiffs' "justifiable reliance" allegations consist of two paragraphs which largely parrot the statutory and common law elements.  Specifically, Plaintiffs allege that they "believed and relied upon the false and misleading representations described above when entering into the SAFE investment." (Compl. ¶ 116.)  Plaintiffs further allege that:

> But for the misrepresentations and omissions committed by the Securities Defendants concerning the Company's capital structure, finances, level of SAFE investment, that the SAFE investment would bridge the Company's capital needs until the end of 2Q22, and the intended use of the SAFE proceeds, the SAFE Plaintiffs would not have agreed to enter into the SAFE.

(*Id.*)

With these allegations, Plaintiffs simply repeat their list of alleged misrepresentations and then state that they relied on those statements.  Courts in this Circuit have repeatedly rejected such conclusory allegations as failing to satisfy Rule 9(b).  *E.g.*, *Wilding v. DNC Servs. Corp.*, 941 F.3d 1116, 1128 (11th Cir. 2019) ("A bare allegation of reliance on alleged misrepresentations, bereft of any additional detail, will not suffice under Rule 9(b)."); *see also Scala v. Eisai, Inc.*, 2021 WL 5935588, at *4 (M.D. Fla. Dec. 14, 2021) (rejecting "conclusory statement that simply recites the element for reliance"); *Magnum Constr. Mgmt., LLC v. WSP USA Sols., Inc.*, 522 F. Supp. 3d 1202, 1209 (S.D. Fla. 2021).

Furthermore, Plaintiffs have not alleged that their reliance was reasonable or justifiable with the specificity required by Rule 9(b).  Plaintiffs' sole allegation on this front is that their reliance on the alleged misrepresentations was justified because Wrigley, Holmes, and Whitcomb were "officers of the Company" and thus "uniquely situated to know and understand the full picture of the Company's finances and prospects . . . ."  (Compl. ¶ 117.)  But simply pointing to a

---

*Affiliati Network, Inc. v. Wanamaker*, 847 F. App'x 583, 588 (11th Cir. 2021); *Billington v. Ginn-La Pine Island, Ltd., LLLP*, 192 So. 3d 77, 81 n.4 (Fla. 5th DCA 2016).

defendant's "position or status" does not satisfy a plaintiff's obligation to plead with particularity the diligence necessary to make reliance justifiable, and ignores the types of responsibility spheres and delegation that exist in companies. *Fernau*, 2020 WL 5371297, at *4 (dismissing complaint where reliance was pled by pointing to defendant's position as CEO, holding that "[i]f anything, Plaintiffs' allegations suggest that they attempted no due diligence simply because [he] was the CEO of the company").

2.   <u>Plaintiffs' Allegations of Reasonable Reliance are Foreclosed by the<br>SAFE Agreement's Non-Reliance Clause.</u>

Even putting aside the Complaint's pleading deficiencies, Plaintiffs cannot state a claim for fraud because they affirmatively represented, in the very agreement under which they seek damages, that they were ***not*** relying on those representations. Specifically, in executing the SAFE Agreement, each Plaintiff "represent[ed] and warrant[ed]" that "no representations or warranties have been made to [Plaintiff] other than pursuant to Section 3 hereof and that [Plaintiff] ***has not relied upon any representation or warranty in making or confirming [its] investment other than pursuant to Section 3 hereof.***" (Marder Decl. Exs. A, B at § 4(c) (emphasis added).) Each Plaintiff further acknowledged that the Company was relying upon this representation of non-reliance and promised to "notify the Company promptly" if that representation ceased to be true. (*Id*. § 4(d).)

Section 3 of the SAFE Agreement lists four warranties made by the Company, none of which is alleged to be false. (*Id*. § 3.) Rather, the various alleged misrepresentations in the Complaint all arise from alleged statements outside the four corners of the SAFE Agreement. Because the alleged misrepresentations are not found in Section 3 of the SAFE Agreement, Plaintiffs specifically disclaimed reliance on them and they cannot form the basis of Plaintiffs' fraud claims.

26

As explained below, whether applying federal securities law, Georgia securities law, or common law, courts uphold the common sense notion that a plaintiff cannot promise that he is not relying on a defendant's statements and then renege on that promise by suing for fraud.

        *a.     The Non-Reliance Clause Bars Plaintiffs' Securities Fraud Claims.*

First, the SAFE Plaintiffs' attestation that they were not relying on the alleged misrepresentations is fatal to their Section 10(b) federal securities claim.  Where a plaintiff promises in a contract that he "has not relied upon any . . . representations . . . or oral statements," he cannot thereafter state a claim under section 10(b) because "[n]o reliance could be reasonable in the face of this express statement." *Garcia*, 528 F. Supp. 2d at 1295 (dismissing complaint with prejudice).

The Court must hold the SAFE Plaintiffs—both of whom are sophisticated parties—to their word and enforce their written representation of non-reliance.  "Securities law does not permit a party to a stock transaction to disavow such representations—to say, in effect, 'I lied when I told you I wasn't relying on your prior statements' and then to seek damages for their contents." *Rissman v. Rissman*, 213 F.3d 381, 383 (7th Cir. 2000).  Observing that "[s]tock transactions would be impossibly uncertain if federal law precluded parties from agreeing to rely on the written word alone," Judge Easterbrook in *Rissman* held that "a written anti-reliance clause precludes any claim of deceit by prior representations."  *Id*. at 383-84.

The rule is the same in this Circuit.  *See, e.g.*, *Hall v. Coram Healthcare Corp.*, 157 F.3d 1286, 1288 (11th Cir. 1998) (where contract included statement that "no representations, warranties or inducements have been made to any party . . . other than the representations, warranties and covenants contained and memorialized in such documents," plaintiff's fraud claim

for damages was properly dismissed);[13] *Garcia*, 528 F. Supp. 2d at 1295; *c.f.*, *Khanimov v. St. Tropez II, LLC*, 2009 WL 10667414, at *3 (S.D. Fla. July 1, 2009) (dismissing federal cause of action requiring allegations of reasonable reliance where "Plaintiff's allegations that he relied on the representations of Defendant [we]re squarely contradicted by the Purchase Agreement," which contained a non-reliance clause); *Trilogy Properties LLC v. SB Hotel Assocs. LLC*, 2010 WL 7411912, at *9 (S.D. Fla. Dec. 23, 2010) (plaintiff cannot show reasonable reliance "if a contract states that the party cannot rely on previous assurances and representations").

Judge Tjoflat's concurrence in *Thompson v. RelationServe Media, Inc.*, 610 F.3d 628 (11th Cir. 2010), is instructive.  In *Thompson*, the district court dismissed a federal Section 10(b) securities fraud claim premised on the plaintiff's purchase of stock in a private offering, a dismissal the Eleventh Circuit affirmed.  The Eleventh Circuit also vacated and remanded the district court's denial of the defendants' motion for Rule 11 sanctions.  Notably, in his Concurrence, Judge Tjoflat concluded that the plaintiff's Section 10(b) claim was "so frivolous that the district court necessarily abused its discretion when it denied sanctions," and thus the Court of Appeals should have imposed sanctions on its own.  *Id.* at 677 (Tjoflat, J., concurring in part).  Specifically, Judge Tjoflat referenced the plaintiff's allegation that, to induce the plaintiff to acquire the stock, the defendants falsely represented that "the shares would be registered and could be quickly sold for a profit."  *Id.* at 678.  Judge Tjoflat reasoned "any argument that [plaintiff] justifiably relied on [this] misrepresentation [wa]s frivolous" in light of a provision in the stock purchase agreement that "no representations or warranties ha[d] been made to [plaintiff]" and that the plaintiff was "not relying on any information, other than that contained in the Offering documents."  *Id.*

---

[13] While the *Hall* court suggested that the outcome may be different had plaintiffs sought rescission rather than damages, the SAFE Plaintiffs have affirmed the contract and sued for damages only under Section 10(b).  (*See* Compl. ¶ 127.)

