**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**West Palm Beach Division**

TRADEINVEST ASSET MANAGEMENT
COMPANY (BVI) LTD., FIRST OCEAN
ENTERPRISES SA, and TECHVIEW
INVESTMENTS, LTD.,

      Plaintiffs,

v.                              Case No.  9:22-cv-80360

WILLIAM "BEAU" WRIGLEY, JR.,
JAMES HOLMES, JAMES WHITCOMB,
SH PARENT INC.  d/b/a PARALLEL,
SURTERRA HOLDINGS, INC., GREEN
HEALTH ENDEAVORS, LLC, PE FUND
LP, and ROBERT "JAKE" BERGMANN,

      Defendants.

_____

**DEFENDANTS' REPLY IN SUPPORT OF THEIR**
**<u>MOTION TO DISMISS PLAINTIFFS' COMPLAINT (D.E. 59)</u>**

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................................. 1

ARGUMENT ....................................................................................................................... 2

I.     THE COURT SHOULD DISMISS THE FRAUD CLAIMS (COUNTS I, III, AND V) ....... 2

   A.  Plaintiffs Fail to Allege a Material Misrepresentation. .......................................... 2

      1.  Plaintiffs Fail to Allege a Misrepresentation Based on Projected Revenue
          and EBITDA Figures. ........................................................................................ 2

      2.  Plaintiffs Fail to Allege a Misrepresentation Based on Representations
          that the SAFE Would Be a "Bridge" to a SPAC Merger or Acquisition. ........ 5

      3.  Plaintiffs Fail to Allege a Misrepresentation Based on Wrigley's SAFE Investment ....... 7

      4.  Plaintiffs Fail to Allege a Misrepresentation Based on Statements
          Regarding the Company's Debts. ...................................................................... 8

   B.  Plaintiffs Fail To Adequately Allege Reasonable Reliance. ................................. 10

      1.  Plaintiffs' Conclusory Reliance Allegations Are Deficient. ............................ 10

      2.  Plaintiffs Cannot Overcome Their Unambiguous Promise of Non-Reliance ............ 11

         a.  The Non-Reliance Clause Means What It Says: Plaintiffs Promised
             They Were Not Relying on Representations Outside of Section 3 ........................... 11

         b.  The Non-Reliance Clause Is Enforceable. ................................................ 13

            (1)  The Clause Is Enforceable Under Federal Securities Law. ............................... 13

            (2)  The Clause Is Enforceable Under the Georgia Securities Statute. ...................... 15

            (3)  The Clause Is Enforceable Under Common Law. ................................................ 16

         c.  Plaintiffs Do Not Allege that Any of the Representations in Section 3
             of the SAFE Were False. ............................................................................ 17

   C.  Plaintiffs Fail to Allege a Strong Inference of Scienter. ..................................... 18

II.    PLAINTIFFS' CONTROL PERSON CLAIMS SHOULD BE DISMISSED ................... 21

i

III.    Plaintiffs' Georgia Uniform Voidable Transfer Act Claim  Should Be Dismissed........... 22

   A. Plaintiffs Have Not Adequately Alleged Any Basis for Subject-Matter
       Jurisdiction over Their GUVTA Claims. ............................................................................ 22

   B. Plaintiffs Have Failed to State a Claim under GUVTA. .................................................... 22

   CONCLUSION ........................................................................................................................... 25

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Abry Partners V, L.P. v. F & W Acquisition LLC*,
    891 A.2d 1032 (Del. Ch. 2006)......................................................................11, 13, 17

*Akzo Nobel Coatings, Inc. v. Auto Paint & Supply of Lakeland, Inc.*,
    2010 WL 2821950 (M.D. Fla. July 16, 2010) ............................................................6

*Asphalt Paving Sys., Inc. v. S. States Pavement Markings, Inc.*,
    2018 WL 3067906 (M.D. Fla. Feb. 20, 2018) ..........................................................22

*Atlanta Fiberglass USA, LLC v. KPI, Co.*,
    911 F. Supp. 2d 1247 (N.D. Ga. 2012) ....................................................................23

*In re ATM Fin. Servs., LLC*,
    2011 WL 2604247 (Bankr. M.D. Fla. June 21, 2011) ..............................................25

*Beranger v. Harris*,
    2019 WL 2718975 (N.D. Ga. June 4, 2019) ............................................................16

*Beranger v. Harris*,
    2021 WL 4254940 (N.D. Ga. Feb. 12, 2021) ..........................................................16

*Broad v. Rockwell Int'l Corp.*,
    642 F. 2d 929 (5th Cir. 1981) ............................................................................19, 20

*Brophy v. Jiangbo Pharms. Inc.*,
    781 F.3d 1296 (11th Cir. 2015) ...............................................................................21

*Bruschi v. Brown*,
    876 F.2d 1526 (11th Cir. 1989) ..........................................................................14, 15

*In re Carnival Corp. Sec. Litig.*,
    2021 WL 2583113 (S.D. Fla. May 28, 2021) ............................................................3

*City Pension Fund for Firefighters & Police Officers in City of Miami Beach*,
    41 F. Supp. 3d 1369, 1408 (S.D. Fla. 2011) .......................................................19, 20

*Condra v. PXRE Grp. Ltd.*,
    357 F. App'x 393 (2d Cir. 2009) .............................................................................18

*Cutsforth v. Renschler*,
    235 F. Supp. 2d 1216 (M.D. Fla. 2002)....................................................................3

*Eclipse Medical, Inc. v. Am. Hydro-Surgical Instr., Inc.*,
262 F. Supp. 2d 1334 (S.D. Fla. 1999) ...................................................................5

*In re Facebook, Inc. IPO Sec. and Derivative Litig.*,
986 F. Supp. 2d 487 (S.D.N.Y. 2013).....................................................................4

*Feldman v. Kritch*,
824 So. 2d 274 (Fla. 4th DCA 2002) ....................................................................11

*Fernau v. Enchante Beauty Prods., Inc.*,
2020 WL 2569300 (S.D. Fla. May 21, 2020) ..................................................10, 11

*In re Fundamental Long Term Care, Inc.*,
873 F.3d 1325 (11th Cir. 2017) ......................................................................24, 25

*Garcia v. Santa Maria Resort*,
528 F. Supp. 2d 1283 (S.D. Fla. 2007) ................................................................15

*Hall v. Coram Healthcare Corp.*,
157 F.3d 1286 (11th Cir. 1998) ...........................................................................14

*Hall v. United Ins. Co. of Am.*,
367 F.3d 1255 (11th Cir. 2004) ...........................................................................24

*Harborview Master Fund, LP v. Lightpath Techs., Inc.*,
601 F. Supp. 2d 537 (S.D.N.Y. 2009)...................................................................13

*Harris v. Ivax Corp.*,
182 F.3d 799 (11th Cir. 1999) ...............................................................................4

*Hemenway v. Bartoletta*,
2012 WL 1252691 (M.D. Fla. Apr. 13, 2012) .......................................................14

*Hubbard v. BankAtlantic Bancorp, Inc.*,
625 F. Supp. 2d 1267 (S.D. Fla. 2008) ...........................................................19, 20

*Keogler v. Krasnoff*,
601 S.E.2d 788 (Ga. Ct. App. 2004) .....................................................................16

*Kipperman v. Onex Corp.*,
411 B.R. 805 (N.D. Ga. 2009) .............................................................................24

*In re KLX, Inc. Sec. Litig.*,
232 F. Supp. 3d 1269 (S.D. Fla. 2017) ...................................................................6

*Kronenberg v. Katz*,
872 A.2d 568 (Del. Ch. 2004)........................................................................13, 16

iv

*Kuhn v. Thompson*,
   304 F. Supp. 2d 1313 (M.D. Ala. 2004) ...................................................................17

*Laperriere v. Vesta Ins. Grp., Inc.*,
   526 F.3d 715 (11th Cir. 2008) ................................................................................22

*Lariosa v. C & R Pallets Corp.*,
   2018 WL 3883170 (S.D. Fla. Jan. 4, 2018) ...........................................................22

*In re Mako Surgical Corp. Sec. Litig.*,
   2013 WL 2145661 (S.D. Fla. May 15, 2013) ...........................................................5

*Meide v. Pulse Evolution Corp.*,
   2020 WL 5350325 (M.D. Fla. Sept. 4, 2020) ...........................................................6

*Miyahira v Vitacost.com*,
   2011 WL 13136262 (S.D. Fla. Dec. 8, 2011) ...........................................................9

*O'Brien v. Progressive N. Ins. Co.*,
   785 A.2d 281 (Del. 2001) .......................................................................................12

*Progressive Int'l Corp. v. E.I. Du Pont de Nemours & Co.*,
   2002 WL 1558382 (Del. Ch. July 9, 2002) .............................................................13

