## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
## WEST PALM BEACH DIVISION

### CASE NO. 22-80360-CIV-CANNON

**TRADEINVEST ASSET MANAGEMENT**
**COMPANY (BVI) LTD.,**
**FIRST OCEAN ENTERPRISES SA**, and
**TECHVIEW INVESTMENTS LTD.,**

      Plaintiffs,

v.

**WILLIAM WRIGLEY JR., et al.,**

      Defendants.

_____/

### ORDER GRANTING IN PART AND DENYING IN PART
### DEFENDANTS' MOTION TO DISMISS

**THIS CAUSE** comes before the Court upon Defendants' Combined Motion to Dismiss

Plaintiffs' Complaint (the "Motion") [ECF No. 82].  The Court held a hearing on the Motion

[ECF No. 105].  The Court has reviewed the Motion, Plaintiffs' Opposition [ECF No. 99],

Defendants' Reply [ECF No. 100], and the full record.  For the reasons set forth below, the Motion

[ECF No. 82] is **GRANTED IN PART AND DENIED IN PART**.

### RELEVANT BACKGROUND

The following facts are drawn from the Complaint [ECF No. 59; s*ee also* ECF No. 1

(redacted version of Complaint)] and accepted as true for purposes of this Order.

Plaintiffs' claims relate to their interactions with Defendants in negotiating their $25

million investment into a Simple Agreement for Future Equity Investment (hereinafter "SAFE

Investment"), yet the story of this case begins far before the SAFE Investment was ever marketed.

Defendant SH Parent, Inc., which does business as Parallel, operates as a holding company focused

on "the development, production, and sale of cannabis products, oils, and extracts through

subsidiaries" [ECF No. 59 ¶ 21].  Defendant Parallel is held by Defendant Surterra Holdings, Inc.

CASE NO. 22-80360-CIV-CANNON

(together "the Company") [ECF No. 59 ¶ 22].[1]   The other Defendants hold various roles within the Company.   Defendant William Wrigley invested in the Company in 2017 and eventually assumed the role of Chairman and CEO in late 2018, a position he held until November 29, 2021 [ECF No. 59 ¶ 25].   Defendant James Holmes worked as a director at Parallel from November 2017 through November 2021, where he also assumed the role of Chief Strategy Officer from January 2019 through December 2021 [ECF No. 59 ¶ 26].   Defendant James Whitcomb held a role as the Company's Chief Development Officer until November 19, 2021, when he assumed his present role as CEO of the Company [ECF No. 59 ¶ 27].   Together, the Company, Wrigley, Holmes, and Whitcomb are collectively referred to as "the Securities Defendants" [ECF No. 59 p. 1].

**The Company's Debt Obligations**

The Company began incurring debt obligations in October 2018, when Wrigley became CEO [ECF No. 59 ¶ 33].   The first notes into which the Company entered are referred to as "the Senior Notes" and consist of $165.5 million in 10% Senior Notes, which accrue interest and have the potential to incur $70 million in pre-payment interest [ECF No. 59 ¶ 33].   These notes are governed by a Note Purchase Agreement dated October 16, 2018, and are secured by first priority liens on and security interests in all the assets of the Company [ECF No. 59 ¶ 35].   Defendant PE Fund, LP ("PE Fund") holds $91.2 million of the Senior Notes as well as the PE Fund Note [ECF No. 59 ¶ 23].   PE Fund "is an investment vehicle within Wrigley's family office" [ECF No. 59 ¶ 23].   PE Fund is a majority holder in the Senior Notes [ECF No. 59 ¶ 36].   Plaintiff Techview Investments Ltd. ("Techview") holds $10 million of the Company's Senior Notes and

---

[1] The Company's invested capital consists of $67 million in SAFE securities, $79 million in aggregate Series E Preferred Stock, $166 million in aggregate Series D Preferred Stock, and other preferred and common stock [ECF No. 59 ¶ 65].

$10 million of the Company's Series D Preferred Stock and represents a minority holder in the Senior Notes [ECF No. 59 ¶¶ 20, 37].

The Company took on another large debt obligation on May 7, 2021, when it entered into the Junior Note with SAF Group, an alternative investment management firm based in Canada [ECF No. 59 ¶ 40].  The Junior Note consists of $145 million of junior secured debt, subject to interest and a potential of $64 million in pre-payment penalties [ECF No. 59 ¶ 40].

The Company is obligated on other debt obligations, including the Green Health Notes, which had a May 1, 2021, maturity date [ECF No. 59 ¶ 42].  The Green Health Notes consist of a $54 million debt on $44.3 million in convertible secured notes, which accrue interest at a rate of 16% per year and carry a prepayment penalty of 25% [ECF No. 59 ¶ 42].  These notes were negotiated during a time when Wrigley held positions as Chairman and CEO of the Company and Chairman and CEO of Green Health [ECF No. 59 ¶ 43].  Holmes was also involved in the transaction to negotiate the Green Health Notes, representing Green Health, while simultaneously serving as director and Chief Strategy Officer for the Company [ECF No. 59 ¶ 45].  These notes were renegotiated several times and were subject to a forbearance agreement in effect from May 7, 2021, to October 31, 2021 [ECF No. 59 ¶¶ 46–50].

In January 2021, the Company incurred an additional debt to its former CEO, Defendant Robert Bergmann, when it entered into an agreement to settle a dispute between Bergmann and the Company over the value of Bergmann's common stock (the "Bergmann Settlement") [ECF No. 59 ¶¶ 53–54].  The Bergmann Settlement required the Company to pay Bergmann $38.5 million, including an initial $6 million payment that was financed by a Green Health Note [ECF No. 59 ¶ 55].

In June 2021, the Company realized that it did not have the funds to make its second $13.5 million payment under the Bergmann Settlement, causing the Company to turn to PE Fund for an

CASE NO. 22-80360-CIV-CANNON

advance [ECF No. 59 ¶¶ 58–59]. This advance was executed as the "PE Fund Note," where PE Fund advanced the Company $13.5 million to be repaid within six months, subject to a $2.5 million transaction fee and a 16% interest rate [ECF No. 59 ¶ 59].

The Company has various other debt obligations, including $107 million in consideration for a 2021 deal to acquire a cannabis dispensary [ECF No. 59 ¶ 63]. More broadly, beginning on September 30, 2021, the Company began to experience defaults on $300 million of outstanding debt, including "covenant and payment defaults on $145 million of recently issued junior debt [,] cross-defaults on $165 million of senior debt [and] defaulting on a $13.5 million promissory note" [ECF No. 59 ¶¶ 3–4].

