## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| TRADEINVEST ASSET MANAGEMENT COMPANY (BVI) LTD., FIRST OCEAN ENTERPRISES SA, and TECHVIEW INVESTMENTS LTD., <br><br> Plaintiffs, <br><br> -against- <br><br> WILLIAM "BEAU" WRIGLEY, JR., JAMES HOLMES, JAMES WHITCOMB, SH PARENT INC. d/b/a PARALLEL, and SURTERRA HOLDINGS INC. <br><br> Defendants. | Case No. 22-CV-80360-AMC <br><br> **ANSWER AND AFFIRMATIVE DEFENSES** <br><br> **JURY TRIAL DEMANDED** |

Defendant William "Beau" Wrigley, Jr. ("Mr. Wrigley") respectfully submits this Answer and Affirmative Defenses to the Complaint filed by Plaintiffs TradeInvest Asset Management Company (BVI) Ltd. ("TradeInvest"), First Ocean Enterprises SA ("First Ocean," and with TradeInvest, the "SAFE Plaintiffs"), and Techview Investments Ltd. ("Techview").[1]

In responding to Plaintiffs' allegations, Mr. Wrigley denies any such averments in the headings and subheadings of the Complaint. Further, except as explicitly admitted herein, Mr. Wrigley denies each and every allegation of the Complaint, including, without limitation, any allegations in the headings, subheadings, footnotes, and/or prayer for relief.

### NATURE OF THE ACTION

1.      This is an action against Beau Wrigley, Jr., scion of the Wrigley fortune, and associated individuals and entities, for committing federal securities fraud in violation of Section 10(b) of the 1934 Securities Exchange Act, and SEC Rule 10b-5 (among other violations).

---

[1] Capitalized terms, unless otherwise defined, shall have the meanings set forth in the Complaint Dkt. 59. Adoption of the capitalized terms herein is for the purposes of convenience and do not constitute an admission as to any allegation.

**ANSWER:**   Mr. Wrigley denies any wrongdoing.   The allegations in Paragraph 1 contain characterizations, legal argument, and conclusions to which no response is necessary. To the extent those allegations require a response, Mr. Wrigley denies them.

2.      Wrigley, the Chairman of the Company and its CEO during the relevant period, along with the other Securities Defendants, fraudulently induced the SAFE Plaintiffs, by means of myriad misrepresentations and omissions about the Company's true financial condition, to invest $25 million in a so-called "SAFE"—a Simple Agreement for Future Equity—issued by the Company. Wrigley and the Securities Defendants initially portrayed the SAFE as a way to maintain planned investments in operating and capital expenditures pending consummation of an announced public merger through a SPAC (as defined below). Thereafter, once the merger talks terminated, the Securities Defendants sold the SAFE as a way to "bridge" the Company's operating and capital expenditures through the second quarter of 2022, by which time an alternative sale could be consummated.

**ANSWER:**      Mr. Wrigley admits that he previously held positions as CEO and Chairman of Surterra Holdings Inc. and SH Parent, Inc. The remaining allegations in Paragraph 2 contain characterizations, legal argument, and conclusions to which no response is necessary. To the extent those allegations require a response, Mr. Wrigley denies them.

3.      In reality, however, the SAFE was a bridge to nowhere. Wrigley and his co-Defendants were secretly just trying to keep the Company from collapsing under the weight of its debt. Indeed, among many other things, Wrigley and the other Securities Defendants failed to inform the SAFE Plaintiffs on September 27, 2021—the day the SAFE Plaintiffs funded their $25 million investment—that the Company was about to experience a cascade of defaults on ***$300 million*** of its outstanding debt beginning ***just three days later***.

**ANSWER:**      Mr. Wrigley admits that the SAFE Plaintiffs funded their $25 million investment on or about September 27, 2021. The remaining allegations in Paragraph 3 contain characterizations, legal argument, and conclusions to which no response is necessary. To the extent those allegations require a response, Mr. Wrigley denies them.

4.      Following several months of discussions, Wrigley and the other Securities Defendants were responsible for, among others, the following catalogue of misrepresentations and omissions to induce the SAFE Plaintiffs to provide the Company with $25 million:

a.      That as of September 27, 2021—the day the SAFE Plaintiffs released their $25 million from escrow—the Company was on the precipice of (i) covenant and payment defaults on $145 million of recently issued junior debt, (ii) cross-defaults on $165 million of senior debt,

and (iii) defaulting on a $13.5 million promissory note issued by Wrigley's "family office," Defendant PE Fund (the "**PE Fund Note**") (PE Fund also held $91.2 million of the Company's $165 million in senior debt);

       b.    That as of September 27, 2021, the Company also was *already in payment default* on approximately $44 million of notes issued by Defendant Green Health (the "**Green Health Notes**")—a *different* Wrigley family office;

       c.    That, before Wrigley and his co-Defendants would move the SAFE Plaintiffs' money out from escrow, the total SAFE investment would have reached $50 million; yet the Securities Defendants took the SAFE Plaintiffs' funds on September 27, 2021 despite having fallen *$10 million short*;

       d.    That, on June 30, 2021, PE Fund and the Company *had violated the Company's junior debt* by entering into the PE Fund Note on terms, devised by Wrigley, that would make a loan shark jealous;

       e.    That the $50 million SAFE investment would be used to fund capital expenditures that would bridge the Company through the end of the second quarter of 2022, when the Securities Defendants actually needed the money to make payments to creditors (including Wrigley's own PE Fund) and would not last even until the end of December 2021; and

       f.    That the Company's performance was actually experiencing wide swings in the opposite direction from what was presented to the SAFE Plaintiffs, making inconceivable the assurances of the funds lasting until the end of 2Q22, especially in light of the imminent bust of financial covenants facing the Company under its junior debt agreement.

     **ANSWER:**    Mr. Wrigley admits that the SAFE Plaintiffs advanced $25 million in SAFE financing to the Company, and that PE Fund, among others, held $91.2 million in Senior Notes issued by the Company.  The remaining allegations in Paragraph 4 contain characterizations, legal argument, and conclusions to which no response is necessary. To the extent those allegations require a response, Mr. Wrigley denies them.

     5.    Wrigley's intent to defraud the SAFE Plaintiffs is evident from his own extreme reluctance to throw good money after bad by committing even a tiny portion of his famous fortune to the SAFE. Wrigley initially agreed to put $5 million into the SAFE only after the SAFE Plaintiffs insisted that he also have some "skin in the game." Then Wrigley ignored this promise, and the SAFE closed without Wrigley's investment and far short of its promised $50 million investment level. The SAFE Plaintiffs did not discover Wrigley's failure until nearly two months later, when it learned that the SAFE investment had never reached the promised $50 million. To avoid further scrutiny of the investment and Wrigley's and his co-Defendants' conduct, Wrigley quickly made up the shortfall of more than $10 million. All the while, however, the Company had quietly used $3 million of the SAFE money to pay back part of Wrigley's PE Fund Note, which

means that while Wrigley was out soliciting "bridge" financing, he was actually ***taking $3 million out of the Company***.

**ANSWER:** Mr. Wrigley admits that he invested $10.6 million in the SAFE. The remaining allegations in Paragraph 5 contain characterizations, legal argument, and conclusions to which no response is necessary. To the extent those allegations require a response, Mr. Wrigley denies them.

6.     The Securities Defendants' urgent need for cash before the end of September, and their willingness to make misrepresentations and omissions to obtain it, was a direct result of Wrigley's profligate leadership. By the summer of 2021, Wrigley had burdened the Company with enormous amounts of debt, and it could not make the required payments as they came due. By the end of June 2021, as discussed above, the Company had incurred more than $350 million in debt, a portion of which—the PE Fund Note—constituted an undisclosed default under $300 million of its Senior and Junior Note. Added to this was the Company's relatively poor recent performance— due, in part, to an industry-wide decline and, in part, to Wrigley's incompetence as CEO—which meant the Company would fall far short of its own contemporaneous rosy projections.

**ANSWER:**     Mr. Wrigley admits that there was an industry-wide decline in the cannabis industry in or around the summer of 2021, and that Company had issued a note to PE Fund for $13.5 million. The remaining allegations in Paragraph 6 contain characterizations, legal argument, and conclusions to which no response is necessary. To the extent those allegations require a response, Mr. Wrigley denies them.

7.     In fact, the Company artificially maintained a strong financial appearance in order to take the SAFE Plaintiffs' money, only to slash it just weeks later, and even more drastically thereafter. The side-by-side comparison of the Company's projections shown to the SAFE Plaintiffs pre-closing and post-closing is nothing short of staggering:

|  | **August 2021** | **October 2021** | **January 2022** |
|---|---|---|---|
| Projected 2022 Net Revenue | $618 million | $492 million | $362 million |
| Projected 2022 Adjusted EBITDA | $167 million | $99 million | $56 million |

**ANSWER:** To the extent the allegations in Paragraph 7 purport to characterize projections and related agreements the Company allegedly provided to Plaintiffs, Mr. Wrigley denies those characterizations and respectfully refers the Court to those projections and related agreements, which speak for themselves. The remaining allegations in Paragraph 7 contain characterizations, legal argument, and conclusions to which no response is necessary. To the extent those allegations require a response, Mr. Wrigley denies them.

8.     In other words, the Company cut its revenue projections for 2022 by *40 percent*, and their EBITDA projections for 2022 by *two-thirds*, between the month before the Securities Defendants took the SAFE Plaintiffs' money and just three months after. The sheer magnitude of the revisions indicates that the Company's August 2021 projections—which they used for purposes of marketing the SAFE to the SAFE Plaintiffs—lacked any reasonable basis.

**ANSWER:** To the extent the allegations in Paragraph 8 purport to characterize projections and related agreements the Company allegedly provided to Plaintiffs, Mr. Wrigley denies those characterizations and respectfully refers the Court to those projections and related agreements, which speak for themselves. The remaining allegations in Paragraph 8 contain characterizations, legal argument, and conclusions to which no response is necessary. To the extent those allegations require a response, Mr. Wrigley denies them.

9.     Still, during the summer of 2021, Wrigley and the Securities Defendants were aiming to put all of the above behind them through acquisition by special purpose acquisition company ("**SPAC**") Ceres Acquisition Corp. ("**Ceres**"), which at the time was backed by music industry mogul Scott "Scooter" Braun. So, at that point, Wrigley and the other Securities Defendants pitched the SAFE financing as a "bridge" until the SPAC could be completed. But by August 2021, the original SPAC transaction value of $1.8 billion had been adjusted to just over $1 billion, and, regardless, Wrigley understood that the Company's poor performance would translate to poor performance in the public markets. He therefore let the SPAC transaction die on the vine (or even orchestrated it so the transaction would never close).

**ANSWER:** Mr. Wrigley admits that the Company signed an agreement pursuant to which it would merge with Ceres Acquisition Corp., a special purpose acquisition company and that the planned transaction was terminated on or about September 30, 2021. The remaining

allegations in Paragraph 9 contain characterizations, legal argument, and conclusions to which no response is necessary. To the extent those allegations require a response, Mr. Wrigley denies them.

10.     To keep investors on the hook even after the SPAC had dissipated, Wrigley and the Securities Defendants pivoted (before the truth about the Company could come out and ruin everything) to claiming that the Company was worth considerably more than the adjusted SPAC valuation, and would obtain much greater value through someone else. So, the story now was that the Company needed a "bridge" until it could complete an alternative sale transaction. Holmes and Whitcomb supported this storyline by telling the SAFE Plaintiffs that cannabis industry players were lighting up their phones and lining up, unsolicited, to buy the Company.

**ANSWER:**     Mr. Wrigley lacks sufficient information to answer the allegations in Paragraph 10 concerning what Mr. Holmes and Mr. Whitcomb told the SAFE Plaintiffs and, on that basis, denies those allegations.   The remaining allegations in Paragraph 10 contain characterizations, legal argument, and conclusions to which no response is necessary. To the extent those allegations require a response, Mr. Wrigley denies them.

11.     The SAFE Plaintiffs prudently inquired as to how much capital the Company would actually need to operate until the end of the second quarter of 2022—by which time the Company expressed extreme confidence that it would be sold to a major industry player. The Company claimed $50 million in SAFE funds would be enough, and the funds would be used to improve the Company's assets to make it even more attractive to a buyer while the Company completed its sales process.

**ANSWER:**     Mr. Wrigley lacks sufficient information to answer the allegations in Paragraph 10 concerning an inquiry by the SAFE Plaintiffs. The allegations in Paragraph 11 contain characterizations, legal argument, and conclusions to which no response is necessary. To the extent those allegations require a response, Mr. Wrigley denies them.

12.     On the basis of these misrepresentations, and ignorant of the Company's dire undisclosed financial situation, on September 27, 2021, the SAFE Plaintiffs advanced $25 million in SAFE financing to the Company.

**ANSWER:**     Mr. Wrigley admits that the SAFE Plaintiffs advanced $25 million in SAFE financing to the Company on or about September 27, 2021. Mr. Wrigley lacks sufficient information to answer the allegations in Paragraph 12 concerning Plaintiff's reasons for agreeing

to provide financing to the Company and, on that basis, denies them. The remaining allegations in Paragraph 12 contain characterizations, legal argument, and conclusions to which no response is necessary. To the extent those allegations require a response, Mr. Wrigley denies them.

13.     In fact, the Securities Defendants had no basis to represent that the SAFE would tide the Company over until the end of 2Q22—or even through the fall of 2021. The Company had defaulted, and was continuing to default, on its outstanding debt; it had incurred other obligations (that it also couldn't pay); its projections were an inflated fantasy; it needed the SAFE to make Ponzi-like payments to its other investors; and these and other performance issues meant it would run out of funds long before 2Q22.

**ANSWER:**     Mr. Wrigley admits that certain putative defaults by the Company on certain debts were alleged in or before fall of 2021.  The remaining allegations in Paragraph 13 contain characterizations, legal argument, and conclusions to which no response is necessary. To the extent those allegations require a response, Mr. Wrigley denies them.

14.     In November 2021, having backed himself into a corner, Wrigley resigned as CEO and his PE Fund, in its capacity as holder of $91.2 million of the Company's senior notes (and not in its capacity as lender of the PE Fund Note), sent the first of the default notices to the Company. The junior creditors soon followed with their own more comprehensive notice, which first exposed that the PE Fund Note was a default under the Junior Note (which in turn cross-defaulted the Senior Notes). And beginning in December 2021, the SAFE Plaintiffs began to learn the extent to which the Securities Defendants had misrepresented the Company's condition and the nature of the SAFE Plaintiffs' investment.

**ANSWER:**     Mr. Wrigley admits that he resigned as CEO of Surterra Holdings Inc. effective November 2021. Mr. Wrigley further admits that PE Fund, among others, held $91.2 million in Senior Notes issued by the Company. Mr. Wrigley further admits that PE Fund served a notice of events of default on the Company on November 29, 2021. To the extent the allegations in Paragraph 14 purport to characterize the notices of events of default, Mr. Wrigley denies those characterizations and respectfully refers the Court to the notices of events of default, which speak for themselves. The remaining allegations in Paragraph 14 contain characterizations, legal argument, and conclusions to which no response is necessary. To the extent those allegations require a response, Mr. Wrigley denies them.

15.     The misconduct described above, and detailed herein, entitles the SAFE Plaintiffs to rescission of their investment with attendant costs, fees and other expenses, including fees and expenses for enforcing their rights. Indeed, although the Company participates in the comparatively new industry of legal cannabis, and the investment at issue is a relatively new and novel security, the Securities Defendants still committed good old-fashioned securities fraud.

**ANSWER:**     The allegations in Paragraph 15 contain characterizations, legal argument, and conclusions to which no response is necessary. To the extent those allegations require a response, Mr. Wrigley denies them.

16.     Separately, Techview, as a holder of the Company's Senior Notes (as defined below), is entitled to invalidation of the Green Health Notes, the Bergmann Debts, and the PE Fund Note as voidable transactions under applicable Georgia law.

**ANSWER:**     Pursuant to the Court's July 5, 2023 Order, Dkt. 108, Plaintiffs' Sixth Cause of Action was dismissed, and no response to the allegations in Paragraph 16 is required. To the extent those allegations require a response, Mr. Wrigley denies them.

## PARTIES

17.     Plaintiff TradeInvest Asset Management Company (BVI) Ltd. is a BVI registered company. TradeInvest invested $20 million in the SAFE.

**ANSWER:**     Mr. Wrigley admits that TradeInvest Asset Management Company (BVI) Ltd. invested $20 million in the SAFE.  Mr. Wrigley lacks sufficient information to answer the remaining allegations in Paragraph 17 and, on that basis, denies it.

18.     Plaintiff First Ocean Enterprises SA is a Cypriot entity, with its principal place of business in Nicosia, Cyprus. First Ocean invested $5 million in the SAFE.

**ANSWER:**     Mr. Wrigley admits that First Ocean Enterprises SA invested $5 million in the SAFE. Mr. Wrigley lacks sufficient information to answer the remaining allegations in Paragraph 18 and, on that basis, denies it.