Judge Tjoflat's reasoning applies with equal force here, given the existence of an explicit non-reliance clause in the present case.  In light of Plaintiffs' contractual representations and warranties that they were not relying on any statements other than those in Section 3 of the SAFE Agreement, Plaintiffs' allegation that they "justifiably relied" on these alleged extra-contractual oral statements (Compl. ¶ 117) is frivolous and warrants dismissal of Plaintiffs' federal securities claims with prejudice.[14]

> b.    *The Non-Reliance Clause Also Bars Plaintiffs' Common Law Fraud Claim.*

Just like the SAFE Plaintiffs' securities fraud claims, the SAFE Plaintiffs' common law fraud claim fails because the SAFE Plaintiffs promised the Company that they were not relying on the same misrepresentations they now claim to have "justifiably relied" on.

Delaware law governs the question of the non-reliance clause's impact on that common law claim because each Plaintiff agreed that "[a]ll *rights and obligations* hereunder will be governed by the laws of the State of Delaware."  (Marder Decl. Exs. A, B at § 5(f) (emphasis added).)  *See Whitesell Corp. v. Whirlpool Corp.*, 2009 WL 3270265, at *2 (W.D. Mich. Oct. 5, 2009) (provision that contract "shall be governed in all respects, including validity, interpretation

---

[14] For the same reason, Plaintiffs' inability to plausibly allege justifiable reliance dooms their GUSA claim, which has "almost identical" elements to Section 10(b) claims.  *Beranger*, 2021 WL 4254940, at *4.  Indeed, while the Georgia Supreme Court held nearly 50 years ago that a non-reliance provision was insufficient to foreclose a claim under an *earlier* Georgia securities fraud statute, *see Meason v. Gilbert*, 226 S.E.2d 49, 50 (Ga. 1976), that statute was amended in 1973 to specifically add a reasonable reliance requirement, which remains an element of a GUSA claim. *Fernandez v. WebSingularity, Inc.*, 681 S.E.2d 717, 724 (Ga. Ct. App. 2009) (distinguishing *Meason* as relating to an earlier statute); *see also GunBroker.com, LLC v. Tenor Cap. Partners, LLC*, 2022 WL 103719, at *3 (N.D. Ga. Jan. 11, 2022) (justifiable reliance an element of GUSA claim).

29

and effect by the laws of Michigan" meant that Michigan law applied in interpreting effect of non-reliance provision).[15]

Under Delaware contract law, an unambiguous non-reliance clause like the one present in the SAFE Agreement unquestionably bars Plaintiffs' fraud claim. "The [Delaware] Court of Chancery has consistently held that sophisticated parties to negotiated commercial contracts may not reasonably rely on information that they contractually agreed did not form a part of the basis for their decision to contract." *H-M Wexford LLC v. Encorp, Inc.*, 832 A.2d 129, 142 n.18 (Del. Ch. 2003). In other words, "a party cannot promise, in a clear integration clause of a negotiated agreement, that it will not rely on promises and representations outside of the agreement and then shirk its own bargain in favor of a 'but we did rely on those other representations' fraudulent inducement claim." *Abry Partners V, L.P. v. F & W Acquisition LLC*, 891 A.2d 1032, 1057 (Del. Ch. 2006); *see also Great Lakes Chem. Corp. v. Pharmacia Corp.*, 788 A.2d 544, 556 (Del. Ch. 2001). Thus, in *In re Marine Energy Sys. Corp.*, 299 F. App'x 222 (4th Cir. 2008), while the plaintiff's fraud claims were substantively governed by South Carolina, the Fourth Circuit also analyzed under Delaware law whether a non-reliance clause barred the plaintiffs' fraud claims, because the agreement at issue provided that Delaware law governed "the construction, validity and interpretation of th[e] [a]greement." *Id.* at 228. The court held that the plaintiff could *not*

---

[15] Even if Florida law were held to govern the substantive elements of Plaintiffs' common law fraud claim, the impact of the non-reliance clause is a question of Delaware law. For example, in *Value Health Sols. Inc. v. Pharm. Rsch. Assocs., Inc.*, 2019 WL 6049988 (N.C. Super. Sept. 6, 2019), a North Carolina court was faced with a contract providing that "[t]his Agreement shall be governed by and construed and enforced in accordance with the internal laws of the State of Delaware." *Id.* at *5. The contract also contained a traditional "merger" clause stating that the contract encompassed the full agreement between the parties. *Id.* at *9. While the *Value Health* court concluded that, under North Carolina's choice of law rules, the plaintiff's fraud claim was governed by the substantive law of North Carolina, it recognized that because Delaware law "applies to the interpretation of the language of the contract at issue here," the enforceability and impact of the merger clause on the plaintiff's fraud claim was a matter of Delaware law. *Id.*

state a fraud claim, reasoning that because "plaintiff . . . contractually promised that it did not rely upon statements outside the contract's four corners in deciding to sign the contract, . . . Delaware courts would find that [it] could not justifiably rely on, and in fact had no right to rely on, any representations not contained in the [agreement] itself." *Id.* at 231.[16]  Based on the same reasoning, Plaintiffs' common law fraud claim must be dismissed.

### C.  The Fraud Claims (Counts I-V) Must Also Be Dismissed Because Plaintiffs Fail to Allege a Strong Inference of Scienter.

To survive dismissal, Plaintiffs must allege particularized facts demonstrating that each Defendant acted with the requisite scienter as to each claim.  *See FindWhat Investor Grp.*, 658 F.3d at 1296–97; *Thompson*, 610 F.3d at 634.  "Although factual allegations may be aggregated to infer scienter, scienter must be alleged with respect to each defendant and with respect to each alleged violation of the statute.  If these PSLRA pleading requirements are not satisfied, the court 'shall' dismiss the complaint.  15 U.S.C. § 78u–4(b)(3)(A)."  *FindWhat Investor Grp.*, 658 F. 3d at 1296–97 (11th Cir. 2011) (citing *Phillips v. Scientific-Atlanta, Inc.*, 374 F.3d 1015, 1016–18 (11th Cir. 2004)).