*In re PXRE Grp., Ltd., Sec. Litig.*,
   600 F. Supp. 2d 510 (S.D.N.Y.) .............................................................................18

*Quail Cruises Ship Mgmt., Ltd. v. Agencia de Viagens CVC Tur Limitada*,
   847 F. Supp. 2d 1333 (S.D. Fla. 2012) ...................................................................14

*Rolling Greens MHP, L.P. v. Comcast SCH Holdings L.L.C.*,
   374 F.3d 1020 (11th Cir. 2004) ..............................................................................22

*Sale v. Ferrari Fin. Servs., Inc.*,
   2020 WL 5750502 (S.D. Fla. Sept. 25, 2020) ........................................................25

*SEC v. Kirkland*,
   521 F. Supp. 2d 1281 (M.D. Fla. 2007) ....................................................................3

*SEC v. Tecumseh Holdings Corp.*,
   765 F. Supp. 2d 340 (S.D.N.Y. 2011) .......................................................................3

*In re Stone & Webster, Inc., Sec. Litig.*,
   414 F.3d 187 (1st Cir. 2005) ................................................................................6, 7

*Strategic Diversity, Inc. v. Alchemix Corp.*,
   666 F.3d 1197 (9th Cir. 2012) ................................................................................10

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007)............................................................................................2

*Thompson v. RelationServe Media, Inc.*,
  610 F.3d 628 (11th Cir. 2010) .........................................................................15

*Twombly. Am. Dental Ass'n v. Cigna Corp.*,
  605 F.3d 1283 (11th Cir. 2010) .......................................................................10

*In re UTStarcom, Inc. Sec. Litig.*,
  617 F. Supp. 2d 964 (N.D. Cal. 2009) ...............................................................3

*Wadlington v. Cont'l Med. Servs., Inc.*,
  907 So.2d 631 (Fla. 4th DCA 2005)....................................................................6

*In re Winn-Dixie Stores, Inc. Sec. Litig.*,
  531 F. Supp. 2d 1334 (M.D. Fla. 2007)...............................................................6

*Xerion Partners, I LLC v. Resurgence Asset Mgmt., LLC*,
  474 F. Supp. 2d 505 (S.D.N.Y. 2007).................................................................3

*Zimmerman v. Matson Money, Inc.*,
  2021 WL 6113659 (N.D. Ga. June 9, 2021) .....................................................16

**Statutes**

8 Del. C. § 262 ........................................................................................................24

15 U.S.C. § 78cc(a) .................................................................................................13

15 U.S.C. § 78u-4(b) ................................................................................................2

O.C.G.A. § 10-5-50 .................................................................................................16

O.C.G.A. § 10-5-58 ...........................................................................................15, 16

O.C.G.A. § 10-5-58(b) .......................................................................................15, 16

O.C.G.A. § 18-2-74(a)(2) .........................................................................................24

O.C.G.A. § 18-2-75 ..................................................................................................24

**Other Authorities**

17 CFR § 240.10b-5 .......................................................................................13, 14, 15

Fed. R. Civ. P. 9(b) ...........................................................................................6, 11

## INTRODUCTION

Plaintiffs are sophisticated institutional investors who made an informed decision to invest in a private Company[1] in the volatile cannabis industry that has seen industry-wide decline. The Opposition confirms that—rather than accept the downside of their risk—Plaintiffs filed this action to jump the line in the waterfall and squeeze money from a Company that faces difficulty. This attempt fails. Plaintiffs' Complaint falls far short of alleging claims of securities fraud, common law fraud, or voidable transfers. Accordingly, the Complaint should be dismissed with prejudice.

Plaintiffs' Opposition is premised on trumped up alleged misrepresentations that, when carefully scrutinized, amount to nothing more than non-actionable predictions about financial performance or how long the SAFE funds would last. And the admitted *warnings* Plaintiffs received about Company debt in the SAFE documents are not rendered misleading by the Company's alleged failure to "disclose" entirely unrelated loans or hypothetical future accusations of defaults by creditors. Equally baseless is the claim that Defendants' alleged promise that Wrigley would serve as a "back-stop" if funding did not reach $50 million constitutes fraud merely because of the timing of Wrigley's transfer of funds.

Nor can Plaintiffs adequately allege reliance. Despite Plaintiffs' efforts to flip the narrative, it is undisputable that Plaintiffs themselves expressly *represented and warranted* that they were not making their investment in reliance on *any* statements other than certain express representations and warranties within the four corners of the SAFE Agreement, none of which constitute the alleged misrepresentations that make up their claims. Nor does Plaintiffs' inapposite authority—much of which does not even concern non-reliance clauses—permit Plaintiffs to walk back their unambiguous, written promises.

---

[1] All capitalized terms not otherwise defined here shall have the definitions ascribed them in the Motion.

Equally deficient are Plaintiffs' scienter allegations that continue to parrot the elements they must plausibly allege, and rely on cookie-cutter "motive and opportunity" allegations that could apply to virtually every company or corporate officer in the nation.  The cursory attention to Plaintiffs' control-person claims further reveals that those claims are deficient for the reasons identified in the Motion.  Finally, the GUVTA claim fails because this Court lacks jurisdiction to resolve it and because Plaintiffs have failed to plead a GUVTA claim on the merits.

## ARGUMENT

## I.    THE COURT SHOULD DISMISS THE FRAUD CLAIMS (COUNTS I, III, AND V)

### A.    Plaintiffs Fail to Allege a Material Misrepresentation.

Plaintiffs begin by accusing Defendants of "address[ing] each [alleged misrepresentation] in isolation" (Opp. at 15), but this misconstrues Defendants' arguments and Plaintiffs' burden.  The PSLRA requires that Plaintiffs "(1) specify each statement alleged to have been misleading and the reason or reasons why the statement is misleading, and (2) state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 321 (2007) (quoting 15 U.S.C. § 78u-4(b)).  Whether evaluated in isolation or collectively, Plaintiffs' allegations fail to state a claim for securities fraud.

### 1.    Plaintiffs Fail to Allege a Misrepresentation Based on Projected Revenue and EBITDA Figures.

In their Opposition, Plaintiffs continue to insist that Defendants' August 2021 revenue and EBITDA projections were materially misleading.  (Opp. at 15-17.)  Plaintiffs are wrong.

*First*, Plaintiffs contend that the discrepancy between the Company's August 2021 financial projections for fiscal year 2022 and the Company's adjusted projections in October 2021 and January 2022 shows that the former was "baseless speculation, not protected prediction." (*Id.* at 15).  But as explained in the Motion, Plaintiffs cannot allege an actionable misrepresentation

merely because later conditions required the Company to modify its forecasted performance. (Mot. at 14-15).  Plaintiffs cannot base a fraud claim solely on "[t]he fact that in hindsight [a] projection turned out to be wrong[.]"  *In re Carnival Corp. Sec. Litig.*, 2021 WL 2583113, at *13 (S.D. Fla. May 28, 2021) (citation omitted).

*Second*, Plaintiffs' assertion that the Company's August 2021 financial projections were unreasonable in light of its alleged "finances and concealed inability to meet such obligations as the Bergmann Debts" also misses the mark.  (Opp. at 16.)  As explained below in Section I.A.4, Plaintiffs' allegations that the Company was unable to pay the Bergmann Debts are baseless.  But, in any event, Plaintiffs fail to explain how any alleged non-disclosure of *debts or defaults* by the Company renders forecasts of *revenue* and *EBITDA* misleading.  Indeed, a company's debt is not built into its revenue or EBITDA.  *Cf. Xerion Partners, I LLC v. Resurgence Asset Mgmt., LLC*, 474 F. Supp. 2d 505, 518 (S.D.N.Y. 2007) ("There is nothing inherently improper . . . about reporting a positive EBITDA while simultaneously reporting a net loss.").  Thus, Plaintiffs fail "to raise issues of fact as to Defendants' bases, if any, for the revenue and EBITDA claims."  (Opp. at 16); *see also Cutsforth v. Renschler*, 235 F. Supp. 2d 1216, 1229 (M.D. Fla. 2002) (no fraud where "alleged merger problems have no relationship to the revenues expected to be generated . . .").[2]

---

[2] The cases on which Plaintiffs rely are therefore distinguishable because unlike here, they concern alleged misrepresentations *directly related* to financial projections.  *See In re UTStarcom, Inc. Sec. Litig.*, 617 F. Supp. 2d 964, 971-72 (N.D. Cal. 2009) (projections actionable where "Defendants continued to issue guidance projections throughout 2004, based on demand for existing" products and new products even though "demand for its products was actually declining"); *SEC v. Tecumseh Holdings Corp.*, 765 F. Supp. 2d 340, 350 (S.D.N.Y. 2011) (projections actionable where "projected *profits* of almost $8.3 million for the fiscal year ending August 31, 2002" when the company "was operating at a *loss*" the year before) (emphasis added);  *SEC v. Kirkland*, 521 F. Supp. 2d 1281, 1300 (M.D. Fla. 2007) (projections actionable where "[d]espite the dismal rental records at all of his developments, [defendant] never adjusted the projected cash returns that were based on a 95% occupancy level, and he continued to represent to investors that units were renting quickly and that investors were making great profits").