**SAFE Negotiations**

Plaintiffs TradeInvest Asset Management Company (BVI) Ltd. ("TradeInvest") and Ocean Interprises SA ("First Ocean"), together the "SAFE Plaintiffs," entered the picture in July 2021 [ECF No. 59 ¶ 66]. From July 2021 to September 27, 2021, the SAFE Plaintiffs engaged in negotiations with the Securities Defendants about a $25 million investment in the SAFE Investment [ECF No 59 ¶ 66]. On July 22, 2021, Trip McCoy, the SAFE Plaintiffs' investment advisor, took part in a Zoom call with Holmes and Whitcomb during which he was told that the Company "was looking to raise between $30 and $50 million as part of a new SAFE security" that would serve as "'bridge' capital to fund the Company's capital projects" while the Company waited for its public merger through a special purpose acquisition company (SPAC) to close [ECF No. 59 ¶¶ 9, 67]. McCoy had additional calls with Holmes and Whitcomb on July 26, 2021, July 30, 2021, and August 2, 2021, during which they discussed an increase in the maximum proceeds of the SAFE and a reduced SPAC valuation [ECF No. 59 ¶ 68]. Holmes and Whitcomb did not inform McCoy about the Company's existing and looming debt obligations [ECF No. 59 ¶¶ 3–4, 69].

4

On August 4, 2021, Holmes provided the SAFE Plaintiffs with a draft of the SAFE instrument and a presentation entitled "August 2021 Company Overview: Parallel/Ceres Acquisition Corp. SPAC transaction" [ECF No. 59 ¶ 70]. The presentation outlined the SPAC and provided information about "the Company, its capital structure, and its financing needs" [ECF No. 59 ¶ 70]. The presentation projected the Company's revenue for 2022 to be $618 million, with an adjusted EBITDA[2] of $167 million [ECF No. 59 ¶ 71]. Those revenues were adjusted down by 20% and 40% in October 2021 [ECF No. 59 ¶ 71]. McCoy held a Zoom call with Holmes and Whitcomb on August 5, 2021, during which he again explained that "the SAFE Plaintiffs would commit funds to the SAFE only if the SAFE Plaintiffs were confident that (i) the Company had significant SAFE and PIPE commitments already in hand, and (ii) the funds raised in connection with the SAFE would be a sufficient bridge until the Company could be sold" [ECF No. 59 ¶ 72]. Holmes and Whitcomb, in response, told McCoy that "the Company had more than $50 million in SAFE commitments ***already in hand***" [ECF No. 59 ¶ 72 (emphasis in original)].

During the course of the negotiations, McCoy went to Holmes and Whitcomb with concerns that the SPAC may not close [ECF No. 59 ¶ 73]. On August 5, 2021, Holmes and Whitcomb explained that "the SAFE funding would be sufficient to fund the Company—and specifically its capital and operating expenses—until a *private* sale could be consummated" [ECF No. 59 ¶ 73 (emphasis in original)]. On August 9, 2021, the Company's counsel sent the SAFE Plaintiffs the latest SAFE documentation with accompanying risk warnings concerning the Company's debt [ECF No. 59 ¶ 75]. On August 16, 2021, Holmes sent the SAFE Plaintiffs an Excel file with the Company's capital structure in relation to the SPAC acquisition, and that Excel file included a statement noting that "the Green Health Notes would convert to $135 million in

---

[2] EBITDA represents earnings before taxes, depreciation, and amortization.

CASE NO. 22-80360-CIV-CANNON

equity with a liquidation preference behind the SAFE as of September 30, 2021" [ECF No. 59 ¶ 76].

There was another Zoom call between Holmes, McCoy, and potentially Whitcomb, on August 22, 2021, during which McCoy "underscored more urgently that the SAFE Plaintiffs were interested in a SAFE investment solely if Defendants could provide reasonable assurance that the Company had sufficient capital to operate until a sale, and what amount of capital that was" [ECF No. 59 ¶ 77]. Holmes told McCoy that the $50 million would be sufficient because the Company would be sold by the second quarter of 2022 [ECF No. 59 ¶ 77]. The Securities Defendants also provided to McCoy a spreadsheet indicating potential values for the Company should it be acquired by any of four well-known cannabis companies; all of those scenarios projected an acquisition value of between $1.5 and $2 billion [ECF No. 59 ¶ 78]. Holmes and Whitcomb told McCoy that "their phones were 'lighting up' with unsolicited offers from major cannabis companies to purchase the Company" [ECF No. 59 ¶ 78]. During the August 22, 2021 call, McCoy "sought further assurance that at least $25 million would be invested in the SAFE alongside the SAFE Plaintiffs' proposed $25 million commitment" [ECF No. 59 ¶ 79]. McCoy was assured that "they had about *$75 million* in verbal commitments (including $5 million from Wrigley)" [ECF No. 59 ¶ 79 (emphasis in original)].

On August 30, 2021, Whitcomb sent an email to McCoy stating that the SAFE was a "structured close for [*$50 million*] coming from multiple investors," and any paperwork signed prior to the close would be "held in escrow until close" [ECF No. 59 ¶ 80]. On a September 2, 2021, Zoom call, Holmes and Whitcomb reviewed in greater detail the Company's plan for capital expenditures through the end of 2022 and indicated that $50 million would bridge the gap through the second quarter of 2022 [ECF No. 59 ¶ 81]. This was reiterated by Holmes and Whitcomb when they told McCoy that "the Company would use the SAFE funds for operating expenses" and

CASE NO. 22-80360-CIV-CANNON

walked McCoy through the Company's capital expenditure plans [ECF No. 59 ¶ 82].  The SAFE Plaintiffs were not told that the SAFE funds would be used to pay the Company's upcoming debts [ECF No. 59 ¶ 83].

Whitcomb continued to provide assurances to the SAFE Plaintiffs on September 7, 2021, when he emailed McCoy to indicate that several people were interested in the SAFE, and that the Company would hold any funds obtained in escrow [ECF No. 59 ¶ 84].  In a September 14, 2021, email, Whitcomb noted that the Company had "several other signatures come in" so they were targeting a September 20, 2021, close date [ECF No. 59 ¶ 84].  Whitcomb then asked McCoy via email on September 20, 2021, to send the signed SAFE agreement as others were doing and said: "***you have zero obligations until all signatures are received***" [ECF No. 59 ¶ 85 (emphasis in original)].

On September 27, 2021, the SAFE Plaintiffs consented to the release of their SAFE documents from escrow and funded their $25 million commitment "in reliance on the Company's and its officers' and directors' misrepresentations and omissions" [ECF No. 59 ¶ 86].