19.     Non-party PSQ Capital ("**PSQ**") serves as the investment adviser to First Ocean and TradeInvest.

**ANSWER:** Mr. Wrigley lacks sufficient information to answer the allegations in Paragraph 19 concerning the relationship between PSQ, First Ocean, and TradeInvest and, on that basis, denies those allegations.

20. Plaintiff Techview Investments Ltd. is a BVI registered company. Techview holds $10 million of the Company's Senior Notes and $10 million of the Company's Series D Preferred Stock.

**ANSWER:** Pursuant to the Court's July 5, 2023 Order, Dkt. 108, Techview Investments Ltd.'s lone claim in this action was dismissed, and no response to the allegations in Paragraph 20 is required. To the extent a response is required, the remaining allegations in Paragraph 20 contain characterizations, legal argument, and conclusions to which no response is necessary. To the extent those allegations require a response, Mr. Wrigley denies them.

21. Defendant Parallel, a Delaware corporation, is a holding company that focuses on the development, production, and sale of cannabis products, oils, and extracts through subsidiaries, including in the State of Florida. Its principal place of business is in Georgia.

**ANSWER:** Mr. Wrigley admits to the allegations in Paragraph 21 except that he denies that Parallel's principal place of business is Georgia.

22. Defendant Surterra Holdings Inc. is a Delaware corporation with its principal place of business in Georgia and a registered agent in Florida. Parallel and Surterra are referred to herein as the "Company."

**ANSWER:** Mr. Wrigley admits that Surterra Holdings Inc. is a Delaware corporation and that Parallel and Surterra are referred to as the "Company." Mr. Wrigley denies the remaining allegations in Paragraph 22.

23. Defendant PE Fund, a Delaware limited partnership, is a holder of $91.2 million in the Company's Senior Notes and the holder of the PE Fund Note. PE Fund is an investment vehicle within Wrigley's family office, and is controlled by Wrigley out of West Palm Beach, Florida.

**ANSWER:** Pursuant to the Court's July 5, 2023 Order, Dkt. 108, PE Fund has been dismissed from this action, and no response to the allegations in Paragraph 23 is required. To the extent a response is required, Mr. Wrigley admits PE Fund is a Delaware limited partnership and

holds Senior Notes in the total principal amount of $91.2 million. The remaining allegations in

Paragraph 23 contain characterizations, legal argument, and conclusions to which no response is

necessary. To the extent those allegations require a response, Mr. Wrigley denies them.

24.     Defendant Green Health, a Delaware limited liability company, is a holder of $44.3
million of convertible secured notes issued by the Company. Green Health is an investment vehicle
within Wrigley's family office, and is controlled by Wrigley out of West Palm Beach, Florida.

**ANSWER:**     Pursuant to the Court's July 5, 2023 Order, Dkt. 108, Green Health has been

dismissed from this action, and no response to the allegations in Paragraph 24 is required. To the

extent a response is required, Mr. Wrigley admits that Green Health is a Delaware limited liability

company and that the Company issued a series of notes to Green Health Endeavors and respectfully

refers the Court to the agreements governing the terms of these notes, which speak for themselves.

The remaining allegations in Paragraph 24 contain characterizations, legal argument, and

conclusions to which no response is necessary. To the extent those allegations require a response,

Mr. Wrigley denies them.

25.     Defendant Wrigley initially invested in the Company in 2017 and assumed day-
today operations as Chairman and CEO in late 2018. Wrigley resigned as CEO effective November
19, 2021 when it became clear the Company would be disclosing various defaults, including one
caused by his vehicle, PE Fund, under the Note Purchase Agreement (described below). He
continues to serve as Chairman of the Company. Wrigley controlled Green Health and PE Fund at
all relevant times. Upon information and belief, Wrigley resides in West Palm Beach, Florida.

**ANSWER:**     Mr. Wrigley admits that he initially invested in the Company in 2017. Mr.

Wrigley further admits that he previously held positions as CEO and Chairman of Surterra

Holdings Inc. but denies that he "assumed day-today operations" of the Company in late 2018.

Mr. Wrigley further admits that he resigned as CEO of Surterra Holdings Inc. effective November

19, 2021 but denies that he continued to serve as Chairman of Surterra Holdings Inc. at any point

after he resigned from that role on December 28, 2021. Mr. Wrigley admits that certain putative

defaults by the Company under the Note Purchase Agreement were alleged before November 19,

2021 but denies the characterization of this fact in Paragraph 25. Mr. Wrigley admits that he

maintains a residence in Florida, in this District. The remaining allegations in Paragraph 25 contain

characterizations, legal argument, and conclusions to which no response is necessary. To the extent

those allegations require a response, Mr. Wrigley denies them.

26.     Defendant Holmes was a director at Parallel from September 2017 through
November 2021, as well as its Chief Strategy Officer from January 2019 through December 2021.
Upon information and belief, Holmes resides in Florida.

**ANSWER:**     Mr. Wrigley admits that Holmes was a director at Parallel from September

2017 through November 2021. Mr. Wrigley further admits that Holmes was the Chief Strategy

Officer of Parallel from January 2019 through December 2021. Mr. Wrigley lacks sufficient

information to answer the allegation in Paragraph 26 concerning Holmes' residence and, on that

basis, denies it.

27.     Defendant Whitcomb was the Company's Chief Development Officer until
November 19, 2021, when he replaced Wrigley as CEO. Upon information and belief, Whitcomb
resides in Florida.

**ANSWER:**     Mr. Wrigley admits that Whitcomb was the Company's Chief Development

Officer until November 19, 2021. Mr. Wrigley further admits that Whitcomb replaced Mr. Wrigley

as CEO of the Company. Mr. Wrigley lacks sufficient information to answer the allegation in

Paragraph 27 concerning Whitcomb's residence and, on that basis, denies it.

28.     Robert "Jake" Bergmann was a founder of Parallel and its first CEO, until he was
replaced by Wrigley. On information and belief, Bergmann resides in Florida.

**ANSWER:**     Pursuant to the Court's July 5, 2023 Order, Dkt. 108, Mr. Bergmann has

been dismissed from this action, and no response to the allegations in Paragraph 28 is required. To

the extent a response is required, Mr. Wrigley admits that Robert "Jake Bergmann" was a founder

of Parallel and its first CEO, and that Mr. Wrigley replaced Bergmann as CEO of Parallel. Mr.

Wrigley lacks sufficient information to answer the allegation in Paragraph 28 concerning Bergmann's residence and, on that basis, denies it.

## JURISDICTION AND VENUE

29.     This Court has jurisdiction over this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1331 and has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367(a).

**ANSWER:**     The allegations in Paragraph 29 contain characterizations, legal argument, and conclusions to which no response is necessary. To the extent those allegations require a response, Mr. Wrigley admits that Plaintiffs purport to establish that the Court has jurisdiction over this proceeding under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1331 and has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367(a).

30.     Venue is proper in this District pursuant to Section 27 of the Exchange Act, and 28 U.S.C. § 1391.

**ANSWER:**     The allegations in Paragraph 30 contain characterizations, legal argument, and conclusions to which no response is necessary. To the extent those allegations require a response, Mr. Wrigley admits that Plaintiffs purport to establish that the Court has jurisdiction over this proceeding under Section 27 of the Exchange Act and 28 U.S.C. § 1391

31.     The court has personal jurisdiction over Defendants because, on information and belief, Defendants Wrigley, Holmes, and Whitcomb reside in Florida, all Defendants regularly conduct business in the State of Florida, and because they transacted business relating to the causes of action alleged herein within the State of Florida, and/or committed tortious acts in the State of Florida, and/or committed tortious acts causing injury to persons or property in the State of Florida.

**ANSWER:**     The allegations in Paragraph 31 contain characterizations, legal argument, and conclusions to which no response is necessary. To the extent those allegations require a response, Mr. Wrigley admits that Plaintiffs purport to establish that the Court has jurisdiction over Mr. Wrigley, Holmes, and Whitcomb.

## FACTUAL BACKGROUND

### I.    THE COMPANY'S CAPITAL STRUCTURE

32.    As alleged above, Wrigley assumed control of the Company in late 2018. Almost immediately after doing so, he began to saddle the Company with substantial amounts of debt and other obligations.

**ANSWER:**    Mr. Wrigley denies the allegations in Paragraph 32.

### A.    The Senior Notes

33.    The most senior tranche of the Company's capital structure is $165.5 million in aggregate 10% Senior Notes due October 16, 2028 (the "**Senior Notes**") (plus interest as well as potentially $70 million in pre-payment penalties). The Company incurred these obligations in October 2018, almost immediately after Wrigley effectively assumed full control of the Company as Chairman and CEO.

**ANSWER:**    Mr. Wrigley admits that the Company's capital structure includes $165.5 million in 10% Senior Notes with a current maturity date of October 16, 2028. The remaining allegations in Paragraph 33 contain characterizations, legal argument, and conclusions to which no response is necessary. To the extent those allegations require a response, Mr. Wrigley denies them.

34.    The Senior Notes were issued pursuant to, and are governed by, a Note Purchase Agreement, by and among the Company and holders of the Senior Notes, dated October 16, 2018.

**ANSWER:**    Mr. Wrigley admits that the Senior Notes were issued pursuant to and are governed by the Note Purchase Agreement by and among the Company and holders of the Senior Notes, dated October 16, 2018. To the extent the allegations in Paragraph 34 purport to characterize the Note Purchase Agreement, Mr. Wrigley denies those characterizations and respectfully refers the Court to the Note Purchase Agreement, which speaks for itself.

35.    The Senior Notes are secured by first priority liens on, and security interests in, substantially all the assets of the Company, as well as each of its direct and indirect subsidiaries, pursuant to Section 3.01 of a Guarantee and Collateral Agreement dated October 16, 2018.

**ANSWER:**    To the extent the allegations in Paragraph 35 purport to characterize the Note Purchase Agreement, the Guarantee and Collateral Agreement, and related agreements, Mr. Wrigley denies those characterizations and respectfully refers the Court to the Note Purchase Agreement, the Guarantee and Collateral Agreement, and related agreements, which speak for themselves. The remaining allegations in Paragraph 35 contain characterizations, legal argument, and conclusions to which no response is necessary. To the extent those allegations require a response, Mr. Wrigley denies them.

36.    PE Fund—which, again, Wrigley controls—holds $91.2 million of the Senior Notes, and is therefore their majority holder.

**ANSWER:**    Mr. Wrigley admits that PE Fund holds Senior Notes in the total principal amount of $91.2 million. The remaining allegations in Paragraph 36 contain characterizations, legal argument, and conclusions to which no response is necessary. To the extent those allegations require a response, Mr. Wrigley denies them.

37.    Techview holds $10 million in original principal amount (setting aside overdue interest, default interest, penalties, and reimbursable expenses), and is thus a minority holder of Senior Notes. Techview also holds $10 million of the Company's Series D Preferred Stock.

**ANSWER:**    Mr. Wrigley admits that Techview Investments Ltd. holds Senior Notes in the total principal amount of $10 million. Mr. Wrigley lacks sufficient information to answer the allegations in Paragraph 37 concerning Techview's ownership of the Company's Series D Preferred Stock and, on that basis, denies that allegation.  The remaining allegations in Paragraph 37 contain characterizations, legal argument, and conclusions to which no response is necessary. To the extent those allegations require a response, Mr. Wrigley denies them.

38.    Beginning in or around June 2021, and continuing past September 2021, the Company defaulted on the Junior and Senior Notes in multiple ways. In particular, the Company issued the PE Fund Note on June 30, 2021 to avoid defaulting on its obligations under the Bergmann Settlement, only to breach covenants under the just-executed Junior Note (as defined below) which restricted the Company's ability to issue additional indebtedness and to enter into affiliate transactions (including with PE Fund). The default, in turn, cross-defaulted the Senior

Notes. And then, as of September 30, 2021, the Company breached various financial test and additional covenants of its Junior and Senior Notes.

**ANSWER:**    Mr. Wrigley admits that certain putative defaults by the Company on certain debts were alleged in or before fall of 2021.  To the extent the allegations in Paragraph 38 purport to characterize the notices of events of default, Mr. Wrigley denies those characterizations and respectfully refers the Court to the notices of events of default, which speak for themselves. The remaining allegations in Paragraph 38 contain characterizations, legal argument, and conclusions to which no response is necessary. To the extent those allegations require a response, Mr. Wrigley denies them.

39.    Defendants did not, however, disclose these defaults to the SAFE Plaintiffs until after the Company took and used their $25 million in SAFE investment funds.

**ANSWER:**    The allegations in Paragraph 39 contain characterizations, legal argument, and conclusions to which no response is necessary. To the extent those allegations require a response, Mr. Wrigley denies them.

**B.    The Junior Note**

40.    The Company's second-largest debt obligation, which is junior to the Senior Notes, is $145 million of junior secured debt issued on May 7, 2021 (the "**Junior Note**") to SAF Group ("**SAF**") (plus interest as well as potentially $64 million in pre-payment penalties). SAF Group is an alternative investment management firm based in Canada.

**ANSWER:**    Mr. Wrigley admits that the Company issued a tranche of Junior Notes pursuant to a Credit Agreement dated as of May 7, 2021, the value of which is reflected in the Junior Credit Agreement and Schedule A of the Intercreditor Agreement, and respectfully refers the Court to those documents, which speak for themselves.  Mr. Wrigley lacks sufficient information to answer the allegations in Paragraph 40 concerning the location of SAF Group and, on that basis, denies those allegations.  The remaining allegations in Paragraph 40 contain

characterizations, legal argument, and conclusions to which no response is necessary. To the extent those allegations require a response, Mr. Wrigley denies them.

41.     The Company used the Junior Note to refinance seller financing provided by the sellers of New England Treatment Access ("**NETA**"). NETA is a cannabis facility that Parallel acquired in 2019. The Junior Note carries an annual non-default interest rate of 14.25%.

**ANSWER:**   Mr. Wrigley admits that the Company acquired NETA in or about 2019, and that it was a cannabis facility.  To the extent the allegations in Paragraph 41 purport to characterize the Note Documents, including the Note Purchase Agreement and Junior Credit Agreement, Mr. Wrigley denies those characterizations and respectfully refers the Court to the Note Documents, including the Note Purchase Agreement and Junior Credit Agreement, which speak for themselves.  The remaining allegations in Paragraph 41 contain characterizations, legal argument, and conclusions to which no response is necessary. To the extent those allegations require a response, Mr. Wrigley denies them.

### C.     The Green Health Endeavors, LLC Convertible Secured Notes ("Green Health Notes")

42.     The Company also appears to owe approximately $54 million on $44.3 million of certain convertible secured notes issued to Green Health. The Green Health Notes accrue interest at a rate of 16% per year, and carried a prepayment penalty of 25% (inclusive of all interest) had they been repaid before the May 1, 2021 maturity date.

**ANSWER:**   Pursuant to the Court's July 5, 2023 Order, Dkt. 108, Green Health has been dismissed from this action, and no response to the allegations in Paragraph 42 is required. To the extent a response is required, Mr. Wrigley admits that the Company issued a series of notes to Green Health and respectfully refers the Court to the agreements governing the terms of these notes, which speak for themselves. The remaining allegations in Paragraph 42 contain characterizations, legal argument, and conclusions to which no response is necessary. To the extent those allegations require a response, Mr. Wrigley denies them.

43.     When the Green Health Notes were negotiated, Wrigley was Chairman and CEO of the Company and *also* the Chairman and CEO of Green Health. He was therefore hopelessly conflicted, as he served effectively as both lender and borrower in the Green Health Notes transaction, and got to choose which side got the best deal.

**ANSWER:**     Pursuant to the Court's July 5, 2023 Order, Dkt. 108, Green Health has been dismissed from this action, and no response to the allegations in Paragraph 43 is required. To the extent a response is required, Mr. Wrigley admits that he was the CEO and Chairman of the Company when the Green Health Notes were negotiated.  Mr. Wrigley admits that he is affiliated with Green Health and that he was the CEO or Chairman of Green Health when the Green Health Notes were negotiated, but denies that he negotiated the Green Health Notes on behalf of either the Company or Green Health. The remaining allegations in Paragraph 43 contain characterizations, legal argument, and conclusions to which no response is necessary. To the extent those allegations require a response, Mr. Wrigley denies them.

44.     Wrigley chose Green Health. The Green Health Notes convert into preferred equity of the Company on extortionate terms that enrich Wrigley and gouge the Company's stockholders. Specifically, under the terms of the conversion, the amount of accrued "debt" represented by the Green Health Notes is multiplied by 2.5, such that Green Health's actual contribution of $44.3 million (now $54 million counting accumulated "interest") would be rapaciously (and fictitiously) magnified into ***$135 million***, and would convert into that amount of preferred stock. To rub salt in the wound Wrigley inflicted on all existing stockholders, this sham amount of preferred stock would enjoy a liquidation preference senior to all existing tranches of equity—including Techview's $10 million of Series D preferred stock.