---

[16] Even if Florida law applies to the question of the impact of the non-reliance provision, Plaintiffs' fraud claims are still barred.  *See Fla. Holding 4800, LLC v. Lauderhill Mall Inv., LLC*, 317 So. 3d 121, 124 (Fla. 4th DCA 2021) (buyer's warranty that seller had not "made any representation or warranty [to] induce[] Buyer to execute this Contract" "clearly negate[d] Buyer's claims for damages, including the fraud claim"); *La Pesca Grande Charters, Inc. v. Moran*, 704 So. 2d 710, 712 n.1 (Fla. 5th DCA 1998) (under Florida law, contracting party "can agree by contract . . . to forego reliance on any prior false representation and limit his reliance to the representations that are expressly contained in the contract"); *Wisthle Inv. Grp., LLC v. CR Hancock Bridge, LLC*, 2009 WL 10670165, at *8 (M.D. Fla. Apr. 3, 2009); *c.f.*, *Weaver v. Opera Tower, LLC*, 2008 WL 4145520, at *2 (S.D. Fla. Aug. 1, 2008) (plaintiff could not establish "reasonable reliance" under false advertising statute given presence of non-reliance clause).  Thus, a provision "which expressly limits the universe of potential misrepresentations" will be upheld, especially here, where Plaintiffs acknowledged that the Company was itself relying on Plaintiffs' promise of non-reliance in agreeing to enter into the SAFE Agreement (*see* Marder Decl., Exs. A, B at § 4(d)). *Creative Am. Educ., LLC v. Learning Experience Sys., LLC*, 2015 WL 2218847, at *7 (S.D. Fla. May 11, 2015), *aff'd*, 668 F. App'x 883 (11th Cir. 2016) (plaintiff could not establish fraud in action seeking rescission of agreement in light of non-reliance clause).

31

As a threshold matter, the Complaint relies heavily on generic allegations that the Securities Defendants acted in unison, or made vague and generalized representations.  For instance, although Plaintiffs attribute certain statements to Individual Securities Defendants, including Whitcomb and Holmes, Plaintiffs bring Counts I, III, and V—the claims corresponding with a primary theory of liability for fraud—against "all Securities Defendants," without specifying what conduct each Defendant contributed to each claim.  This is quintessential shotgun pleading.  *See, e.g.*, *Weiland v. Palm Beach Cnty. Sheriff's Off.*, 792 F.3d 1313, 1325 (11th Cir. 2015) (holding that dismissal was warranted where, as here, it is "virtually impossible to know which allegations of fact are intended to support which claim(s) for relief") (citation omitted); *Yuanxiao Feng v. Walsh*, 2020 WL 5822420, at *12 (S.D. Fla. Sept. 14, 2020) *report and recommendation adopted*, 2020 WL 5819615 (S.D. Fla. Sept. 30, 2020) (dismissing securities fraud claims because complaint failed to provide details about "how each Defendant committed the alleged harm").  As demonstrated below, the Complaint's scienter allegations suffer from a number of additional deficiencies.

1.  <u>Plaintiffs Fail To Adequately Allege Scienter As To Their Federal Securities Law And Georgia Securities Law Claims.</u>

For a Rule 10b-5 violation, the required level of scienter is either "an intent to deceive, manipulate, or defraud" investors or "severe recklessness."  *Brophy v. Jiangbo Pharms. Inc.*, 781 F.3d 1296, 1302 (11th Cir. 2015).  "Severe recklessness is limited to those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable neglect but an extreme departure from the standards of ordinary care."  *Bryant*, 187 F.3d at 1282 n. 18 (quoting *McDonald v. Alan Bush Brokerage Co.*, 863 F.2d 809, 814 (11th Cir. 1989)).  The PSLRA requires plaintiffs to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  15 U.S.C. § 78u-4(b)(2).  This strong inference of scienter "must be more than merely 'reasonable' or 'permissible'—it must be cogent and compelling, thus strong

in light of other explanations." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007).  As the Eleventh Circuit has confirmed, this "strong inference" requirement is "stringent" and "difficult to meet." *Mizzaro*, 544 F.3d at 1257.  Additionally, the "complaint must allege facts supporting a strong inference of scienter for each defendant with respect to each violation." *Id.* at 1238; *see also Thorpe v. Inv. Walter Mgmt., Corp.*, 2014 WL 11961964, at *11 (S.D. Fla. Dec. 23, 2014).

The Georgia Court of Appeals has held that "Section 10-5-12(a)(2) [of the Georgia Securities Act] mirrors Rule 10b-5" and that it "requires a showing of scienter." *Patel v. Patel*, 761 F. Supp. 2d 1375, 1379-80 (N.D. Ga. 2011) (citing, inter alia, *Keogler v. Krasnoff*, 601 S.E.2d 788 (Ga. Ct. App. 2004)).  Specifically, plaintiffs asserting a claim under the Georgia Securities Act "face a heightened requirement to plead [scienter] with specificity." *Beranger*, 2021 WL 4254940, at *4 n.4.  As with federal securities law, Georgia securities law requires that a plaintiff allege "particular facts that give rise to a strong inference that the defendant acted in a severely reckless manner." *GCA Strategic Inv. Fund, Ltd. v. Joseph Charles & Assoc., Inc.*, 537 S.E.2d 677, 682 (Ga. Ct. App. 2000).

### a.    *Plaintiffs' conclusory scienter allegations are deficient.*

Fundamentally, a plaintiff must allege "particularized facts" that each defendant "intended to deceive shareholders or knew about or was severely reckless with respect to deficiencies in reporting." *Brophy*, 781 F.3d at 1303.  The same is true of the Georgia Securities Act—a "general averment of scienter clearly is deficient under Georgia law." *Brown v. J.P. Turner & Co.*, 2011 WL 1882522, at *4 (N.D. Ga. May 17, 2011).  Plaintiffs fail to meet this burden.

Plaintiffs' scienter section merely alleges in conclusory fashion that Defendants made misrepresentations "knowingly and intentionally."  (Compl. ¶ 118.)  This type of vague, generalized allegation of scienter fails under federal securities law. *See Garfield v. NDC Health*

*Corp.,* 466 F.3d 1255, 1265 (11th Cir. 2006) ("claims of securities fraud cannot rest on speculation and conclusory allegations"). Indeed, the Complaint is devoid of *particularized facts* demonstrating that each Defendant was consciously aware of the alleged misrepresentations or acted with intent to defraud Plaintiffs. By way of example, other than the conclusory allegation that the financial projections "lacked any reasonable basis" (Compl. ¶ 71), the Complaint "contains no relevant allegations—no reports (generated when or by whom), no conversations, no tips, no emails, no confidential witnesses—that indicate or even suggest that Defendants made any statements knowing them to be false." *In re KLX, Inc. Sec. Litig.*, 232 F. Supp. 3d at 1281. This is not enough to raise a strong inference of scienter under the PSLRA. *Id.* And because the Georgia Securities Act likewise requires particularized allegations of scienter, Count III fails for the same reasons. *See Beranger*, 2021 WL 4254940, at *4.

Plaintiffs' conclusory allegation that the "Securities Defendants had both motive and opportunity to deceive the SAFE Plaintiffs" because "[a]s officers of the Company, they stood to gain from successfully raising tens of millions of dollars with the SAFE" (Compl. ¶ 119) is similarly deficient. To begin with, the Eleventh Circuit has held that "allegations of motive and opportunity . . . without more, are not sufficient" to establish scienter. *Bryant*, 187 F.3d at 1285-86. But even if allegations of motive could contribute to a finding of scienter, the motive alleged by Plaintiffs here—the desire to secure funding for the Company without requiring any "expenditure in interest or repaid principal on the part of the Company" (Compl. ¶ 119)—is a generalized motive to raise equity shared by all companies and corporate officers and thus cannot establish scienter. *See City of Philadelphia v. Fleming Cos., Inc.*, 264 F.3d 1245, 1269 (10th Cir. 2001) ("generalized motives shared by all companies" are not "specifically and uniquely related" to the defendant and thus cannot establish a strong inference of scienter). Simply put, "[t]he desire