*Third*, Plaintiffs argue that the bespeaks caution doctrine is inapplicable because Defendants' warnings of risks had already materialized on August 4, 2021—the date of the SPAC presentation—given the "reduced projected revenues by well over $100 million only weeks later in October 2021." (Opp. at 17.) But this simply repackages the untenable theory of fraud by hindsight; indeed, the bespeaks caution doctrine would be meaningless if plaintiffs could, using 20-20 hindsight, point to *future* failures to meet predictions as evidence that those predictions were baseless *when made*. And Plaintiffs fail to allege particularized facts showing that, in August 2021, the risks had materialized in the form of *lost revenue or EBITDA*, as opposed to increased debt or speculative defaults. *Compare In re Facebook, Inc. IPO Sec. and Derivative Litig.*, 986 F. Supp. 2d 487, 516 (S.D.N.Y. 2013) ("Facebook's Registration Statement did not disclose that increased mobile usage and the Company's product decisions had already had a negative impact on the Company's revenues and revenue growth. The Company's purported risk warnings misleadingly represented that this revenue cut was merely possible when, in fact, it had already materialized.").

Plaintiffs' argument that the bespeaks caution doctrine fails because Defendants' cautionary language did not "identify language . . . alerting investors to a swift and sudden collapse in vital Company metrics" also misstates the law. (Opp. at 17.) Forward-looking statements are protected "when an investor has been warned of risks of a significance similar to that actually realized," and this "does not require a listing of *all* factors." *Harris v. Ivax Corp.*, 182 F.3d 799, 807 (11th Cir. 1999). Plaintiffs were "warned of risks of a significance similar to that actually realized" when the August 2021 presentation expressly warned Plaintiffs of "the risks of downturns and the possibility of rapid change in the highly competitive industry in which Parallel operates," as well as "the risk that Parallel and its current and future collaborators are unable to successfully develop and commercialize Parallel's products, brands or services, or experience significant delays

4

in doing so." (Marder Decl., Ex. D at 3.)  Plaintiffs were also warned that the Company had nearly

$350 million in debt that could negatively impact its operations through the detailed risk factors

that were provided to Plaintiffs in connection with the SAFE Agreement.   (*See* Marder Decl., Ex.

C).  Such meaningful cautionary language forecloses liability under the bespeaks caution doctrine

as a matter of law.  *See In re Mako Surgical Corp. Sec. Litig.*, 2013 WL 2145661, at *7 (S.D. Fla.

May 15, 2013) (cautionary language sufficient where it "warned investors of precisely what

happened here: that projected system sales and procedures might be lower than projected due to

the economic downturn, variable sales, and a reluctance . . . to adopt the new technology").

> 2.  Plaintiffs Fail to Allege a Misrepresentation Based on Representations that the SAFE Would Be a "Bridge" to a SPAC Merger or Acquisition.

As previously demonstrated, Plaintiffs fail to allege any misrepresentations that the SAFE

funding would be used to fund "capital projects and operating expenses." (Mot. at 17.)[3]  No matter

how many times Plaintiffs incorrectly label Defendants' routine debt payments as "Ponzi-like"

(Opp. at 19, 23), they cannot overcome the fact that the Company had *complete discretion* over

how the SAFE funds would be used, as made clear by the lack of any use restriction in the SAFE

documents.  (Marder Decl., Ex. C at 1-2.)[4]  Plaintiffs also do not dispute that a promise of future

performance *cannot* constitute fraud without allegations that a defendant never intended to perform

---

[3] Plaintiffs wrongly contend that "Defendants do not even address the separate misrepresentations" concerning the use of the funds to bridge operating expenses until a private acquisition.  (Opp. at 17.)  As Defendants explained, the Company's alleged statements that it would use the SAFE proceeds to bridge operating expenses (whether to a SPAC closing *or* a private sale) were not false or, at worst, rendered immaterial by the statement in the SPAC documents that it "will have broad discretion in the use of the Company's cash, cash equivalents, and investments."  (Mot. at 17.)

[4] Plaintiffs cite *Eclipse Medical, Inc. v. Am. Hydro-Surgical Instr., Inc.*, 262 F. Supp. 2d 1334 (S.D. Fla. 1999), for the proposition that a disclosure must "'specifically contradict[]' an alleged misrepresentation to render it inactionable."  (Opp. at 18.)  While the *Eclipse* court observed that the disclosures had "specifically contradict[ed]" the alleged misrepresentation, it did not limit its holding to those instances and observed that "fraudulent inducement claims will fail even where the subsequent contract simply says nothing about the allegedly false promise."  *Id.* at 1342.

(Opp. at 19). And notably, Plaintiffs do not point to any facts plausibly suggesting that Defendants never intended to use the SAFE funds for operational expenses.[5]

Instead, Plaintiffs pivot to the theory that Defendants falsely represented that "the SAFE funding was sufficient for Company needs." (Opp. at 18.) But the Opposition and the Complaint are devoid of any well-pled factual allegations that this alleged prediction was false *at the time it was made*. *See In re KLX, Inc. Sec. Litig.*, 232 F. Supp. 3d 1269, 1275 (S.D. Fla. 2017). Instead, the Complaint only states the unsupported legal conclusion that Holmes and Whitcomb "had no reasonable basis to claim the SAFE would bridge the Company until a private sale. They were merely spinning a new yarn to obtain badly-needed cash under false and fraudulent pretenses." (Compl. ¶ 74.) Moreover, even if Plaintiffs had adequately alleged that Holmes and Whitcomb were "[]aware of the Company's debt situation," which they have not, that would in no way suggest that Defendants' alleged predictions about how long funds would last were false when made in the absence of any particularized allegations giving rise to a strong inference that the "debt situation" rendered it impossible that the funds would last through the second quarter of 2022. *In re Winn-Dixie Stores, Inc. Sec. Litig.*, 531 F. Supp. 2d 1334, 1348 (M.D. Fla. 2007) (statements about ultimately unsuccessful reform efforts not fraudulent). And, no such allegations exist.

Lastly, a prediction as to how long a set amount of funding will last is precisely the type of forward-looking statement that is not actionable under the securities laws. (Mot. at 15-17.) Plaintiffs cite *In re Stone & Webster, Inc., Sec. Litig.*, 414 F.3d 187 (1st Cir. 2005) for the

---

[5] Plaintiffs cite *Wadlington v. Cont'l Med. Servs., Inc.*, 907 So.2d 631 (Fla. 4th DCA 2005) for the proposition that "the plain allegation that a defendant had 'no intent' to perform a promise of future action" is sufficient to survive a motion to dismiss. While this may be true in state court, Plaintiffs elected to sue in federal court, where a recitation of the elements is insufficient and where Plaintiffs must satisfy both Rule 9(b) and the PSLRA. *See, e.g.*, *Akzo Nobel Coatings, Inc. v. Auto Paint & Supply of Lakeland, Inc.*, 2010 WL 2821950, at *3 (M.D. Fla. July 16, 2010); *Meide v. Pulse Evolution Corp.*, 2020 WL 5350325, at *16 n.10 (M.D. Fla. Sept. 4, 2020).

proposition that statements regarding a company's "present access to funds sufficient to meet anticipated future needs" is not forward-looking. (Opp. at 18.)  But that case supports Defendants' position, because it distinguished a situation where there was a "contention that the defendants were underestimating the amount of their future cash needs" (which is forward-looking) versus a claim that the defendants lied about "the quantity of cash on hand" (which is not).  *Id.* at 212-13. Defendants allegedly claimed "that $50 million would be sufficient" to last to 2Q 2022.  (Compl. ¶ 77.)  This is a statement about the amount of *future* cash needs, not a misrepresentation about the "quantity of cash on hand," and is thus a protected prediction.  *Stone & Webster*, 414 F.3d at 212.

> 3.   Plaintiffs Fail to Allege a Misrepresentation Based on Wrigley's SAFE Investment.