**Procedural History**

On the basis of these allegations, Plaintiffs filed a six-count Complaint, asserting the following claims:

(1) the Securities Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5, 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5, when they made false and materially misleading statements to entice the SAFE Plaintiffs to invest in the SAFE [ECF No. 59 ¶¶ 122–27] (**Count I** – Violations of § 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 Against the Securities Defendants);

(2) Wrigley, Holmes, and Whitcomb violated Section 20(a) of the Exchange Act, 15 U.S.C. § 78, because as controlling persons of the Company they are liable for the Company's violations of the securities laws [ECF No. 59 ¶¶ 128–34] (**Count II** – Violations of Sections 20(a) of the Securities Exchange Act of 1934 Against Wrigley, Holmes, and Whitcomb);

(3) the Securities Defendants violated the Georgia Uniform Securities Act, Ga. Code. Ann. § 10-5-58, when they made false and materially misleading statements to the SAFE

Plaintiffs in negotiating the SAFE Agreement [ECF No. 59 ¶¶ 135–41] (**Count III** – Violation of Georgia Uniform Securities Act of 2008 (Blue Sky Laws), Ga. Code Ann. § 10-5-58 Against the Securities Defendants);

(4) Wrigley, Holmes, and Whitcomb are jointly and severally liable for the Company's violations of the Georgia Uniform Securities Act, Ga. Code Ann. § 10-5-58(g), by virtue of their positions of control and authority [ECF No. 59 ¶¶ 142–48] (**Count IV** – Violation of Georgia Uniform Securities Act of 2008 (Blue Sky Laws), Ga. Code Ann. § 10-5-58(g) Against Wrigley, Holmes, and Whitcomb);

(5) the Securities Defendants are liable for common law fraud and fraudulent inducement for the false and misleading statements they made to the SAFE Plaintiffs in negotiating the SAFE Agreement [ECF No. 59 ¶¶ 149–57] (**Count V** – Common Law Fraud/Fraudulent Inducement Against the Securities Defendants); and

(6) Defendants violated the Georgia Uniform Voidable Transactions Act, Ga. Code Ann. § 18-2-74, by incurring obligations and transfers with the intent to hinder, delay, or defraud the Company's other investors [ECF No. 59 ¶¶ 158–64] (**Count VI** – Violation of the Georgia Uniform Voidable Transactions Act, Ga. Code. Ann. § 18-2-74 Against All Defendants).

[ECF No. 59].

On June 21, 2022, Defendants filed the instant Motion, seeking dismissal for failure to state a claim under Rules 12(b)(6) and 9(b) of the Federal Rules of Civil Procedure [ECF No. 82]. The Motion is ripe for adjudication [ECF Nos. 99, 100].

## LEGAL STANDARD

Rule 8(a)(2) requires complaints to provide "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). To avoid dismissal under Rule 12(b)(6), a complaint must allege facts that, if accepted as true, "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *see* Fed. R Civ. P. 12(b)(6). A claim for relief is plausible if the complaint contains factual allegations that allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 545). Conclusory allegations,

unwarranted deductions of facts or legal conclusions masquerading as facts will not prevent dismissal. *Oxford Asset Mgmt., Ltd. v. Jaharis*, 297 F.3d 1182, 1188 (11th Cir. 2002).

Securities fraud claims are subject to the heightened pleading requirements of Rule 9(b). *Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230, 1237 (11th Cir. 2008). That rule requires a party to "state with particularity the circumstances constituting fraud or mistake," but allows "[m]alice, intent, knowledge, and other conditions of a person's mind" to be alleged generally. Fed. R. Civ. P. 9(b). The Eleventh Circuit has explained that:

> While Rule 9(b) does not abrogate the concept of notice pleading, it plainly requires a complaint to set forth (1) precisely what statements or omissions were made in which documents or oral representations; (2) the time and place of each such statement and the person responsible for making (or, in the case of omissions, not making) them; (3) the content of such statements and the manner in which they misled the plaintiff; and (4) what the defendant obtained as a consequence of the fraud.

*FindWhat Inv. Grp. v. FindWhat.com*, 658 F.3d 1282, 1296 (11th Cir. 2011). Under Rule 9(b), it is "sufficient to plead the who, what, when, where, and how of the allegedly false statements and then allege generally that those statements were made with the requisite intent." *Mizzaro*, 544 F.3d at 1237.

Further, to survive a motion to dismiss, a securities-fraud claim brought under Rule 10b–5 also must satisfy the special fraud pleading requirements imposed by the Private Securities Litigation Reform Act (PSLRA). 15 U.S.C. § 78u-4. The PSLRA requires a complaint to "specify each statement alleged to have been misleading" and "the reason or reasons why the statement is misleading." 15 U.S.C. § 78u–4(b)(1)(B). It also requires, "with respect to each act or omission alleged," that a complaint "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Id.* § 78u–4(b)(2)(A). The required state of mind is an "intent to defraud or severe recklessness on the part of the defendant." *FindWhat*, 658 F.3d at 1299 (quoting *Edward J. Goodman Life Income Tr. v. Jabil Circuit, Inc.*, 594 F.3d 783, 790

(11th Cir. 2010)). And a "strong inference" is one that is "cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 324 (2007). Although factual allegations may be aggregated to infer scienter, scienter must be alleged with respect to each defendant and with respect to each alleged violation of the statute. *Phillips v. Sci.-Atlanta, Inc.*, 374 F.3d 1015, 1016 (11th Cir. 2004). If these PSLRA pleading requirements are not satisfied, the court "shall" dismiss the complaint. 15 U.S.C. § 78u–4(b)(3)(A).

## DISCUSSION

### I.      Fraud Claims (Counts I–V)

A review of the Complaint establishes that Plaintiffs have met their burden under both Rule 8 and the heightened pleading standards of Rule 9(b) and the PSLRA. Defendants ask the Court to dismiss the fraud counts in the Complaint (Counts I-V) because the Complaint fails to adequately allege misrepresentations made by the Securities Defendants, subsequent reliance by the SAFE Plaintiffs on any alleged misrepresentations, and the requisite scienter under the PSLRA [ECF No. 82]. The Court declines to do so and concludes that the Complaint meets the applicable heightened pleading standards. The Court addresses each argument in turn, focusing on the particular allegations in the Complaint.

#### a.  Misrepresentations

The Complaint raises four categories of misrepresentations allegedly made by the Securities Defendants during the course of the SAFE negotiations: (1) statements about the Company's existing default obligations; (2) statements about when the SAFE funding would be removed from escrow; (3) statements about how the SAFE funding would be used; and (4) statements about the Company's projected revenues.

To reiterate, Rule 9(b) requires a plaintiff to allege: "(1) the precise statements, documents,

or misrepresentations made; (2) the time, place, and person responsible for the statement, (3) the content and manner in which these statements misled the Plaintiffs, and (4) what the defendants gained in the alleged fraud." *Brooks v. Blue Cross & Blue Shield of Fla, Inc*., 116 F.3d 1364, 1380–81 (11th Cir. 1997). The PSLRA requires a complaint to "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1).

The Eleventh Circuit adheres to the "bespeaks caution" doctrine in assessing the materiality of forward-looking statements: "When an offering document's projections are accompanied by meaningful cautionary statements and specific warnings of the risks involved, that language may be sufficient to render the alleged omissions or misrepresentations immaterial as a matter of law." *S.E.C. v. Merch. Cap., LLC*, 483 F.3d 747, 767 (11th Cir. 2007). Further, "[s]tatements regarding future performance are actionable only if 'they are worded as guarantees or are supported by specific statements of fact or if the speaker does not genuinely or reasonably believe them.'" *FindWhat Inv. Grp*., 658 F.3d at 1304 (quoting *Merch. Cap., LLC*, 483 F.3d at 767).