**ANSWER:**     Pursuant to the Court's July 5, 2023 Order, Dkt. 108, Green Health has been dismissed from this action, and no response to the allegations in Paragraph 44 is required. To the extent a response is required, Mr. Wrigley admits that the Company issued a series of notes to Green Health Endeavors and respectfully refers the Court to the Pursuant to the Court's July 5, 2023 Order, Dkt. 108, Mr. Bergmann and PE Fund have been dismissed from this action, and no response to the allegations in Paragraph 61 is required. To the extent a response is required, agreements governing the terms of these notes, which speak for themselves. The remaining

allegations in Paragraph 44 contain characterizations, legal argument, and conclusions to which no response is necessary. To the extent those allegations require a response, Mr. Wrigley denies them.

45.     Upon information and belief, the Company conducted no arm's length negotiation over the financing terms of the Green Health Notes, and failed to explore other financing options that might offer better terms. In fact, Wrigley's lieutenant, Holmes, represented Green Health in the transaction, while also serving in his capacities as director and Chief Strategy Officer for the Company, and it is unclear who—if anyone—played the part of Company representative in the sham negotiations. Holmes' positions at the two companies had one main feature in common: both reported directly to Wrigley. In other words, both principal (Wrigley) and agent (Holmes) were hopelessly conflicted in negotiating the Green Health Notes.

**ANSWER:**     Pursuant to the Court's July 5, 2023 Order, Dkt. 108, Green Health has been dismissed from this action, and no response to the allegations in Paragraph 45 is required. To the extent a response is required, the allegations in Paragraph 45 contain characterizations, legal argument, and conclusions to which no response is necessary. To the extent those allegations require a response, Mr. Wrigley denies them.

46.     Plaintiffs do not have full insight into the specific uses of the proceeds from the Green Health Notes. But it appears that Wrigley would periodically plug the Company's operating cash shortfalls by advancing funds from his family office, Green Health, and then taking, in exchange, a usurious note with equity-like returns for Green Health. The nature of these investments as "debt" is highly suspect.

**ANSWER:**     Pursuant to the Court's July 5, 2023 Order, Dkt. 108, Green Health has been dismissed from this action, and no response to the allegations in Paragraph 46 is required. To the extent a response is required, the allegations in Paragraph 46 contain characterizations, legal argument, and conclusions to which no response is necessary. To the extent those allegations require a response, Mr. Wrigley denies them.

47.     For example, Green Health provided $6 million to the Company in January 2021, and took a convertible secured note in exchange. That $6 million later converted into Series D Preferred Stock on the sweetheart terms described above. On information and belief, the $6 million was used to pay the first installment on the Company's Bergmann Debts (described below).

**ANSWER:**     Pursuant to the Court's July 5, 2023 Order, Dkt. 108, Green Health has been dismissed from this action, and no response to the allegations in Paragraph 47 is required. To the extent a response is required, Mr. Wrigley admits that the Company advanced $6 million to Bergmann. The remaining allegations in Paragraph 47 contain characterizations, legal argument, and conclusions to which no response is necessary. To the extent those allegations require a response, Mr. Wrigley denies them.

48.     The total amount of approximately $44.3 million advanced under the Green Health Notes was amended and restated on May 7, 2021 through instruments referred to as the Third and Fourth Amended Green Health Endeavors Convertible Secured Notes ("**Third and Fourth Amended Green Health Notes**"). These two promissory notes likewise carried the same features as the original: interest accrual at a usurious 16% with a punishing prepayment penalty of 25% (inclusive of all interest) if repaid prior to the maturity date of May 1, 2021 , and the 2.5-times multiplier to gouge stockholders if Wrigley preferred the conversion option—a decision he could wait until the last minute to make, depending on the Company's prospects as observed from the C-suite. (Although the 25% pre-payment obviously never took place, it reflects Wrigley's intent to provide for himself a minimum return of 25% on the short-term advance of funds).

**ANSWER:**     Pursuant to the Court's July 5, 2023 Order, Dkt. 108, Green Health has been dismissed from this action, and no response to the allegations in Paragraph 48 is required. To the extent a response is required, Mr. Wrigley admits that the Company issued a series of notes to Green Health and respectfully refers the Court to the agreements governing the terms of these notes and related amendments, which speak for themselves. The remaining allegations in Paragraph 48 contain characterizations, legal argument, and conclusions to which no response is necessary. To the extent those allegations require a response, Mr. Wrigley denies them.

49.     Remarkably, the fact that the Third and Fourth Amended Green Health Notes were executed as of May 7, 2021, with a past-due maturity date of May 1, 2021, means the notes were *already in default upon execution*. Apparently realizing that fact, the Company also entered into an *undisclosed* forbearance agreement with Green Health on May 7, 2021, pursuant to which the Company purportedly waived any claims it might have against Green Health. No information about those potential claims has ever been disclosed. Upon information and belief, the forbearance agreement expired on October 31, 2021.

**ANSWER:**      Pursuant to the Court's July 5, 2023 Order, Dkt. 108, Green Health has been dismissed from this action, and no response to the allegations in Paragraph 49 is required. To the extent a response is required, Mr. Wrigley respectfully refers the Court to the amendments and forbearance agreement, which speak for themselves. The allegations in Paragraph 49 contain characterizations, legal argument, and conclusions to which no response is necessary. To the extent those allegations require a response, Mr. Wrigley denies them.

50.      But Wrigley's Green Health machinations were far from over. On the same date as the forbearance agreement—May 7, 2021—the Company substituted the Third and Fourth Amended Green Health Notes with substitute or "restated" obligations (the "**Fourth and Fifth Restated Green Health Notes**"). Clearly an after-thought cleanup effort, the Company now inserted preconditions to the "restated" debts—albeit ceremonial ones—on the approval of Green Health Notes, including approval of (i) a majority of disinterested directors; (ii) a majority of "Unaffiliated Directors," pursuant to the requirements of Section 8(w) of the Company's Stockholders Agreement; (iii) a majority of independent directors of SH Parent, pursuant to Section 10.2 of the NPA; (iv) the Required Holders, as defined in the NPA (*i.e.*, PE Fund, which was Wrigley); and (v) a majority of Company minority stockholders. The Company's and Wrigley's failure to require similar approvals and authorizations for previous iterations of the Green Health Notes was never explained, and the idea that one could fairly seek approvals of insider debts that are already in default, or else the Company will face the consequences of no more forbearance, is patently absurd.

**ANSWER:**      Pursuant to the Court's July 5, 2023 Order, Dkt. 108, Green Health has been dismissed from this action, and no response to the allegations in Paragraph 50 is required. To the extent a response is required, Mr. Wrigley admits that the Company issued a series of notes to Green Health and respectfully refers the Court to the agreements governing the terms of these notes, which speak for themselves. To the extent the allegations in Paragraph 50 purport to characterize the Company's Stockholders Agreement, the NPA, amendments, and the forbearance agreement, Mr. Wrigley denies those characterizations and respectfully refers the Court to those documents, which speak for themselves.  The remaining allegations in Paragraph 50 contain characterizations, legal argument, and conclusions to which no response is necessary. To the extent those allegations require a response, Mr. Wrigley denies them.

51.     As a whole, the Green Health Notes were a sweetheart deal for Wrigley, negotiated by him and his lieutenant, Holmes. Upon information and belief, Wrigley had no expectation that the nominal "debt" obligation would ever be repaid—indeed, the maturity windows were so artificial that the last two iterations of the debts were already in default *upon issuance*. Rather, Wrigley intended to benefit from the relatively quick conversion of the Green Health Notes into a tranche of preferred stock that was, remarkably, ***senior*** to every other existing tranche and so jumped to the front of the liquidation line, ahead of all other preferred stockholders, including the $10 million of Series D Preferred Stock held by Techview.

**ANSWER:**     Pursuant to the Court's July 5, 2023 Order, Dkt. 108, Green Health has been dismissed from this action, and no response to the allegations in Paragraph 51 is required. To the extent a response is required, the allegations in Paragraph 51 contain characterizations, legal argument, and conclusions to which no response is necessary. To the extent those allegations require a response, Mr. Wrigley denies them.

52.     Furthermore, there was no justification for the conversion to take place at an extortionate ***2.5 times the accrued value*** of the Green Health Notes, such that the initial $44.3 million of capital would be fictionally treated as a staggering $135 million in preferred equity when the Company only received $44.3 million. Upon information and belief, that figure was devised by, and for the benefit of, Wrigley.

**ANSWER:**     Pursuant to the Court's July 5, 2023 Order, Dkt. 108, Green Health has been dismissed from this action, and no response to the allegations in Paragraph 52 is required. To the extent a response is required, Mr. Wrigley admits that the Company issued a series of notes to Green Health and respectfully refers the Court to the agreements governing the terms of these notes, which speak for themselves. The remaining allegations in Paragraph 52 contain characterizations, legal argument, and conclusions to which no response is necessary. To the extent those allegations require a response, Mr. Wrigley denies them.

**D.     The Bergmann Debts**

53.     Defendant Robert "Jake" Bergmann was a founder of Parallel and its first CEO. Wrigley succeeded Bergmann, who stepped down as CEO on November 5, 2018.

**ANSWER:**    Pursuant to the Court's July 5, 2023 Order, Dkt. 108, Mr. Bergmann has

been dismissed from this action, and no response to the allegations in Paragraph 53 is required.

To the extent a response is required Mr. Wrigley admits the allegations in Paragraph 53.

54.    A dispute between Bergmann and the Company arose over the value of Bergmann's common stock. To resolve the dispute, and disregarding that Bergmann's interests should have been junior to all of the Company's debt and Preferred Stock obligations described herein, the Company entered into the Bergmann Settlement in or around January 2021.

**ANSWER:**    Pursuant to the Court's July 5, 2023 Order, Dkt. 108, Mr. Bergmann has

been dismissed from this action, and no response to the allegations in Paragraph 54 is required.

To the extent a response is required, Mr. Wrigley admits that Bergmann and the Company entered

into a settlement. The remaining allegations in Paragraph 54 contain characterizations, legal

argument, and conclusions to which no response is necessary. To the extent those allegations

require a response, Mr. Wrigley denies them.

55.    Under the Bergmann Settlement, the Company agreed to pay Bergmann $38.5 million (which valued each of Bergmann's 1.25 million common shares at $30.80). On or about January 8, 2021, the Company made an initial $6 million payment to Bergmann. As noted above, upon information and belief, the Company did not have this $6 million in available funds, so Wrigley financed this initial payment through a Green Health Note.

**ANSWER:**    Pursuant to the Court's July 5, 2023 Order, Dkt. 108, Mr. Bergmann has

been dismissed from this action, and no response to the allegations in Paragraph 55 is required.

To the extent a response is required, Mr. Wrigley admits that under the Bergmann Settlement, the

Company agreed to pay Bergmann a certain amount, as specified in that Agreement. To the extent

the allegations in Paragraph 55 purport to characterize the Bergmann Settlement Agreement, Mr.

Wrigley denies those characterizations and respectfully refers the Court to the agreement, which

speaks for itself. The remaining allegations in Paragraph 55 contain characterizations, legal

argument, and conclusions to which no response is necessary. To the extent those allegations

require a response, Mr. Wrigley denies them.

56.    Around the same time, the Company obligated itself to pay the remaining $32.5 million by:

a.    Obligating itself to pay the $12.5 Million Disguised Bergmann Note, which despite accruing interest at 16% and requiring payment of principal and interest at maturity six months later, was denominated a "second payment," rather than a promissory note or other debt instrument. The Bergmann Settlement also carried the express understanding that the "second payment" would increase to $13.5 million if the Company did not make the payment before June 30, 2021;

b.    Issuing the $20 Million Bergmann Note at 16% interest and with amortization of $2.5 million every six months, with the first paydown due June 30, 2021.

**ANSWER:**    Pursuant to the Court's July 5, 2023 Order, Dkt. 108, Mr. Bergmann has been dismissed from this action, and no response to the allegations in Paragraph 54 is required. To the extent the allegations in Paragraph 55 purport to characterize the Bergmann Note, Mr. Wrigley denies those characterizations and respectfully refers the Court to the agreement, which speaks for itself. The allegations in Paragraph 56 contain characterizations, legal argument, and conclusions to which no response is necessary. To the extent those allegations require a response, Mr. Wrigley denies them.

57.    Defendants did not disclose the Company's subsequent inability to satisfy its obligations under the Bergmann Debts, before the Company took the SAFE Plaintiffs' $25 million with the goal of converting the funds into equity, which would come behind all debts.

**ANSWER:**    The allegations in Paragraph 57 contain characterizations, legal argument, and conclusions to which no response is necessary. To the extent those allegations require a response, Mr. Wrigley denies them.

**E.    The PE Fund Note, Which Breached The Prohibition Under the Junior Note Against Incurring Additional Prohibited Debt**

58.    On information and belief, as of June 30, 2021, and consistent with the Company's increasingly bleak (and undisclosed) financial landscape, the Company lacked the funds to make the "second payment"—$13.5 million—under the Bergmann Settlement ($12.5 million plus $1.0 million late fee). It follows that the Company was also likely unable to make the first $2.5 million amortization payment under the $20 Million Bergmann Note due June 30, 2021.

23

**ANSWER:**     Pursuant to the Court's July 5, 2023 Order, Dkt. 108, Mr. Bergmann and PE Fund have been dismissed from this action, and no response to the allegations in Paragraph 58 is required. To the extent a response is required, the allegations in Paragraph 58 contain characterizations, legal argument, and conclusions to which no response is necessary. To the extent those allegations require a response, Mr. Wrigley denies them.

59.     To make up for some of the shortfall, Wrigley turned to PE Fund, of which his namesake family office is the General Partner. Wrigley caused PE Fund to advance $13.5 million to the Company in exchange for the PE Fund Note, which would then need to be repaid within six months. The PE Fund Note transaction also included an unexplained (and inexplicable) $2.5 million "transaction fee," which would be added to the balance due at maturity on a note that already accrued interest at an exorbitant 16%.

**ANSWER:**     Pursuant to the Court's July 5, 2023 Order, Dkt. 108, Mr. Bergmann and PE Fund have been dismissed from this action, and no response to the allegations in Paragraph 59 is required. To the extent a response is required, Mr. Wrigley admits that the Company issued a note to PE Fund and respectfully refers the Court to the agreement governing the terms of the note, which speaks for itself. The remaining allegations in Paragraph 59 contain characterizations, legal argument, and conclusions to which no response is necessary. To the extent those allegations require a response, Mr. Wrigley denies them.

60.     Defendants failed to disclose that the PE Fund Note constituted a default under the Junior Note, which then cross-defaulted the Senior Notes.

**ANSWER:**     Pursuant to the Court's July 5, 2023 Order, Dkt. 108, Mr. Bergmann and PE Fund have been dismissed from this action, and no response to the allegations in Paragraph 60 is required. The allegations in Paragraph 60 contain characterizations, legal argument, and conclusions to which no response is necessary. To the extent those allegations require a response, Mr. Wrigley denies them.

61.     Notably, the $13.5 million value of the PE Fund Note, along with the $2.5 million transaction fee, matches the $16 million presumably paid to Bergmann in June 2021 in connection with the Bergmann Settlement. In other words, the $16 million that the Company previously owed

to its former CEO Bergmann it now owes to PE Fund, and therefore to its own CEO at the time, Wrigley.

      **ANSWER:**    Pursuant to the Court's July 5, 2023 Order, Dkt. 108, Mr. Bergmann and PE Fund have been dismissed from this action, and no response to the allegations in Paragraph 61 is required. To the extent a response is required, Mr. Wrigley admits that the Company issued a note to PE Fund and respectfully refers the Court to the agreement governing the terms of the note, which speaks for itself. The remaining allegations in Paragraph 61 contain characterizations, legal argument, and conclusions to which no response is necessary. To the extent those allegations require a response, Mr. Wrigley denies them.

      62.    For reasons similar to the Green Health Notes, the PE Fund Note transaction was a conflicted transaction, orchestrated by Wrigley, acting on both sides, for the benefit of his own entity. In particular, it appears the funds advanced in connection with the PE Fund Note were used to pay Bergmann for his interest in the Company, which was held in common stock. In other words, while the Company was beginning its downward spiral, the PE Fund Note was used to jump the line of priority to pay Bergmann—whose interests represented the residual value of the Company after *every* holder of debt and preferred stock was paid in full.

      **ANSWER:**    Pursuant to the Court's July 5, 2023 Order, Dkt. 108, Mr. Bergmann and PE Fund have been dismissed from this action, and no response to the allegations in Paragraph 62 is required. To the extent a response is required, the allegations in Paragraph 62 contain characterizations, legal argument, and conclusions to which no response is necessary. To the extent those allegations require a response, Mr. Wrigley denies them.

      **F.**    **Other Potential Debt Obligations**

      63.    Finally, upon information and belief, there is up to $107 million of consideration that the Company owes in connection with its 2021 deal to acquire certain operations of Windy City Cannabis ("**Windy City**"), an Illinois-based cannabis dispensary.