34

to make a company seem more profitable is a desire universally held among corporations and their executives, and thus insufficient to support an inference of scienter." *Jackson Inv. Grp., LLC v. Thomas*, 325 F. Supp. 3d 1334, 1352 (N.D. Ga. 2017) (quoting *Horizon Asset Mgmt. Inc. v. H & R Block, Inc.*, 580 F.3d 755, 766 (8th Cir. 2009)).

          b.     *Plaintiffs' scienter allegations against Whitcomb fail to meet the formidable requirements of scienter under both the PSLRA and the Georgia Securities Act.*

Plaintiffs fail to adequately allege scienter against Whitcomb. For starters, Plaintiffs suggest that Whitcomb's status as an "officer[]" of the Company—the Company's Chief Development Officer until November 19, 2021, when he was appointed CEO of the Company—imputes scienter to him. (Compl. ¶ 119; *see also id.* ¶ 27.) But it is black-letter law that allegations based on a defendant's position as a director or officer in a company are "at best speculative and conclusory" and "insufficient" to raise a strong inference of scienter. *City Pension Fund for Firefighters & Police Officers in City of Miami Beach v. Aracruz Cellulose S.A.*, 41 F. Supp. 3d 1369, 1407-08 (S.D. Fla. 2011) (declining to confer scienter on a defendant based on the "questionable premise[] that his position as CEO means he must have had detailed knowledge" of the alleged misrepresentations).

What remains are conclusory allegations about what Whitcomb "intended" to accomplish for the Company when he made certain alleged misrepresentations, and vague allegations about alleged misrepresentations that were "knowingly false," that Whitcomb "deliberately made," or that he made with "reckless[] disregard" for the truth. (Compl. ¶¶ 67, 70, 74, 80, 84, 117, 118, 124, 153.) Yet, Plaintiffs fail to allege any *particularized facts* about what Whitcomb actually knew, how he knew it, and when he knew it. Plaintiffs' speculative assertions are not enough. *See Feeney v. Mego Mortg. Corp.*, 45 F. Supp. 2d 1356, 1357 (N.D. Ga. 1999) ("Plaintiffs' unsupported allegations that defendants knew that the alleged statements were false when made or that

35

defendants 'must have known' the falsity of their statements because making false statements would have made it easier to obtain financing are not sufficient to meet the pleading requirements.").

                        *c.*      *Plaintiffs' scienter allegations against Wrigley fail to satisfy either the PSLRA or the Georgia Securities Act.*

Plaintiffs' allegations concerning Wrigley's scienter are deficient for similar reasons. Notably, the Complaint is devoid of allegations that Wrigley participated in *any* of the allegedly false or misleading statements cited in the Complaint. The only statements attributed to Wrigley are an email sent on his "behalf" to the Company's stakeholders revealing that the SPAC transaction was no longer on the table (Compl. ¶ 101), and Wrigley's "let[ting] slip" that he had not yet funded his SAFE commitment (*id.* ¶ 111)—neither of which is alleged to be false. Plaintiffs fail to allege that Wrigley was responsible for any alleged misrepresentations made by others, or would have known that those statements were untrue. Wrigley's supervisory authority in and of itself is insufficient to support a strong inference of scienter regarding statements made by others. *In re Smith Gardner Sec. Litig.*, 214 F. Supp. 2d 1291, 1303 (S.D. Fla. 2002).

As articulated above, Plaintiffs' assertions that Whitcomb and Wrigley, as officers, were "uniquely situated to know and understand the full picture of the Company's finances and prospects" (Compl. ¶ 117) are insufficient and untethered to any specific allegations of false or misleading statements. The allegation that "Wrigley in particular stood to gain" from the SAFE due to his indirect credit interests in the Company (*id.* ¶ 119) is nothing but an exaggeration of the "motive and opportunity" argument that the Eleventh Circuit has rejected time and again. Plaintiffs' further attempt to impute scienter to Wrigley on the basis of his own purported "extreme reluctance" to commit "even a tiny portion of his famous fortune to the SAFE (*id.* ¶ 5) is (in addition to improperly trying to impute liability and responsibility to another party simply due to

their financial status) contravened by the allegation that, despite promising to commit only $5 million to the SAFE, Wrigley instead ultimately funded $10.5 million (*id.*).

> d.     *Plaintiffs' scienter allegations against Holmes fail to satisfy either the PSLRA or the Georgia Securities Act.*

Similar to both Whitcomb and Wrigley, Plaintiffs' allegations concerning Holmes's scienter are woefully deficient under both the PSLRA and the Georgia Securities Act.  As with Whitcomb, the only real attempt to place scienter with Holmes is by alleging that Holmes was a director and officer of the Company and that he would benefit from the SAFE investment *in that capacity*.  As explained above, this simply is not enough.  *City Pension Fund for Firefighters & Police Officers in City of Miami Beach*, 41 F. Supp. 3d at 1408.  But, more troubling is Plaintiffs' suggestion that they need only take discovery to be able to adequately plead their case.  (Compl. ¶ 115 ("It is therefore particularly important that Plaintiffs take discovery from the Defendants to determine the full scale of the underlying scheme, as well as to be able to inform other investors (and potentially relevant authorities) so that all parties involved here have the best chance to recover the funds [that] they provided to the Company.")  *See Carter v. DeKalb Cty., Ga.*, 521 F. App'x 725, 728 (11th Cir. 2013) (affirming district court's dismissal of complaint with prejudice prior to discovery because "discovery *follows* 'the filing of a well-pleaded complaint.  It is not a device to enable the plaintiff to make a case when his complaint has failed to state a claim.'" (citation omitted)).

There simply are no allegations of *why* Holmes allegedly made the purported misleading statements sufficient to satisfy the PSLRA or the Georgia Securities Act.  As noted above:

> Although factual allegations may be aggregated to infer scienter, scienter must be alleged with respect to each defendant and with respect to each alleged violation of the statute.  *Phillips*, 374 F.3d at 1016–18.  If these PSLRA pleading requirements are not satisfied, the court 'shall' dismiss the complaint.   15 U.S.C. § 78u-4(b)(3)(A).

*FindWhat Inv'r Group*, 658 F.3d at 1296–97.  At best, Holmes was alleged to be an officer of the Company (Compl. ¶ 118) and Wrigley's "lieutenant" (*id.* ¶ 45).  The allegations regarding Holmes are then hopelessly intertwined with Whitcomb, leaving roughly four allegations against *just Holmes*.  (*Id.* ¶ 70 (sent initial draft of the SAFE); ¶ 76 (sent cap table re: SPAC); ¶ 77 ($50 million sufficient to fund company through 2022); ¶ 109 (did not disclose relation to Green Health Notes).)  However, there is no attempt to place scienter with respect to these four purported misrepresentations.  Therefore, under the PSLRA and the Georgia Securities Act, the securities claims and common law fraud claims against Holmes should be dismissed.

> e.    *Plaintiffs fail to raise a strong inference of scienter against the Company under both the PSLRA and the Georgia Securities Act.*

Because corporations "have no state of mind of their own," courts must "look to the state of mind of the individual corporate official or officials who make or issue the statement (or order or approve it or its making or issuance, or who furnish information or language for inclusion therein, or the like)." *Mizzaro*, 544 F.3d at 1254 (quoting *Southland Secs. Corp. v. INSpire Ins. Sols., Inc.*, 365 F.3d 353, 366 (5th Cir. 2004)). Under the *Mizzaro* standard, a plaintiff does not adequately plead a strong inference of corporate scienter unless there is a single natural person who both "must have known about the fraud" and is "responsible for the allegedly misleading statements." *Id.* (emphasis omitted).  For the reasons outlined above, Plaintiffs fail to allege scienter as to the Individual Securities Defendants.  Nor do Plaintiffs allege that scienter could be imputed to the Company from another person not named as a defendant in the Complaint. Accordingly, the Complaint fails to raise a strong inference of scienter against the Company.  *See Mulvaney v. GEO Grp., Inc.*, 237 F. Supp. 3d 1308, 1325 (S.D. Fla. 2017) (concluding where complaint fails to sufficiently plead scienter as to any corporate directors or officers, complaint fails to plead scienter as to corporation).