Plaintiffs next assert that Defendants materially misled them about the alleged $50 million investment commitment to the SAFE.  (Opp. at 19.)  In Plaintiffs' view, "Wrigley's reluctant contribution to the SAFE, two months after the funds were taken" did not render the assurance that the remaining $25 million would be committed to the SAFE "retroactively true."  (*Id.* at 20.) Plaintiffs miss the point.  Defendants do not maintain that Wrigley's November 2021 payment corrected a prior misrepresentation, but rather that the payment fulfilled the expected "level of investment commitment to the SAFE" previously communicated to Plaintiffs.  (Compl. ¶ 103.) Plaintiffs acknowledge that Wrigley had agreed to "serve *as a backstop* in the event that the Company was unable to obtain $50 million in commitments from outside investors."  (*Id.* ¶ 79 (emphasis added).)  And that is what happened in November 2021—Plaintiffs allege that Wrigley made up the "$10.5 million shortfall to reach the previously promised $50 million."  (*Id.* ¶ 103.)

Undeterred, Plaintiffs argue that the supposed "delay" in payment was material given "what the level of investment indicated about the Company at the time of investment."  (Opp. at 20.)  In support, they cite their allegation that "Wrigley initially agreed to put $5 million into the

SAFE" after "Plaintiffs insisted that he also have some 'skin in the game.'" (Compl. ¶ 5.) But the Complaint defeats Plaintiffs' suggestion that this alleged commitment needed to be *actualized* by September 2021: it alleges that Defendants' "assurance that at least $25 million would be invested in the SAFE alongside the SAFE Plaintiffs' proposed $25 million (for a total of $50 million, ***which was the amount needed to get through the sale process***)." (*Id.* ¶ 79 (emphasis added).)

The Court should also reject Plaintiffs' attempt to conflate the alleged $50 million commitment to the SAFE and its purported improper *use*. Even if $3 million of the SAFE proceeds was used to service the PE Fund Note (Opp. at 20-21), that does not render the commitment itself fraudulent, especially because the SAFE expressly contemplated such use and Plaintiffs do not dispute that PE Fund was a bona fide creditor. (Marder Decl., Ex. C at 2 (Risk Factors)) (disclosing that management has "broad discretion" to use SAFE funds). If Plaintiffs did not want their investment in the SAFE to be used to service PE Fund's debts, they should have negotiated a term to that effect. Plaintiffs quote e-mails from Whitcomb that they allege contain misrepresentations outside the SAFE, but they contain no such promises. (Compl. ¶¶ 80, 84, 85.) Nor would any extra-contractual representation be relevant in light of Plaintiffs' agreement not to rely on any such representations. (*See infra* Section I.B.2.) Moreover, Plaintiffs fail to coherently explain how the timing of their contribution relative to Wrigley's funding could be material. (Opp. at 20.)

4. <u>Plaintiffs Fail to Allege a Misrepresentation Based on Statements Regarding the Company's Debts.</u>

Notably, Plaintiffs do not respond to—and thus concede—Defendants' argument that they cannot state a claim based on allegations regarding the alleged conflicted status of Wrigley and Holmes in negotiating certain Company debt deals, or the resulting allegedly "extortionate," "exorbitant," or "usurious" terms of the PE Fund Notes and Green Health Notes. (*See* Mot. at 20-22.) Nor have they stated a claim that Defendants concealed the existence of alleged current and

future defaults on the Senior and Junior Notes (to which the SAFE Plaintiffs are not parties).  (Opp. at 21.)  As Defendants explained, the Complaint does not plausibly allege that: (1) Defendants were aware of *future* defaults, (2) the alleged omissions were material, and (3) Defendants had a duty to disclose these alleged future defaults to Plaintiffs.  (Mot. at 22-24.)

Plaintiffs ask the Court to presume that Defendants must have been aware of future defaults simply because they allegedly occurred on September 30, 2021—a few days after the SAFE closed (although one to two months after the alleged misrepresentations).  (Opp. at 21-22.)  This argument relies on the incorrect proposition that mere "closeness in time" can constitute plausible allegations of a fraudulent omission of a future event.  *See Miyahira v Vitacost.com*, 2011 WL 13136262, at *13 (S.D. Fla. Dec. 8, 2011).   Further, Plaintiffs' argument that the Company defaulted on September 30 is belied by the Complaint, which acknowledges that this default was based on a November 29, 2021 notice from the Senior Note Holders that indicated the Company had "failed to deliver . . . Company's financial statements for the quarter ended September 30, 2021."  (Compl. ¶ 97.)   But the Complaint does not allege these financial statements had to be provided *on September 30* (and common sense suggests they could not be provided the same day the quarter ends), meaning that this alleged default clearly did not occur on "Thursday," as Plaintiffs claim.

Nor do Plaintiffs explain how their conclusory allegations of materiality satisfy their pleading obligations.  (Mot. at 23.)  Plaintiffs erroneously focus on the purported materiality of the *loan amount* (Opp. at 22 ("defaults on $300 million in Company debt are self-evidently material")) rather than the materiality of the default, and cite paragraph 99 of the Complaint for the proposition that the default included the "failure to make required payments under the Junior Note," but paragraph 99 says nothing about the failure to make payments.  Moreover, the Opposition ignores Defendants' argument that, even if material, the Company had no duty to disclose the purported

defaults because they did not render any statement by the Company misleading.  (Mot. at 23-24.)

Plaintiffs lastly argue that Defendants should have disclosed the Company's "inability to satisfy the Bergmann Debts."  (Opp. at 21.)  But Plaintiffs do not actually allege an "inability" to satisfy the Bergmann Debts—they simply allege that the Company financed its payments to Bergmann through a loan from PE Fund.  (*See* Compl. ¶¶ 59-61.)  Plaintiffs cite no authority for the proposition that an issuer is required to disclose to potential equity investors the *funding source* of a settlement payment made months prior to a third-party with no connection to Plaintiffs or the SAFE investment.  Plaintiff make much of the fact that "the $16 million that the Company previously owed to its former CEO Bergmann it now owes to PE Fund."  (Compl. ¶ 61.)  Even if true, companies routinely refinance debt, and Plaintiffs cite no law demonstrating that the failure to disclose such a refinancing, unrelated to the SAFE investment, amounts to securities fraud.  *See Strategic Diversity, Inc. v. Alchemix Corp.*, 666 F.3d 1197, 1207 (9th Cir. 2012) (no obligation to disclose fact that "was not connected" to the securities transaction at issue).

### B.   Plaintiffs Fail To Adequately Allege Reasonable Reliance.

#### 1.   Plaintiffs' Conclusory Reliance Allegations Are Deficient.

Plaintiffs do not dispute that their federal securities law and common law fraud claims require that they allege *reasonable* or *justifiable* reliance.  According to Plaintiffs, the Complaint adequately alleges such reliance.  (Opp. at 23-24.)  But, in doing so, Plaintiffs rely on Defendants' purported "very high burden of showing that the plaintiff cannot conceivably prove any set of facts that would entitle him to relief" (Opp. at 24)—a standard the Supreme Court expressly "retired" in *Iqbal* and *Twombly*.  *Am. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1288 (11th Cir. 2010).

Applying the proper standard, Plaintiffs fail to allege reliance.  (*See* Mot. at 25-26.)  Instead, the Opposition demonstrates that Plaintiffs improperly conflate the element of reliance with that of misrepresentations.  (Opp. at 23.)  *See Fernau v. Enchante Beauty Prods., Inc.*, 2020

WL 2569300, at *2 (S.D. Fla. May 21, 2020) ("[I]dentifying the statements in the problematic document and explaining *how* those statements misled the plaintiff are separate requirements of Rule 9(b).") (emphasis added).  Nor does the Opposition explain how Plaintiffs' reliance was reasonable, other than simply repeating the argument that Plaintiffs were permitted to rely on "assurances from Company officers."  (Opp. at 24.)[6]

       2.    <u>Plaintiffs Cannot Overcome Their Unambiguous Promise of Non-Reliance.</u>

Plaintiffs ask the Court to ignore that they promised that they were *not* relying on any statements in executing the SAFE Agreement other than those listed in Section 3 of the SAFE Agreement.  To salvage their fraud claim, Plaintiffs now seek to obviate this representation.

Plaintiffs' policy argument that a non-reliance clause amounts to a "get out of jail free" card (Opp. at 1) is unpersuasive, as "[i]t is never the role of the trial court to rewrite a contract to make it more reasonable for one of the parties or to relieve a party from what turns out to be a bad bargain."  *Feldman v. Kritch*, 824 So. 2d 274, 277 (Fla. 4th DCA 2002).  Moreover, Plaintiffs' "fairness" argument misses the point.  As the Delaware Court of Chancery explained in a case that Plaintiffs cite, "[t]o fail to enforce non-reliance clauses is not to promote a public policy against lying.  Rather, it is to excuse a lie made by one contracting party in writing—the lie that it was relying only on contractual representations and that no other representations had been made—to enable it to prove that another party lied orally or in a writing outside the contract's four corners."  *Abry Partners V, L.P. v. F & W Acquisition LLC*, 891 A.2d 1032, 1058 (Del. Ch. 2006).  This is especially true where, as here, the Plaintiffs are sophisticated and well represented investors.

       a.    *The Non-Reliance Clause Means What It Says: Plaintiffs Promised*

---

[6] Plaintiffs criticize Defendants' citation to the magistrate judge's report and recommendation in *Fernau*, asserting Defendants "fail[] to alert the Court" that the district court declined, in part, to adopt the report and recommendation.  (Opp. at 24-25.)  But *Plaintiffs* fail to mention that the sole aspect of the report and recommendation that the district court declined to adopt was the magistrate judge's recommendation to grant the plaintiffs leave to amend.  *Fernau*, 2020 WL 2569300, at *1.