The Complaint pleads particular material omissions made by the Securities Defendants when they failed to disclose their existing default obligations to the SAFE Plaintiffs throughout the SAFE funding negotiations. Plaintiffs point to two critical Company debts that were not disclosed during the SAFE negotiations: "(i) [the Company's] inability to satisfy the Bergmann debts; (ii) the existence of (and need for) the PE Fund Note and the consequent default of $300 million of Junior and Senior Notes" [ECF No. 99 p. 29]. The Complaint's allegations bear out Plaintiffs' argument, contrary to the Securities Defendants' position [ECF No. 82 pp. 32–36 (arguing that any such omissions were not material and that, even so, the Securities Defendants did not have an affirmative duty to disclose the default obligations to sophisticated investors like

Plaintiffs, because that information was not necessary to render their statements about the Company's financial circumstances not misleading given the already-disclosed risk information set forth in the SAFE Agreement's Risk Factors [ECF No. 83-3])].   As alleged, Holmes and Whitcomb, by virtue of their senior-level positions in the Company (Chief Strategy Officer and Chief Development Officer, respectively), knew during the SAFE negotiations in July through September 2021 that the Company had very large debts coming due immediately thereafter—indeed, the forbearance on the Green Health Note expired a mere thirty-three days after the SAFE Plaintiffs executed the SAFE Agreement, which obligated the Company to pay Green Health $54 million by November 1, 2021 [ECF No. 59 ¶ 100], with other payment obligations following soon thereafter [ECF No. 59 ¶¶ 26–27, 45].   In total, as of September 27, 2021, the "Company was about to experience a cascade of defaults on *$300 million* of its outstanding debt beginning *just three days later*" [ECF No. 59 ¶ 3 (emphasis in original)].   At no time during the SAFE negotiations were these very significant and looming obligations disclosed to the SAFE Plaintiffs [ECF No. 59 ¶ 69].   Instead, as alleged with sufficient detail, the Securities Defendants painted a rosy picture of the Company's future while hiding these massive debts [ECF No. 59 ¶ 71 (projecting the Company's revenue for 2022 at $618 million with an adjusted EBITDA of $167 million)].   These allegations are sufficient for the Court to find that the Securities Defendants omitted material information about the Company's default obligations in their negotiations with the SAFE Plaintiffs.   "Materiality is proved by showing a 'substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available.'"   *S.E.C. v. Ginsburg*, 362 F.3d 1292, 1302 (11th Cir. 2004) (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976).   Plaintiffs allege that these defaults, "if honestly revealed[,] would have stopped the SAFE Plaintiffs from investing $25 million in the SAFE" [ECF No. 59 ¶ 93].   This is reflected by the

SAFE Plaintiffs' repeated requests for information during the course of the negotiations [ECF No. 59 ¶¶ 72, 77 ("McCoy underscored more urgently that the SAFE Plaintiffs were interested in a SAFE investment solely if Defendants could provide reasonable assurance that the Company had sufficient capital to operate until a sale, and what amount of capital that was.")]. The omissions alleged in the Complaint are of the type that "would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available.'" *See Ginsburg*, 362 F.3d at 1302.

The Securities Defendants made similar misrepresentations when they assured the SAFE Plaintiffs that their $25 million contribution would not be removed from escrow until the investments in the SAFE fund totaled $50 million. Plaintiffs argue that they repeatedly informed Defendants of the importance of the funds remaining in escrow until the total SAFE fund reached $50 million, and in return, received reassurances that the funds would not be moved until that time [ECF No. 99 pp. 27–28]. Defendants dispute Plaintiffs' characterization of those statements as misrepresentations and argue that, in any event, the SAFE fund eventually reached the $50 million mark, without any allegation by Plaintiffs that the delay caused harm [ECF No. 82 pp. 30–31]. At this stage, taking the detailed allegations in the Complaint as true, the Court agrees with Plaintiffs that the Securities Defendants made material misrepresentations about when the SAFE Plaintiffs' money would be removed from escrow. On this issue, the Complaint specifies multiple occasions on which the Securities Defendants told the SAFE Plaintiffs that their funds would be held in escrow until the SAFE fund had $50 million in investments [ECF No. 59 ¶¶ 80, 84, 85]. In particular, the Complaint includes specific statements made by Defendants in emails, including a statement by Whitcomb that the Company would "receive[] signed SAFE notes today and tomorrow and hold those in escrow until signed documents for all [$50 million] come in" [ECF No. 59 ¶ 84 (alteration in original)]. The Complaint also alleges that the SAFE Plaintiffs

relied on these statements in making their decision to invest in the SAFE fund [ECF No. 59 ¶ 86].

Despite these reassurances, the Complaint adequately alleges that the "Defendants had closed the

SAFE and called the SAFE Plaintiffs' money *despite failing to reach the $50 million investment*"

[ECF No. 59 ¶ 102 (emphasis in original)].   On this record, the Complaint contains sufficiently

particularized allegations from which the Court can infer, under the applicable heightened pleading

standards, that the Securities Defendants made material misrepresentations about the timing

condition for removing the SAFE Plaintiffs' funds from escrow.

The same conclusion follows when analyzing the Securities Defendants' statements about

how the SAFE funding would be used—that is, that the Securities Defendants assured the SAFE

Plaintiffs that the money would be a "bridge" for the Company's operating expenses until a sale

was concluded [ECF No. 59 ¶¶ 66–68 (Holmes and Whitcomb describing how the SAFE funds

would be used)].   Plaintiffs argue that these statements were misleading because they omitted key

information, namely that the Company had looming debt obligations that it would need to use the

SAFE fund to meet [ECF No. 99 p. 16].   Defendants disagree, arguing that the SAFE Agreement

Risk Factors gave them broad discretion to utilize the funds, so even if the Securities Defendants

stated that the money would be used to pay the Company's operating expenses, that alone would

not qualify as an actionable misrepresentation because that was one possible use among many

allowed by the language of the risk factors [ECF No. 82 p. 30; *see also* ECF No. 83-3 p. 3

("Management will have broad discretion in the use of the Company's cash, cash equivalents, and

investments, and may not use them effectively.")].