      **ANSWER:**    Mr. Wrigley admits that the Company entered into an agreement to acquire certain assets and operations from Windy City. The remaining allegations in Paragraph 63 contain

characterizations, legal argument, and conclusions to which no response is necessary. To the extent

those allegations require a response, Mr. Wrigley denies them.

64.     On information and belief, Wrigley recklessly entered into the Windy City acquisition knowing the Company lacked the means to pay for it, in an effort to bolster the prospects of closing the SPAC by expanding the Company's geographic footprint and augmenting the Company's EBITDA. Windy City is now an albatross around the Company's neck that serves only to impede the very alternative acquisition transaction Wrigley claimed to be seeking. On information and belief, the Windy City transaction is awaiting regulatory approval from the State of Illinois, which might be granted in the first or second quarter of 2022 —though such approval still will not solve the Company's problem of how to actually pay the required consideration.

**ANSWER:**     The allegations in Paragraph 64 contain characterizations, legal argument,

and conclusions to which no response is necessary. To the extent those allegations require a

response, Mr. Wrigley denies them.

### G.     Parallel's Remaining Capital Structure

65.     As of the date hereof, the total remaining invested capital was structured as follows:

a.     Approximately $67 million[2] invested through SAFE securities that the Company is holding in cash or has transferred to operating subsidiaries; if not rescinded prior to conversion, the SAFE was to be converted into Series EE Preferred Stock on December 31, 2021. TradeInvest rescinded its SAFE investment on December 30, 2021 (which rescission is disputed by the Company).

b.     $79 million in aggregate Series E Preferred Stock;

c.     $166 million in aggregate Series D Preferred Stock (of which Techview holds $10 million); and

d.     Certain additional interests of Preferred and Common Stock that are junior to the Series EE, Series E, and Series D Preferred Stock.

**ANSWER:**     Mr. Wrigley admits that the Company's capital structure includes other

equity and debt investments in addition to the Senior Notes and Junior Notes but lacks sufficient

information to answer the allegations in Paragraph 65 concerning the nature and value of those

---

[2]     This figure reflects the value of the SAFE investment—including Wrigley's post-closing supplement of more than $10 million (discussed below)—after conversion to Series EE Preferred Stock of the Company.

investments and, on that basis, denies those allegations. The allegations in Paragraph 65, including footnote 3, contain characterizations, legal argument, and conclusions to which no response is necessary. To the extent those allegations require a response, Mr. Wrigley denies them.

## II. THE SECURITIES DEFENDANTS SOLICIT $25 MILLION IN SAFE FUNDING FROM THE SAFE PLAINTIFFS THROUGH MISREPRESENTATIONS AND OMISSIONS

66.     The SAFE Plaintiffs began discussing the SAFE investment with the Securities Defendants in earnest in or around July 2021. Between then and September 27, 2021, when the SAFE Plaintiffs funded their $25 million SAFE investment, the Securities Defendants offered a litany of false and misleading statements and omissions concerning matters critical to the SAFE investment and the Company's finances. Each of these was made intentionally, to induce the SAFE Plaintiffs to supply the Company with critically-needed capital against a false picture of the Company's financial condition, and contrary to federal and state anti-fraud securities laws, as well as common-law fraud principles.

**ANSWER:**     Mr. Wrigley admits that the SAFE Plaintiffs funded $25 million in SAFE financing to the Company. The remaining allegations in Paragraph 66 contain characterizations, legal argument, and conclusions to which no response is necessary. To the extent those allegations require a response, Mr. Wrigley denies them.

### A.     The Securities Defendants Initially Claim The SAFE Will "Bridge" the Company Until The SPAC Can Close

67.     On or about July 22, 2021, Trip McCoy, Director of Private Investments at PSQ (which, as noted above, served as investment adviser to the SAFE Plaintiffs), joined a Zoom call with Holmes and Whitcomb. During the call, Holmes and Whitcomb explained that the SPAC transaction was being repriced at a lower value, and that the Company was looking to raise between $30 and $50 million as part of a new SAFE security. At this point, Holmes' and Whitcomb's story was that the additional funds would be "bridge" capital to fund the Company's capital projects and operating expenses until the SPAC could close. Because the Company actually intended to use the SAFE proceeds to pay looming debt obligations to other investors, these statements concerning the use of the SAFE proceeds were false and misleading.

**ANSWER:**     Mr. Wrigley lacks sufficient information to answer the allegations in Paragraph 67 concerning a July 22, 2021 call involving McCoy, Holmes, and Whitcomb and, on that basis, denies them. The remaining allegations in Paragraph 67 contain characterizations, legal

argument, and conclusions to which no response is necessary. To the extent those allegations require a response, Mr. Wrigley denies them.

68.     McCoy held additional Zoom calls with Holmes and Whitcomb on July 26, 2021, in which Holmes and Whitcomb informed McCoy that the Company's board of directors had approved increasing the maximum proceeds of the SAFE to $100 million; and on July 30, 2021 and August 2, 2021, in which the reduced SPAC valuation and treatment of warrants were discussed. The Securities Defendants even represented to McCoy that the lowered valuation was beneficial, because the Company's stock would outperform expectations once it began trading.

**ANSWER:**   Mr. Wrigley lacks sufficient information to answer the allegations in Paragraph 68 concerning calls involving McCoy, Holmes, and Whitcomb and, on that basis, denies them. The remaining allegations in Paragraph 68 contain characterizations, legal argument, and conclusions to which no response is necessary. To the extent those allegations require a response, Mr. Wrigley denies them.

69.     At no time during these communications concerning the Company and its prospects did Holmes or Whitcomb disclose:

   a.     The Company's recent inability to meet the obligations under the Bergmann Debts;

   b.     The purpose of the PE Fund Note, or that its issuance defaulted the Junior Note, which in turn cross-defaulted the Senior Notes; or

   c.     That the Company had no foreseeable way to meet all of its existing obligations, including the Senior and Junior Note, the Green Health Notes, the PE Fund Note, and the $20 Million Bergmann Note.

**ANSWER:**   Mr. Wrigley lacks sufficient information to answer the allegations in Paragraph 69 concerning Holmes and Whitcomb and, on that basis, denies them. The remaining allegations in Paragraph 69 contain characterizations, legal argument, and conclusions to which no response is necessary. To the extent those allegations require a response, Mr. Wrigley denies them.

70.     On August 4, 2021, Holmes provided to Plaintiffs the initial draft of the SAFE instrument, as well as a presentation titled "August 2021 Company Overview: Parallel / Ceres Acquisition Corp. SPAC Transaction." The 64-page presentation outlined the proposed SPAC

transaction with Ceres and provided purportedly updated and accurate information about the Company, its capital structure, and its financing needs. In particular, consistent with Holmes' and Whitcomb's representations concerning the purposes of the SAFE financing, the presentation claimed that the Company "anticipates raising a $50 million SAFE *to fund capex plan* through SPAC closing (this will be non-dilutive to PIPE and SPAC investors)." This presentation was likewise false and misleading because the Company intended to use the SAFE proceeds to attempt to stave off payment defaults on obligations to other investors, rather than for capital or operating expenses.

        **ANSWER:**   To the extent the allegations in Paragraph 70 purport to characterize an August 2021 presentation, Mr. Wrigley denies those characterizations and respectfully refers the Court to the presentation, which speaks for itself. The remaining allegations in Paragraph 70 contain characterizations, legal argument, and conclusions to which no response is necessary. To the extent those allegations require a response, Mr. Wrigley denies them.

71.    The same presentation also projected that the Company's revenue for 2022 would be $618 million, and its adjusted EBITDA would be $167 million. But in October 2021, shortly after the Securities Defendants took the SAFE Plaintiffs' funds, the Company revised those projections downward by approximately 20% and 40%, respectively, and again in early January by approximately 25% and 45% off of the October projections alone:

| | **August 2021** | **October 2021** | **January 2022** |
|---|---|---|---|
| Projected 2022 Net Revenue | $618 million | $492 million | $362 million |
| Projected 2022 Adjusted EBITDA | $167 million | $99 million | $56 million |

In just the three months *after* the SAFE Plaintiffs provided their funds, the Company had lowered its revenue projections for 2022 by more than 40% and its EBITDA projections by 66%. The August 2021 projections were therefore false and misleading, and lacked any reasonable basis.

        **ANSWER:**   To the extent the allegations in Paragraph 71 purport to characterize projections and related agreements the Company allegedly provided to Plaintiffs, Mr. Wrigley denies those characterizations and respectfully refers the Court to those projections and related agreements, which speak for themselves.  The remaining allegations in Paragraph 71 contain characterizations, legal argument, and conclusions to which no response is necessary. To the extent those allegations require a response, Mr. Wrigley denies them. The remaining allegations in

Paragraph 71 contain characterizations, legal argument, and conclusions to which no response is necessary. To the extent those allegations require a response, Mr. Wrigley denies them.

72.     On an August 5, 2021 Zoom, McCoy explained to Holmes and Whitcomb—not for the first time—that the SAFE Plaintiffs would commit funds to the SAFE only if the SAFE Plaintiffs were confident that (i) the Company had significant SAFE and PIPE commitments already in hand, and (ii) the funds raised in connection with the SAFE would be a sufficient bridge until the Company could be sold. Holmes and Whitcomb responded that the Company had more than $50 million in SAFE commitments *already in hand*.

**ANSWER:**   Mr. Wrigley lacks sufficient information to answer the allegations in Paragraph 72 concerning an August 5, 2021 Zoom call involving McCoy, Holmes, and Whitcomb and, on that basis, denies them. The remaining allegations in Paragraph 72 contain characterizations, legal argument, and conclusions to which no response is necessary. To the extent those allegations require a response, Mr. Wrigley denies them.

## B.     The Securities Defendants Begin Pivoting To The Claim That The SAFE Would Be Sufficient To Bridge The Company Until An Alternative Sale

73.     Notably, at or around this time, McCoy also raised with the Company that he had heard *from others*—not from the Company—that the SPAC might not close. When confronted, Holmes and Whitcomb conceded that the pending transaction might not be consummated. Pivoting to the new storyline, and despite knowing their revenue and EBITDA projections were completely unrealistic, they claimed the SPAC valuation was too low, the SPAC market was in decline, and the public shares would in any case be relatively illiquid because they would be listed on a Canadian exchange. Instead, they explained on the August 5, 2021 call that the SAFE funding would be sufficient to fund the Company—and specifically its capital and operating expenses— until a *private* sale could be consummated.

**ANSWER:**   Mr. Wrigley lacks sufficient information to answer the allegations in Paragraph 73 concerning any communication shared among McCoy, Holmes, and/or Whitcomb and, on that basis, denies them. The remaining allegations in Paragraph 73 contain characterizations, legal argument, and conclusions to which no response is necessary. To the extent those allegations require a response, Mr. Wrigley denies them.

74.     These assertions were all false and misleading. In fact, Holmes and Whitcomb had no reasonable basis to claim the SAFE would bridge the Company until a private sale. They were merely spinning a new yarn to obtain badly-needed cash under false and fraudulent pretenses.

Further, as of that date, the Company lacked the commitments it assured the SAFE Plaintiffs that it had, and ultimately closed the SAFE and took the SAFE Plaintiffs' money *without the $50 million in total commitments that Holmes and Whitcomb represented they had*.

**ANSWER:**   The allegations in Paragraph 74 contain characterizations, legal argument, and conclusions to which no response is necessary. To the extent those allegations require a response, Mr. Wrigley denies them.

75.   On August 9, 2021, Company counsel transmitted to Plaintiffs the latest SAFE documentation. Notably, as discussed below, the SAFE included risk "warnings" about the Company's debt that were misleading because the "risks" they identified had in fact already materialized.

**ANSWER:**   Mr. Wrigley lacks sufficient information to answer the allegations in Paragraph 75 concerning an August 9, 2021 transmission of SAFE documentation by Company counsel and, on that basis, denies them. To the extent the allegations in Paragraph 75 purport to characterize the SAFE documentation, Mr. Wrigley denies those characterizations and respectfully refers the Court to the documents, which speak for themselves. The remaining allegations in Paragraph 75 contain characterizations, legal argument, and conclusions to which no response is necessary. To the extent those allegations require a response, Mr. Wrigley denies them.

76.   On August 16, 2021, Holmes transmitted to Plaintiffs an Excel file detailing the capital structure in relation to the SPAC acquisition (even though they were already laying the groundwork to induce the SAFE investment regardless of the SPAC). The document was titled Project Cereal Cap Table Analysis and dated as of August 11, 2021. It indicated, among other things, that the Green Health Notes would convert to $135 million in equity with a liquidation preference behind the SAFE, albeit per their (lopsided) terms, as of September 30, 2021. Plaintiff learned, months later, that this, too, was a misrepresentation about the Company's capital structure and outstanding obligations. As the Company disclosed in December 2021, and so far as Plaintiffs are aware, the Green Health Notes still to this day constitute purported ***debt*** obligations of the Company, which means that, contrary to the SAFE Plaintiffs' understanding based on the disclosed conversion date of the Green Health Notes, the SAFE would *not* be senior to the obligations under the Green Health Notes, since they had *not* converted to equity, but were still debt.

**ANSWER:**   Mr. Wrigley lacks sufficient information to answer the allegations in Paragraph 76 concerning an alleged August 16, 2021 transmission of an Excel file by Holmes and, on that basis, denies them. To the extent the allegations in Paragraph 76 purport to characterize the

Excel file and the Green Health Notes, Mr. Wrigley denies those characterizations and respectfully refers the Court to the documents, which speak for themselves. The remaining allegations in Paragraph 76 contain characterizations, legal argument, and conclusions to which no response is necessary. To the extent those allegations require a response, Mr. Wrigley denies them.

77.     During an August 22, 2021 Zoom call with Holmes and potentially Whitcomb as well, and in light of the SAFE Plaintiffs' understanding that the chances of consummating the SPAC transaction were diminishing, McCoy underscored more urgently that the SAFE Plaintiffs were interested in a SAFE investment solely if Defendants could provide reasonable assurance that the Company had sufficient capital to operate until a sale, and what amount of capital that was. Holmes again stated that $50 million would be sufficient, and expected that, even absent the SPAC, the Company would be sold before the end of the second quarter of 2022. Holmes similarly lacked any reasonable basis to make that statement, given the Company's existing debt defaults, looming additional defaults, cratering revenues and EBITDA, and mounting obligations. This statement was therefore knowingly false when made.

**ANSWER:**   Mr. Wrigley lacks sufficient information to answer the allegations in Paragraph 77 concerning an alleged August 22, 2021 Zoom call involving McCoy, Holmes, and potentially Whitcomb and, on that basis, denies them. The remaining allegations in Paragraph 77 contain characterizations, legal argument, and conclusions to which no response is necessary. To the extent those allegations require a response, Mr. Wrigley denies them.

78.     In further support of their new story that the Company would be acquired through a private sale, in or around this same time, the Securities Defendants transmitted to McCoy a spreadsheet indicating potential values if the Company were acquired by any of four different, well-known, cannabis companies. For the most part, the scenarios envisioned an acquisition value between $1.5 and $2.0 billion, premised upon the projected revenue and EBITDA contemporaneously disclosed to the SAFE Plaintiffs. Although the Company indicated the spreadsheet was illustrative, it was part and parcel of the same misrepresentation that the Company was performing in line with projections and therefore had a reasonable expectation of being acquired at values greatly exceeding the Company's debt, much less by any of the companies mentioned or on the timeline the Securities Defendants now claimed. Indeed, Holmes and Whitcomb were also representing to McCoy around this time that their phones were "lighting up" with unsolicited offers from major cannabis companies to purchase the Company.

**ANSWER:**   Mr. Wrigley denies that he transmitted to McCoy a spreadsheet indicating potential values if the Company were acquired by any of four different, well-known, cannabis companies.  Answering further, Mr. Wrigley lacks sufficient information to answer the allegations

in Paragraph 78 concerning the transmission of such a document by the other Securities

Defendants, or any purported representations by Holmes or Whitcomb and, on that basis, denies

them. To the extent the allegations in Paragraph 78 purport to characterize the spreadsheet, Mr.

Wrigley denies those characterizations and respectfully refers the Court to the document, which

speaks for itself. The remaining allegations in Paragraph 78 contain characterizations, legal

argument, and conclusions to which no response is necessary. To the extent those allegations

require a response, Mr. Wrigley denies them.

79.     On the same call, McCoy sought further assurance that at least $25 million would
be invested in the SAFE alongside the SAFE Plaintiffs' proposed $25 million commitment (for a
total of $50 million, which was the amount needed to get through the sale process). Holmes and
Whitcomb had raised, during the course of these discussions, that Wrigley might also serve as a
backstop in the event that the Company was unable to obtain $50 million in commitments from
outside investors, though they indicated that was unlikely to be needed, given they had about
***$75 million*** in verbal commitments (including $5 million from Wrigley). These statements were
false in light of the fact that the Company closed the SAFE, and took the SAFE Plaintiffs' $25
million, despite its failure to have the minimum $50 million in funds that the SAFE Plaintiffs
repeatedly stated was a prerequisite to their commitment.