2.    Plaintiffs Fail To Adequately Allege Scienter As To Their Common Law
Fraud Claim Under Florida Law.

The scienter requirement under Florida common law claim is only slightly less stringent than that under federal and Georgia securities law.  To allege fraud under Florida law, Plaintiffs must allege facts demonstrating "the representor's knowledge that the representation is false." *Butler v. Yusem*, 44 So. 3d 102, 105 (Fla. 2010).   Plaintiffs may establish scienter by showing that the representation was made: (1) "with actual knowledge of its falsity"; (2) "without knowledge either of its truth or falsity"; or (3) "under circumstances in which the person making it ought to have known, if he did not know, of its falsity." *Bankers Life Ins. Co. v. Credit Suisse First Boston Corp.*, 2008 WL 1817294, at *5 (M.D. Fla. Apr. 22, 2008) (citing *Parker v. State of Fla. Bd. of Regents*, 724 So. 2d 163, 168 (Fla. 1st DCA 1998)).   Critically, Plaintiffs must "provide factual support" to establish scienter with respect to a claim for common law fraud under Florida law, and "conclusory statements alone will not withstand a 12(b)(6) motion to dismiss." *Id.*

Here, for the same reasons described above in connection with the securities fraud claims, the Complaint's paltry scienter allegations fail to satisfy the scienter element under Florida common law.  *See Fernau*, 2020 WL 5371297, at *5–6 (plaintiffs' conclusory allegation that defendant "knew of the 'poor financial performance' and 'poor and deteriorating financial condition of Enchante, but did not disclose it to the Plaintiffs,' does not satisfy Rule 9(b).").

**D.    Plaintiffs Fail To Adequately Allege Control Liability Against the Individual Securities Defendants.**

Plaintiffs assert a claim for control liability under Section 20(a) of the Securities Exchange Act (Count II) and Section 10-5-58(g) of the Georgia Securities Act (Count IV) against the Individual Securities Defendants.   Georgia's control liability provision mirrors federal law. *See Curry v. TD Ameritrade, Inc.*, 662 F. App'x 769, 772 n.5 (11th Cir. 2016) (Georgia statute's

control liability provisions are "nearly identical to the federal statute").[17]  For the reasons stated below, Plaintiffs fail to allege a cognizable theory of secondary liability against the Individual Securities Defendants.

At the outset, Plaintiffs' control liability claims fail because Plaintiffs do not adequately allege a primary violation under either the Securities Exchange Act (Count I) or the Georgia Securities Act (Count III).  Indeed, Plaintiffs' failure to allege a primary violation under federal securities law compels dismissal of their federal control person claim.  *See Mizzaro*, 544 F.3d at 1237 ("Because a primary violation of the securities laws is an essential element of a § 20(a) derivative claim . . . a plaintiff adequately pleads a § 20(a) claim only if the primary violation is adequately pleaded."); *Mulvaney*, 237 F. Supp. 3d at 1326 ("Because Plaintiffs fail to plead a primary violation of Section 10(b) of the Exchange Act, Plaintiffs do not plead a violation of Section 20(a).").  Likewise, because Plaintiffs have not adequately alleged a primary violation under Georgia securities law, their Georgia control person claim necessarily fails.  *See Barron v. Lampley*, 2015 WL 12591006, at *18 (N.D. Ga. June 22, 2015) ("Plaintiffs also may not sustain a claim under O.C.G.A. § 10-5-58(g) without first establishing liability under O.C.G.A. § 10-5-58(b)."); *Scott v. Vantage Corp.*, 845 F. App'x 170, 179–80 (3d Cir. 2021) (where the company did not commit a primary violation of either federal or Georgia securities law, there was "no basis to

---

[17] As part of their control liability claim under Georgia securities law, Plaintiffs conclusorily allege that "[t]he SAFE Plaintiffs bring this cause of action pursuant to Section 10-5-58(g) of the Georgia Code against Wrigley, Holmes, and Whitcomb.  The SAFE Plaintiffs are not required to allege that Wrigley, Holmes, and Whitcomb acted with scienter or fraudulent intent."  (Compl. ¶ 143.) That is not the law; in fact, this reading has been expressly *rejected* by a federal court sitting in Georgia.  *See Zimmerman v. Matson Money, Inc.*, 2021 WL 6113659, at *9 (N.D. Ga. June 9, 2021) (dismissing control liability claim under Georgia law because "Plaintiffs have not alleged anything more to demonstrate that Matson Money materially aided Defendants in their illegal activity or had the requisite scienter to state a claim for relief under Georgia law") (quoting *Patel*, 761 F. Supp. 2d at 1379 ("Georgia law requires a showing of scienter to state a claim for relief" for Georgia Securities Act violations)).

40

conclude [that the individual defendant] was a 'control person' liable under the federal or state securities laws").

Regardless, the control liability claims must be dismissed because the Complaint fails to make particularized allegations that the Individual Securities Defendants asserted the requisite level of control over the Company.  Instead, the Complaint makes conclusory allegations that the Individual Securities Defendants "participated in calls, written communications, and other aspects of the transactions" and "had significant day-to-day involvement in the operations of the Company and in particular the transactions at issue here" (Compl. ¶ 131 (federal control claim)), and that the Individual Securities Defendants "participated in and materially aided the misstatements and omissions," "had direct and supervisory involvement in the SAFE investment," and "had the ability to influence and direct and did so influence and direct the activities of the Company" (Compl. ¶ 146 (Georgia control claim)).  Plaintiffs must do more than restate a legal conclusion of control.  *See In re Smith Barney Transfer Agent Litig.*, 884 F. Supp. 2d 152, 166 (S.D.N.Y. 2012) ("[C]onclusory allegations of control are insufficient as a matter of law."); *Zimmerman*, 2021 WL 6113659, at *9 ("Plaintiffs['] mere conclusions that Matson Money materially aided the others cannot be accepted by this Court, and the claim for relief under § 10-5-58(g)(4) must be dismissed.").

Plaintiffs also make the conclusory statement that "[b]y reason of their positions of control and authority as officers . . . of the Company, Wrigley, Holmes, and Whitcomb had the power and authority to cause the Company to engage in the conduct complained of herein" (Compl. ¶ 145; *see also id.* ¶ 131.)  But "[a] defendant is not subject to control person liability simply because he is an officer or director of a corporation."  *Tippens v. Round Island Plantation L.L.C.*, 2009 WL 2365347, at *10 (S.D. Fla. July 31, 2009) ("Plaintiffs' factual allegations do not support such a

showing [of control].  Plaintiffs make a few bare assertions, for example, that [the individual defendant] was 'a top-level executive,' 'had the power to control and influence the actions' of the [company], and 'caused [his] company to engage in the acts and omissions' constituting securities fraud.").  Moreover, by improperly lumping all of the Individual Securities Defendants together, the Complaint necessarily fails to allege specific facts sufficient to establish that any one of them effectively "controlled" the Company with respect to the alleged "primary violation" or "acted recklessly in failing to do what [they] could have done to prevent the violation."  *Laperriere v. Vesta Ins. Grp., Inc.*, 526 F.3d 715, 725 (11th Cir. 2008) (citation omitted).