*They Were Not Relying on Representations Outside of Section 3.*

To try to escape from the non-reliance clause, Plaintiffs argue that the clause, in which each Plaintiff represented that it "has not relied upon any representation or warranty in making or confirming [its] investment other than pursuant to Section 3 hereof" (SAFE at 4(c)) "was not intended to limit the SAFE Plaintiffs to reliance solely on representations in Section 3" (Opp. at 26). To accept this argument is to rewrite the SAFE Agreement and hold that the clause has no meaning. Indeed, while Plaintiffs point to various other provisions in the SAFE Agreement in a failed attempt to create ambiguity (discussed below), ***they conspicuously never articulate what it is that they believe the above-quoted language in Section 4(c) means***, if not a complete disclaimer of reliance on statements other than those in Section 3. As Plaintiffs themselves admit, courts may not adopt interpretations of contracts that "render any provisions illusory or meaningless." (Opp. at 27 (quoting *O'Brien v. Progressive N. Ins. Co.*, 785 A.2d 281, 287 (Del. 2001)).)

Plaintiffs' citation to Section 4(e), which provides that each Plaintiff "acknowledges that it is not relying upon any person, other than the Company and its officers and directors, in making its investment or decision to invest in the Company" does not "expressly entitle[]" Plaintiffs "to rely upon statements by Wrigley, Whitcomb, and Holmes," as Plaintiffs say. (Opp. at 26-27.) To the contrary, read in context, Section 4(e) serves to insulate *entirely* from liability non-Company individuals, such as other investors. (SAFE § 4(e) ("The Investor agrees that neither any Investor nor the respective controlling persons, officers, directors, partners, agents, or employees of any Investor shall be liable to any other Investor for any action heretofore taken or omitted to be taken by any of them in connection with the purchase of the Safe.").) Sections 4(c) and 4(e) therefore are harmonious: section 4(e) makes it clear that only the Company and its officers can be liable for misrepresentations, and section 4(c) limits *the representations* for which they can be liable. Likewise, the SAFE Agreement's customary reference to Plaintiffs having conducted their "own

due diligence" (Opp. at 27) does not compel—or even suggest—that their assertion of non-reliance on any representation or warranty is not binding.  To the contrary, it confirms that Plaintiffs "had the means at [their] disposal to *independently* evaluate the merits of a proposed deal[.]" *Progressive Int'l Corp. v. E.I. Du Pont de Nemours & Co.*, 2002 WL 1558382, at *8 (Del. Ch. July 9, 2002) (emphasis added).[7]

>    b.    *The Non-Reliance Clause Is Enforceable.*

Plaintiffs next argue that even if they *did* promise the Company that they were not relying on any representations outside of Section 3, the Court should not hold them to their word because their promise is not enforceable.  (Opp. at 28-33.)  Plaintiffs are wrong under both the securities statutes and common law.

>    (1)    The Clause Is Enforceable Under Federal Securities Law.

According to Plaintiffs, a contractual promise of non-reliance has no effect on a Rule 10b-5 claim because of Section 29(a) of the Exchange Act, which prohibits contracts that "waive compliance" with the Exchange Act.  15 U.S.C. § 78cc(a).  But Defendants do not argue that the SAFE constituted a "waiver" of the Exchange Act; rather, they simply seek to hold Plaintiffs to their word that they did not, in fact, rely on the alleged misrepresentations, thereby foreclosing an element of Plaintiffs' claims.  *See Harborview Master Fund, LP v. Lightpath Techs., Inc.*, 601 F. Supp. 2d 537, 548 (S.D.N.Y. 2009) (contract did not violate Section 29(a) where it "merely served to memorialize two sophisticated parties' understanding that plaintiff . . . was entering into the transaction without access to any material non-public information regarding LightPath and based

---

[7] Plaintiffs argue that the "absence of a merger or integration clause" suggests that the non-reliance clause does not mean what it says.  (Opp. at 28.)  However, unlike a non-reliance clause, a merger or integration clause "simply operates to police the variance of the agreement by parol evidence" and serves to "limit the scope of the parties' contractual obligations to those set forth in the written agreement."  *Kronenberg v. Katz*, 872 A.2d 568, 591-92 (Del. Ch. 2004).  Courts thus *distinguish* merger or integration clauses from non-reliance clauses, holding that the latter, and not the former, bar fraud claims premised on extra-contractual representations.  *Abry Partners*, 891 A.2d at 1058.

solely on the information contained within the agreement itself").

In arguing that non-reliance clauses are barred by Section 29(a), Plaintiffs rely heavily upon *Bruschi v. Brown*, 876 F.2d 1526 (11th Cir. 1989), ***a case that did not involve a non-reliance clause.*** *Bruschi* concerned a high school graduate with minimal investment experience who was tricked by an investment advisor with an undisclosed conflict of interest into making an extremely risky investment. *Id*. at 1527-28. The investment advisor argued that the plaintiff could not establish that she reasonably relied on his alleged oral misrepresentations because "*some information in the disclosure documents*" (which the plaintiff did not read) "would have indicated that some of [the investment advisor's] alleged oral misrepresentations were unreliable." *Id*. at 1530 (emphasis original). The Eleventh Circuit declined to hold that "an investor is always precluded from recovering under Rule 10b–5 if [alleged oral misrepresentations] *conflict in some way* with contemporaneous written representations available to the investor." *Id*. at 1529 (emphasis added). The court's treatment of written statements that merely *conflict* with oral representations says nothing about the impact of a written representation by a sophisticated investment fund *disclaiming reliance* on purported oral representations.[8]

Given that *Bruschi* did not concern a non-reliance clause, it is no surprise that Defendants' cases showing that courts in this Circuit routinely enforce non-reliance clauses in securities cases did not mention that decision. Yet, that is primarily how Plaintiffs attempt to distinguish those case. (Opp. at 30 (attempting to distinguish *Hall v. Coram Healthcare Corp.*, 157 F.3d 1286 (11th

---

[8] The Florida district court cases Plaintiffs cite are likewise inapposite as none of them concerned an unambiguous non-reliance clause like the one at issue here. *See Quail Cruises Ship Mgmt., Ltd. v. Agencia de Viagens CVC Tur Limitada*, 847 F. Supp. 2d 1333, 1346 (S.D. Fla. 2012) (concerning an "as-is" and merger clause, not a non-reliance clause); *Hemenway v. Bartoletta*, 2012 WL 1252691, at *2 (M.D. Fla. Apr. 13, 2012) (considering, as in *Bruschi*, a written contract which "contradict[ed] some of the[] misrepresentations and omissions").

Cir. 1998) because the court did "not address[] *Bruschi* or Section 29(a)"); *id*. at 30 n.12 (arguing Judge Tjoflat in *Thompson v. RelationServe Media, Inc.*, 610 F.3d 628 (11th Cir. 2010), "d[id] not discuss *Bruschi* or Section 29(a)"; *id*. at 29 (arguing *Garcia v. Santa Maria Resort*, 528 F. Supp. 2d 1283 (S.D. Fla. 2007), "nowhere addresses *Bruschi* or Section 29(a)").)

Plaintiffs' argument that certain language from the non-reliance clause in *Garcia* is "missing from the SAFE" (Opp. at 29-30) is also mistaken; they are substantively identical. *Compare Garcia*, 528 F. Supp. 2d at 1289 ("Purchaser has not relied upon any prior agreements or representations made by anyone other than Developer, or oral statements (including oral statements of sales representatives), except as specifically stated in this Contract"), *with* Marder Decl. Exs. A, B at § 4(c) ("[Plaintiff] has not relied upon any representation or warranty in making or confirming [its] investment other than pursuant to Section 3 hereof."). That the *Garcia* non-reliance clause contains an "including" parenthetical, while the SAFE non-reliance clause utilizes the broad phrase "any representation or warranty," does not meaningfully distinguish them.[9]

(2)   The Clause Is Enforceable Under the Georgia Securities Statute.