Following careful review, and under the applicable pleading standards, the Court agrees

with Plaintiffs; the Complaint contains sufficient allegations indicating that, at the time the

Securities Defendants made the subject "bridge" statements about their plans for the SAFE funds,

they "had no basis to believe the SAFE funding was sufficient, given existing and approaching

defaults and cratering revenues" [ECF No. 99 p. 26]. This is confirmed by the allegations in the Complaint. The Securities Defendants reassured the SAFE Plaintiffs on multiple occasions that their contributions to the SAFE fund would be sufficient to "bridge" the Company through the fiscal year and that the funds would not be repurposed to cover the Company's existing debts [ECF No. 59 ¶¶ 67, 70, 72, 77, 81, 82, 83]. The SAFE Plaintiffs specifically informed the Securities Defendants that they would commit money to the SAFE fund only if "the funds raised in connection with the SAFE would be a sufficient bridge until the Company could be sold" [ECF No. 59 ¶ 72]. In response to each question from the SAFE Plaintiffs, Holmes and Whitcomb continued to reiterate that the SAFE fund would be sufficient to cover the Company's operating expenses in the interim. However, as the Complaint alleges in great detail, they did so with the knowledge that the Company had severe impending debts that the "Company intended to use the SAFE proceeds to attempt to stave off payment defaults on obligations to other investors" [ECF No. 59 ¶ 70]. Nowhere in the Risk Factors that Defendants now seek to use as a shield for liability were the impending debts, or the use of the SAFE funds to meet them, mentioned [*see* ECF No. 83-3]. The Risk Factors were given to Plaintiffs against the backdrop of the Securities Defendants' statements about how the funds were to be used and cannot now, as Defendants argue, be used at the motion to dismiss stage to bar liability for misrepresentations made during the SAFE negotiations. On the contrary, the allegations provided give rise to a strong inference that the Securities Defendants' reassurances about the way the SAFE funding would be utilized were made without a genuine or reasonable belief in their truth. *See FindWhat Inv. Grp.*, 658 F.3d at 1304 (quoting *Merch. Cap., LLC*, 483 F.3d at 767).

The final category of alleged misrepresentations relates to the Securities Defendants' statements about the Company's projected revenues [ECF No. 59 ¶ 71 (chart showing Company's projected revenue)]. Defendants argue that these statements were forward-looking projections

protected by the bespeaks caution doctrine [ECF No. 82 pp. 26–28].  Plaintiffs respond by pointing to the allegations in the Complaint that Holmes and Whitcomb were major players in the Company, each with substantial access and knowledge about the Company's rapidly occurring debts [ECF No. 59 ¶ 45 (noting that Holmes was involved in negotiating the Green Health Notes)].  Due to their positions, Plaintiffs argue, the Securities Defendants could not have had a genuine or reasonable belief that the statements they provided about the Company's future revenues were true, rendering them actionable misrepresentations [ECF No. 99 pp. 23–27 (quoting *FindWhat Inv. Grp.*, 658 F.3d at 1304)].  The Court has reviewed these competing positions and concludes as follows: while the misrepresentations regarding revenue standing alone may not be actionable, when added to the surrounding circumstances, the statements bolster the already strong and particularized inference of material misrepresentations and omissions and further support the denial of Defendants' motion to dismiss.

For these reasons, the allegations in the Complaint are sufficient, at this stage, to show material misrepresentations and omissions made by the Securities Defendants during the course of the SAFE negotiations.  The Court now addresses whether the SAFE Plaintiffs relied on those misrepresentations and omissions.

### b.  Reliance

The Complaint similarly contains a sufficient basis from which the Court can conclude that the SAFE Plaintiffs relied on the alleged misrepresentations and omissions made by the Securities Defendants.  The Complaint contains three different types of fraud claims: (1) federal securities fraud (Counts I & II); (2) Georgia securities fraud (Counts III & IV); and (3) common law fraud (Count V).  Defendants argue that the non-reliance clause contained in the SAFE Agreement [ECF No. 83-1 § 4(c)] shows that the SAFE Plaintiffs could not have reasonably relied on the statements made during the negotiations.  The Court addresses the application of the non-reliance

clause to each type of claim separately.

To begin, Plaintiffs have shown, accepting the allegations in the Complaint as true, that they relied on the Securities Defendants' misrepresentations and omissions sufficient to satisfy the requirements of federal securities law. "[A] plaintiff in a § 10(b) suit must demonstrate reliance—that is, that he or she actually relied upon the alleged misrepresentation." *Meyer v. Greene*, 710 F.3d 1189, 1194 (11th Cir. 2013). The most direct way for a plaintiff "to demonstrate reliance is by showing that he was aware of a company's statement and engaged in a relevant transaction . . . based on that specific misrepresentation." *Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds*, 568 U.S. 455, 461 (2013). Plaintiffs have done so here. Plaintiffs specifically plead that the SAFE Plaintiffs relied on the statements made during the course of the SAFE negotiations [ECF No. 59 ¶ 86]. This reliance is also clear from the other allegations contained in the Complaint. The SAFE Plaintiffs were aware of the statements made by Holmes and Whitcomb and repeatedly sought reassurances based on the information the Securities Defendants had provided [ECF No. 59 ¶¶ 72, 79]. After a nearly three-month negotiation period with multiple conversations via Zoom and email, the SAFE Plaintiffs paid $25 million into the SAFE fund [ECF No. 59 ¶¶ 66–86 (detailing SAFE negotiations)]. These allegations are sufficient to show that the SAFE Plaintiffs relied on the misrepresentations and omissions made by the Securities Defendants during the SAFE negotiations.

The non-reliance clause in the SAFE Agreement does not dictate a different result at this stage. The Eleventh Circuit has "never held that, regardless of the circumstances, an investor is always precluded from recovering under Rule 10b–5 if the misrepresentations upon which the investor relied were oral and conflict in some way with contemporaneous written representations available to the investor." *Bruschi v. Brown*, 876 F.2d 1526, 1529 (11th Cir. 1989). Instead, a court can consider the following factors in determining whether the investor's reliance was

justified: "(1) the sophistication and expertise of the plaintiff in financial and security matters; (2) the existence of long standing business or personal relationships between the plaintiff and the defendant; (3) the plaintiff's access to relevant information; (4) the existence of a fiduciary relationship owed by the defendant to the plaintiff, (5) concealment of fraud by the defendant; (6) whether the plaintiff initiated the stock transaction or sought to expedite the transaction; and (7) the generality or specificity of the misrepresentations." *Id.* Here, accepting the allegations in the Complaint as true, the *Bruschi* factors weigh in favor of finding that the SAFE Plaintiffs were justified in relying on the Securities Defendants' statements.  While the SAFE Plaintiffs are sophisticated investors [ECF No. 59 ¶ 67 (noting that the SAFE Plaintiffs engaged an investment advisor to negotiate the SAFE fund)], the Complaint does not show a long-standing relationship between the SAFE Plaintiffs and the Securities Defendants [ECF No. 59 ¶ 67 (detailing July 22, 2021, as the SAFE Plaintiffs' first interaction with the Securities Defendants)].  The SAFE Plaintiffs could not have otherwise accessed the relevant information as the Securities Defendants were in sole possession of the information about their Company's default obligations [ECF No. 59 ¶¶ 32–64 (information about the Company's capital structure)], and this information was not disclosed during the course of the negotiations [ECF No. 59 ¶ 69].  There are no allegations that the Securities Defendants owed a fiduciary duty to the SAFE Plaintiffs or that the Securities Defendants actively concealed fraud.  It is also unclear from the allegations in the Complaint who initiated the SAFE negotiations—i.e., the SAFE Plaintiffs or the Securities Defendants [ECF No. 59 ¶ 67 (detailing the beginning of negotiations)].  However, the misrepresentations on which the Complaint relies are specific and detailed, including as to the plan for releasing the funds from escrow, the purpose for which the Securities Defendants were soliciting the funds, and the particularized revenue projections and related statements [ECF No. 59 ¶¶ 71–72, 78, 80, 84].  Given the parties' brief relationship, the fact that the misrepresentations concerned information

solely in the Securities Defendants' possession, and the specificity of the alleged misrepresentations, the Court finds that the SAFE Plaintiffs' reliance on the Securities Defendants' misrepresentations was justified sufficient to survive a Rule 12(b)(6) challenge.