**ANSWER:**   Mr. Wrigley lacks sufficient information to answer the allegations in

Paragraph 79 concerning alleged discussions involving McCoy, Holmes, and Whitcomb, including

any discussions concerning whether Mr. Wrigley would "serve as a backstop" and, on that basis,

denies them. The remaining allegations in Paragraph 79 contain characterizations, legal argument,

and conclusions to which no response is necessary. To the extent those allegations require a

response, Mr. Wrigley denies them.

80.     On August 30, 2021, Whitcomb sent McCoy an e-mail concerning closing the
SAFE transaction. He indicated—again falsely—that "this is a structured close for [***$50 million***]
coming from multiple investors. Any paperwork you sign prior to then (which we would like you
to do) will be held in escrow until close." In fact, Defendants knew, or were reckless in not
knowing, they would have to close the transaction, including the SAFE Plaintiffs' $25 million, in
order to meet looming debt obligations—regardless of the level of total SAFE commitments that
Defendants had repeatedly assured the SAFE Plaintiffs the Company would have.

**ANSWER:**   Mr. Wrigley lacks sufficient information to answer the allegations in Paragraph 80 concerning an alleged August 30, 2021 email by Whitcomb and, on that basis, denies them. To the extent the allegations in Paragraph 80 purport to characterize the email, Mr. Wrigley denies those characterizations and respectfully refers the Court to the document, which speaks for itself. The remaining allegations in Paragraph 80 contain characterizations, legal argument, and conclusions to which no response is necessary. To the extent those allegations require a response, Mr. Wrigley denies them.

81.     On a September 2, 2021, Zoom call with Holmes and Whitcomb, Defendants reviewed in greater detail the Company's plans for capital expenditures through the end of 2022. Defendants again indicated—again with no reasonable basis—that $50 million would bridge the capex need through the end of the second quarter of 2022. They made this plain misrepresentation because the SAFE Plaintiffs, particularly through McCoy, again sought assurance that the Company would not run out of funds before the sale process could be completed. Holmes and Whitcomb noted that the Company might conceivably need to raise an additional $25-$50 million to sustain the Company through the end of 2022 *after* the $50 million SAFE investment had bridged the Company through 2Q22.

**ANSWER:**   Mr. Wrigley lacks sufficient information to answer the allegations in Paragraph 81 concerning an alleged September 2, 2021 Zoom call involving Holmes and Whitcomb and, on that basis, denies them. The remaining allegations in Paragraph 81 contain characterizations, legal argument, and conclusions to which no response is necessary. To the extent those allegations require a response, Mr. Wrigley denies them.

82.     Holmes and Whitcomb also again indicated, in or around this time, in direct communications with McCoy, that the $50 million would be sufficient to fund the Company's capital and operating expenses—which, as noted above, was false—and also that the Company would use the SAFE funds for capital and operating expenses, and therefore ***not*** to make Ponzi-like payments on upcoming obligations to other investors. In fact, during this same time period, the Company continued to emphasize that it would apply the SAFE funds to the Company's capital needs by walking the SAFE Plaintiffs through its (supposed) capital expenditure plans, including:

a.     Up to 27 new stores in Florida by the end of 2022 and approximately 30,000 square feet of additional canopy space for growing plants;

b.     A new dispensary by the end of 2022;

c.      Expanding market infrastructure in Texas to position the Company as a market leader, with an additional 10,000 square feet of cultivation and processing capabilities;

d.      Up to five new stores in Pennsylvania by the end of 2022 and another 25,000 square feet of cultivation and processing; and

e.      Closing on the Windy City acquisition in Illinois.

**ANSWER:**   Mr. Wrigley lacks sufficient information to answer the allegations in

Paragraph 82 concerning alleged communications involving McCoy, Holmes, and Whitcomb and,

on that basis, denies them. The remaining allegations in Paragraph 82 contain characterizations,

legal argument, and conclusions to which no response is necessary. To the extent those allegations

require a response, Mr. Wrigley denies them.

83.     At no time during these detailed discussions about the use of proceeds did Defendants mention that the SAFE proceeds would actually be used to pay down the Company's upcoming debts, which was a misleading omission totally inconsistent with the rosy projections provided (presumably for exactly that reason) that also rendered false the Company's statements about its capital expenditure plans.

**ANSWER:**   Mr. Wrigley lacks sufficient information to answer the allegations in

Paragraph 83 concerning alleged discussions among McCoy, Holmes, and/or Whitcomb and, on

that basis, denies them. The remaining allegations in Paragraph 83 contain characterizations, legal

argument, and conclusions to which no response is required. To the extent those allegations require

a response, Mr. Wrigley denies them.

84.     On September 7, 2021, Whitcomb continued to provide assurances that the SAFE raise would easily amount to $50 million. He e-mailed McCoy indicating "several more people demonstrating interest in the SAFE," and that the Company was "definitely ready to do the first $50m close with you all included if you're still inclined." The Company's plan, according to Whitcomb, was to "receive[] signed SAFE notes today and tomorrow and hold those in escrow until signed documents for all [$50 million] come in and then release the escrow and fund this week." He added that he believed a "second close" would yield perhaps another $45 million before the end of the month. On September 14, 2021, Whitcomb noted in another e-mail that they "had several other signatures come in so at this point [we] are targeting a Monday [September 20, 2021] close / funding." These statements were knowingly false when made, as the Company was unable to close the SAFE at even the minimal required level of $50 million.

**ANSWER:**   Mr. Wrigley lacks sufficient information to answer the allegations in Paragraph 84 concerning Mr. Whitcomb's e-mails and respectfully refers the Court to the emails, which speak for themselves. The remaining allegations in Paragraph 84 contain characterizations, legal argument, and conclusions to which no response is required. To the extent those allegations require a response, Mr. Wrigley denies them.

85.   On September 20, 2021, Whitcomb asked McCoy via e-mail to "send us your signed SAFE agreement and signed PIPE termination agreement, Ceres is doing the same, and [Greenberg Traurig, escrow agent] will not release any of those signatures from escrow until we have everything that we need to close. ***Your signature is completely meaningless while being held in escrow until all signatures are received, so you have zero obligation until all signatures are received***." This statement was also false and misleading because, regardless of whether or not it reached the $50 million investment that the Company had promised to the SAFE Plaintiffs, the Company intended to close the SAFE investment in order to access the SAFE Plaintiffs' money to keep the Company's head just above water.

**ANSWER:**   Mr. Wrigley lacks sufficient information to answer the allegations in Paragraph 85 concerning Mr. Whitcomb's email and respectfully refers the Court to the email, which speaks for itself. The remaining allegations in Paragraph 85 contain characterizations, legal argument, and conclusions to which no response is required. To the extent those allegations require a response, Mr. Wrigley denies them.

86.   On September 27, 2021, the SAFE Plaintiffs, in reliance on the Company's and its officers' and directors' misrepresentations and omissions, consented to the release of their SAFE documents from escrow, and funded their $25 million commitment. In particular, it was the Securities Defendants' misrepresentations that the preconditions for releasing the SAFE Plaintiffs' signatures from escrow and closing their $25 million investment—*i.e.*, the remaining SAFE investment totaled at least $50 million—that induced the SAFE Plaintiffs to give final permission to release their signatures and funds. Even setting aside the Securities Defendants' steady drumbeat of other misrepresentations and omissions, inducing the SAFE Plaintiffs to release $25 million on ***knowingly false pretenses*** entitles the SAFE Plaintiffs to rescission of their $25 million investment.

**ANSWER:**   Mr. Wrigley admits the SAFE Plaintiffs consented to the release of their SAFE documents from escrow and funded their $25 million commitment on or about September 27, 2021. The remaining allegations in Paragraph 86 contain characterizations, legal argument,

and conclusions to which no response is required.  To the extent those allegations require a

response, Mr. Wrigley denies them.

## III.  THE SAFE INSTRUMENT THAT THE SAFE PLAINTIFFS EXECUTED ALSO CONTAINED MISREPRESENTATIONS

87.     SAFE stands for "Simple Agreement for Future Equity." A SAFE is a relatively new type of security under which, depending upon the terms of the individual instrument, an investor's cash investment generally converts to equity in the issuing company under conditions specified in the SAFE. They are often issued to provide a company with bridge financing until it can complete an additional capital raise or a sale of the company, and will often convert to equity upon the occurrence of that future, specified event.

**ANSWER:**     Mr. Wrigley admits that SAFE stands for "Simple Agreement for Future

Equity," and that, as a general matter, an investment under a SAFE converts to equity in the issuing

company under conditions specified in the SAFE.  Mr. Wrigley lacks sufficient information to

answer the allegations in Paragraph 87 and, on that basis, denies them.

88.     The SAFE Plaintiffs entered into the SAFE security with SH Parent, which was executed "on or about September 27, 2021." Whitcomb executed the SAFE on behalf of SH Parent in his capacities as its Chief Development Officer and Secretary.

**ANSWER:**     Mr. Wrigley admits the allegations in Paragraph 88.

### A.     The Conversion Terms

89.     The SAFE provided that it would convert to equity upon the occurrence of certain specified events:

a.     *First*, the SAFE would convert to shares of certain preferred stock, referred to in the SAFE as SAFE Preferred Stock, upon an Equity Financing (as defined in the SAFE) of at least $10 million. SAFE ¶ 1(a).

b.     *Second*, the SAFE would convert to shares of Series EE Preferred Stock, upon a Liquidity Event, which the SAFE defined as a change in control of SH Parent, or the closing of the SPAC transaction. *Id.* ¶ 1(b).

c.     *Third*, the SAFE would convert to shares of Series EE Preferred stock upon a Dissolution Event, which the SAFE defined as including termination of the Company's operations, assignment of its assets to creditors, or its liquidation. *Id.* ¶ 1(c).

d.     *Finally*, the SAFE provided that, if none of the foregoing events had occurred by December 31, 2021, the SAFE would (after obtaining certain approvals and authorizations) "automatically and immediately convert into the number of shares of Series EE

Preferred Stock equal to the Deemed Series EE Purchase Amount divided by the Series EE Preferred Stock Price." *Id.* ¶ 1(d).

**ANSWER:**   To the extent the allegations in Paragraph 89, including subparts (a) through (d), purport to quote from or characterize the SAFEs entered into by the SAFE Plaintiffs, Mr. Wrigley denies those characterizations and respectfully refers the Court to the SAFEs, which speak for themselves.  To the extent those allegations require a response, Mr. Wrigley denies them.

### B.   The SAFE's Ineffective Attempts to Disclaim Liability

90.   The SAFE also contains certain provisions that purport to limit the liability of SH Parent and its officers and directors. For instance, the SAFE represents that the investor "has had an opportunity to ask questions of and receive answers from representatives of the Company concerning the investment in this [SAFE] and the securities to be acquired by the Investor hereunder." *Id.* ¶ 4(c). As detailed herein, although the SAFE Plaintiffs had the opportunity to ask questions, Defendants failed to provide truthful, complete, non-fraudulent answers.

**ANSWER:**   To the extent the allegations in Paragraph 90 purport to quote from or characterize the SAFEs entered into by the SAFE Plaintiffs, Mr. Wrigley denies those characterizations and respectfully refers the Court to the SAFEs, which speak for themselves.  The remaining allegations in Paragraph 90 contain characterizations, legal argument, and conclusions to which no response is required. To the extent those allegations require a response, Mr. Wrigley denies them.

91.   Although the SAFE Plaintiffs noted their "knowledge and experience in financial and business matters," *id.*, and that they had attempted to conduct responsible and adequate due diligence before investing, *id.*, any investor, regardless of sophistication, will be thwarted in their efforts to conduct sufficient diligence by misleading and fraudulent misrepresentations and omissions.

**ANSWER:**   To the extent the allegations in Paragraph 91 purport to quote from or characterize the SAFEs entered into by the SAFE Plaintiffs, Mr. Wrigley denies those characterizations and respectfully refers the Court to the SAFEs, which speak for themselves, except admit that the SAFE Plaintiffs acknowledged their knowledge and experience in financial and business matters. The remaining allegations in Paragraph 91 contain characterizations, legal

argument, and conclusions to which no response is required. To extent those allegations require a response, Mr. Wrigley denies them.

92.     Similarly, the generic, blanket provision that "no representations or warranties have been made to the Investor other than pursuant to Section 3 [of the SAFE] and that the Investor has not relied upon any representation or warranty in making or confirming [its] investment other than pursuant to Section 3," *id.* ¶ 4(c), is ineffective, and cannot relieve the Securities Defendants of their basic legal (not to mention ethical) responsibilities to provide true and complete information and disclosures. Notably, the SAFE expressly provides that TradeInvest or First Ocean "acknowledges that it is not relying upon any person, *other than the Company and its officers and directors*, in making its investment or decision to invest in the Company." *Id.* ¶ 4(e).

**ANSWER:**   To the extent the allegations in Paragraph 92 purport to quote from or characterize the SAFEs entered into by the SAFE Plaintiffs, Mr. Wrigley denies those characterizations and respectfully refers the Court to the SAFEs, which speak for themselves.  The remaining allegations in Paragraph 92 contain characterizations, legal argument, and conclusions to which no response is required. To the extent those allegations require a response, Mr. Wrigley denies them.

### C.     The SAFE Included Incomplete and Misleading Risk Factors

93.     The SAFE also included a list of general warnings, most of which concerned the Company's business operations, rather than the Company's capital structure. Regardless, none of these could have sufficiently apprised the SAFE Plaintiffs that the Company would simply *misrepresent* its finances, including by omitting that it was *in default* on, and three days from incurring additional significant defaults on, at least *$300 million* in debt obligations, which if honestly revealed would have stopped the SAFE Plaintiffs from investing $25 million in the SAFE. Indeed, the Company misleadingly warned that there could be "no assurance" that additional financing "will be available to the Company or [the post-SPAC Parallel entity], as applicable, on favorable terms or at all," without disclosing that its ability to obtain financing had evaporated along with myriad existing and/or imminent defaults on the vast majority of its debt obligations. The foregoing warning was, in other words, at best a misleading and impermissible half-truth.

**ANSWER:**   To the extent the allegations in Paragraph 93 purport to quote from or characterize the SAFEs entered into by the SAFE Plaintiffs, Mr. Wrigley denies those characterizations and respectfully refers the Court to the SAFEs, which speak for themselves.  The remaining allegations in Paragraph 93 contain characterizations, legal argument, and conclusions

to which no response is required. To the extent those allegations require a response, Mr. Wrigley denies them.

94.     Similarly, the Company's "warning" that "[t]he Company's debt could have important consequences to the Company" and that the Company's debt could cause numerous operational difficulties, was incomplete and misleading because it failed to address not only that the Company **had already defaulted** on its Senior and Junior Notes by issuing the PE Fund Note, but that, come September 30, 2021, the Company was going to pile more defaults on top of those based on its poor performance, dooming the Company into being at the mercy of their secured lenders. The notion that the Company's debt "could have important consequences" for the Company was starkly misleading because that day had already arrived.

**ANSWER:**   To the extent the allegations in Paragraph 94 purport to quote from or characterize the SAFEs entered into by the SAFE Plaintiffs, Mr. Wrigley denies those characterizations and respectfully refers the Court to the SAFEs, which speak for themselves. The remaining allegations in Paragraph 94 contain characterizations, legal argument, and conclusions to which no response is required. To the extent those allegations require a response, Mr. Wrigley denies them.

95.     The risks and problems that the Company warned about in general terms had already materialized in the specific form of serious debt defaults on the vast majority of the Company's outstanding debt obligations, and such warnings were therefore fraudulent and misleading.

**ANSWER:**   The allegations in Paragraph 95 contain characterizations, legal argument, and conclusions to which no response is required. To the extent those allegations require a response, Mr. Wrigley denies them.

## IV.   THREE DAYS AFTER THE SAFE PLAINTIFFS FUND THE SAFE, THE COMPANY INCURS NUMEROUS ADDITIONAL DEBT DEFAULTS ON $300 MILLION OF SENIOR AND JUNIOR NOTES

96.     On September 30, 2021—***three days after*** the SAFE Plaintiffs funded their $25 million investment—the Company incurred further defaults on the Senior and Junior Notes, which comprise approximately ***$300 million*** in debt obligations, and is the vast majority of the Company's outstanding debt. The Company thus knew, but did not disclose, that based on its actual financial performance during the diligence period it was about to incur numerous additional defaults on its outstanding obligations, and therefore failed to disclose material information

necessary to, among other things, make statements about the sufficiency of the Company's funding and capital, and the warning language in the SAFE, not misleading.

**ANSWER:** Mr. Wrigley admits that certain putative defaults by the Company on certain debts were alleged in or before fall of 2021. The remaining allegations in Paragraph 96 contain characterizations, legal argument, and conclusions to which no response is required. To the extent those allegations require a response, Mr. Wrigley denies them.