### E.     Techview's Sixth Cause of Action for Violation of GUVTA Fails.

Count VI alleges a violation of Section 18-2-74 of the GUVTA on behalf of Plaintiff Techview against all Defendants.  (Compl. ¶¶ 158-164.)  Plaintiffs appear to challenge two types of transactions with respect to the PE Fund Note, the Green Health Note, and the Bergmann Debts[18] (together, the "Challenged Debts"): (1) the incurrence of obligations, *i.e.*, the Challenged Debts; and (2) the subsequent transfers to PE Fund, Green Health, and Bergmann.  (*See id.* ¶¶ 160–161.)

Count VI is legally unsound for numerous reasons.  First, Plaintiffs have not alleged facts to bring their claim inside this Court's subject-matter jurisdiction.  Second, Whitcomb, Holmes, and Wrigley are not proper defendants.  Third, Plaintiffs lack standing to challenge the Company's incurrence of obligations.  Fourth, Plaintiffs have failed to adequately allege actual fraudulent intent attending the Company's transfer of assets.  Fifth, Count VI is barred by the *Rooker-*

---

[18] The Complaint uses the term "Bergmann Debts."  This term is not explicitly defined, but it appears to refer to payment obligations incurred as a result of the January 1, 2021 Settlement Agreement, which includes the contemporaneously executed Negotiable Subordinated Promissory Note between SH Parent, Inc. and Surterra Holdings, Inc. and Bergmann.  (Marder Decl., Ex. H (Promissory Note).)

*Feldman* doctrine.  Sixth, Plaintiffs fail to adequately allege constructive fraudulent transfer.

          1.     The Court Lacks Subject-Matter Jurisdiction.

Acknowledging that Green Health, PE Fund, and Bergmann played no role in the SAFE and that the loans at issue predated the SAFE Agreement by months, Techview attempts to avail itself of this Court's jurisdiction through unrelated claims brought by unrelated plaintiffs.  Because Plaintiffs provide no basis for subject-matter jurisdiction over Count VI, this Court *must* dismiss that cause of action, as well as Plaintiff Techview and Defendants Green Health, PE Fund, and Bergmann, without considering the merits of the claim or the sufficiency of the pleading.  Fed. R. Civ. P. 12(h)(3) ("If the court determines at any time that it lacks subject-matter jurisdiction, the court *must* dismiss the action.") (emphasis added).

Contrary to Plaintiffs' assertion (Compl. ¶ 29), Count VI does not fall within this Court's supplemental jurisdiction.  "In deciding whether a state law claim is part of the same case or controversy as a federal issue," courts in this Circuit must examine "whether the claims arise from the same facts, or involve similar occurrences, witnesses or evidence." *Hudson v. Delta Air Lines*, Inc., 90 F.3d 451, 455 (11th Cir. 1996).  Plaintiffs' causes of action arising under original federal jurisdiction, Counts I and II, are not of the same case or controversy as the state law cause of action in Count VI.  Tellingly, Counts I and II (brought by the SAFE Plaintiffs) do not share a single plaintiff with Count VI (brought only by Techview).  Three of the eight defendants in Count VI (PE Fund, Green Health, and Bergmann) are not named in any other Count; one other (Whitcomb) is not alleged to have participated in any of the events underlying Count VI (and should therefore be dismissed from Count VI for that reason).  Moreover, the incurrences challenged in Count VI all occurred months before the SAFE marketing process even began, and the payments made were contractually required—not merely permissive.  In sum, the inquiry as to whether certain Defendants made transfers with the intent to defraud the Company's creditors is dependent on

43

wholly different evidence from the inquiry into whether *other* Defendants made false or misleading statements of material fact in connection with the SAFE.[19]

        2.    <u>Whitcomb, Holmes, and Wrigley are Not Proper Defendants to a GUVTA Claim Because They Neither Transferred Nor Received Assets.</u>

Plaintiffs do not adequately plead a GUVTA claim against Whitcomb, Holmes, and Wrigley, none of whom are alleged to be transferors or transferees of any of the allegedly voidable transfers. *See Atlanta Fiberglass USA, LLC v. KPI, Co.*, 911 F. Supp. 2d 1247, 1264 (N.D. Ga. 2012) (individual owners of transferor were not proper defendants in GUVTA claim because they were neither "debtors" nor "transferees of the property that allegedly was fraudulently conveyed"); *RES-GA YPL, LLC v. Rowland*, 798 S.E.2d 315, 321-22 (Ga. Ct. App. 2017) (affirming dismissal of a fraudulent transfer claim against a debtors' relatives and their companies, despite allegations that they jointly participated in the debtor's fraudulent scheme, because they were not debtors themselves and did not receive any interests in the transferred property).

        3.    <u>Techview Fails to Adequately Allege Standing as to the Challenged Obligations.</u>

Plaintiffs have also failed to demonstrate a cognizable injury-in-fact that would grant Techview standing to challenge the Company's incurrence of obligations under the PE Fund Note, Green Health Notes, and Bergmann Debts. The irreducible minimum required by the Constitution for a plaintiff to proceed in federal court requires three things: "(1) an injury in fact, (2) a traceable connection between the injury and the complained-of conduct, and (3) redressability." *Lichtman v. Litvin Law Firm P.C.*, 2014 WL 1230724, at *3 (S.D. Fla. Mar. 25, 2014) (citing *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 102 (1998)).

---

[19] Even if the Court finds that supplemental jurisdiction exists over Count VI, it should decline to exercise that jurisdiction here. *See, e.g.*, 28 U.S.C. § 1367(c); *Palmer v. Hosp. Auth. of Randolph Cnty.*, 22 F.3d 1559, 1569 (11th Cir. 1994).

The incurrence of obligations under the Challenged Debts did not transfer any assets; thus, the pool of Parallel's assets available to Techview remain undiminished unless and until Parallel transferred funds on account of these obligations, which Plaintiffs have not alleged.  *See Korth v. Luther*, 935 N.W.2d 220, 241 (Neb. 2019) ("A transfer of property in which the debtor has no equity cannot be the subject of a fraudulent transfer action because the creditors cannot show they would have received anything by avoiding the transfer and were injured thereby.").  Techview has not and cannot allege other indirect harms to its interests, such as a reduction in the value of its lien or a lowered chance of recovery, as it has not alleged that any of the challenged obligations gave PE Fund, Green Health, or Bergmann a security interest senior to Techview's own, or otherwise compromised Techview's interests.  Indeed, Techview has not alleged that any of the obligations besides the Green Health Notes are even secured.  Techview does not have standing to sue on behalf of those absent entities, and cannot claim to litigate derivatively on behalf of Parallel, as would be required to invoke standing based on its preferred stock holdings; nor is it a receiver or trustee acting on behalf of the whole body of Parallel's creditors.  Put another way, Techview has no claim the Court can redress—if Parallel was no longer obliged to certain Defendants on account of the PE Fund Note, Green Health Notes, or Bergmann Debts, Techview's priority claim on Parallel's assets would not improve.