Plaintiffs' sole argument for why the non-reliance clause does not preclude their GUSA claim is because reliance is not "an element of a cause of action under GUSA § 10-5-58." (Opp. at 30.) But the plain language of section 10-5-58 requires Plaintiffs to prove that Defendants induced their investment "*by means of* an untrue statement of a material fact." Ga. Code Ann. § 10-5-58(b) (emphasis added). Plaintiffs offer no explanation for how their SAFE investment could have been procured "by means of" Defendants' alleged fraud if Plaintiffs did not rely on the alleged misrepresentations. Thus, where a plaintiff "merely points out that [a defendant] made

---

[9] Plaintiffs mention in a footnote that they have sought rescission in their prayer for relief. (Opp. at 30 n.11.) Notably, however, Plaintiffs do not seek rescission in connection with their Rule 10b-5 claim. (Compl. ¶ 127.)

misrepresentations and false promises" but does not identify "which statements *caused* [the plaintiff] to purchase securities," a section 10-5-58(b) claim is properly dismissed. *Zimmerman v. Matson Money, Inc.*, 2021 WL 6113659, at *9 (N.D. Ga. June 9, 2021) (emphasis added).

To support their argument that they may state a Georgia securities fraud claim without reliance, Plaintiffs cite out-of-state cases applying *different* statutes, but ignore the rule in Georgia that "[j]ustified reliance is an essential element of *any* fraud claim." *Keogler v. Krasnoff*, 601 S.E.2d 788, 792 (Ga. Ct. App. 2004) (emphasis added). Plaintiffs also attempt to distinguish *Beranger v. Harris*, 2021 WL 4254940 (N.D. Ga. Feb. 12, 2021), on the purported ground that the case addressed GUSA § 10-5-50 rather than § 10-5-58. But the *Beranger* plaintiffs *did* bring claims under § 10-5-58, and the court's dismissal of those claims based on a failure to plead reliance thus applies here with equal force. *See id.* at *7 (describing § 10-5-58 claims); *see also* First Am. Compl., *Beranger v. Harris*, 2019 WL 2718975 (N.D. Ga. June 4, 2019) at ¶¶ 124, 129.

### (3)    The Clause Is Enforceable Under Common Law.

Plaintiffs acknowledge that Delaware law applies to the enforceability and impact of the non-reliance clause on their common law fraud claim. (Opp. at 33.) Plaintiffs likewise acknowledge that, under Delaware law, a "clear anti-reliance clause" "bar[s] a fraud in the inducement claim." (*Id.* (quoting *Kronenberg*, 872 A.2d at 593).) *Kronenberg* in turn explains that a "clear anti-reliance clause" is one in which "the plaintiff has contractually promised that it did not rely upon statements outside the contract's four corners in deciding to sign the contract." *Kronenberg*, 872 A.2d at 593. This describes the clause at issue here. *Supra* Section I.B.2.a. Plaintiffs' argument that the cases cited by Defendants all contained "express integration clauses" (Opp. at 33) is meritless because Delaware courts hold that integration clauses *do not* bar fraud claims and that what is required instead is "explicit anti-reliance representations." *Kronenberg*,

16

872 A2d at 593.[10]  And, because the SAFE contains this "explicit anti-reliance representation[]," Plaintiffs' common law fraud claims premised on statements outside of Section 3 are barred.

> c.     *Plaintiffs Do Not Allege that Any of the Representations in Section 3 of the SAFE Were False.*

Perhaps recognizing that the non-reliance clause is unambiguous and enforceable, Plaintiffs try to pigeonhole their fraud claims to fall within the clause's scope.  Their efforts fail.

*First*, Plaintiffs argue that the Company's representation in Section 3 that it "has the power and authority to . . . carry on its business as now conducted" was misleading because it "suggest[ed] that the Company is not in default on its obligations."  (Opp. at 26.)  But this alleged misrepresentation is *nowhere* in their Complaint and Plaintiffs "cannot amend the complaint by arguments of counsel made in opposition to a motion to dismiss."  *Kuhn v. Thompson*, 304 F. Supp. 2d 1313, 1321 (M.D. Ala. 2004).  Moreover, this new theory fails on the merits:  A representation that a company is "duly organized" and "in good standing under the laws of the state of incorporation" such that it has the power to carry on its business (SAFE § 3.a) says nothing about the company's debt levels.[11]

*Second*, Plaintiffs repeat the conclusory assertion from their Complaint that the SAFE Agreement itself included misrepresentations, "including misleading warning language."  (Opp. at 26 (citing Compl. ¶¶ 93-95).)  But Plaintiffs fail to address, or even mention, Defendants' argument that warning statements such as "[t]he Company's debt could have important consequences to the

---

[10] Plaintiffs are correct that in *H-M Wexford*, the court stated that "[t]his conclusion is supported by reference to the comprehensive integration clause."  Plaintiffs do not mention, however, that this statement related to plaintiff's *breach of contract* claim, not their fraud claim.

[11] Thus, Plaintiffs' citation to *Abry Partners* does not help their cause.  That case held only that if defendants had "manipulate[d] the Company's financial statements," then defendants' representation and warranty *in the contract* that the financial statements "fairly present in all material respects the financial condition of the Company" could form the basis for a fraud claim. 891 A.2d at 1039-42.

Company" do not "suggest to a reasonable investor—and certainly not a sophisticated investor like the SAFE Plaintiffs—that a default could not occur in the future," even the near future. (Mot. at 23-24.)  Furthermore, Plaintiffs acknowledge that these risk factor statements were not included in Section 3 of the SAFE, and therefore Plaintiffs expressly disclaimed Reliance on them when it signed the SAFE.  (Opp. at 26.)

### C.      Plaintiffs Fail to Allege a Strong Inference of Scienter.

In their Opposition, Plaintiffs also fail to demonstrate that the Complaint raises a strong inference of scienter.  (Opp. at 33-36.)

To start, contrary to Plaintiffs' assertion (*id.* at 34), the Complaint's scienter-related allegations are quintessential shotgun pleading because they stand for the unremarkably vague and conclusory propositions (1) that the "Securities Defendants made numerous misrepresentations and omissions . . . knowingly and intentionally to induce the SAFE Plaintiffs to provide $25 million or the SAFE" (Compl. ¶ 118), and (2) that the "Securities Defendants had both motive and opportunity to deceive the SAFE Plaintiffs" and "[a]s officers of the Company, they stood to gain from successfully raising tens of millions of dollars with the SAFE[.]"  (*Id.* ¶ 119.)  These conclusory allegations fail to identify what, if any, scienter may be imputed to each of the Individual Securities Defendants.

Plaintiffs next argue that Defendants' motive and opportunity to defraud was not generalized.  (Opp. at 34-35.)  But Plaintiffs own argument shows that the Individual Securities Defendants did not personally benefit from the allegedly misleading statements: "Holmes and Whitcomb made active and affirmative misrepresentations ***to obtain funding necessary to avoid approaching collapse***, while concealing the Company's financial condition and various defaults." (Opp. at 34 (emphasis added).)  Indeed, obtaining funding to avoid a company's decline is a universal desire of executives and is insufficient to support an inference of scienter.  *In re PXRE*

*Grp., Ltd., Sec. Litig.*, 600 F. Supp. 2d 510, 533 (S.D.N.Y.) ("[R]aising capital as part of an amorphous scheme to stave off a company's collapse . . . does not suffice.  Such a motive is too generalized, and if scienter could be pleaded on that basis alone, virtually any company that attempted to raise capital . . . would face specious securities fraud allegations."), *aff'd sub nom. Condra v. PXRE Grp. Ltd.*, 357 F. App'x 393 (2d Cir. 2009).

As to Whitcomb, Plaintiffs argue that the Court "can infer that a C-suite officer who was authorized to discuss Company finances with investors had knowledge about that topic—including existing and imminent debt defaults."  (Opp. at 35.)  But an executive's role cannot alone support an inference of scienter without particularized allegations of severe recklessness.  *See City Pension Fund for Firefighters & Police Officers in City of Miami Beach*, 41 F. Supp. 3d 1369, 1408 (S.D. Fla. 2011) (rejecting scienter where allegations were "speculative and conclusory" and "largely based upon [the officer's] position in the company.").  It is necessary to make a showing of severe recklessness which requires "those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it."  *Hubbard v. BankAtlantic Bancorp, Inc.*, 625 F. Supp. 2d 1267, 1283 (S.D. Fla. 2008) (quoting *Broad v. Rockwell Int'l Corp.*, 642 F. 2d 929, 961-62 (5th Cir. 1981).  Here, Plaintiffs fail to allege any particularized facts showing that Whitcomb was severely reckless in the representations he made about the Company or that he knowingly omitted information that would render any representations he made misleading.  (*See* Compl. ¶¶ 67, 70, 74, 80, 84, 117, 118, 124, 153.)  For these reasons, Plaintiffs fail to adequately allege scienter against Whitcomb.