The same conclusion follows with regard to Plaintiffs' claims for violations of Georgia's securities laws.  The Georgia Uniform Securities Act, under which Plaintiffs bring Counts III and IV, requires that a plaintiff satisfy similar elements to those required by Section 10(b) of the federal securities laws, including that the plaintiff relied on the misstatements or omissions.  *GCA Strategic Inv. Fund, Ltd. v. Joseph Charles & Assocs., Inc.*, 537 S.E.2d 677, 682 (Ga. Ct. App. 2000).  As such, the Court finds adequate reliance by the SAFE Plaintiffs for the reasons stated above.  Defendants argue, however, that the non-reliance clause in the SAFE Agreement precludes Plaintiffs' claims because the existence of that clause shows that Plaintiffs cannot "prove that Defendants induced their investment '*by means of*' an untrue statement of a material fact" [ECF No. 100 p. 22 (quoting Ga. Code. Ann. § 10-5-58(b) (emphasis in original))].  However, the Georgia Supreme Court has made clear that "[t]o allow a purchaser to waive by contract at the time of purchase all violations of the Securities Act would eviscerate the very protections afforded by the statute and such a purported waiver would be void and of no effect."  *Meason v. Gilbert*, 226 S.E. 2d 49, 50 (Ga. 1976).  That principle applies here; Section 3(c) of the SAFE Agreement states that "[t]he performance and consummation of the transactions contemplated by this Safe do not and will not: (i) violate any material judgment, statute, rule, or regulation appliable to the Company" [ECF No. 83-1 § 3(c)].  This provision asks the SAFE Plaintiffs, in signing the SAFE Agreement, to warrant that the agreement "does not and will not" violate the securities laws.  As such, the non-reliance clause does not, on its own, operate to bar Plaintiffs' claims.  *See Meason*, 226 S.E. 2d at 50.  Plaintiffs have adequately pled reliance as to their Georgia securities law claims.

Finally, the Court turns to Plaintiffs' common law fraud claim in Count V and agrees with

Plaintiffs that it adequately alleges reliance under Florida law.[3]  *Johnson v. Davis*, 480 So. 2d 625, 627 (Fla. 1985).  The main dispute here is whether the non-reliance clause operates to bar the common law fraud claim.  It does not.  The parties agree that Delaware law determines the non-reliance clause's application to the common law claim because Section 5(f) of the SAFE Agreement provides that "[a]ll rights and obligations hereunder will be governed by the laws of the State of Delaware" [ECF No. 83-1 § 5(f); *see also* ECF No. 82 p. 41, ECF No. 99 p. 41].  Though Defendants are correct that the general rule under Delaware law is that non-reliance clauses bar a plaintiff from later bringing a fraud claim based on supposedly disclaimed misrepresentations, *see RAA Mgmt., LLC v. Savage Sports Holdings, Inc.*, 45 A.3d 107, 117 (Del. 2012), the non-reliance clause must be clear.  *Kronenberg v. Katz*, 872 A.2d 568, 593 (Del. Ch. 2004) ("In all of the decisions in which this court has found that fraud claims were barred by contractual provisions, the court has concluded that the contract's terms, when read together, constituted a clear statement by the plaintiff that it was not relying on the very factual statements that the plaintiff was contending to be fraudulent.").  Put another way, "for a contract to bar a fraud in the inducement claim, the contract must contain language that, when read together, can be said to add up to a clear anti-reliance clause by which the plaintiff has contractually promised that it did not rely upon statements outside the contract's four corners in deciding to sign the contract." *Id.*  That is not the case here.  The non-reliance clause Defendants seek to use as a shield to bar Plaintiffs' common-law fraud claims is Section 4(c) of the SAFE Agreement, which reads, in relevant part, "[t]he Investor confirms that no representations or warranties have been made to the Investor other than pursuant to Section 3 hereof and that the Investor has not relied on any representation or warranty in making or confirming the Investor's investment other than pursuant

---

[3] The parties do not dispute that Florida law governs the substantive elements of the common law fraud claim in Count V even if Delaware law governs the impact of the non-reliance clause on the reliance prong of the substantive claim [ECF No. 82 p. 42 n.15; ECF No. 99 p. 41].

to Section 3 hereof" [ECF No. 83-1 § 4(c)].  This provision is muddled by the provision in Section 4(e), which states that "[t]he investor acknowledges that it is not relying upon any person, other than the Company and its officers and directors, in making its investment or decision to invest in the Company" [ECF No. 83-1 § 4(e)].  The misrepresentations Plaintiffs raise as a basis for their common law fraud claim were made by Holmes and Whitcomb, both of whom were officers and directors of the Company [*see* ECF No. 59 ¶¶ 26 (denoting Holmes as director and Chief Strategy Officer), 27 (denoting Whitcomb as Chief Development Officer and eventual CEO)].  As such, it is not clear that the non-reliance clause in Section 4(c) of the SAFE Agreement bars Plaintiffs from relying on the statements made by Holmes and Whitcomb during the SAFE negotiations.  Because the language in the SAFE agreement does not "add up to a clear anti-reliance clause," the Court disagrees with Defendants' view that the non-reliance clause bars Plaintiffs' common law fraud claim as a matter of law.  *See Kronenberg*, 872 A.2d at 593.

      **c.   Scienter**

Defendants' argument that the Complaint does not contain sufficient allegations of scienter on the part of the Securities Defendants fails when viewed in light of the Complaint's detailed description of the Securities Defendants' knowledge throughout the SAFE negotiations.  The PSLRA requires that "in any private action arising under this chapter in which the plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind, the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  15 U.S.C. § 78u-4(b)(2)(A).  "To qualify as 'strong' . . . an inference of scienter must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent."  *FindWhat Inv. Grp*., 658 F.3d at 1300.  "In sum, the reviewing court must ask: When the allegations are accepted as true and taken collectively, would

a reasonable person deem the inference of scienter at least as strong as any opposing inference?" *Id.* To make this finding, courts are permitted to aggregate facts. *Phillips*, 374 F.3d at 1017 ("We readily join the courts that have interpreted the PSLRA to permit the aggregation of facts to infer scienter."). This scienter requirement applies to Plaintiffs' Georgia securities fraud claims (Counts III and IV)[4] and Florida common law fraud claim (Count V)[5] as well as the federal securities fraud claims (Counts I and II).