97. On November 29, 2021, PE Fund—which inescapably was the ***cause*** of one of the Company's defaults under the Senior and Junior Notes—in its capacity as the "Required Holder" for the Senior Notes, notified the Company that, as of September 30, 2021, the Company had defaulted on certain covenant obligations under the Senior Notes. Specifically, PE Fund notified the Company that it had failed to deliver to the lenders under the Senior Notes the Company's financial statements for the quarter ended September 30, 2021, and failed to notify the Senior Note holders that it defaulted on this obligation. Upon information and belief, including the Company's knowledge of its obligations under the Senior and Junior Notes and the timing of those obligations, the Company was aware as of September 27, 2021—the date the SAFE Plaintiffs funded their $25 million SAFE investment—that the Company would incur this default on September 30, 2021.

**ANSWER:** Mr. Wrigley admits that PE Fund was a "Required Holder" for the Senior Notes under the NPA, and that, on November 29, 2021, PE Fund served a Notice of Events of Default on the Company. To the extent the allegations in Paragraph 97 purport to characterize that Notice of Events of Default, Mr. Wrigley denies those characterizations and respectfully refers the Court to the First Lien Notice, which speaks for itself. The remaining allegations in Paragraph 97 contain characterizations, legal argument, and conclusions to which no response is necessary. To the extent those allegations require a response, Mr. Wrigley denies them.

98. On December 16, 2021, the Company received an even more alarming default notice—this time for the Junior Note—in the form of a Notice of Default, Election of Default Rate and Reservation of Rights to the Company (the "**Junior Lien Notice**") from Talladega LP, the Administrative Agent and Collateral Agent for the Junior Note holders. The Junior Lien Notice informed the Company that it had failed to (i) maintain the required debt-service-coverage ratio; (ii) maintain specified adjusted consolidated EBITDA as of September 30, 2021; and (iii) "pay Catch-Up [a]mount[s]" due as of September 30, 2021.

**ANSWER:** Mr. Wrigley admits that the Company received a default notice from Talladega LP for the Junior Note in the form of a Notice of Default, Election of Default Rate, and

Reservation of Rights and that Talladega LP was the Administrative Agent and Collateral Agent for the Junior Note holders. To the extent the allegations in Paragraph 98 purport to characterize the Junior Lien Notice, Mr. Wrigley denies those characterizations and respectfully refers the Court to the Junior Lien Notice, which speaks for itself.  The remaining allegations in Paragraph 98 contain characterizations, legal argument, and conclusions to which no response is required. To the extent those allegations require a response, Mr. Wrigley denies them.

99.     The Junior Lien Notice also explained that the Company had defaulted on the Junior Note through its "incurrence of Indebtedness pursuant to that certain Negotiable Subordinated Promissory Note dated June 30, 2021"—*i.e.*, the PE Fund Note. Section 9.11 of the NPA incorporates these Junior Note covenants as equal protections for the Senior Notes, so the Company's defaults under the Junior Note constituted Events of Default under the Senior Notes. Upon information and belief, including the Company's knowledge of its obligations under the Senior and Junior Notes and the timing of those obligations, and the Company's knowledge that it had incurred the obligations under the PE Fund Note (and had not disclosed the effect of those obligations to investors), the Company was aware as of September 27, 2021 —the date the SAFE Plaintiffs funded their $25 million SAFE investment—that the Company would incur these defaults just days later.

**ANSWER:**     To the extent the allegations in Paragraph 99 purport to quote from or characterize the NPA or the Junior Lien Notice, Mr. Wrigley denies those characterizations and respectfully refers the Court to those documents, which speak for themselves.  The remaining allegations in Paragraph 99 contain characterizations, legal argument, and conclusions to which no response is required. To the extent those allegations require a response, Mr. Wrigley denies them.

100.     Further, although the foregoing default notices did not raise the issue, as of September 27, 2021, the Company also knew that its forbearance agreement with Green Health would expire 30 days after September 30, 2021—and that the Company had no way to meet an obligation to pay Green Health $44.3 million (now $54 million with accrued interest) by November 1, 2021. To the contrary, the Securities Defendants had disclosed that the Green Health Notes would have converted into equity by the time the SAFE funding had closed—which was false.

**ANSWER:**     To the extent the allegations in Paragraph 100 purport to characterize the default notices, Mr. Wrigley denies those characterizations and respectfully refers the Court to the

documents, which speak for themselves. The remaining allegations in Paragraph 100 contain characterizations, legal argument, and conclusions to which no response is required. To the extent those allegations require a response, Mr. Wrigley denies them.

101.    Notably, on October 1, 2021, the Company sent an e-mail, on behalf of Wrigley, to the Company's investors explaining that the Company was no longer pursuing the SPAC transaction. Among other things, he noted that the Company would " focus on alternative financing avenues to pursue a vast array of growth opportunities," and that, the Company had "just raised and closed a significant initial equity financing through the private markets," referring to the SAFE.

**ANSWER:**    Mr. Wrigley admits that on October 1, 2021, the Company sent an e-mail to investors. To the extent the remaining allegations in Paragraph 101 purport to characterize that e-mail, Mr. Wrigley denies those characterizations and respectfully refers the Court to the e-email, which speaks for itself.

102.    What this e-mail omitted was Wrigley's extreme resistance—given his knowledge of the Company's dire finances—to put up any of his own funds to support the SAFE. As part of the SAFE negotiations, McCoy conveyed to Holmes and Whitcomb that it was important to the SAFE Plaintiffs that Wrigley also have invested in the SAFE. Holmes and Whitcomb represented that Wrigley would agree to commit $5 million. But, as the SAFE Plaintiffs learned nearly two months later, Wrigley invested ***nothing*** in the SAFE—which also revealed that the Securities Defendants had closed the SAFE and called the SAFE Plaintiffs' money ***despite failing to reach the $50 million investment*** that they promised they would reach before calling the SAFE Plaintiffs' $25 million.

**ANSWER:**    Mr. Wrigley denies that he was "extreme[ly] resistan[t]" to invest his own funds to support the SAFE, and denies that he did not invest in the SAFE.  Answering further, Mr. Wrigley states that, on or about September 21, 2021, he invested $5 million in the SAFE, and that he invested a further $5.6 million in the SAFE on or about November 18, 2021.  Mr. Wrigley lacks sufficient information to answer the allegations concerning communications among McCoy, Holmes, and Whitcomb and, on that basis, denies them.  The remaining allegations in Paragraph 102 contain characterizations, legal argument, and conclusions to which no response is required. To the extent those allegations require a response, Mr. Wrigley denies them.

103.     Upon this discovery, in order to avoid additional discussion or scrutiny of the Company's deteriorating condition, Wrigley finally (and quickly) invested his own personal funds in late November 2021, though now he had to make up a whopping *$10.5 million shortfall* to reach the previously promised $50 million—a fact wholly inconsistent with being fully, if not over-subscribed in late September. But Wrigley failed to truly maintain even that level of investment commitment to the SAFE. As the SAFE Plaintiffs learned in January 2022, the Company had used $3 million of the SAFE proceeds to make a payment back to Wrigley under the PE Fund Note. In other words, Wrigley invested $10.5 million in the Company from one pocket (to artificially make it appear there was $50 million raised), but had taken *$3 million back* to put in another pocket. Consequently, even with Wrigley's post-closing SAFE advance, the Company never had $50 million in capital to bridge to 2Q22, because Wrigley simply round-tripped $3 million to an entity that he controlled, for his own benefit.

**ANSWER:**     Wrigley admits that he invested $10.6 million in the SAFE.  The remaining allegations in Paragraph 103 contain characterizations, legal argument, and conclusions to which no response is required. To the extent those allegations require a response, Mr. Wrigley denies them.

## DEFENDANTS MISREPRESENTATIONS FINALLY COME TO LIGHT

### I.     THE COMPANY REVEALS NUMEROUS DEBT DEFAULTS ON AT LEAST $300 MILLION IN OUTSTANDING DEBT OBLIGATIONS AND THE DIRE STATE OF ITS CAPITAL NEEDS

104.     On December 1, 2021—just two months after the SAFE Plaintiffs funded their $25 million SAFE investment—the Company revealed more previously undisclosed facts that completely altered the landscape of the investment.

**ANSWER:**     The allegations in Paragraph 104 contain characterizations, legal argument, and conclusions to which no response is required. To the extent those allegations require a response, Mr. Wrigley lacks sufficient information to answer them.

105.     During a Zoom call that day with Perella Weinberg Partners ("**PWP**")—one of the Company's financial advisors in connection with the purported effort to sell the Company—PWP disclosed that the year-end interest payment due on the $165 million in Senior Notes would not be paid, because the Company would instead need to conserve precious cash for the sale process.

**ANSWER:**     Mr. Wrigley admits that Perella Weinberg Partners served as a financial advisor to the Company. Mr. Wrigley lacks sufficient information to answer the remaining allegations in Paragraph 105 and, on that basis, denies them.

106.    This same disclosure also made clear that, contrary to the Company's repeated portrayals, the funds raised through the SAFE *would not* last the Company through the end of the second quarter of 2022. Indeed, it would not last the Company through the fall of 2021. Defendants, with full knowledge of their own capital structure and exclusive knowledge of their internal finances, as well as the truth behind their diminishing revenue and EBITDA prospects and projections, had no reasonable basis to claim that the SAFE would last the Company through the end of 2Q22, and indeed knew (or were reckless in not knowing) it could not.

**ANSWER:**    The allegations in Paragraph 106 contain characterizations, legal argument, and conclusions to which no response is required. To the extent those allegations require a response, Mr. Wrigley denies them.

107.    During the same call, PWP disclosed for the first time the various debt defaults enumerated above—including the issuance of the PE Fund Note (as of June 2021), and the various defaults that happened on September 30, 2021—just *three days* after the SAFE Plaintiffs were induced to provide the Company with $25 million.

**ANSWER:**    Mr. Wrigley lacks sufficient information to answer the allegations in Paragraph 107 concerning what was communicated in the alleged call, or what PWP allegedly disclosed and, on that basis, denies those allegations.

108.    In a December 7, 2021 text message, McCoy expressed to Whitcomb that he was (justifiably) "astounded" that the Company had closed on a $50 million SAFE raise, and was now seeking concessions from creditors (including Techview). McCoy asked where the funds had gone. Whitcomb attempted to deflect the issue to PWP's supposed mishandling of the situation, but also conceded that although "we still have most of that money today" "[t]he issue is we need to raise more, and the [newly appointed strategic advisory] committee is focused a lot on unwinding of some of Beau's securities and redistribution of this equity back to the rest of the cap table."

**ANSWER:**    Mr. Wrigley lacks sufficient information to answer the allegations in Paragraph 108 concerning the content of text messages exchanged between McCoy and Whitcomb and, on that basis, denies those allegations.  To the extent the allegations in Paragraph 108 purport to characterize the text messages, Mr. Wrigley denies those characterizations and respectfully refers the Court to the messages, which speak for themselves.

109.    Whitcomb further conceded in the same message exchange that "Beau and Jay have some explaining to do to you as I mentioned in our last call." Whitcomb here was referring to two issues: (i) that Wrigley initially failed to fund his SAFE commitment, yet had taken the SAFE Plaintiffs' $25 million without reaching the agreed-upon $50 million; and (ii) that neither Holmes

(nor anyone else) had disclosed that Holmes had negotiated the Green Health Notes from both sides of the transaction.

**ANSWER:**   Mr. Wrigley lacks sufficient information to answer the allegations in Paragraph 109 concerning the content of text messages exchanged between McCoy and Whitcomb and, on that basis, denies those allegations.  Mr. Wrigley denies that he failed to fund the SAFE. To the extent the allegations in Paragraph 109 purport to characterize the text messages, Mr. Wrigley denies those characterizations and respectfully refers the Court to the messages, which speak for themselves. The remaining allegations in Paragraph 109 contain characterizations, legal arguments, and conclusions to which no response is required. To the extent those allegations require a response, Mr. Wrigley denies them.

110.    At Plaintiffs' request, on December 8, PWP granted Plaintiffs access to PWP's data room for the first time. The first document posted was titled "Capital Structure and Waterfall Information," which was obviously important to investors given the (now disclosed) state of free fall debt defaults. This chart indicated, inconsistent with the projections provided to the SAFE Plaintiffs to induce the SAFE investment, that the Green Health Notes *were still outstanding*. The SAFE Plaintiffs would not have advanced funds to be converted into equity had they know that equity would be repaid in liquidation *behind* the Green Health Notes. Knowing how obvious such a concern would be to any investor, the Company had previously provided the Project Cereal Cap Table Analysis, dated as of August 11, 2021, which showed the Green Health Notes converting into equity prior to (and thus junior to) the SAFE investment's conversion.

**ANSWER:**   Mr. Wrigley lacks sufficient information to answer the allegation in Paragraph 110 that PWP granted Plaintiffs access to PWP's data room for the first time on December 8 at Plaintiffs' request.  To the extent the allegations in Paragraph 110 purport to quote from or characterize the documents titled "Capital Structure and Waterfall Information" and "Project Cereal Cap Table Analysis," Mr. Wrigley denies those characterizations and respectfully refers the Court to those documents, which speak for themselves.  The remaining allegations in Paragraph 110 contain characterizations, legal argument, and conclusions to which no response is required. To the extent those allegations require a response, Mr. Wrigley denies them.

## II.   THE COMPANY REVEALS THAT IT TOOK THE SAFE PLAINTIFFS' MONEY EVEN THOUGH THE SAFE COMMITMENTS DID NOT TOTAL THE PROMISED $50 MILLION

111.   During a November 18, 2021 Zoom call with McCoy, Wrigley, Holmes, and Whitcomb, Wrigley (who had just resigned as CEO) let slip that he had never funded his SAFE commitment.  During a call the same day, McCoy expressed appropriate shock to Holmes at this failure to abide by the Company's repeated representations that Wrigley would commit funds ***and*** that the SAFE would not close without reaching $50 million in total investment. Indeed, Defendants had told the SAFE Plaintiffs that their signatures were "***meaningless***" and would ***not*** be released until the promised SAFE commitment of $50 million was met. These statements were made precisely to induce the SAFE Plaintiffs to fund. On November 22, 2021, Wrigley hurriedly funded his SAFE commitment, and had to commit $10.5 million to make up for the significant shortfall.

**ANSWER:**   Mr. Wrigley admits that he participated in Zoom call with McCoy, Holmes, and Whitcomb on November 18, 2021 and that he funded an additional $5.6 million in the SAFE (in addition to the $5 million he invested on or about September 21, 2021) on or about November 18, 2021.  Mr. Wrigley lacks sufficient information to answer the allegations in Paragraph 111 concerning communications between McCoy and Holmes and, on that basis, denies those allegations.  The remaining allegations in Paragraph 111 contain characterizations, legal argument, and conclusions to which no response is required. To the extent those allegations require a response, Mr. Wrigley denies them.

## III.   THE COMPANY REVEALS THE SAFE FUNDS WERE USED TO PAY OTHER INVESTORS, INCLUDING PE FUND

112.   On January 24, 2022, the PWP data room was updated with another revealing chart:

| Cash Flow Bridge | | |
|---|---|---|
| *($ in Millions)* | | *1/24/2022* |
| **Item** | **Amount** | **Note** |
| Cash Balance as of 6/30/2021 | $47 | Per Company |
| Proceeds from SAFE Note | 50 | |
| Interest on Senior Notes | (4.1) | |
| Interest on SAF Notes | (5.7) | Includes October catch-up interest |
| Amortization of SAF Notes | (2.5) | Principal |
| Catch Up Payments / Fees on SAF Note | (6.0) | 2M catch up principal in October + 4M fees in Q4 |
| Amortization of PE Promissory Notes | (3.0) | Principal |
| Van Dyk Loan | (0.2) | Principal & interest |
| Professional Fees | (12.1) | Irregular & non-recurring items |
| Net Capex Payments | (18.1) | |
| Rent | (19.4) | Includes SLB |
| Operating Cash Flow | 1.6 | |
| Ending Cash Balance on 12/30/2021 | $27 | Per TWCF dated 1.7.22 |

**ANSWER:** Mr. Wrigley lacks sufficient information to answer the allegation concerning the date when the PWP data room was updated with the portion of the chart purportedly depicted in Paragraph 112 and, on that basis, denies it. To the extent the allegations in Paragraph 112 purport to quote from or reflect a document loaded to the PWP data room, Mr. Wrigley denies those characterizations and respectfully refers the Court to that document, which speaks for itself.

113. Without fanfare, the Company yet again disclosed another set of astounding misrepresentations. Defendants, through PWP and the above chart, admitted that the Company used the proceeds from the SAFE *to fund outstanding debt obligations*, as opposed to using it to fund the capital and operating expenses that Defendants had represented all along.