        4.    <u>Techview Has Failed to Adequately Allege Actual Fraudulent Intent as to the Challenged Transfers</u>

Because Section 18-2-74(a)(1) is premised on allegations of *actual intent* to hinder, delay, or defraud, it is subject to Rule 9(b)'s heightened pleading standard for claims of intentional fraud. Plaintiffs fail to plead any voidable transfer claims with requisite particularity.  With the exception of a $6 million payment to Bergmann "[o]n or about January 8, 2021" (Compl. ¶ 55), the Complaint fails to allege with the requisite specificity "the exact date on which the transfers

occurred, the exact dollar amount that cleared, and the method used, wire transfer, check, etc." *Kipperman v. Onex Corp.*, 2007 WL 2872463, at *7 (N.D. Ga. Sept. 26, 2007); *see also* O.C.G.A. § 18-2-74.[20]  In fact, Plaintiffs have failed to allege that any payments have been made toward the Green Health Notes; to the extent conversion of such Notes to preferred equity would evince a "transfer," the Complaint characterizes the harm from such a putative conversion as a "wound Wrigley inflicted on all existing stockholders" (Compl. ¶ 44)—that is, a harm that can be remedied only in a derivative suit, not a direct suit by a single shareholder.  The only transfer the Company is alleged to have made on account of the PE Fund Note is the $3 million payment that Plaintiffs mischaracterize as "round-tripping."  *See* Section IV.A.3, *supra*.

Plaintiffs' imagined "badges of fraud" surrounding the two challenged transfers—the $6 million Bergmann payment and the $3 million PE Fund payment—are too vaguely described to satisfy Rule 9(b).  For example, the Complaint alleges, without elaboration, that Wrigley "controlled" PE Fund, such that a transfer to PE Fund was tantamount to a transfer to Wrigley, a Company insider; it baselessly modifies the GUVTA definition of insolvency as an inability to pay debts "from operations" alone; it fails to identify the "substantial debts" after which each transfer was allegedly made; and it claims a lack of reasonably equivalent value "as alleged herein," without citing to even one paragraph that shows as much.  (Compl. ¶¶ 162-163.)

5.   The GUVTA Claim Relating to the Bergmann Debts Should Be Dismissed Under the *Rooker-Feldman* Doctrine.

This Court should also abstain from exercising jurisdiction over the GUVTA claim under the *Rooker-Feldman* doctrine, which provides that this Court "has no authority to review final judgments of a state court in judicial proceedings." *D.C. Ct. of Appeals v. Feldman*, 460 U.S. 462,

---

[20] Plaintiffs' idle observation that $16 million was "presumably paid to Bergmann in June 2021" (Compl. ¶ 61) is far too speculative to credit on a motion to dismiss.  Plaintiffs do not even claim information and belief that this alleged payment was made.

482 (1983).  The law of this circuit is clear:  the *Rooker-Feldman* doctrine applies not only to claims "presented or adjudicated by a state court, but also to claims that are 'inextricably intertwined' with a state court judgment."  *Goodman ex rel. Goodman v. Sipos*, 259 F.3d 1327, 1332 (11th Cir. 2001) (quoting *Siegel v. LePore*, 234 F.3d 1163, 1172 (11th Cir. 2000) (en banc)).  "A claim is inextricably intertwined if it would 'effectively nullify' the state court judgment."  *Casale v. Tillman*, 558 F.3d 1258, 1260 (11th Cir. 2009); *see also Staley v. Ledbetter*, 837 F.2d 1016 (11th Cir. 1988) (applying *Rooker-Feldman* doctrine to § 1983 suit seeking to collaterally attack divorce decree); *In re Thorlton*, 2020 WL 6019696, at \*5 (Bankr. M.D. Fla. Sept. 23, 2020) (applying *Rooker-Feldman* doctrine to suit challenging final judgment in foreclosure action where plaintiff asserted that signature on underlying note documents had been forged, noting that forgery claim was inextricably intertwined with foreclosure judgment).

Plaintiffs frame their request for relief as voiding the Bergmann Debts, but those debts are part of a settlement between Bergmann and the Company.  Indeed, through Count VI, Plaintiffs ask this Court to void the Bergmann Settlement that resolved Bergmann's litigation against the Company in the Delaware Court of Chancery.  The Bergmann Note was entered contemporaneously with the Bergmann Settlement, and the Bergmann Debts (comprised of both the debt obligation in the Note and the payments required by the Settlement itself) represent the main piece of consideration[21] that Bergmann received in exchange for his dismissal of his appraisal claim against the Company.  (Compl. ¶¶ 54-56.)  Because the Bergmann Debts are inextricably intertwined with the Bergmann Settlement, voiding the debts will necessarily require voiding the entire settlement between Bergmann and the Company.  Unwinding the settlement means that this

---

[21] Beyond the exchange of the Company's payment obligations for Bergmann's dismissal, the parties also exchanged mutual releases.  Bergmann also transferred to the Company his common stock at issue in the Bergmann Litigation.

Court would have to undo the Delaware Court of Chancery's entry of a dismissal with prejudice of the Bergmann Litigation.[22]

Plaintiffs will likely argue that they are not seeking to disturb either the entire Bergmann Settlement or the orders of the Delaware state courts and are merely seeking a run-of-the-mill ruling voiding the Company's transfers and debt obligations to Bergmann. But if this Court were to invalidate only the Bergmann Debts and nothing else, then Bergmann would have to return the funds that the Company already paid to him under the settlement, and the Company would not have any obligation to make further payments to him. Yet, Bergmann's release of the Company, his transfer of common stock to the Company, and his dismissal of the Bergmann Litigation with prejudice would all remain in effect. In other words, as a result of its alleged violation of the GUVTA, the Company would be freed from having to pay tens of millions of dollars to Bergmann under the settlement, they would not face any risk of judgment in the Bergmann Litigation, and they would retain Bergmann's shares. Bergmann would be left with nothing—a startlingly inequitable result. This cannot plausibly be the outcome were Plaintiffs to succeed on Count VI. Instead, were this Court to invalidate the most significant piece of consideration supporting the Bergmann Settlement, then the entire settlement would have to be invalidated. *Cf. Balooshi v. GVP Glob. Corp.*, 2022 WL 576819, at *11 (Del. Super. Ct. Feb. 25, 2022) (where a "contract's illegal terms are so central to the parties' agreement . . . , then the contract is void despite any lawful terms expressed therein" (internal quotation marks omitted)); *cf. also* O.C.G.A. § 13-3-45 ("If the consideration is illegal in whole or in part, the whole promise fails."); *Starr v. Robinson*, 351 S.E.2d 238, 240 (Ga. Ct. App. 1986) (invalidating entire contract where a portion of

---

[22] The Company, Whitcomb, and Holmes do not join any argument which purports to speculate as to the legal effect on the Bergmann Settlement of any hypothetical order of the Court.

consideration was found to be illegal); *Hanley v. Savannah Bank & Tr. Co.*, 68 S.E.2d 581, 582-83 (Ga. 1952) ("The contract alleged and relied upon in this case was supported in part by a consideration which was illegal and void, as against public policy, and the contract is therefore unenforceable.").  In order to invalidate the entire Bergmann Settlement, this Court would have to also invalidate the final judgment of the Delaware Court of Chancery dismissing the Bergmann Litigation with prejudice.