With respect to Holmes, Plaintiffs argue that "the Court should infer his knowledge as

well." (Opp. at 35.)   This is simply not so.   Plaintiffs maintain that the Complaint attributes numerous misleading statements to Holmes, but the Complaint does not contain factual allegations that would support a finding that these statements were made with the requisite scienter.  As noted above, scienter cannot be inferred simply because Holmes is an executive.  *See City Pension Fund*, 41 F. Supp. 3d at 1408.  Rather, a showing of severe recklessness is also necessary.  *See id*.  Severe recklessness requires "those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it."  *Hubbard v. BankAtlantic Bancorp, Inc.*, 625 F. Supp. 2d 1267, 1283 (S.D. Fla. 2008) (quoting *Broad v. Rockwell Int'l Corp.*, 642 F. 2d 929, 961-62 (5th Cir. 1981)).  No such allegations exist in the Complaint.

Moreover, and contrary to Plaintiffs' contention otherwise, the four specific Holmes misrepresentations that Plaintiffs mention (Opp. at 35), do not contain the requisite specificity or recklessness to constitute scienter.  (*See* Compl. ¶¶ 70, 76, 77, 109.)  Plaintiffs allege that the Motion "ignores the detailed financial and debt-related allegations" in the Complaint but fail to provide citations to any such allegations.  (Opp. at 36.)  Merely stating that Holmes was an "active particip[ant]" (*id.*) is not sufficient to meet the PSLRA's pleading requirements for scienter.  Any remaining allegations are vague and conclusory and do not create an inference of scienter.  For these reasons, Plaintiffs fail to allege scienter against Holmes.

Finally, as to Wrigley, Plaintiffs continue to rely on broad and conclusory allegations that Defendants, collectively, made misrepresentations.  That is not enough—Plaintiffs must plead, with specificity, that Wrigley made misrepresentations that he knew to be false, and with the intent

to deceive.  *Brophy v. Jiangbo Pharms. Inc.*, 781 F.3d 1296, 1302 (11th Cir. 2015).

Nor can Plaintiffs establish scienter by suggesting that Wrigley allegedly knew of the precarious state of the Company or that his investment in the SAFE showed "that he lacked the confidence" in the Company.  (Opp. at 36.)  Whether Wrigley was familiar with the financial state of the Company is immaterial where there are no allegations that he made any misrepresentations. Moreover, Plaintiffs ignore that, by their own admission, Wrigley committed *more funds* than what he promised to commit.  (Compl. ¶ 5; *see also* Mot. at 36-37.)  Likewise, Plaintiffs' argument that Wrigley was allegedly "round-tripping" funds to himself as a result of the Company's partial satisfaction of debts owed to PE Fund is without merit.  Putting aside that this theory essentially collapses—without any supporting factual allegations—the Company, Wrigley, PE Fund, and Green Health into one, any alleged "benefit" enjoyed by Wrigley is beside the point where, as shown above, Plaintiffs fail to allege that Wrigley made *any* misrepresentations.

## II.     PLAINTIFFS' CONTROL PERSON CLAIMS SHOULD BE DISMISSED

According to Plaintiffs, "Wrigley, Holmes, and Whitcomb had day-to-day involvement in and supervised the SAFE through multiple interactions with the SAFE Plaintiffs, [and] made many of the alleged misstatements themselves," which support a control liability claim under federal and Georgia securities law.  (Opp. at 37.).  This simply regurgitates the same conclusory assertions in the Complaint.  (Compl. ¶¶ 131, 145-146.)  Thus, while the control person claims fail for the threshold reason that Plaintiffs fail to adequately allege a primary securities fraud claim (Mot. at 40),[12] these claims also lack specific facts sufficient to establish that each Individual Securities Defendant effectively "controlled" the Company with respect to the alleged "primary violation" or "acted recklessly in failing to do what [they] could have done to prevent the violation."

---

[12] Plaintiffs do not dispute that if their primary fraud claims fail, the control person claims do too.

*Laperriere v. Vesta Ins. Grp., Inc.*, 526 F.3d 715, 725 (11th Cir. 2008) (citation omitted).

### III.   PLAINTIFFS' GEORGIA UNIFORM VOIDABLE TRANSFER ACT CLAIM SHOULD BE DISMISSED.

#### A.   Plaintiffs Have Not Adequately Alleged Any Basis for Subject-Matter Jurisdiction over Their GUVTA Claims.

Neither of the two bases Plaintiffs assert for jurisdiction of their voidable transfer claims has any merit.  Plaintiffs first suggest that their GUVTA claims regarding the Green Health Notes, PE Fund Note, and Bergmann Debts present the "same facts or involve similar occurrences, witnesses, or evidence" as their fraud claims regarding the SAFE.  (Opp. at 38).  They cite no case that supports this proposition or that bears any similarities to this lawsuit.  Plaintiffs likewise fail to explain how claims about the *incurrence* of an obligation would involve "similar occurrences, witnesses, or evidence" as claims about the *means used to pay* those obligations.  *See Lariosa v. C & R Pallets Corp.*, 2018 WL 3883170, at *2–3 (S.D. Fla. Jan. 4, 2018).

Plaintiffs' retreat to diversity jurisdiction fares no better.  The Complaint contains neither any reference to diversity nor any factual allegations supporting its exercise.  In their Opposition, Plaintiffs contend that they are "citizens or subjects of foreign states" and Defendants are "citizens of a State."  (Opp. at 39).  But that is not enough.  *See Rolling Greens MHP, L.P. v. Comcast SCH Holdings L.L.C.*, 374 F.3d 1020, 1022 (11th Cir. 2004); *Asphalt Paving Sys., Inc. v. S. States Pavement Markings, Inc.*, 2018 WL 3067906, at *1 (M.D. Fla. Feb. 20, 2018).  The Complaint does not plead the structure of TradeInvest, First Ocean, or Techview, explain why structures of these foreign associations should be treated as corporations for jurisdictional purposes, or allege the principal places of business for TradeInvest or Techview.  (Compl. ¶¶ 17, 18, 20).  Nor does it plead the identities and the domiciles of the members of PE Fund or Green Health.  (*Id.* ¶¶ 23, 24.)

#### B.   Plaintiffs Have Failed to State a Claim under GUVTA.

To start, Plaintiffs make the meritless argument that Wrigley and Holmes *must* have been

subsequent transferees under the Green Health and PE Fund Notes because Green Health and PE Fund are Wrigley's family office entities.[13]  This is not the law, and Plaintiffs do not distinguish the cases cited in the Motion, including the extreme allegations rejected in *Atlanta Fiberglass USA, LLC v. KPI, Co.*, 911 F. Supp. 2d 1247 (N.D. Ga. 2012).  There, the plaintiff sought to add the alleged sole owners of the transferee company as GUVTA defendants.  *Id.* at 1253, 1263.  The court held that even the complete domination these owners were alleged to exercise over the transferee company was insufficient to make them presumptive transferees.  *Id.* at 1264.

Plaintiffs likewise fail to establish any harm.  Conceding the absence of indirect injury, such as a reduction in the value of Techview's lien (Mot. at 45), Plaintiffs instead assert that a redressable injury-in-fact exists because the Company allegedly paid some fraction of the challenged obligations.  (Opp. at 39–40.)  Even if a *partial* transfer on account of an obligation would give a creditor standing to void the *entire* obligation, as Plaintiffs seek (Compl. ¶ 164), Plaintiffs forfeit such claim as to the Green Health Notes by conceding that no funds have been transferred on account of those obligations.  (Opp. at 39–40.)  As for the Bergmann Debts, Plaintiffs cannot articulate which transfers caused them harm, instead vaguely referring to "millions more in partial satisfaction of the Bergmann Debts."  (*Id*. at 39.)  But Plaintiffs ignore that the "partial satisfaction" was realized by the Green Health and PE Fund Notes (Compl. ¶¶ 47, 61), *not* from the assets available to satisfy Techview's debt.[14]

---

[13] Plaintiffs' argument that Holmes is a proper GUVTA defendant because he allegedly *negotiated* the challenged transfer likewise rests on no authority whatsoever.