Defendants argue that Plaintiffs have failed to adequately allege scienter as to any of the Securities Defendants because their allegations are "conclusory" and rely too heavily on the Securities Defendants' positions as officers and directors of the Company [ECF No. 82 pp. 43–51]. Although it is true that a party's position is not sufficient to support a finding of scienter, *see Durgin v. Mon*, 415 F. App'x 161, 165 (11th Cir. 2011), Defendants' argument ignores the plethora of allegations in the Complaint about what each of the Securities Defendants knew at the time the alleged misrepresentation was made. To analyze the Complaint's allegations effectively, the Court deals with each of the individual Securities Defendants in turn.

Beginning with Whitcomb, the Complaint contains sufficient allegations from which the Court can infer that he acted with the required state of mind. Whitcomb was functioning as the Company's Chief Development Officer during the SAFE negotiations [ECF No. 59 ¶ 27]. He was a key part of the SAFE negotiations. He attended meetings with the SAFE Plaintiffs where he and Holmes provided the SAFE Plaintiffs with detailed financial information about the Company [ECF No. 59 ¶¶ 67, 68, 72, 73, 81, 84]. He also affirmatively represented to the SAFE Plaintiffs

---

[4] *Keogler v. Krasnoff*, 601 S.E.2d 788, 791 (2004).

[5] Under Florida common law, "scienter, can be established by either one of the three following phases of proof: (1) That the representation was made with actual knowledge of its falsity; (2) without knowledge either of its truth or falsity; (3) under circumstances in which the person making it ought to have known, if he did not know, of its falsity." *Parker v. State of Fla. Bd. of Regents ex rel. Fla. State Univ.*, 724 So.2d 163, 168 (Fla. Dist. Ct. App. 1998).

in emails that the SAFE funds would not be pulled from escrow until the funds totaled $50 million [ECF No. 59 ¶ 80, 84]. Whitcomb's position, coupled with his detailed knowledge of the Company's financial status, is sufficient for the Court to draw, at this stage of the litigation, a cogent inference that Whitcomb acted with the requisite scienter in making the alleged misrepresentations to the SAFE Plaintiffs.

The allegations against Holmes are even more robust. Not only was Holmes the Company's director and Chief Strategy Officer during the negotiations [ECF No. 59 ¶ 26], but the Complaint alleges that he was heavily involved in the Company's negotiations to acquire the Green Health Notes [ECF No. 59 ¶ 45 ("Holmes, represented Green Health in the transaction.")]. This makes clear that Holmes had knowledge of at least some, if not all, of the Company's existing default obligations. With this knowledge, Holmes engaged in the SAFE negotiations with the SAFE Plaintiffs where he provided the SAFE Plaintiffs with detailed financial information about the Company [ECF No. 59 ¶¶ 67, 68, 70, 72, 73, 76, 77, 78, 81, 82]. At no time during these negotiations did Holmes mention the Green Health Notes or any of the Company's other default obligations [ECF No. 59 ¶ 69]. Taken together, the allegations in the Complaint are sufficient to plead scienter on the part of Holmes.

Though Wrigley did not personally engage in the SAFE negotiations, the Complaint's allegations detail his involvement with both the Company's existing debt obligations and the SAFE fund itself, the combined effect of which is sufficient to establish scienter at this stage. During the course of the SAFE negotiations, Wrigley operated as CEO of the Company [ECF No. 59 ¶ 25]. He was a major player in the Company's decision to enter into the Green Health and PE Fund Notes [ECF No. 59 ¶¶ 43–45, 59]. He served as the Chairman and CEO of Green Health [ECF No. 59 ¶ 43] and had an inside track to PE Fund [ECF No. 59 ¶ 59 (stating that Wrigley's "namesake family office is the General Partner" of PE Fund)]. These allegations, accepted as true,

sufficiently plead Wrigley's clear knowledge about the Company's default obligations at the time the SAFE negotiations were ongoing.  Wrigley was also heavily involved in the SAFE Fund, though he had no direct contact with the SAFE Plaintiffs.  The Complaint alleges that Holmes and Whitcomb told the SAFE Plaintiffs that "Wrigley might also serve as a backstop in the event that the Company was unable to obtain $50 million in commitments" [ECF No. 59 ¶ 79].  He also sent an email to investors regarding the Company's decision not to go forward with the SPAC transaction [ECF No. 59 ¶ 101].  In November 2021, Wrigley also eventually invested $10.5 million of his personal funds into the SAFE to meet the $50 million initial requirement [ECF No. 59 ¶ 103].  These allegations as to Wrigley are sufficient at this juncture to meet the heightened pleading requirements attendant to Plaintiffs' various fraud claims.

As a final point, under the PSLRA, "personal financial gain may weigh heavily in favor of a scienter inference." *Tellabs, Inc.*, 551 U.S. at 325.  The Complaint shows a motivation on the part of the Securities Defendants to fund the SAFE in order to ensure that the Company did not experience financial ruin [ECF No. 59 ¶ 66].  Wrigley especially stood to gain personally from any success of the SAFE as it would help alleviate the Company's financial burdens and ensure that his other related companies, Green Health and PE Fund, received their payments [ECF No. 59 ¶ 119].  These allegations of personal financial gain on the part of the Securities Defendants bolster the Court's ultimate conclusion that scienter is established by the allegations in the Complaint.

## II.    Control Liability

Having found that the Complaint alleges sufficient facts to state a claim for securities fraud under federal law, Georgia statutory law, and Florida common law, the Court now considers whether Whitcomb, Holmes, and Wrigley can be held jointly and severally liable for the Company's securities violations.  A review of the facts in the Complaint answers that question in the affirmative.

Section 20(a) of the Securities Act imposes joint and several liability on "control persons" of the entity liable under federal securities law. *Laperriere v. Vesta Ins. Grp., Inc.*, 526 F.3d 715, 721 (11th Cir. 2008). The statute provides, in relevant part, that "[e]very person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable." 15 U.S.C. § 78t. The relevant regulation defines control as "the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through ownership of voting securities, by contract, or otherwise." 17 C.F.R. § 230.405. This determination is "dependent on the particular factual circumstances of each case." *Laperriere*, 526 F.3d at 723. Georgia law similarly imposes joint and several liability on "[a] person that directly or indirectly controls" or "[a]n individual who is a managing partner, executive officer, or director of" a party found to have violated the securities laws. Ga. Code Ann. § 10-5-58(g)(1)–(2).[6]

The Complaint contains sufficient factual allegations from which the Court can conclude that Whitcomb had sufficient "control" over the Company to be held jointly and severally liable for the Company's securities law violations. Whitcomb was the Company's Chief Development Officer [ECF No. 59 ¶ 27]. In that role, he negotiated the SAFE Agreement with the SAFE Plaintiffs, which ultimately led to an investment contract involving the Company and the SAFE Plaintiffs [ECF No. 59 ¶¶ 85–86; *see also* ECF No. 59 ¶¶ 66–86 (SAFE funding negotiations)]. This is sufficient to show that Whitcomb had the "power to . . . cause the direction of the management and policies of [the Company] by contract." *See* 17 C.F.R. § 230.405.