**ANSWER:** To the extent the allegations in Paragraph 113 purport to quote from or characterize a document loaded to the PWP data room, Mr. Wrigley denies those characterizations and respectfully refers the Court to that document, which speaks for itself. The remaining allegations in Paragraph 113 contain characterizations, legal argument, and conclusions to which no response is required. To the extent those allegations require a response, Mr. Wrigley denies them.

114. The same chart even revealed that the Company had used at least $3 million of the SAFE proceeds to pay down the obligation under the PE Fund Note, meaning Wrigley actually round-tripped $3 million of his own SAFE commitment *back to himself*.

**ANSWER:**     To the extent the allegations in Paragraph 114 purport to quote from or characterize a document loaded to the PWP data room, Mr. Wrigley denies those characterizations and respectfully refers the Court to that document, which speaks for itself. The allegations in Paragraph 114 contain characterizations, legal argument, and conclusions to which no response is required. To the extent those allegations require a response, Mr. Wrigley denies them.

115.    The implications of the foregoing are disturbing for another reason. The practice of raising funds under false pretenses, with the promise of a return that the promisor knows is unlikely ever to be fulfilled, then using those funds instead to pay other investors to whom a company has also promised returns, is the essence of a Ponzi scheme. It is therefore particularly important that Plaintiffs take discovery from the Defendants to determine the full scale of the underlying scheme, as well as to be able to inform other investors (and potentially relevant authorities) so that all parties involved have the best chance to recover the funds they provided to the Company.

**ANSWER:**     The allegations in Paragraph 115 contain characterizations, legal argument, and conclusions to which no response is required. To the extent those allegations require a response, Mr. Wrigley denies them.

## JUSTIFIABLE RELIANCE

116.    The SAFE Plaintiffs believed and relied upon the false and misleading representations described above when entering into the SAFE investment. But for the misrepresentations and omissions committed by the Securities Defendants concerning the Company's capital structure, finances, level of SAFE investment, that the SAFE investment would bridge the Company's capital needs until the end of 2Q22, and the intended use of the SAFE proceeds, the SAFE Plaintiffs would not have agreed to enter into the SAFE.

**ANSWER:**     The allegations in Paragraph 116 contain characterizations, legal argument, and conclusions to which no response is required. To the extent those allegations require a response, Mr. Wrigley denies them.

117.    The SAFE Plaintiffs justifiably relied upon these misrepresentations and omissions about the Company and the SAFE. As officers of the Company, Wrigley, Holmes, and Whitcomb were uniquely situated to know and understand the full picture of the Company's finances and prospects, as well as how much had been raised for the SAFE and how the Company would use those proceeds. Nonetheless, the Securities Defendants deliberately made the misrepresentations and omissions detailed above. The SAFE Plaintiffs, by contrast, were not in a position to know the non-public, undisclosed information about the Company's obligations, including existing, undisclosed debt defaults.

**ANSWER:**    Mr. Wrigley admits that he, Holmes, and Whitcomb were officers of the Company as of the date of the SAFE. The remaining allegations in Paragraph 117 contain characterizations, legal argument, and conclusions to which no response is required. To the extent those allegations require a response, Mr. Wrigley denies them.

## SUMMARY OF SCIENTER ALLEGATIONS

118.    It is clear from the foregoing allegations that the Securities Defendants made numerous misrepresentations and omissions about the Company, its capital structure, and the SAFE investment, while in possession of undisclosed facts that were contrary to their representations, or necessary to make their representations complete and not misleading. The Securities Defendants therefore made these alleged misstatements knowingly and intentionally to induce the SAFE Plaintiffs to provide $25 million for the SAFE, and intended that the SAFE Plaintiffs rely on them.

**ANSWER:**    Mr. Wrigley denies that he made any misrepresentations or omissions to Plaintiffs.  The remaining allegations in Paragraph 118 contain characterizations, legal argument, and conclusions to which no response is required. To the extent those allegations require a response, Mr. Wrigley denies them.

119.    The Securities Defendants had both motive and opportunity to deceive the SAFE Plaintiffs. As officers of the Company, they stood to gain from successfully raising tens of millions of dollars with the SAFE, particularly because the SAFE required no expenditure in interest or repaid principal on the part of the Company. Further, Wrigley in particular stood to gain because the SAFE could help alleviate the burdens on the Company so that the obligations to his personal investment vehicles—Green Health and PE Fund—could be satisfied. And the Cash Flow Bridge chart above shows that the SAFE proceeds were used to pay at least $3 million to PE Fund—which benefited Wrigley personally. Indeed, this also means that, even though Wrigley invested $10.5 million in the SAFE, he ***took $3 million back***.

**ANSWER:**    Mr. Wrigley denies that he deceived Plaintiffs.  Answering further, Mr. Wrigley admits that he invested $10.5 million of his funds in the SAFE.  The remaining allegations in Paragraph 119 contain characterizations, legal argument, and conclusions to which no response is required. To the extent those allegations require a response, Mr. Wrigley denies them.

## LOSS CAUSATION

120.     The SAFE Plaintiffs have been deprived of, and lost, at least $25 million in connection with the SAFE. In particular, Defendants' misrepresentations and omissions caused the SAFE Plaintiffs to commit $25 million to the SAFE, which they would not have committed had the SAFE Plaintiffs known the truth that was revealed shortly afterward.

**ANSWER:**     Mr. Wrigley denies the allegations in Paragraph 120.

121.     Furthermore, it was Defendants' misrepresentations and omissions that caused the SAFE Plaintiffs' losses, as absent those misrepresentations and omissions, the SAFE Plaintiffs would still be in possession of the $25 million of which they were deprived.

**ANSWER:**     Mr. Wrigley denies the allegations in Paragraph 121.

## FIRST CAUSE OF ACTION
### For Violations of §10(b) of the Securities Exchange Act of 1934 and Rule 10b-5
### (Against the Securities Defendants)

122.     The SAFE Plaintiffs repeat and reallege each and every allegation above as if fully set forth herein.

**ANSWER:**     Mr. Wrigley incorporates by reference his responses to each and every allegation above as if fully set forth herein.

123.     The SAFE Plaintiffs bring this cause of action against the Securities Defendants for violation of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder.

**ANSWER:**     The allegations in Paragraph 123 purport to characterize the SAFE Plaintiffs' claims, and do not require a response. To the extent those allegations require a response, Mr. Wrigley admits that the SAFE Plaintiffs bring this cause of action against the Securities Defendants for violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, but denies that they are entitled to any recovery or relief whatsoever.

124.     Between July and September 2021, inclusive, the Securities Defendants made the various false and materially misleading statements specified above, which they knew or recklessly disregarded were misleading because they misrepresented or omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading.

**ANSWER:**     Mr. Wrigley denies the allegations in Paragraph 124.

125.     The Securities Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they: (a) employed devices, schemes, and artifices to defraud; (b ) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon the SAFE Plaintiffs related to the SAFE.

**ANSWER:**     Mr. Wrigley denies the allegations in Paragraph 125.

126.     As a direct and proximate result of the Securities Defendants' wrongful conduct, the SAFE Plaintiffs suffered damages in connection with the SAFE. In reliance on the Securities Defendants' misstatements and omissions, the SAFE Plaintiffs committed $25 million to the SAFE. The SAFE Plaintiffs would not have provided those funds for the SAFE if they had been aware of the misstatements and omissions made by the Securities Defendants. The SAFE Plaintiffs did not know, and could not in the exercise of reasonable diligence have known, of the Securities Defendants' misrepresentations and omissions. These same misrepresentations and omissions caused the SAFE Plaintiffs' losses.

**ANSWER:**     Mr. Wrigley denies the allegations in Paragraph 126.

127.     By virtue of the conduct alleged herein, the Securities Defendants have each violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, and are liable to the SAFE Plaintiffs for damages in an amount to be determined at trial, but not less than $25 million.

**ANSWER:**     Mr. Wrigley denies the allegations in Paragraph 127.

<u>**SECOND CAUSE OF ACTION**</u>
**For Violations of Section 20(a) of the Securities Exchange Act of 1934**
**(Against Wrigley, Holmes, and Whitcomb)**

128.     The SAFE Plaintiffs repeat and reallege the allegations in Paragraphs 1-121 as if fully set forth herein.

**ANSWER:**     Mr. Wrigley incorporates by reference his responses the allegations in

Paragraphs 1-121 as if fully set forth herein.

129.     The SAFE Plaintiffs bring this cause of action against Wrigley, Holmes, and Whitcomb for violations of Section 20(a) of the Exchange Act, 15 U.S.C. § 78(a).

**ANSWER:**     The allegations in Paragraph 129 purport to characterize the SAFE

Plaintiffs' claims and do not require a response. To the extent those allegations require a response,

Mr. Wrigley admits that the SAFE Plaintiffs bring this cause of action against the Securities

Defendants for violations of Section 20(a) of the Exchange Act, 15 U.S.C. § 78(a), but denies that

they are entitled to any recovery or relief whatsoever.

130.     In their positions as officers and directors of the Company, Wrigley , Holmes, and
Whitcomb were controlling persons of the Company within the meaning of Section 20(a) of the
Exchange Act. By reason of their positions of control and authority as officers and/or directors of
the Company, Wrigley, Holmes, and Whitcomb had the power and authority to cause the Company
to engage in the conduct complained of herein. These Defendants were able to, and did, control,
directly and indirectly, the decision-making of the Company, including the misstatements and
omissions made by and on behalf of the Company.

**ANSWER:**   Mr. Wrigley admits that he, Holmes, and Whitcomb were officers of the

Company as of the date of the SAFE. Mr. Wrigley denies the remaining allegations in Paragraph

130.

131.     Furthermore, Wrigley, Holmes, and Whitcomb, as alleged above, had significant
day-to-day involvement in the operations of the Company and in particular the transactions at issue
here, and are therefore culpable participants in the alleged misconduct. They participated in calls,
written communications, and other aspects of the transactions that were responsible for inducing
the SAFE Plaintiffs to invest $25 million in the SAFE.

**ANSWER:**   Mr. Wrigley admits that, as former CEO of the Company, he had day-to-

day involvement in some of the operations of the Company.  Mr. Wrigley denies the remaining

allegations in Paragraph 131.

132.     As a result, Wrigley, Holmes, and Whitcomb were control persons of the Company
within the meaning of Section 20(a) of the Exchange Act.

**ANSWER:**   The allegations in Paragraph 132 contain characterizations, legal argument,

and conclusions to which no response is necessary. To the extent those allegations require a

response, Mr. Wrigley denies them.

133.     The Company committed violations of Section 10(b) of the Exchange Act.

**ANSWER:**     The allegations in Paragraph 133 contain characterizations, legal argument, and conclusions to which no response is necessary. To the extent those allegations require a response, Mr. Wrigley denies them.

134.     By reason of the foregoing, Wrigley, Holmes, and Whitcomb violated Section 20(a) of the Exchange Act, 15 U.S.C. § 78(a), and are liable to the SAFE Plaintiffs.

**ANSWER:**     The allegations in Paragraph 134 contain characterizations, legal argument, and conclusions to which no response is necessary. To the extent those allegations require a response, Mr. Wrigley denies them.

<u>**THIRD CAUSE OF ACTION**</u>
**For Violation of Georgia Uniform Securities Act of 2008 (Blue Sky Laws)**
**Ga. Code Ann., § 10-5-58**
**(Against the Securities Defendants)**

135.     The SAFE Plaintiffs repeat and reallege the allegations in Paragraphs 1-121 as if fully set forth herein.

**ANSWER:**     Mr. Wrigley incorporates by reference his responses the allegations in Paragraphs 1-121 as if fully set forth herein.

136.     Upon information and belief, the Securities Defendants negotiated significant portions of the SAFE investment within, from, and/or directed into the state of Georgia, and executed the SAFE in Georgia, as evidenced by, among other things, the address under Whitcomb's signature on the SAFE itself, which is in Atlanta, Georgia. The Securities Defendants were therefore subject to, and required to comply with, the requirements of the Georgia Uniform Securities Act of 2008.

**ANSWER:**     The allegations in Paragraph 136 contain characterizations, legal argument, and conclusions to which no response is required. To the extent those allegations require a response, Mr. Wrigley denies them.

137.     The SAFE Plaintiffs bring this cause of action under Section 10-5-58 of the Georgia Code against the Securities Defendants. The SAFE Plaintiffs are not required under this cause of action to allege that the Securities Defendants acted with scienter or fraudulent intent, as these are not elements of a claim under Section 10-5-58(c).

**ANSWER:** The allegations in Paragraph 137 purport to characterize the SAFE Plaintiffs' claims and do not require a response. To the extent those allegations require a response, Mr. Wrigley admits that the SAFE Plaintiffs bring this cause of action against the Securities Defendants under Section 10-5-58 of the Georgia Code, but denies that they are entitled to any recovery or relief whatsoever. The remaining allegations in Paragraph 137 contain characterizations, legal argument, and conclusions to which no response is required. To the extent those allegations require a response, Mr. Wrigley denies them.

138. During discussions concerning the SAFE, the Securities Defendants made the false and materially misleading statements specified above, and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

**ANSWER:** Mr. Wrigley denies the allegations in Paragraph 138.

139. The Securities Defendants did not disclose the concealed information described above to the SAFE Plaintiffs. Rather, the SAFE Plaintiffs first learned that information beginning in November and December 2021, two to three months after providing their SAFE investments to the Securities Defendants. The SAFE Plaintiffs did not know, and could not in the exercise of reasonable diligence have known, of the Securities Defendants' misrepresentations and omissions.

**ANSWER:** Mr. Wrigley denies the allegations in Paragraph 139.

140. But for the Securities Defendants' misrepresentations and omissions, the SAFE Plaintiffs would not have invested in the SAFE. As a direct and proximate result of the Securities Defendants' wrongful conduct, upon which the SAFE Plaintiffs did rely, the SAFE Plaintiffs have suffered damages in connection with the SAFE.

**ANSWER:** Mr. Wrigley denies the allegations in Paragraph 140.

141. By virtue of the conduct alleged herein, the Securities Defendants have each violated § 10-5-58 of the Georgia Code, and are liable to the SAFE Plaintiffs for damages in an amount to be determined at trial, but not less than $25 million. The Securities Defendants are also entitled to rescission of the SAFE investment, along with interest, expenses, fees, and costs associated with the investment and recovery thereon.

**ANSWER:** The allegations in Paragraph 141 contain characterizations, legal argument, and conclusions to which no response is necessary. To the extent those allegations require a response, Mr. Wrigley denies them.

**FOURTH CAUSE OF ACTION**
**For Violation of Georgia Uniform Securities Act of 2008 (Blue Sky Laws)**
**Ga. Code Ann., § 10-5-58(g)**
**(Against Wrigley, Holmes, and Whitcomb)**

142.    The SAFE Plaintiffs repeat and reallege the allegations in Paragraphs 1-121 as if fully set forth herein.

**ANSWER:**    Mr. Wrigley incorporates by reference his responses the allegations in

Paragraphs 1-121 as if fully set forth herein.

143.    The SAFE Plaintiffs bring this cause of action pursuant to Section 10-5-58(g) of the Georgia Code against Wrigley, Holmes, and Whitcomb. The SAFE Plaintiffs are not required to allege that Wrigley, Holmes, and Whitcomb acted with scienter or fraudulent intent.

**ANSWER:**    The allegations in Paragraph 143 purport to characterize the SAFE

Plaintiffs' claims and do not require a response. To the extent those allegations require a response,

Mr. Wrigley admits that the SAFE Plaintiffs bring this cause of action against the Securities

Defendants under Section 10-5-58(g) of the Georgia Code, but denies that they are entitled to any

recovery or relief whatsoever.    The remaining allegations in Paragraph 143 contain

characterizations, legal argument, and conclusions to which no response is required. To the extent

those allegations require a response, Mr. Wrigley denies them.

144.    As directors, executive officers, and/or "persons" who directly or indirectly control the Company, Wrigley, Holmes, and Whitcomb are liable jointly and severally with and to the same extent as the Company under Section 10-5-58(g) of the Georgia Code.

**ANSWER:**    The allegations in Paragraph 144 contain characterizations, legal argument,

and conclusions to which no response is necessary. To the extent those allegations require a

response, Mr. Wrigley denies them.

145.    By reason of their positions of control and authority as officers and/or directors of the Company, Wrigley, Holmes, and Whitcomb had the power and authority to cause the Company to engage in the conduct complained of herein. These Defendants were able to, and did, control, directly and indirectly, the decision-making of the Company, including the statements made to the representatives of the SAFE Plaintiffs.

**ANSWER:**    The allegations in Paragraph 145 contain characterizations, legal argument, and conclusions to which no response is necessary. To the extent those allegations require a response, Mr. Wrigley denies them.

146.    Wrigley, Holmes, and Whitcomb, in their capacities as officers and/or directors of the Company, participated in and materially aided the misstatements and omissions set forth above. Wrigley, Holmes, and Whitcomb had direct and supervisory involvement in the SAFE investment and in procuring funds related thereto, and had the ability to influence and direct and did so influence and direct the activities of the Company in its violations of Section 58 of the Georgia Uniform Securities Act of 2008.