Not only does Count VI implicate the final judgment in the Bergmann Litigation, but it also conflicts with Bergmann's pending lawsuit against the Company in Delaware Superior Court seeking an entry of judgment on the Bergmann Note.  (Marder Decl., Ex. J (Letter Notice of Entry of Judgment).)  That suit has been pending since March 1, 2022—a week before Plaintiffs filed the instant case.  The Delaware court is currently considering the Company's objections to the entry of judgment.  (Marder Decl., Ex. K (Docket Report).)  Here, Plaintiffs seek to collaterally attack and effectively nullify the Delaware courts' final judgment in the Bergmann Litigation.  Under the *Rooker-Feldman* doctrine, this Court cannot do so.

Simply put, Plaintiffs' Count VI is an improper attempt to collaterally attack the judgment of the Delaware courts.  For that reason, this Court should dismiss the GUVTA claim for lack of jurisdiction under the *Rooker-Feldman* doctrine.

6.   <u>Plaintiffs Fail To Allege A Constructive Fraud Theory As to the Bergmann Debts.</u>

To void a transfer for constructive fraud under Georgia law, a plaintiff must demonstrate that the debtor did not "receiv[e] a reasonably equivalent value in exchange for the transfer or obligation" and that the debtor was either insolvent at the time or became insolvent as a result of the transfer.  O.C.G.A. §§ 18-2-74(a)(2), 18-2-75.

Plaintiffs fail to adequately allege that the Company received a reasonably equivalent value in exchange for the Bergmann Debts.  Instead, Plaintiffs merely assert a legal conclusion, copying the language from the statute without attempting to allege any factual allegations to support that conclusion.  (Compl. ¶ 163 ("[N]or did the Company receive reasonably equivalent value from Bergmann in exchange for the Company's commitments or transfers made pursuant to the Bergmann Debts.").)  In fact, the Complaint does not allege *anything* about what Bergmann provided to the Company in exchange for the Bergmann Debts.  (*Id.* ¶¶ 53-57.)  Plaintiffs only describe the obligations that the Company incurred and state that those obligations resolved the dispute over the value of Bergmann's common stock.  (*Id.*)[23]  Without any substantive allegations showing that the Company did not receive a reasonably equivalent value for the Bergmann Debts, Count VI should be dismissed.  *Diverse Power, Inc.*, 934 F.3d at 1273.

## V.    CONCLUSION

For all of the foregoing reasons, Defendants respectfully request the Court dismiss Plaintiffs' Complaint with prejudice.

---

[23] Plaintiffs' allegations—*i.e.*, that the Bergmann Debts were incurred in order to resolve the Bergmann Litigation concerning the value of Bergmann's stock (Compl. ¶¶ 54-55)—actually suggest that the Company *did* receive consideration of a reasonably equivalent value.  In exchange for the Bergmann Debts, Bergmann agreed to dismiss the Bergmann Litigation with prejudice.  (*See* Marder Decl., Exs. F, H.)  Nothing in the Complaint provides any basis to think that the settlement of the Bergmann Litigation was unreasonable, inflated in value, or reached for any reason other than the resolution of a disputed claim.  To the contrary, when two adverse parties settle a case following more than a year of contentious litigation and discovery, the reasonable inference is that the settlement terms are fair and reasonable, such that they include an exchange of consideration of reasonably equivalent value.  *Cf. Ruderman ex rel. Schwartz v. Washington Nat'l Ins. Co.*, 2010 WL 11505859, at *3 (S.D. Fla. Aug. 27, 2010) (noting the presumption in class-action lawsuits that settlements resulting from "arm's length negotiations between experienced counsel after significant discovery has occurred" are "fair and reasonable"). (*See also* Marder Decl., Ex. F (reflecting litigation and discovery disputes in Bergmann Litigation).)

Date:   June 21, 2022

### SAUL EWING ARNSTEIN & LEHR LLP


By:     */s/ Steven M. Dickstein*
        **Jeffrey Gilbert**
        Florida Bar No. 375411
        **Steven M. Dickstein**
        Florida Bar No. 1010439
        Jeffrey.Gilbert@saul.com
        Steven.Dickstein@saul.com
        701 Brickell Avenue, 17th Floor
        Miami, Florida 33131
        305-428-4552


### AKIN GUMP STRAUSS HAUER & FLED LLP


By:     */s/ Neal R. Marder*
        Neal Ross Marder (*pro hac vice*)
        nmarder@akingump.com
        Joshua A. Rubin (*pro hac vice*)
        rubinj@akingump.com
        Sina S. Safvati (*pro hac vice*)
        ssafvati@akingump.com
        1999 Avenue of the Stars, Suite 600
        Los Angeles, CA 90067
        310-229-1000

        Stephanie Lindemuth (*pro hac vice*)
        slindemuth@akingump.com
        One Bryant Park
        Bank of America Tower
        New York, NY 10036
        212-872-7491

        ***Attorneys for Defendants SH Parent Inc.
        d/b/a Parallel, Surterra Holdings Inc., and
        James Whitcomb***

51

**MARCUS NEIMAN**
**RASHBAUM & PINEIRO LLP**


By:    */s/ Jeffrey E. Marcus*
       Jeffrey E. Marcus, Esq.
       Florida Bar No. 310890
       jmarcus@mnrlawfirm.com
       Jason L. Mays, Esq.
       Florida Bar No. 106495
       jmays@mnrlawfirm.com
       2 S. Biscayne Blvd., Suite 2530
       Miami, Florida 33131
       Tel: (305) 400-4262
       Fax: (954) 688-2492


**WILLKIE FARR & GALLAGHER LLP**


By:    */s/ Sameer Nitanand Advani*
       Sameer Nitanand Advani (*pro hac vice*)
       sadvani@willkie.com
       Brittany M. Wagonheim (*pro hac vice*)
       bwagonheim@willkie.com
       787 Seventh Avenue
       New York, NY  10019-6099
       212-728-8587

       Craig C. Martin (*pro hac vice*)
       cmartin@willkie.com
       Aaron J. Hersh (*pro hac vice*)
       ahersh@willkie.com

       300 North LaSalle Drive
       Chicago, IL 60654
       312-728-9000

       ***Attorneys for Defendants William Wrigley Jr., Green Health Endeavors, LLC and PE Fund LP***

**AKERMAN LLP**


By:    */s/ Zachary Ryan Kobrin*
       Zachary Ryan Kobrin
       zackary.kobrin@akerman.com
       Nicole Villamar
       nicole.villamar@akerman.com
       201 E. Las Olas Boulevard
       Suite 1800
       Fort Lauderdale, FL  33131
       954-759-8967

       Jonathan Seth Robbins
       jonathan.robbins@akerman.com
       Las Olas Centre
       350 E. Las Olas Boulevard
       Suite 1600
       Fort Lauderdale, FL  33301-0006
       954-463-2700

       CAPLAN COBB
       Sarah Brewerton-Palmer (*pro hac vice*)
       spalmer@caplancobb.com
       Michael A. Caplan (*pro hac* vice)
       mcaplan@caplancobb.com
       75 Fourteenth Street NE
       Suite 2700
       Atlanta, GA  30309
       404-596-5600

       ***Attorneys for Defendant Robert Bergmann***

53

**ZEBERSKY PAYNE SHAW LEWENZ LLP**


By:      */s/ Jordan Alexander Shaw*
         Jordan Alexander Shaw (FBN 111771)
         jshaw@zpllp.com
         Zachary Dean Ludens (FBN 111620)
         zludens@zpllp.com
         110 Southeast 6th Street
         Suite 2900
         Fort Lauderdale, FL  33301
         954-595-6075

         ***Attorneys for Defendant James Holmes***