[14] Plaintiffs' claim about the $3 million allegedly paid toward the PE Fund Note (Compl. ¶ 112, Opp. at 39) fares no better.  Rescinding the PE Fund Note would result in $10.5 million in outstanding principal flowing back to *PE Fund*, thus not improving Techview's secured position. (Mot. at 45.)  Moreover, Plaintiffs do not show that the PE Fund Note was "highly favorable to" Wrigley and PE Fund at the expense of senior noteholders.  (Opp. at 40–41.)  To the extent Techview's chances of recovery on the Senior Notes have allegedly been reduced by the PE Fund

Plaintiffs also have not pled a GUVTA claim based on constructive fraud against Mr. Bergmann because they have not alleged that the value of the Bergmann Debt was not reasonably equivalent to what the Company received in exchange, *i.e.*, a release, the transfer of Mr. Bergmann's stock, and the dismissal of the Bergmann Litigation with prejudice. O.C.G.A. §§ 18-2-74(a)(2), 18-2-75; *see In re Fundamental Long Term Care, Inc.*, 873 F.3d 1325, 1344 (11th Cir. 2017); *Kipperman v. Onex Corp.*, 411 B.R. 805, 837 (N.D. Ga. 2009). In their response, Plaintiffs attempt to support a constructive fraud theory by pointing to allegations that (1) the Bergmann Settlement valued Mr. Bergmann's stock at $30.80 and (2) the Company was subsequently unable to satisfy its obligations under the Bergmann Debts. (Opp. at 41–42 (citing Compl. ¶¶ 55, 57).) According to Plaintiffs, these allegations demonstrate that Bergmann's stock was "vastly overvalued, and so the Company paid something for nothing—or at minimum, much more than it received." (*Id*. at 42.) But Plaintiffs' allegations establish only that the Company was unable to make certain payments six or more months after the Bergmann Settlement; they have no bearing on the value the Company received from the transfer of Mr. Bergmann's stock. Moreover, Plaintiffs completely ignore Mr. Bergmann's release and dismissal of the Bergmann Litigation with prejudice. The Complaint does not value those aspects of the Bergmann Settlement at all, let alone allege that they were not reasonably equivalent in value to the Bergmann Debts.[15] Because

---

Note, PE Fund's chances of recovery—as the majority holder of the Senior Notes with nine-times Techview's stake (Compl. ¶ 4a)—have been reduced, pro rata, to a much greater extent.

[15] Plaintiffs alternatively seek leave to amend their Complaint. (Opp. at 42 n.19.) The Court should deny that request because such an amendment would be futile. *See Hall v. United Ins. Co. of Am.*, 367 F.3d 1255, 1262–63 (11th Cir. 2004). Plaintiffs cannot allege in good faith that the dismissal of Mr. Bergmann's Delaware litigation, his release of the Company, and his transfer of 1.5 million of his shares were not reasonably equivalent in value to the Bergmann Debts. (Mot. at 50 n.23.) Indeed, the value of the dismissal of the Bergmann Litigation was higher than that of a typical dismissal because Delaware law had already established the Company's liability. *See* 8 Del. C. § 262. The only question for the Court was the value of Mr. Bergmann's stock at the time of the

the Complaint does not allege the value of the consideration provided in the Bergmann Settlement, let alone that it was not reasonably equivalent to the Bergmann Debts, Plaintiffs' GUVTA claim must be dismissed. *In re Fundamental Long Term Care, Inc.*, 873 F.3d 1325, 1345 (11th Cir. 2017) (dismissing fraudulent conveyance claim where complaint "does not contain sufficient factual detail to plausibly assert that [settled claims] were sold for less than reasonably equivalent value"); *see also Sale v. Ferrari Fin. Servs., Inc.*, 2020 WL 5750502, at *7 (S.D. Fla. Sept. 25, 2020).

In addition, this Court should decline to exercise jurisdiction over Count VI under the *Rooker-Feldman* doctrine, given the grave inequity that would occur if the Bergmann Debts were voided. Plaintiffs argue that *Rooker-Feldman* is inapplicable, but they fail to acknowledge the untenable position that Mr. Bergmann would be placed in should Plaintiffs succeed. Were this Court to void the Bergmann Debts, the Company would get back the consideration it provided for the Bergmann Settlement. But Mr. Bergmann would not receive the consideration he provided because his claims were dismissed with prejudice in Delaware state court, and this Court has no power to undo that dismissal. Mr. Bergmann thus would be left with no ability to pursue his statutory appraisal rights against the Company, while the Company would have paid him nothing for the compromise of that claim. Given the inequities that could result from Count VI, this Court should decline to exercise its jurisdiction over it.

## CONCLUSION

For all of the foregoing reasons, Defendants respectfully request the Court dismiss Plaintiffs' Complaint with prejudice.

---

June 2019 merger; the Company would have been required to pay Mr. Bergmann whatever price the Court set. Plaintiffs cannot plausibly allege that the Company "paid something for nothing" (Opp. at 42) when it settled the appraisal claim. *Fundamental Long Term Care, Inc.*, 873 F.3d at 1344; *In re ATM Fin. Servs., LLC*, 2011 WL 2604247, at *4 (Bankr. M.D. Fla. June 21, 2011).

Date:   August 26, 2022

                                             **SAUL EWING ARNSTEIN & LEHR LLP**

By:    /s/ Jeffrey Gilbert

          Jeffrey Gilbert
          Florida Bar No. 375411
          Steven M. Dickstein
          Florida Bar No. 1010439
          Jeffrey.Gilbert@saul.com
          Steven.Dickstein@saul.com
          701 Brickell Avenue, 17th Floor
          Miami, Florida 33131
          305-428-4552

                                             **AKIN GUMP STRAUSS HAUER & FLED LLP**

By:    */s/ Neal R. Marder*
          Neal Ross Marder (*pro hac vice*)
          nmarder@akingump.com
          Joshua A. Rubin (*pro hac vice*)
          rubinj@akingump.com
          Sina S. Safvati (*pro hac vice*)
          ssafvati@akingump.com
          1999 Avenue of the Stars, Suite 600
          Los Angeles, CA 90067
          310-229-1000

          Stephanie Lindemuth (*pro hac vice*)
          slindemuth@akingump.com
          One Bryant Park
          Bank of America Tower
          New York, NY 10036
          212-872-7491

          *Attorneys for Defendants SH Parent Inc.*
          *d/b/a Parallel, Surterra Holdings Inc., and*
          *James Whitcomb*

**MARCUS NEIMAN**
**RASHBAUM & PINEIRO LLP**

By:    */s/ Jeffrey E. Marcus*
      Jeffrey E. Marcus, Esq.
      Florida Bar No. 310890
      jmarcus@mnrlawfirm.com
      Jason L. Mays, Esq.
      Florida Bar No. 106495
      jmays@mnrlawfirm.com
      2 S. Biscayne Blvd., Suite 2530
      Miami, Florida 33131
      Tel: (305) 400-4262
      Fax: (954) 688-2492


**WILLKIE FARR & GALLAGHER LLP**

By:    */s/ Sameer Nitanand Advani*
      Sameer Nitanand Advani (*pro hac vice*)
      sadvani@willkie.com
      Brittany M. Wagonheim (*pro hac vice*)
      bwagonheim@willkie.com
      787 Seventh Avenue
      New York, NY  10019-6099
      212-728-8587

      Craig C. Martin (*pro hac vice*)
      cmartin@willkie.com
      Aaron J. Hersh (*pro hac vice*)
      ahersh@willkie.com

      300 North LaSalle Drive
      Chicago, IL 60654
      312-728-9000

      ***Attorneys for Defendants William Wrigley Jr., Green Health Endeavors, LLC and PE Fund LP***

**AKERMAN LLP**

By:    <u>*/s/ Zachary Ryan Kobrin*</u>
       Zachary Ryan Kobrin
       zackary.kobrin@akerman.com
       Nicole Villamar
       nicole.villamar@akerman.com
       201 E. Las Olas Boulevard
       Suite 1800
       Fort Lauderdale, FL  33131
       954-759-8967

       Jonathan Seth Robbins
       jonathan.robbins@akerman.com
       Las Olas Centre
       350 E. Las Olas Boulevard
       Suite 1600
       Fort Lauderdale, FL  33301-0006
       954-463-2700

       CAPLAN COBB
       Sarah Brewerton-Palmer (*pro hac vice*)
       spalmer@caplancobb.com
       Michael A. Caplan (*pro hac* vice)
       mcaplan@caplancobb.com
       75 Fourteenth Street NE
       Suite 2700
       Atlanta, GA  30309
       404-596-5600

       ***Attorneys for Defendant Robert Bergmann***

**ZEBERSKY PAYNE SHAW LEWENZ LLP**

By:     */s/ Zachary D. Ludens*
        Jordan Alexander Shaw (FBN 111771)
        jshaw@zpllp.com
        Zachary Dean Ludens (FBN 111620)
        zludens@zpllp.com
        110 Southeast 6th Street
        Suite 2900
        Fort Lauderdale, FL  33301
        954-595-6075

        ***Attorneys for Defendant James Holmes***

## CERTIFICATION OF SERVICE

I HEREBY CERTIFY that on August 26, 2022, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record via transmission of Notice of Electronic Filing generated by CM/ECF.

By:     */s/ Jeffrey Gilbert*
        Jeffrey Gilbert
        Florida Bar No. 375411
        Steven M. Dickstein
        Florida Bar No. 1010439