The same conclusion follows with respect to Holmes. Holmes, in his position as director

---

[6] The remainder of this section refers to the federal (Count I) and Georgia (Count II) securities law violations brought against the Securities Defendants collectively as "securities law violations."

and chief strategy officer was permitted to control the Company's position by entering into contracts on behalf of the Company. Not only did Holmes engage in the SAFE funding negotiations, during which he provided the SAFE Plaintiffs with the initial draft of the SAFE Agreement [ECF No. 59 ¶ 70; *see also* ECF No. 59 ¶¶ 66–86 (SAFE funding negotiations)], but he was also instrumental in the negotiations and ultimate signing of the Green Health Notes [ECF No. 59 ¶ 45]. The allegations in the Complaint show Holmes in a position to obligate the Company in contracts for both debt (Green Health Notes) and investments by third parties (SAFE Agreement). These allegations are sufficient for the Court to find, at this stage, that Holmes was a "control person" and thus jointly and severally liable for the Company's securities law violations.

Finally, in examining the allegations regarding Wrigley's conduct, it is clear that he is a "control person" within the meaning of the statute and can be held jointly and severally liable for the Company's securities law violations. As Chairman and CEO of the Company [ECF No. 59 ¶ 25], Wrigley had the power "to direct or cause the direction of the management and policies of" the Company. *See* 17 C.F.R. § 230.405. This is borne out by the allegations in the Complaint. Wrigley entered into at least two large debt obligations on behalf of the Company, the Green Health and PE Fund Notes [ECF No. 59 ¶¶ 42–43, 59]. During his tenure as CEO, the Company also entered into a settlement with Defendant Bergmann wherein the Company was obligated to pay $38.5 million [ECF No. 59 ¶ 55]. Emails sent by Wrigley show his ability to steer the Company's direction [*see* ECF No. 59 ¶ 101 (detailing the email sent by Wrigley stating that the Company "would 'focus on alternative financing avenues to pursue a vast array of growth opportunities'")]. His large personal investment in the SAFE fund to ensure that it went forward further shows his control over the Company [ECF No. 59 ¶ 103]. Taken together, the allegations in the Complaint are more than sufficient to show that Wrigley had "control" over the Company in a way that would render him jointly and severally liable for the Company's violations of the

federal securities laws.

In sum, Plaintiffs, at this stage, have stated a claim for joint and several liability by the individual Securities Defendants.

### III.    GVUTA Claim (Count VI)

The Court declines to exercise supplemental jurisdiction over Techview's claim under the Georgia Uniform Voidable Transactions Act (GVUTA), *see* Ga. Code Ann. § 18-2-74, which arises out of facts materially separate from the other five counts in the Complaint.

When district courts have original jurisdiction over a civil action, "the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a).  To be a part of the same case or controversy, "[t]he state and federal claims must derive from a common nucleus of operative fact." *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 725 (1966).  Factors considered in making this determination include whether the claims "will involve the same witnesses, presentation of the same evidence, and determination of the same, or very similar, facts." *Palmer v. Hosp. Auth. of Randolph Cnty.*, 22 F.3d 1559, 1563–64 (11th Cir. 1994).

The GVUTA claim does not form a part of the same case or controversy as Plaintiffs' fraud claims.  Several factors inform the Court's conclusion.  First, Techview, the Plaintiff bringing the GVUTA claim, is not named in any of the other counts.  Additionally, Defendants Green Health, PE Fund, and Bergmann are named only in the GVUTA claim.  Additionally, the incidents that form the basis of Techview's GVUTA claim occurred well before the SAFE negotiations that form the basis of Plaintiffs' federal fraud claims.  The GVUTA claim asks the Court to "void the obligations incurred, and transactions made, pursuant to the Green Health Notes, Bergmann Debts, and the PE Fund Note" [ECF No. 59 ¶ 159].  These transactions were entered into by the Company

before the SAFE Plaintiffs ever entered the equation.  The Company took on these obligations in January 2021 (Bergmann Debts) [ECF No. 59 ¶ 54], May 2021 (Green Health Notes) [ECF No. 59 ¶ 49], and June 2021 (PE Fund Note) [ECF No. 59 ¶ 58].  The SAFE fund negotiations did not begin until July 2021, with the actual SAFE Agreement being executed on September 27, 2021 [ECF No. 59 ¶ 66].  More substantively, although the SAFE Plaintiffs allege that Defendants made material omissions during the SAFE negotiations by not disclosing the debts that Techview now seeks to void in Count VI (e.g., the Bergmann Debts, the Green Health Notes, and the PE Fund Note) [*see* ECF No. 59 ¶ 69], the SAFE Plaintiffs' federal claims are not related to, or otherwise dependent on, the merits or validity of those debts [ECF No. 59 ¶¶ 158–64].  There is thus an insufficient basis to believe that proof of Techview's GVUTA claim would involve the same witnesses, evidence, or set of facts as the SAFE Plaintiffs' federal securities fraud claims.

For these reasons, Techview's GVUTA claim is not a part of the same "case or controversy" as the SAFE Plaintiffs' federal securities fraud claims.  The Court declines to exercise supplemental jurisdiction over Count VI.

## CONCLUSION

Accordingly, it is hereby **ORDERED AND ADJUDGED** as follows:

1. Defendants' Combined Motion to Dismiss Plaintiffs' Complaint [ECF No. 82] is **GRANTED IN PART AND DENIED IN PART**.

   a. Plaintiffs' Georgia Uniform Voidable Transactions claim (Count VI) is **DISMISSED WITHOUT PREJUDICE**.

   b. Plaintiffs' remaining claims (Counts I–V) may proceed.

2. The Securities Defendants shall file an answer to Counts I–V of the Complaint on or before **July 20, 2023**.

CASE NO. 22-80360-CIV-CANNON

3. The Clerk of Court shall **TERMINATE** Defendants Green Health Endeavors, LLC, PE Fund LP, and Robert Bergmann from this action.

4. On or before **August 1, 2023**, the parties shall file an updated **joint** scheduling report containing all of the information specified in Local Rule 16.1 along with a Joint Proposed Scheduling Order that is both attached as an exhibit on CM/ECF and sent in Word format via email to cannon@flsd.uscourts.gov.

5. In addition, on or before **August 1, 2023**, the parties, including governmental parties, must file Certificates of Interested Parties and Corporate Disclosure Statements that contain a complete list of persons, associated persons, firms, partnerships, or corporations that have a financial interest in the outcome of this case, including subsidiaries, conglomerates, affiliates, parent corporations, and other identifiable legal entities related to a party.  Throughout the pendency of the action, the parties are under a continuing obligation to amend, correct, and update the Certificates.

**DONE AND ORDERED** in Chambers at Fort Pierce, Florida, this 5th day of July 2023.

**AILEEN M. CANNON**
**UNITED STATES DISTRICT JUDGE**

cc:    counsel of record

29