**ANSWER:**    Mr. Wrigley denies the allegations in Paragraph 146.

147.    As set forth above, the Securities Defendants violated Section 58 of the Georgia Uniform Securities Act of 2008. By virtue of their positions as controlling persons, executive officers and directors, and as a result of their aforesaid conduct and culpable participation, Wrigley, Holmes, and Whitcomb are liable pursuant to Section 58(g) of the Georgia Uniform Securities Act of 2008, jointly and severally with, and to the same extent as the Company is to the SAFE Plaintiffs.

**ANSWER:**    The allegations in Paragraph 147 contain characterizations, legal argument, and conclusions to which no response is necessary. To the extent those allegations require a response, Mr. Wrigley denies them.

148.    By reason of the foregoing, Wrigley, Holmes, and Whitcomb violated Section 58(g) of the Georgia Uniform Securities Act of 2008, Georgia Code § 10-5-58(g), and are liable to the SAFE Plaintiffs.

**ANSWER:**    The allegations in Paragraph 148 contain characterizations, legal argument, and conclusions to which no response is necessary. To the extent those allegations require a response, Mr. Wrigley denies them.

## FIFTH CAUSE OF ACTION
### For Common Law Fraud / Fraudulent Inducement
### (Against the Securities Defendants)

149.    The SAFE Plaintiffs repeat and reallege the allegations in Paragraphs 1-121 as if fully set forth herein.

**ANSWER:** Mr. Wrigley incorporates by reference his responses the allegations in Paragraphs 1-121 as if fully set forth herein.

150. The SAFE Plaintiffs bring this cause of action against the Securities Defendants.

**ANSWER:** The allegations in Paragraph 150 purport to characterize the SAFE Plaintiffs' claims do not require a response. To the extent those allegations require a response, Mr. Wrigley admits that the SAFE Plaintiffs bring this cause of action against the Securities Defendants, but denies that they are entitled to any recovery or relief whatsoever.

151. Each of the Securities Defendants made, authorized, or caused the misrepresentations or omissions at issue, which are summarized above.

**ANSWER:** Mr. Wrigley denies the allegations in Paragraph 151.

152. The misrepresentations and omissions set forth above were fraudulent and material.

**ANSWER:** The allegations in Paragraph 152 contain characterizations, legal argument, and conclusions to which no response is necessary. To the extent those allegations require a response, Mr. Wrigley denies them.

153. Each of the Securities Defendants knew or recklessly disregarded that their representations and omissions were false and/or misleading at the time they were made. Each of the Securities Defendants made the misleading statements with an intent to defraud the SAFE Plaintiffs, as detailed above.

**ANSWER:** The allegations in Paragraph 153 contain characterizations, legal argument, and conclusions to which no response is necessary. To the extent those allegations require a response, Mr. Wrigley denies them.

154. The Securities Defendants had reason to expect that the SAFE Plaintiffs would rely on such representations and intended that their misleading statements and omissions would fraudulently induce the SAFE Plaintiffs to invest $25 million in the SAFE.

**ANSWER:** The allegations in Paragraph 154 contain characterizations, legal argument, and conclusions to which no response is necessary. To the extent those allegations require a response, Mr. Wrigley denies them.

155.    The SAFE Plaintiffs justifiably relied on the Defendants' misrepresentations and omissions, as detailed above. The SAFE Plaintiffs did not know, and could not in the exercise of reasonable diligence have known, of the Securities Defendants' misrepresentations and omissions.

**ANSWER:**    The allegations in Paragraph 155 contain characterizations, legal argument, and conclusions to which no response is necessary. To the extent those allegations require a response, Mr. Wrigley denies them.

156.    Had the SAFE Plaintiffs known the facts regarding the SAFE and the Company, they would not have invested in the SAFE.

**ANSWER:**    Mr. Wrigley denies the allegations in Paragraph 156.

157.    As a direct and proximate result of the Securities Defendants' false representations and omissions, the SAFE Plaintiffs have suffered damages in an amount to be proven at trial, but no less than $25 million.

**ANSWER:**    The allegations in Paragraph 157 contain characterizations, legal argument, and conclusions to which no response is necessary. To the extent those allegations require a response, Mr. Wrigley denies them.

<u>**SIXTH CAUSE OF ACTION**</u>
**For Violation of the Georgia Uniform Voidable Transactions Act, Ga. Code Ann., § 18-2-74**
**(Against All Defendants)**

158.    Plaintiffs repeat and reallege the allegations in Paragraphs 1-121 as if fully set forth herein.

**ANSWER:**    This cause of action was dismissed by the Court on July 5, 2023, so no response is required to Paragraph 158.  To the extent Paragraph 158 requires a response, Mr. Wrigley incorporates by reference his responses the allegations in Paragraphs 1-121 as if fully set forth herein.

159.    Techview, as holder of $10 million of the Senior Notes, brings this cause of action against all Defendants to void the obligations incurred, and transactions made, pursuant to the Green Health Notes, Bergmann Debts, and the PE Fund Note.

**ANSWER:**    This cause of action was dismissed by the Court on July 5, 2023, so no response is required to Paragraph 159. To the extent the allegations in Paragraph 159 require a

response, Mr. Wrigley admits that Techview is the holder of $10 million of the Senior Notes and sought to void the obligations incurred and transactions made pursuant to the Green Health Notes, Bergmann Debts, and the PE Fund Note but denies that Techview is entitled to any recovery or relief whatsoever.

160.    The obligations incurred and transfers made by the Company to Green Health and PE Fund, evidenced by the Green Health Notes and PE Fund Note, are voidable because the obligations were incurred and transfers were made with intent to hinder, delay, or defraud the Company's other creditors, including Techview, as holder of $10 million of the Senior Notes.

**ANSWER:**    This cause of action was dismissed by the Court on July 5, 2023, so no response is required to Paragraph 160. Further, the allegations in Paragraph 160 contain characterizations, legal argument, and conclusions to which no response is required. To the extent the allegations in Paragraph 160 require a response, Mr. Wrigley denies them.

161.    The Bergmann Debts are voidable because those obligations, and any transfers made pursuant thereto, were incurred or made with intent to hinder, delay, or defraud the Company's other creditors, including Techview, as holder of $10 million of the Senior Notes.

**ANSWER:**    This cause of action was dismissed by the Court on July 5, 2023, so no response is required to Paragraph 161. Further, the allegations in Paragraph 161 contain characterizations, legal argument, and conclusions to which no response is required. To the extent the allegations in Paragraph 161 require a response, Mr. Wrigley denies them.

162.    As alleged, among other badges of fraud:

a.    The Green Health and PE Fund Notes constituted transfers to Company insiders, namely Wrigley, via entities that he controlled;

b.    None of the Green Health Notes, nor either the PE Fund Note or the Bergmann Debts, were timely submitted for the approval of the Company's independent directors and its stockholders with full and fair disclosure;

c.    The Company was insolvent or left with unreasonably small capital at the time these debts were incurred given that the Company was operating without ability to pay debts as they came due from operations and relied on luring future investors' capital based on fantasy financial projections;

d.      The transfers were each made, or obligations incurred, shortly after substantial debts were incurred; and

e.      The terms of the Green Health and PE Fund Notes were the result of hopelessly conflicted transactions in which the terms were unfavorable to the Company and very favorable to Wrigley.

**ANSWER:**      This cause of action was dismissed by the Court on July 5, 2023, so no response is required to Paragraph 162(a)-(e). Further, the allegations in Paragraph 162(a)-(e) contain characterizations, legal argument, and conclusions to which no response is required. To the extent the allegations in Paragraph 162(a)-(e) require a response, Mr. Wrigley denies them.

163.    Further, as alleged herein, neither Green Health nor PE Fund provided reasonably equivalent value to the Company in exchange for any transfers made pursuant thereto, nor did the Company receive reasonably equivalent value from Bergmann in exchange for the Company's commitments or transfers made pursuant to the Bergmann Debts.

**ANSWER:**      This cause of action was dismissed by the Court on July 5, 2023, so no response is required to Paragraph 163. Further, the allegations in Paragraph 163 contain characterizations, legal argument, and conclusions to which no response is required. To the extent the allegations in Paragraph 163 require a response, Mr. Wrigley denies them.

164.    Consequently, the obligations incurred in relation to, and transfers made pursuant to, the Green Health Notes and PE Fund Note, and the Bergmann Debts, should be voided.

**ANSWER:**      This cause of action was dismissed by the Court on July 5, 2023, so no response is required to Paragraph 164. Further, the allegations in Paragraph 164 contain characterizations, legal argument, and conclusions to which no response is required. To the extent the allegations in Paragraph 161 require a response, Mr. Wrigley denies them.

## **PRAYER FOR RELIEF**

WHEREFORE Plaintiffs pray for relief as follows:

1.      An award in favor of the SAFE Plaintiffs against the Securities Defendants, jointly and severally, in an amount to be proven at trial, but no less than $25 million; and/or rescission of the SAFE Plaintiffs' SAFE investments along with attendant fees, costs, and expenses, and such other and further relief as the Court may deem just and proper;

2.      Invalidation of the Green Health Notes and PE Fund Note, and the Bergmann Debts, and rescission of the respective transactions evidenced by those notes or instruments;

3.      All other relief the Court deems just and proper.

**ANSWER**: The headings and Prayers for Relief contained in the Complaint contain characterizations, legal argument, and conclusions to which no response is necessary. To the extent those allegations require a response, Mr. Wrigley denies them.  Answering further, Mr. Wrigley denies that the SAFE Plaintiffs are entitled to any relief whatsoever, and denies that they are entitled to the relief sought in their Prayer for Relief.

## <u>AFFIRMATIVE AND OTHER DEFENSES</u>

In addition to the foregoing denials, Mr. Wrigley asserts the following defenses and reserves the right to assert other defenses and/or claims when and if they become appropriate and/or available in this action and to withdraw defenses that he determines are not applicable during the course of discovery and other proceedings in this action. By asserting these defenses, Mr. Wrigley does not assume the burden of proof, production, or persuasion for any fact, issue, or element of a cause of action as to which the applicable law places that burden on the Plaintiffs. No assertion of any defense is intended or may be construed as a concession that any particular issue or subject matter is relevant to the Plaintiffs' allegations.  Mr. Wrigley incorporates by reference any affirmative defense asserted by any other Defendant as if fully set forth below.

### FIRST DEFENSE

The Complaint fails, in whole or in part, to state a claim against Mr. Wrigley upon which relief can be granted.

### SECOND DEFENSE

The Complaint fails to plead fraud with particularity as required by Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u-4(b)(1), and otherwise fails to properly identify any alleged false or misleading statements made by Mr. Wrigley.

### THIRD DEFENSE

The Complaint fails to plead adequately any alleged underlying conduct by Mr. Wrigley that gives rise to any liability for Mr. Wrigley.

### FOURTH DEFENSE

Mr. Wrigley is not liable because he did not make any false or misleading statement of material fact, or omitted any fact that was required to be disclosed or that was necessary to render a statement not misleading.

## FIFTH DEFENSE

Mr. Wrigley is not liable because the Plaintiffs invested in the SAFE with actual or constructive knowledge of the risks involved therein, and thus voluntarily assumed the risk that the value of their investment would decline, or would not be realized, if such risk materialized.

## SIXTH DEFENSE

Mr. Wrigley is not liable because he never acted knowingly or recklessly with respect to any alleged material misstatement or omission.

## SEVENTH DEFENSE

Mr. Wrigley is not liable because he, at all times, and with respect to the matters contained herein, acted in good faith, exercised reasonable care, and did not know, and in the exercise of reasonable care could not have known, of the purported untruths, misstatements, and/or omissions alleged in the Complaint.

## EIGHTH DEFENSE

Mr. Wrigley is not liable because the misstatements and omissions alleged, if any, were made by others, without his approval or authorization, acting for their own benefit and interests.

## NINTH DEFENSE

Mr. Wrigley is not liable because some or all of the matters now claimed by the Complaint to be the subject of misrepresentations or omissions were in fact disclosed or otherwise available or knowable upon the reasonable exercise of diligence.

## TENTH DEFENSE

Mr. Wrigley is not liable because any allegedly untrue statement of material fact, omissions of material fact, misleading statements, or other actions allegedly taken by Mr. Wrigley were not material to the Plaintiffs' investment decisions.

## ELEVENTH DEFENSE

Mr. Wrigley is not liable because the alleged misstatements are nonactionable statements

that contain expressions of opinion or corporate optimism (e.g., puffery).

### TWELFTH DEFENSE

Mr. Wrigley is not liable because certain alleged misstatements about which the Plaintiffs complain concern nonactionable matters of opinion or soft information, rather than material fact.

### THIRTEENTH DEFENSE

Mr. Wrigley is not liable because certain statements alleged in the Complaint as false and misleading are accompanied by meaningful cautionary language, and therefore are not actionable because they warned the Plaintiffs of all risks it alleges were misstated or omitted.

### FOURTEENTH DEFENSE

Mr. Wrigley is not liable because the Plaintiffs knowingly executed and adopted a non-reliance clause in the SAFE, as set forth in Section 4(c) of the SAFE.

### FIFTEENTH DEFENSE

Mr. Wrigley is not liable because he was under no duty to disclose the alleged underlying conduct.

### SIXTEENTH DEFENSE

Mr. Wrigley is not liable because the Plaintiffs fail to allege that Mr. Wrigley made any material misstatement or omission or that they relied on any material misstatement or omission by him.

### SEVENTEENTH DEFENSE

Mr. Wrigley is not liable because the Plaintiffs fail to allege that Mr. Wrigley knew or should have known, or is any way responsible for, any alleged material misstatements or omissions by others.

### EIGHTEENTH DEFENSE

The Plaintiffs claims are barred, in whole or in part, by their own actions, omissions, and/or negligence.

### NINETEENTH DEFENSE

The Plaintiffs' claims are barred, in whole or in part, because some or all of the alleged public disclosures bespoke caution and/or were forward-looking statements and/or contained sufficient cautionary language and risk disclosure as to be non-actionable under the PSLRA.

### TWENTIETH DEFENSE

The Plaintiffs' claims are barred, in whole or in part, because Mr. Wrigley is not liable to Plaintiffs for any claims based on alleged misrepresentations or omissions for which Plaintiffs and/or their agents, financial representatives, and/or broker-dealers had, in whole or part, actual or constructive knowledge.

### TWENTY-FIRST DEFENSE

Any damage, loss, or liability sustained by Plaintiffs (which Mr. Wrigley denies) must be reduced, diminished, and/or barred in proportion to Plaintiffs' failure to mitigate, reduce, or otherwise avoid any alleged damages.

### TWENTY-SECOND DEFENSE

Plaintiffs' claims for relief are barred, in whole or in part, insofar as Plaintiffs lack standing to assert the claims alleged in this action, including because the only claim to which Plaintiff Techview Investments, Ltd. was a party, Count VI, alleging violations of the Georgia Uniform Voidable Transactions Act, was dismissed on July 5, 2023, Dkt. 108.

### TWENTY-THIRD DEFENSE

Mr. Wrigley reserves the right to raise any additional defenses, counterclaims, cross-claims, and third party claims, not asserted herein of which it may become aware through discovery or other investigation and will withdraw, amend, or modify his Answer accordingly.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Mr. Wrigley respectfully seeks judgment as follows:

A.      That Plaintiffs are denied any recovery or relief whatsoever by virtue of the Complaint;

B.      That Plaintiffs' claims against Mr. Wrigley are dismissed with prejudice;

C.      That Mr. Wrigley be awarded the costs of defending this action, including reasonable attorneys' fees, costs, and disbursements; and

D.      For such other and further relief as this Court may deem just and proper.

## **DEMAND FOR JURY TRIAL**

Mr. Wrigley hereby demands a jury trial.

* * *

DATED: August 3, 2023
       Miami, Florida

**RASHBAUM & PINEIRO LLP**
By: /s/ *Jeffrey E. Marcus*
Jeffrey E. Marcus, Esq.
Florida Bar No. 310890
jmarcus@mnrlawfirm.com
Jason L. Mays, Esq.
Florida Bar No. 106495
jmays@mnrlawfirm.com
2 S. Biscayne Blvd., Suite 2530
Miami, Florida 33131
Tel: (305) 400-4262
Fax: (954) 688-2492

**WILLKIE FARR & GALLAGHER LLP**
By: /s/ *Sameer Nitanand Advani*
Sameer Nitanand Advani (*pro hac vice*)
sadvani@willkie.com
Brittany M. Wagonheim (*pro hac vice*)
bwagonheim@willkie.com
787 Seventh Avenue
New York, NY 10019-6099
212-728-8587

Craig C. Martin (*pro hac vice*)
cmartin@willkie.com
Aaron J. Hersh (*pro hac vice*)
ahersh@willkie.com
300 North LaSalle Drive
Chicago, IL 60654
312-728-9000

***Attorneys for Defendant William "Beau" Wrigley Jr.***