UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 9:22-cv-80360-LEIBOWITZ/REINHART

TRADEINVEST ASSET MANAGEMENT
COMPANY (BVI) LTD., *et al.*,

     *Plaintiffs,*

v.

WILLIAM "BEAU" WRIGLEY, JR., *et al.*,

     *Defendants.*

_____/

ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Before the Court is Defendants' Joint Motion for Summary Judgment [ECF Nos. 272 (SEALED) & 274 (REDACTED)] (the "Motion"), filed on March 7, 2025. The Motion is fully briefed and ripe for resolution. [*See* ECF Nos. 298, 299, 305, 307]. Upon due consideration of the Motion, the parties' papers, the summary judgment record, and the governing law, the Motion is GRANTED on Counts I, II, III and IV of the Complaint [ECF No. 59]. The Court declines to retain supplemental jurisdiction over Count V; so, Count V is DISMISSED WITHOUT PREJUDICE.[1]

## I. INTRODUCTION

This securities fraud lawsuit involves private securities not traded on any domestic exchange—the SAFE Investment executed by the parties in late 2021. A SAFE—Simple Agreement for Future Equity "is a type of security through which an investment converts to equity in a company *upon the occurrence of certain triggering events* set forth in the terms of the SAFE." [JSF, ECF No. 276 ¶ 10 (emphasis added)]. The SAFE Investments in this case were to convert to equity—SAFE Preferred Stock or

---

[1]     Defendants did not separately address summary judgment on Count V (common law fraud) beyond their general argument that if Plaintiffs cannot show justifiable reliance, loss causation, or actionable misrepresentations/omissions, they cannot survive summary judgment on all counts. [*See generally*, ECF No. 272 (SEALED), ECF No. 274 (REDACTED)].

Series EE Preferred Stock—in Defendant S.H. Parent, Inc. (d/b/a "Parallel") (hereinafter "Parallel") when one of four triggering events enumerated in the parties' SAFE Agreements occurred. [*See* ECF Nos. 272-26 & 272-27 at 3–4]. To avail themselves of the federal securities fraud laws upon which two counts are predicated—Section 10(b) of the Exchange Act of 1934 and Rule 10b-5 (Count I) and Section 20(a) control person claims (Count II)—Plaintiffs must show that the SAFE Investments were domestic transactions as contemplated by *Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247, 265–67, 273 (2010), and further refined by *Quail Cruises Ship Mgmt. Ltd. v. Agencia de Viagens CVC Tur Limitada*, 645 F.3d 1307 (11th Cir. 2011).

Here's the bottom line in advance: At summary judgment, Plaintiffs have not met their burden for the federal claims to survive; Defendants are entitled to judgment as a matter of law on Counts I and II. With those federal claims dismissed, the state-law claims follow. For Counts III and IV (which arise under the State of Georgia's "Blue Sky" securities fraud statutes), Plaintiffs have also failed to show that the SAFE transactions had a nexus to Georgia as required to survive summary judgment. Therefore, Defendants are also entitled to judgment as a matter of law on Counts III and IV. For Count V, the parties' summary judgment briefing and filings do not squarely address this claim for state common law fraud. [*See* ECF Nos. 272, 274, 298, 299, 305, 307]. After applying the factors under *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715 (1966), the Court declines to exercise its discretion to retain jurisdiction over this lone state-law claim as allowed under 28 U.S.C. § 1367(c)(3). Accordingly, Count V is DISMISSED WITHOUT PREJUDICE. *See also Crosby v. Paulk*, 187 F.3d 1339, 1352 (11th Cir. 1999) (explaining that if the district court chooses to dismiss state law claims, it should do so without prejudice as to refiling in state court).

Let's go through each of these arguments, but before we do, the Court describes the players, the relevant transactions, and the roadblocks to Plaintiffs' surviving summary judgment on their

statutory securities fraud claims (both federal and state).  Get ready for some acronyms and initialisms, and for ease of reading the next section drops the record citations into footnotes.

## II.      SUMMARY JUDGMENT EVIDENCE[2]

### A.  The Parties

Plaintiffs TradeInvest Asset Management Company (BVI) Ltd. ("TradeInvest") and First Ocean Enterprises SA ("First Ocean") are sophisticated offshore investment funds managed and controlled by Sarkis Izmirlian ("Izmirlian") and Athanasios Laskaridis ("Laskaridis") (together, the "Controllers").[3]

TradeInvest is an offshore investment entity registered in the British Virgin Islands ("BVI").[4] Izmirlian controls a global portfolio of investments across a variety of industries and serves as CEO of many of the businesses in which he invests.[5]  Izmirlian's investments include "aggressive" currency trades, as well as investments in debt tied to emerging economies.[6]   Izmilian resides in the Bahamas.[7]

First Ocean is a Cypriot entity controlled by Laskaridis, who lives in Athens, Greece.[8] Laskaridis was CEO of his family's shipping empire for decades.[9]  Laskaridis's estimated net worth is at least one hundred million dollars.[10]

---

[2]      The parties originally filed much of the evidence in support of and in opposition to summary judgment under seal.  The Court subsequently ordered all information unsealed, permitting only limited redactions of sensitive, confidential information within certain documents.  [*See* ECF No. 334 (Aug. 22, 2025) & ECF No. 339 (Sept. 11, 2025)].

[3]      JSF, ECF No. 276 ¶¶ 3, 5; Izmirlian Depo. Tr., ECF No. 272-4 at 19:3–21:19, 24:10–15; Laskaridis Depo. Tr., ECF No. 272-5 at 43:18 thru 45:21.

[4]      JSF, ECF No. 276 ¶ 3; Izmirlian Depo. Tr., ECF No. 272-4 at 19:3-8; ECF No. 300-8 at 24:23 thru 25:2 (Q: So the BVI entity is the—is the structural entity through which all of those investments go through?  A: Yes).

[5]      Izmirlian Depo. Tr., ECF No. 272-4 at 12:11-14, 29:12-16.

[6]      *Id.* at 50:13-15; 59:18-61:11.

[7]      *Id.* at 18:4-5.

[8]      JSF, ECF No. 276 ¶ 5; Laskaridis Depo. Tr., ECF No. 272-5 at 45:19-21; 12:17-20.

[9]      Laskaridis Depo. Tr., ECF No. 272-5 at 17:20-24.

[10]      PSQ (Schlakman) Depo. Tr., ECF No. 272-6 at 126:15-127:25.

The Controllers and their investment-vehicle Plaintiffs are advised by an outside financial advisor, PSQ.[11]  The Controllers (and their respective affiliated investment vehicles/family offices) are PSQ's only clients.[12]

During the relevant period, Defendant Parallel was a privately-owned, multi-state cannabis company, known in the industry as a "multistate operator" or "MSO."[13]  Parallel is a Delaware corporation, with its principal place of business in Atlanta, Georgia.[14]

Defendant William "Beau" Wrigley, Jr. ("Wrigley") served as CEO and Chairman of Parallel from 2018 to 2021.[15]  Wrigley has invested nearly $200 million in Parallel (personally and through certain affiliated entities) and was its largest shareholder during all times relevant to this litigation.[16]  Defendants James Whitcomb ("Whitcomb") and Jay Holmes ("Holmes") served as senior executives at Parallel:  Whitcomb served primarily as Parallel's Chief Development Officer and Holmes as Parallel's Chief Strategy Officer.[17]  Whitcomb became CEO of Parallel upon Wrigley's departure in November 2021.[18]  (All Defendants are referred to collectively herein as the "Securities Defendants.")

B.  **The SPAC Merger**

By way of background, in early 2021, TradeInvest and First Ocean executed subscription agreements (the "PIPE") to acquire $40 million and $8 million worth of public equity, respectively, in connection with Parallel's planned merger with a Special Purpose Acquisition Company ("SPAC"),

---

[11]     JSF, ECF No. 276 ¶ 6; PSQ (Schlakman) Depo. Tr., ECF No. 272-6 at 31:15-32:10, 33:6-17; Izmirlian Depo. Tr., ECF No. 300-8 at 34:7-8.
[12]     JSF, ECF No. 276 ¶ 6.
[13]     PSQ (McCoy) Depo. Tr., ECF No. 272-7 at 151:12-15; Whitcomb Depo. Tr., ECF No. 272-2 at 23:19-21; 34:19-25.
[14]     JSF, ECF No. 276 ¶ 1; *See* ECF Nos. 272-26 & 272-27 at 2; ECF No. 369-2; *See* PSF 300-2 at 1.
[15]     JSF, ECF No. 276 ¶¶ 1-2
[16]     JSF, ECF No. 276 ¶ 2; ECF No. 272-17.
[17]     JSF, ECF No. 276 ¶ 3; Whitcomb Depo. Tr., ECF No. 272-2 at 44:5-19; Holmes Depo. Tr., ECF No. 272-3 at 32:4-9; ECF No. 272-20.
[18]     PSF, ECF No. 300-2 ¶ 3; Whitcomb Depo. Tr., ECF No. 300-7 at 49:6-13.

Ceres Acquisition Corporation ("Ceres"), through which Parallel would become a publicly-traded company on the Canadian Securities Exchange.[19]  Ceres is a British Columbia public corporation.[20]

The merger between Parallel and Ceres was to be accomplished pursuant to a Business Combination Agreement (the "BCA").[21]  The BCA valued Parallel at approximately $2 billion dollars.[22] Parallel and Ceres launched the PIPE to raise between $200 million and $300 million to support the planned merger.[23]

In or around January 2021, Parallel provided prospective PIPE investors with a slide presentation, among other things, as part of its fundraising efforts for its merger with Ceres.[24] TradeInvest and First Ocean sought to invest a combined $60 million in the PIPE.[25]   However, due to high demand at the time, Parallel allocated only $48 million to TradeInvest and First Ocean, who committed to investing that amount in February 2021.[26]

Before Parallel could consummate its merger with Ceres, however, Parallel was required to submit to an audit and meet other requirements for becoming a publicly-traded company on the Canadian stock exchange.[27]  Then, months after the BCA was executed in mid-2021, the cannabis industry generally turned downward, partly due to the COVID-19 pandemic.[28]  Thereafter, Ceres viewed Parallel worth substantially less than the nearly $2 billion valuation set forth in the BCA.[29]  As

---

[19]     *See generally*, ECF No. 272-23.
[20]     *See* ECF No. 272-48 at 2.
[21]     *See* ECF No. 272-46 at 16.
[22]     *See* ECF No. 300-6 at 10 (reflecting $1.83B valuation).
[23]     ECF No. 272-28 at 6; ECF No. 272-29 at 3; *see* ECF No. 272-28 at 6–7.
[24]     *See generally*, ECF No. 272-28 at 2.
[25]     ECF No. 272-34 at 2–3.
[26]     ECF No. 272-23; ECF No. 272-24 at 28; ECF No. 272-35 at 2.
[27]     Whitcomb Depo. Tr., ECF No. 272-2 at 141:14-21; ECF No. 272-36 at 2.
[28]     Eckhardt Expert Report, ECF No. 272-30 at 10, 19–22; *see* PSQ (McCoy) Depo. Tr., ECF No. 300-9 at 244:19 thru 245:22; 247:20-24.
[29]     Crouthers Depo. Tr., ECF No. 272-15 at 93:3-16; *see also* Wrigley Depo. Tr., ECF No. 272-1 at 117:17 thru 118:8.

a result, Ceres attempted to renegotiate the terms of the merger at a much lower valuation.[30]  As attempts to renegotiate the terms of the merger languished, the SPAC closing was delayed.[31]  So, around July 2021, Parallel decided to launch the SAFE fundraising round (which is the subject of this litigation) to provide Parallel with enough cash-on-hand if the SPAC deal failed to close as planned.[32]

### C.    The SAFE Investments

With that backdrop sketched out, let's turn to the transactions giving rise to this lawsuit. Around late June or early July 2021, Izmirlian grew frustrated that TradeInvest's $40 million in capital was committed to the PIPE—given that the SPAC had seemingly stalled.[33]  Izmirlian thus directed PSQ to find a way to get TradeInvest "out" of its PIPE investment.[34]  Around that time, PSQ learned about Parallel's SAFE fundraising round, viewing it as an opportunity to get TradeInvest and First Ocean out of their PIPE commitments.[35]

On July 23, 2021, Parallel's Board of Directors held a virtual meeting during which it approved by resolution a SAFE fundraising round of $50 million.[36]  On or around July 27, 2021, PSQ called Holmes and asked him to "shift [Plaintiffs'] PIPE commit to the safe."[37]  On July 30, 2021, TradeInvest's President Pascale Allen sent Izmirlian an e-mail with the Subject line "CERES Subscription," informing Izmirlian that PSQ could "restructure the deal" by "[c]ancel[ing] the $40 million PIPE Subscription; and [p]urchasing a $20 million SAFE Note instead."[38]

---

30      *See id.*
31      Whitcomb Depo. Tr., ECF No. 272-2 at 96:21 thru 98:13; *see* ECF No. 272-37 at 3.
32      *See id.*
33      Izmirlian Depo. Tr., ECF No. 272-4 at 235:9-25.
34      *See* ECF No. 272-25 at 2.
35      PSQ (McCoy) Depo. Tr., ECF No. 272-7 at 238:14-243:19; ECF No. 272-25 at 2; ECF No. 272-39 at 3.
36      ECF No. 272-37 at 3; *see also* ECF No. 300-24 (Ex. A).
37      ECF No. 272-39 at 3.
38      ECF No. 272-40 at 2.

On August 2, 2021, PSQ had another call with Holmes and Whitcomb to discuss the possibility of Plaintiffs' switching from the PIPE to the SAFE.[39]  On August 4, 2021, Holmes sent PSQ an e-mail (with a copy to Whitcomb) Subject line: Parallel SAFE + Updated Presentation, attaching a draft of the SAFE Agreement and an "updated PIPE deck."[40]  Holmes explained that the updated PIPE deck (the "August 2021 Deck") was being shared with PIPE investors to reflect the "updated transaction terms and forecasting for the business."[41]  Holmes provided the August 2021 Deck to PSQ "in connection with the potential SAFE transaction."[42]

On August 5, 2021, Izmirlian "tentatively approved a $20m investment" in the SAFE subject to "additional diligence."[43]  On August 6, 2021, PSQ sent internal e-mails to update the team about communications with Holmes and Whitcomb about the SAFE transaction.[44]   In those communications, PSQ indicated that Parallel's common stock was now valued at $3 per share, down from $17 per share.[45]  PSQ also noted it was aware that Wrigley had stepped down as Parallel's CEO, which PSQ viewed as a "good move" because PSQ had grown dissatisfied with Wrigley's management of Parallel.[46]

On August 9, 2021, Parallel sent PSQ a form SAFE Agreement accompanied by a thirty-eight-page Risk Factors document (the "Risk Factors").[47]  On August 13, 2021, PSQ e-mailed Izmirlian and TradeInvest's in-house counsel that PSQ had a "fairly short" call with Parallel's new CFO about

---

[39]     *See* ECF No. 272-41 at 2; ECF No. 272-42 at 2; ECF No. 272-43; ECF No. 272-44 at 7–8.
[40]     *See* ECF No. 272-19 at 2.
[41]     ECF No. 272-19 at 2.
[42]     PSQ (McCoy) Depo. Tr., ECF No. 272-7 at 257:13-16; Wrigley Depo. Tr., ECF No. 300-21 at 170:2-25; 177:22 thru178:11; Holmes Depo. Tr., ECF No. 300-12 at 155:3-11; ECF No. 272-19; Whitcomb Depo. Tr., ECF No. 300-7 at 269:18-23.
[43]     ECF No. 272-48 at 2; PSQ (McCoy) Depo. Tr., ECF No. 300-9 at 305:23 thru 306:19.
[44]     ECF No. 272-17 at 2.
[45]     *Id.*
[46]     *Id.*
[47]     ECF No. 272-46.

Parallel's "forecasting issues" to which the CFO replied that he had a "solid grasp on the forecasting issues in Massachusetts and [Florida], the primary drivers behind the reduced SPAC valuation."[48] During those conversations, PSQ conveyed that it wanted Parallel to "structure a first close of between $40m and $50m instead of just doing a rolling close—so they don't end up being the only money in the SAFE."[49]

On August 19, 2021, PSQ e-mailed Izmirlian, in-house counsel for TradeInvest (and others) about the SAFE.[50] After explaining that TradeInvest's outside counsel had reviewed the SAFE Agreement, PSQ stated that Plaintiffs would not fund the SAFE until Plaintiffs had a fully executed agreement to terminate the PIPE, and that Whitcomb and Holmes "verbally committed" to PSQ that they "currently have ~$40m of SAFE commitments and expect to have $50M+ by the time they call capital next week."[51]

On August 22, 2021, Izmirlian e-mailed PSQ to ask if Parallel had "commented on the weak underlying business?" and PSQ replied, "Nothing substantive about business conditions that we hadn't already heard."[52]

In an August 30, 2021, e-mail to Izmirlian, PSQ explained that the PIPE termination agreement was forthcoming; that Parallel planned to hold the SAFE documents "in escrow until they get to $50m in subscriptions;" and promised to "press [Parallel] for more protections as discussed."[53] In a September 14, 2021, e-mail, Whitcomb explained to PSQ that the escrow in question "was not an escrow for the actual capital, but just each party holding signature pages to both the SAFE docs

[48]    Izmirlian Depo. Tr., ECF No. 272-4 at 229:21-230:13; ECF No. 272-55 at 3.
[49]    ECF No. 272-53 at 2.
[50]    ECF No. 272-55 at 3–5; Izmirlian Depo. Tr., ECF No. 272-4 at 229:21 thru 230:13.
[51]    ECF No. 272-55 at 4–5.
[52]    ECF No. 272-55 at 2.
[53]    ECF No. 272-57 at 2.

and PIPE termination agreement in escrow" and that Parallel "wouldn't ask [investors] to fund [the SAFE] until those signature pages are given to you…."[54]

On September 1, 2021, Whitcomb sent PSQ an Excel spreadsheet for PSQ to use to "flex the 2022 revenue assumption" "depending on what level of 2022 revenues you choose to underwrite," which included as a starting point the August 2021 Deck.[55]

On September 3, 2021, PSQ sent an e-mail to Izmirlian, stating, in part, as follows:

> I think of this situation as given what we know today, what do we think about putting fresh money into this company at a $1bn equity value?
> Becomes an exercise of how much upside we think we are playing for relative to the downside risk of there being no imminent sale of the company and the very high likelihood they will need to raise additional capital again in '22.
>
> The pref liquidation on the SAFE note definitely helps.  Guards against the risk that the offers for the company come in well below what they think they are worth…
> As long as our downside is protected I would feel comfortable enough making this investment. [56]

This e-mail was shared with Laskaridis (First Ocean) on September 10, 2021.[57]  PSQ conducted the due diligence for Plaintiffs regarding the SAFE transactions.[58]

On September 10, 2021, PSQ e-mailed Whitcomb and Holmes to inform them that TradeInvest would invest $20 million in the SAFE.[59]  PSQ followed up on September 13, 2021, to confirm that First Ocean would invest $5 million in the SAFE.[60]  On September 14, 2021, Whitcomb

---

[54]     ECF No. 272-58 at 2; see ECF No. 300-6 at 7 (discussing signatures to be held in escrow).
[55]     ECF No. 272-60 at 2; Whitcomb Depo. Tr., ECF No. 272-2 at 214:2-10; see also ECF No. 300-6 at 3 ("TradeInvest asking for fully executed copies of termination agmt and SAFE note before they fund").
[56]     ECF No. 272-62 at 2.
[57]     ECF No. 272-94 at 2.
[58]     See Izmilian Depo. Tr., ECF No. 300-30 at 204:2-21; DSOF, ECF No. 273 ¶ 43.
[59]     ECF No. 272-63 at 2; see generally, ECF No. 272-64 at 2 (discussing, among other things, the signature pages for TradeInvest's PIPE termination); ECF No. 300-5 at 7 (attaching First Ocen's PIPE termination agreement).
[60]     ECF No. 272-63 at 2.

e-mailed PSQ and other prospective SAFE investors (copying Holmes) a form e-mail Subject line:

SAFE Risk Factors-Reminder, attaching a SAFE Investor Q2 (2021) Update.[61]

The SAFE Agreements entered into by the parties contain the following disclaimer language

at the very top of page one:

> THIS INSTRUMENT AND ANY SECURITIES ISSUABLE PURSUANT HERETO HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933 (THE "SECURITIES ACT") OR UNDER THE SECURITIES OR BLUE SKY LAWS OF ANY STATE.  THESE SECURITIES MAY NOT BE OFFERED, SOLD OR OTHERWISE TRANSFERRED, PLEDGED OR HYPOTHECATED EXCEPT AS PERMITTED IN THIS SAFE AND UNDER THE ACT AND APPLICABLE SECURITIES OR BLUE SKY LAWS PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT OR AN EXEMPTION THEREFROM.[62]

On September 17, 2021, Laskaridis approved First Ocean's $5 million SAFE Investment, and

First Ocean funded its $5 million SAFE Investment on September 21, 2021.[63]  The record reflects

that First Ocean's authorized signatory, Maria I.V. Protopapa, executed the SAFE Agreement on

behalf of First Ocean (date of execution not reflected) using a signature block with a Cyprus mailing

address.[64]

Izmirlian tentatively approved TradeInvest's $20 million SAFE Investment on August 5, 2021,

then authorized the transaction to proceed on September 21, 2021.[65]  The record reflects that

TradeInvest's BVI Board of Directors approved the SAFE Agreement on TradeInvest's behalf by

written resolution dated September 20, 2021.[66]  TradeInvest's Director Representative, Pascale S.

---

[61]     ECF No. 272-66 at 2.

[62]     ECF Nos. 272-26 & 272-27 at 1.

[63]     Laskaridis Depo. Tr., ECF No. 272-5 at 198:16-202:5; ECF No. 272-68 at 2; ECF No. 272-68 at 2.

[64]     *See* ECF No. 272-27 at 10.

[65]     Izmirlian Depo. Tr., ECF No. 272-4 at 378:13-379:3; ECF No. 272-48 at 2; ECF No. 272-70 at 2; ECF No. 272-100.

[66]     *See* ECF No. 272-100 at 2–5; *see also* ECF No. 300-6 at 3.

Allen, executed the SAFE Agreement on TradeInvest's behalf (date of execution not reflected on the agreement) using a signature block with a Bahamas mailing address.[67]

The SAFE Agreements executed by First Ocean and TradeInvest each contain an *unexecuted* signature block for Parallel's Chief Development Officer & Secretary, James Whitcomb, using an Atlanta, Georgia mailing address.[68]   The Plaintiffs' SAFE Agreements are substantially identical, apart from the identities of the parties and the amount of money invested.[69]

### D.      Triggering Events under the SAFE Agreements

Boiled to their essence, Section 1 of the SAFE Agreements lists four separate triggering events, the occurrence of any of which would convert the SAFE Investment into shares of Parallel stock: (1) Equity Financing; (2) Liquidity Event; (3) Dissolution Event; and (4) Time Conversion Event.[70] Section 1(f) of the SAFE Agreements state that, in order for the SAFE Investment to convert into shares of Parallel stock, "the Investor will, *as a condition precedent to such conversion*, execute and deliver to the Company all documents requested by the Company which are relevant to the conversion . . . ."[71] In addition, the SAFE Agreements make clear that an investor is not entitled to "be deemed a holder of Capital Stock . . . nor will anything in this S[AFE] be construed to confer on the Investor, as such, *any rights of a Company stockholder . . . until shares have been issued on the terms described in Section 1.*"[72]

To state it plainly, for title of Parallel shares to pass to SAFE investors, investors (like Plaintiffs) must satisfy the condition precedent of delivering documents requested by Parallel.[73]   And here's the bottom line: that condition precedent was never satisfied.  Plaintiffs refused to provide the

---

[67]      ECF No. 272-26 at 10.
[68]      *See* ECF Nos. 272-26 at 10; 272-27 at 10.
[69]      *See* ECF Nos. 272-26 & 272-27.
[70]      *See* ECF Nos. 272-26 at 2–3; 272-27 at 2–3.
[71]      *Id.* at 3–4 (emphasis added).
[72]      *Id.* at 8 (emphasis added).  The "Company" is Parallel for these provisions.
[73]      *See* ECF No. 375-8 at 4.

documents requested by Parallel and rescinded their SAFE Agreements in lieu of accepting transfer of Parallel stock.

The summary judgment record is clear that, on February 3, 2022, Parallel "followed up with a detailed demand for information as to who will own interests in Parallel following conversion, including a demand for the organizational documents, operating agreements, by-laws, or other governing documents for every entity that will have a direct or indirect ownership interest."[74]   In response, TradeInvest sent a letter dated February 4, 2022, to Parallel *via* e-mail, stating in relevant part:[75]

> TradeInvest has no obligation to execute or provide to Parallel any documents or information *relating to the conversion of its SAFE investment into equity*…. TradeInvest has rescinded the SAFE, tenders it to the Issuer, and is entitled to the immediate return of its $20 million SAFE investment….
>
> In light of the recission of the SAFE by TradeInvest, Paragraph 1(f) of the SAFE imposes no obligation upon TradeInvest to execute any documents…. Paragraph 1(f) merely provides that, "[i]n connection with any conversion of this [SAFE] agreement into shares of … Series EE Preferred Stock, the Investor will, as a condition precedent to such conversion, execute and deliver" documents requested by the Issuer.

Thus, TradeInvest's rights to receive shares in Parallel never materialized into actual ownership.  And the same is true for First Ocean.  On February 8, 2022, First Ocean's authorized signatory, Maria I.V. Protopapa, responded to Parallel's demand letter that First Ocean, too, "*will not be converting [its] SAFE investment into Series EE Preferred Stock.*"[76]

So, what is missing from the summary judgment record (even after the Court gave the parties notice and opportunity to supplement)?  Evidence the SAFEs were "domestic transactions" such that Plaintiffs' federal securities fraud claims (Counts I and II) comply with *Morrison* and survive summary judgment.  For starters, the Complaint never pleaded the SAFEs as domestic transactions.  [*See* ECF

---

[74]     *See* ECF No. 376-2.
[75]     *Id.* (emphasis added).
[76]     ECF No. 376-3 (emphasis added).

No. 59]. And the SAFE Agreements themselves do not set forth the terms of closing for the SAFEs *in the United States.*[77]

To show a domestic transaction, Plaintiffs principally rely upon (1) Whitcomb's Atlanta, Georgia, signature block; (2) Parallel's principal place of business in Atlanta, Georgia; (3) PSQ's transfer of foreign Plaintiffs' SAFE funds into domestic banks; and (4) Plaintiffs' signatures on the SAFE Agreements being escrowed in the United States. But all this does not establish that title to the SAFE Investments transferred *in the United States.* A similar evidentiary problem exists with respect to Plaintiffs' securities fraud claims arising under the State of Georgia's Blue Sky laws. Plaintiffs have failed to show a sufficient nexus between the SAFEs and the State of Georgia to proceed to a jury trial on those claims (Counts III and IV). These territorial deficiencies in Plaintiffs' federal and state statutory fraud claims are discussed more fully below.

## III. STANDARD OF REVIEW

Summary judgment is appropriate when "the pleadings … show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986) (quoting Fed. R. Civ. P. 56(c)); *HCA Health Servs. of Ga., Inc. v. Employers Health Ins. Co.*, 240 F.3d 982, 991 (11th Cir. 2001). Once the moving party demonstrates the absence of a genuine issue of material fact, the non-moving party must "come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e)). The Court must view the record and all factual inferences therefrom in the light most favorable to the non-moving party and decide whether "'the evidence presents a sufficient disagreement to require submission to a jury

---

[77] *See* ECF Nos. 272-26 & 272-27.

or whether it is so one-sided that one party must prevail as a matter of law.'" *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997) (quoting *Anderson*, 477 U.S. at 251–52)).

In opposing a motion for summary judgment, the non-moving party may not rely solely on the pleadings, but must show by affidavits, depositions, answers to interrogatories, and admissions that specific facts exist demonstrating a genuine issue for trial. *See* Fed. R. Civ. P. 56(c), (e); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). A mere "scintilla" of evidence supporting the opposing party's position will not suffice; instead, there must be a sufficient showing that the jury could reasonably find for that party. *Anderson*, 477 U.S. at 252; *see also Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990).

A motion for summary judgment should be granted only if the pleadings, the discovery and disclosure materials on file, and any affidavits show there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a), (c). At summary judgment, the moving party has the burden of proving the absence of a genuine issue of material fact, and all factual inferences are drawn in favor of the non-moving party. *See Allen v. Tyson Foods Inc.*, 121 F.3d 642, 646 (11th Cir. 1997). If there are factual issues, summary judgment must be denied, and the case proceeds to trial. *See Whelan v. Royal Caribbean Cruises Ltd.*, No. 1:12-CV-22481, 2013 WL 5583970, at *2 (S.D. Fla. Aug. 14, 2013) (citing *Envt'l Def. Fund v. Marsh*, 651 F.2d 983, 991 (5th Cir. 1981)).

Summary judgment for the defendant is improper unless the record reveals that there are no genuine issues as to any material fact supporting the plaintiff's claim and the defendant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). In applying this standard, a court must resolve all reasonable doubts in favor of the nonmoving party. *Williams v. City Dothan,* 745 F.2d 1406 (11th Cir. 1984).

## IV.    DISCUSSION

> **A.** *Morrison* **and its progeny direct that the federal securities laws invoked here do not apply to the SAFE investments.**

14

Count I of the Complaint asserts claims for violations of Section 10(b) of the Exchange Act and Rule 10b-5 against the Securities Defendants for false and materially misleading statements and/or omissions that enticed Plaintiffs to invest in the SAFE. [Compl., ECF No. 59 ¶¶ 122–27]. Count II of the Complaint asserts claims against Wrigley, Holmes, and Whitcomb for control person derivative liability under Section 20(a) of the Exchange Act. [*Id.* ¶¶ 128–34].

The parties did not initially address the impact of *Morrison* in their summary judgment papers.[78] The Supreme Court in *Morrison* held that Section 10(b) of the Exchange Act and Rule 10b-5 do not apply extraterritorially to securities transactions that occur outside the United States. *See Morrison*, 561 U.S. at 265. As *Morrison* instructs, "only transactions in securities listed on domestic exchanges, and domestic transactions in other securities" fall under Section 10(b). *Id.* at 267. Because the SAFE Investments are not publicly traded securities on a domestic stock exchange, the Court asked the parties *sua sponte* to brief the issue of whether the SAFE Investments were "domestic transactions" under *Morrison*.[79] [*See* ECF No. 367 ¶ 2; ECF No. 375; ECF No. 380]. After reviewing the parties' supplemental filings, this Court concludes that the SAFE Investments fall outside of the application

---

[78] The Court notes that Plaintiffs filed this action on March 3, 2022, and the case was subsequently reassigned to the undersigned on March 7, 2024. [*See* ECF No. 157; ECF No. 164 at 2].

[79] After the summary judgment briefing was completed, the Court became concerned that the failure to address *Morrison* and provide evidence that satisfied its dictates might be jurisdictional, so the Court requested supplemental briefing from the parties. [*See* ECF No. 367 at 1–2]. The Court's notice in this regard complied with the requirements of Rule 56(f) of the Federal Rules of Civil Procedure, and the Court now rules based in part upon the supplemental briefing and with the understanding that *Morrison*'s requirements are not jurisdictional. *See Byars v. Coca-Cola Co.*, 517 F.3d 1256, 1264 (11th Cir. 2008) ("Although a court may *sua sponte* grant summary judgment on a claim not presented in a summary judgment motion, the court is required to give notice to the parties that it intends to address the claim on summary judgment."); *Flood v. Young Woman's Christian Ass'n of Brunswick, Ga., Inc.*, 398 F.3d 1261, 1267 (11th Cir. 2005) ("[A] district court may enter summary judgment *sua sponte* if the parties are given adequate notice that they must present all of their evidence.") (citing *Celotex*, 477 U.S. at 326).

of the federal securities laws invoked in Count I, as interpreted by *Morrison, Quail Cruises,* and other cases.

Plaintiffs' attempts to avoid this conclusion all fail.  First, Plaintiffs shift the burden of proof, arguing that domesticity of a security transaction is an affirmative defense for which Defendants bear the burden.  [*See* ECF No. 373 ¶¶ 3, 6; ECF No. 375 at 3 & n.3].  The Court readily dispatches with this argument.  In *Morrison*, the Supreme Court made it abundantly clear that Section 10(b)'s extraterritorial reach is not a jurisdictional issue but rather a "merits question." 561 U.S. at 254.  The Supreme Court thus corrected the Second Circuit's error in that regard, ruling that domesticity does not implicate the court's subject-matter jurisdiction.  *See id.* at 253–54.  The Court then proceeded to analyze extraterritoriality under Rule 12(b)(6) of the Federal Rules of Civil Procedure, finding that petitioners "*failed to state a claim* on which relief can be granted." *Id.* at 273 (emphasis added).  A plain reading of *Morrison* cannot possibly lead to the conclusion that lack of domesticity is an affirmative defense; it is a pleading requirement (with a corresponding burden of proof) for every plaintiff.

Additionally, Plaintiffs' other cited authorities do not help their cause on this point.  Plaintiffs assert the Honorable Ursula Ungaro's decision in *Quantum Cap., LLC v. Banco de los Trabajadores*, No. 14-cv-23193, 2015 WL 12259226, at *12 (S.D. Fla. Dec. 22, 2015), stands for the proposition that courts routinely view domesticity under *Morrison* as an affirmative defense.  [*See* ECF No. 373 ¶ 6; ECF No. 375 at 3–4 n.3].  That take on *Quantum Capital* goes too far.  In *Quantum Capital*, Judge Ungaro stated merely that "Defendants, *as proponents of the defense*, have the burden of producing evidence from which the fact finder could conclude that the parties incurred irrevocable liability or transferred title to securities in the United States." 2015 WL 12259226, at *12 (emphasis added).  Judge Ungaro did not hold that domesticity of a securities transaction is always an affirmative defense on which the defendant bears the burden.  *See id.*  Judge Ungaro was only addressing the domesticity affirmative defense pleaded as such by the defendants in the case before her.  *See id.*  Just because the

defendants asserted domesticity as an "affirmative defense" in *Quantum Capital* does not make *Morrison* domesticity an affirmative defense as a matter of law.  Defendants routinely assert affirmative defenses which are, in fact, general denials that attempt to negate an element of the plaintiff's *prima facie* case. *See, e.g.*, *Berry v. Diamond Resorts Mgmt., Inc.*, No. 09-227400-CIV, 2010 WL 11504802, at *1 (S.D. Fla. Oct. 4, 2010) (Jordan, D.J.) ("Because it is apparently an element of a claim, this alleged affirmative defense will be treated as a denial of an element of the cause of action rather than as an affirmative defense.").  Beyond *Quantum Capital*, which is readily distinguished here, Plaintiffs cite no authority holding that the domestic nature of a securities transaction for purposes of *Morrison* and the non-extraterritorial application of Section 10(b) is an affirmative defense.

Cases following *Morrison* place the burden on the party asserting a Section 10(b) claim to show the domestic nature of the transaction.  *See, e.g.*, *Cavello Bay Reinsurance Ltd. v. Shubin Stein*, 986 F.3d 161, 165 (2d Cir. 2021) ("Unless a security is listed on a domestic exchange, a domestic transaction is a necessary element of a § 10(b) claim.") (citing *Morrison*, 561 U.S. at 267); *Zalazar v. Cap. Force, LLC*, No. 23-21512-CIV, 2023 WL 4186397, at *5 (S.D. Fla. June 26, 2023) (Altonaga, C.J.) ("Alleging a domestic transaction is necessary because Section 10(b) and Rule 10b-5 do not apply extraterritorially—that is, to a securities transaction that occurs outside the United States.").  That is particularly true for the plaintiff to survive summary judgment on a Section 10(b) claim.  *See Sec. & Exch. Comm'n v. Revelation Cap. Mgmt., Ltd.*, 246 F. Supp. 3d 947, 954 (S.D.N.Y. 2017) ("The SEC fails to adduce any evidence that Defendants incurred irrevocable liability within the United States relative to their purchase in the Offering, *as is the SEC's burden to do to survive Defendants' motion for summary judgment.*" (emphasis added)).  Accordingly, Plaintiffs bear the burden to show the domesticity of the SAFE Investments to defeat summary judgment on their Section 10(b) claim.

17

Moving on to the legal merits, the Honorable Chief Judge Cecilia M. Altonaga has succinctly summarized what is required of a plaintiff to show that a securities transaction is domestic after *Morrison*:

> In determining whether a transaction is domestic, courts apply a "transactional test" that looks to "whether the purchase or sale [of the security] is made in the United States, or involves a security listed on a domestic exchange[.]" *Morrison*, 561 U.S. at 269–70 (alterations added); *see also Quail Cruises Ship Mgmt. Ltd. v. Agencia de Viagens CVC Tur Limitada*, 645 F.3d 1307, 1310 (11th Cir. 2011). . . . [T]he Eleventh Circuit has noted it is sufficient to allege that a transaction was closed, such that "title to the shares was transferred" domestically, *Quail Cruises*, 645 F.3d at 1310.
>
> The Second Circuit, referencing *Quail Cruises*, has provided further color, explaining that "a securities transaction is domestic when the parties incur irrevocable liability to carry out the transaction within the United States or when title is passed within the United States." *Absolute Activist Value Master Fund Ltd. v. Ficeto*, 677 F.3d 60, 69 (2d Cir. 2012). The Third and Ninth Circuits have adopted and applied this formulation, as have courts in this District. *See United States v. Georgiou*, 777 F.3d 125, 136 (3d Cir. 2015); *Stoyas v. Toshiba Corp.*, 896 F.3d 933, 949 (9th Cir. 2018); *Quantum Cap., LLC v. Banco de los Trabajadores*, No. 14-cv-23193, 2015 WL 12259226, at *12 (S.D. Fla. Dec. 22, 2015); *SEC v. Berbel*, No. 17-23572-Civ, 2018 WL 1135659, at *3 (S.D. Fla. Feb. 27, 2018). Put another way: "territoriality under *Morrison* turns on 'where, physically, the purchaser or seller committed him or herself' to pay for or deliver a security." *Georgiou*, 777 F.3d at 136. "[P]laintiff must plead facts concerning the formation of contracts to buy or sell securities, the placement of purchase orders, the passing of titles, or exchanges of money, within the United States." *Acerra*, 2021 WL 1269919, at *3.

*Zalazar*, 2023 WL 4186397 at *5 (cleaned up).[80]

---

[80]   Because the Eleventh Circuit did not go beyond what was required in deciding *Quail Cruises*, its "title transfer" test has been adhered to more strictly by some lower courts thereafter, instead of folding in other formulations (like the Second Circuit's in *Absolute Activist*) that meet *Morrison*'s test of whether a transaction is "domestic," or "whether the purchase or sale [of the security] is made in the United States." *Morrison*, 561 U.S. at 269–70; *see also Absolute Activist*, 677 F.3d at 69; *Quail Cruises*, 645 F.3d at 1310; *Goldstein v. Firer*, 2022 WL 17343638 (S.D. Fla. Nov. 16, 2022) (adhering strictly to *Quail Cruises* "title transfer" test). This Court does not construe the *Quail Cruises* formulation so strictly here, as the Eleventh Circuit appears to use the "title transfer" formulation in *Quail Cruises* because it fit *Morrison*'s demand for a domestic transaction on the facts before it in that case. In any event, this Court concludes that under any announced formulation of *Morrison*'s transactional bright-line rule, the Plaintiffs have failed to meet their burden.

18

There are only two possible transaction points to look at on this summary judgment record (at most):  (1) when the SAFE investments themselves were consummated in September 2021, and (2) when the stock transfer in Parallel closed under the terms of the SAFE Agreements.  The latter transaction point is easy to put to rest, because it is beyond dispute that title to Parallel stock *never transferred* to Plaintiffs.[81]  Plaintiffs refused to satisfy any of the conditions precedent for their SAFE investments to be converted into Parallel Common Stock or Parallel Preferred Stock and rescinded their SAFE Agreements before their rights to stock were ever converted into any Parallel shares.  [*See* ECF Nos. 376-2; 376-3].  So that leaves the SAFE Investments themselves as the only plausible focal point for the Plaintiffs to train their evidence upon to attempt to satisfy *Morrison*, when the Plaintiffs (to mitigate the losses of their PIPE investments) entered into the SAFE Agreements and provided $25 million to Parallel in exchange for contingent rights to Parallel stock.

Plaintiffs do not argue or offer any record evidence to show that the SAFE Investments were listed on a domestic exchange.  [*See* ECF Nos. 375, 380].  So that means Plaintiffs must show that

---

[81]     The SAFE Agreements provide that upon the occurrence of certain events, Parallel would issue "rights to certain shares of the [Parallel]'s Capital Stock," and that investors like Plaintiffs will "purchase rights to receive certain shares" in exchange for a sum.  [*See* ECF Nos. 272-26 & 272-27 at 3].  ("Capital Stock" is defined in the SAFE Agreements as "Class A Common Stock of [Parallel]" or "any preferred stock of [Parallel]," which includes Series E or Series EE Preferred Stock.  [ECF No. 375-8 at 5–6].)  Under the terms of the SAFE Agreements then, Plaintiffs received the *right to receive* shares of stock in Parallel.  The question then becomes: when did Plaintiffs' "rights to receive" vest and convert to a Parallel stock title transfer?  The SAFE Agreements again show the way.  Section 1(f) of the SAFE states that, in order for the SAFE to convert into shares of either SAFE Preferred Stock or Series EE Preferred Stock, "the Investor will, *as a condition precedent to such conversion*, execute and deliver to the Company all documents requested by the Company which are relevant to the conversion . . . ."  [*Id.* at 4 (emphasis added)].  Thus, for title of Parallel stock to transfer to Plaintiffs, Plaintiffs were required to "execute and deliver all documents requested by" Parallel.  [*See id.*].  It is undisputed on this summary judgment record that Plaintiffs refused to execute and deliver the documents demanded by Parallel and that Plaintiffs, instead, rescinded their SAFE agreements.  [ECF No. 376-2; ECF No. 376-3].  That means no title transfer of Parallel stock ever took place.  Without a title transfer, the Parallel stock cannot serve as the basis of a domestic securities transaction under *Quail Cruises*.  *See Goldstein*, 2022 WL 17343638, at *5 (finding no domestic transaction where no title transferred).

19

either that the parties incurred irrevocable liability to carry out the SAFE Investments *within the United States* or that title to the SAFE Investments transferred to Plaintiffs *within the United States.* *See Quail Cruises*, 645 F.3d at 1310; *Absolute Activist*, 677 F.3d at 69. In *Quail Cruises*, the Eleventh Circuit explained that transfer of a security's title is determined by the terms of closing set forth in the parties' "purchase and sale agreement." 645 F.3d at 1310.[82] That means this Court must examine the closing terms of the SAFE Agreements on this score. But crucially, while the SAFE Agreements set forth some detail about the conditions, delivery, and execution *of Parallel stock* (were it ever to occur), the Agreements say nothing about *where* the contingent rights to purchase that stock (*the SAFE Investments themselves*) *transfer.*[83] [*See generally,* ECF Nos. 272-26 & 272-27; *id.* ¶ 1(f).]

---

[82] The Eleventh Circuit is not alone on this score; the Second Circuit, too, has acknowledged the importance of the operative agreement in determining title transfer. *See Absolute Activist*, 677 F.3d at 67 ("[T]hese definitions [in the Exchange Act] nonetheless suggest that the act of purchasing or selling securities is the act of entering into a binding contract to purchase or sell securities. Put another way, these definitions suggest that the 'purchase' and 'sale' take place when the parties become bound to effectuate the transaction."). District courts inside and outside of this Circuit have followed suit. *See, e.g.*, *Zalazar*, 2023 WL 4186397, at *6 (stating that a domestic transaction was alleged because, in addition to other events, *the security agreements expressly stated they were effective when signed* by the defendants) (emphasis added); *Goldstein*, 2022 WL 18704836, at *3 (denying motion to dismiss where "the operating agreement . . . substantiates that Plaintiff *became a member of Star Development upon the execution* of that document") (emphasis added); *SEC v. Yin Nan Michael Wang*, No. CV13-07553, 2015 WL 12656906, at *11 (C.D. Cal. Aug. 18, 2015) ("These documents demonstrate that the sale of the securities to the investors *did not close until the subscription agreements were accepted by the BPS Funds in the United States* and the notes were signed by Wang.") (emphasis added).

[83] Compare the absence of facts related to location or closing in the SAFE Agreements here to what the Eleventh Circuit faced, and clearly leaned on, in *Quail Cruises*:

> Quail clearly alleged (and we must accept as true) that "[t]he transaction for the acquisition of the Templeton stock closed in Miami, Florida on June 10, 2008, by means of the parties submitting the stock transfer documents by express courier into this District ...." Amend. Compl. ¶ 66. Thus, Quail alleged that the closing *actually* occurred in the United States, and it was here that "the transaction [wa]s consummated." Black's Law Dictionary 291 (9th ed. 2009) (defining "closing"). Indeed, **the purchase and sale agreement confirms that it was not until this domestic closing that title to the shares was transferred to Quail**.

645 F.3d at 1310 (bold emphasis added).

20

Plaintiffs argue that the purchase and sale of the SAFE Investments (embodied in the SAFE Agreements) took place in the United States because of the following:  (1) Plaintiffs' signatures on the SAFE Agreements were escrowed in the United States (as the SAFE Agreement was not delivered until the PIPE was terminated); (2) Parallel through Whitcomb countersigned the SAFE Agreements while in the United States; (3) Plaintiffs' funds for the SAFE Investments were wired to domestic banks; and (4) Parallel received Plaintiffs' SAFE funds while in the United States.  [ECF No. 375 at 4–7].  The SAFE Agreements also state that Parallel is a Delaware corporation and contains a choice-of-law provision, selecting Delaware law.  [*See* ECF Nos. 272-26 & 272-27 at 2 & ¶ 5(f)].

Defendants, for their part, argue that the summary judgment record unequivocally shows that Plaintiffs' decision-makers and signatories were outside the United States when they authorized execution and funding of the SAFE Agreements.  [ECF No. No. 376 at 5–6].  As for the escrowed signatures above, Defendants point to Plaintiffs' own e-mails showing that receipt of the escrowed signatures *outside* the United States effectuated the SAFE Agreements and obligated Plaintiffs to fund the SAFE.  [*Id.* at 7].  Defendants also argue that Plaintiffs cannot point to any evidence showing that Parallel countersigned First Ocean's SAFE at all, much less within the United States.  [*Id.* at 10; ECF No. 375 at 5 n.4].  Indeed, the SAFE Agreements that bear Whitcomb's *signature block* do not contain his *signature.*  [*See* ECF No. 375-8 at 11; ECF No. 375-2 at 11].  Defendants also point out that Plaintiffs fail to establish Whitcomb's physical location at the time he countersigned the SAFE Agreements on Parallel's behalf, complaining that Plaintiffs can't merely rest on Whitcomb's United States citizenship and residency to meet their burden to show a domestic transaction.  [ECF No. 376 at 10–11].

While a closer question than *Quail Cruises*, an examination of the (September 2021) SAFE Agreement transactions themselves, in combination with the relevant law, leads to the conclusion that Plaintiffs have failed to meet their burden to show the SAFE Investments were "domestic transactions" for purposes of *Morrison,* even when viewing the evidence in the light most favorable to

Plaintiffs. Even if you broaden the formulation beyond the Eleventh Circuit's strict "title transfer" test in *Quail Cruises*, the placement of the evidentiary burden ends up being dispositive: Plaintiffs have failed to show "'where, physically, the purchaser or seller committed him or herself' to pay for or deliver a security," *Georgiou*, 777 F.3d at 136, or where the parties "incur[red] irrevocable liability to carry out the transaction within the United States or when title [wa]s passed within the United States," *Absolute Activist*, 677 F.3d at 69. For purposes of Section 10(b) and *Morrison*, it doesn't matter that the alleged fraudulent conduct relating to the securities occurred in the United States, *see Acerra*, 2021 WL 1269919, at *4, or that a party's residency or citizenship may be in the United States, *see Absolute Activist*, 677 F.3d at 70, or that events preparatory to the transaction occurred in the United States, *Cascade Fund, LLP v. Absolute Cap. Mgmt. Holdings Ltd.*, 2011 WL 1211511, at *7 (D. Colo. Mar. 31, 2011), or that money was wired to a bank in the United States, *Absolute Activist*, 677 F.3d at 70. The summary judgment record for the SAFE Investment transactions, parsed carefully, simply does not show that *Plaintiffs' rights to purchase certain Parallel shares* were transferred in the United States.[84]

Finally, the Court emphasizes *Morrison*'s "presumption against extraterritoriality" canon, which "we apply in all cases." 561 U.S. at 261. As Justice Scalia explained, "Section 10(b) does not punish deceptive conduct, but only deceptive conduct 'in connection with the purchase or sale of any security registered on a national securities exchange'… and domestic transactions in other securities." *Id.* at 266–67. "It is the foreign location of the *transaction* that establishes (or reflects the presumption of)

---

[84]    In important respects, *Quail Cruises* alone cannot carry the day for Plaintiffs. The Eleventh Circuit there held, on a motion to dismiss posture, that plaintiffs met their burden by alleging the transaction closed "by means of the parties submitting the stock transfer documents by express courier" domestically *and critically because the transaction agreement itself* "confirm[ed] that it was not until this domestic closing that title to the shares was transferred." *Quail Cruises*, 645 F.3d at 1310. Here, the SAFE agreements themselves do not contain such a provision regarding where or when the rights to purchase (as conferred and conditioned by the SAFE Agreements) transferred. (Notably, the SAFE Agreements do contain a provision regarding when conversion of the SAFE Agreement into Parallel stock shares occurs. [*See* ECF Nos. 272-26 & 272-27 ¶ 1(f)].

the Act's inapplicability…." *Id.* at 268 (emphasis in original).  Here, we have two foreign investor Plaintiff entities that purchased *rights* to acquire stock in an unlisted Delaware corporation (Parallel, the *title* of which *never transferred* to Plaintiffs) under SAFE Agreements that contemplated the Parallel stock would ultimately be listed and traded on a Canadian stock exchange.  Moreover, according to their signatures, Plaintiffs' representatives executed the SAFE Agreements on their behalf while *outside the United States.*

Plaintiffs' assertion that the SAFE Agreements themselves are akin to options contracts and that the SAFEs are securities for purposes of the federal securities laws is correct.  [ECF No. 380 at 7–8].  But that does not mean Plaintiffs have shown that the SAFE Investment transactions were *domestic* for purposes of the federal securities fraud statutes.  The only thing in the SAFE Agreements themselves that shows a connection to the *United States* is Whitcomb's unexecuted signature block (with an Atlanta, Georgia mailing address).  We don't even have Whitcomb's *signature* on the SAFE Agreements,[85] and Plaintiffs have not pointed to any record evidence that establishes (or creates a genuine issue) that Whitcomb was physically located in the United States at the time he countersigned the SAFE Agreements (if indeed he signed them).  Thus, on this record, Plaintiffs have failed to meet their burden to plead and prove the SAFE transactions were domestic.  *See Morrison*, 561 U.S. at 273 (affirming dismissal of complaint).

Accordingly, Defendants are entitled to summary judgment on Plaintiff's Section 10(b) claim (Count I).  And, without a Section 10(b) claim, Plaintiffs cannot withstand summary judgment on their Section 20(a) derivative claim (Count II).  *See Carvelli v. Owen Fin. Corp.,* 934 F.3d 1307, 1330 (11th Cir.

---

[85]    *See* ECF No. 375-8 at 11 (Plaintiffs' exhibit of TradeInvest's SAFE agreement with unexecuted James Whitcomb's signature block); ECF No. 375-2 at 11 (Plaintiffs' exhibit of First Ocean's SAFE agreement with unexecuted James Whitcomb's signature block).

23

2019) (first quoting *Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230, 1237 (11th Cir. 2008); then citing 15 U.S.C. § 78t(a)).

**B.  Counts III and IV fall outside of Georgia's Blue Sky laws.**

A similar extraterritorial problem exists with respect to Plaintiffs' securities fraud claims asserted under Georgia's Blue Sky laws (Counts III and IV).  At summary judgment, Plaintiffs have not shown the required nexus between the SAFE Investments and the State of Georgia to survive summary judgment on these claims.

Count III asserts claims against the Securities Defendants for violations of the Georgia Uniform Securities Act of 2008 ("GUSA"), Ga. Code Ann. § 10-5-58, for making materially misleading statements or omissions in negotiating the SAFE Agreements.  [Compl., ECF No. 59 ¶¶ 135–41].  Count IV asserts claims for violations of Section 10-5-58(g) of the GUSA against Wrigley, Holmes, and Whitcomb as directors, executive officers, and/or "persons" who directly or indirectly controlled the Company.  [*Id.* ¶¶ 142–48].  Because the parties failed to adequately brief these claims in their initial summary judgment briefing, the Court directed the parties to supplement their filings on Counts III and IV.  [*See* ECF No. 368 at 1 (citing ECF No. 272 at 49–50; ECF No. 300-1 at 47)].  The parties' supplemental filings show that no genuine issue of material fact exists as to whether the SAFE Investments had a sufficient connection to Georgia to proceed to trial on Counts III and IV.  [*See* ECF Nos. 369, 370].

1.  Georgia's "in this state" requirement

When determining whether a state's Blue Sky laws apply, "the pertinent question … is whether there was a sufficient territorial nexus between *the state*… and *the transaction*."  *See Garland v. Advanced Med. Fund, L.P. II*, 86 F. Supp. 2d 1195, 1204 (N.D. Ga. 2000) (emphasis added); *Allen v. Smith & Medford, Inc.,* 199 S.E.2d 876, 877 (Ga. 1973) ("Since the facts reveal that a sale took place *in this state* within the meaning of the Georgia Securities Act, a failure to comply with the registration provisions

of such Act made the sale voidable at the election of the purchaser.") (emphasis added).  In aspects relevant to this litigation, Georgia has adopted the Uniform Securities Act.  *See* Ga. Code. Ann. § 10-5-20; Jack E. McClard, *The Applicability of Local Securities Acts to Multi-State Securities Transactions*, 20 U. Rich. L. Rev. 139 n.6 (1985).  "It has been suggested that the only limitation on the reach of the statute is that the state have a real nexus to the transaction, *i.e.*, that one or more prohibited actions occur in the state."  *Barnebey v. E.F. Hutton & Co.*, 715 F. Supp. 1512, 1534 (M.D. Fla. 1989) (discussing *Lintz v. Carey Manor Ltd.*, 613 F. Supp. 543 (W.D. Va. 1985) and citing Louis Loss, *The Conflict of Laws and the Blue Sky Laws*, 71 Harv. L. Rev. 209 (1957) ("in this state" is an implied limitation on the scope of Blue Sky laws)).  As is expressly set forth in the limiting language bolded below, Georgia has adopted an "in this state" requirement for the application of its Blue Sky laws, tying them not to the physical location of the parties to the transaction but to the territorial nexus of the transaction to the State of Georgia.

Section 10-5-79(a) of the Georgia Code provides that Section 10-5-58 (which Plaintiffs assert in Counts III and IV) "does not apply to a person that sells or offers to sell a security unless the offer to sell or the sale is made **in this state** or the offer to purchase or the purchase is made and accepted **in this state**."  Ga. Code. Ann. § 10-5-79(a) (emphasis added).  Section 10-5-79(c) goes on to explain that "an offer to sell or purchase a security is made **in this state**, *whether or not either party is then present in this state*, if the offer: (1) Originates from **within this state**; <u>or</u> (2) Is directed by the offeror to a place **in this** state <u>and</u> received at the place to which it is directed."  Ga. Code. Ann. § 10-5-79(c) (emphasis added). "[A]n offer to purchase or sell is accepted **in this state**, *whether or not either party is then present in this state*, if the acceptance: (1) Is communicated to the offeror **in this state** <u>and</u> the offeree reasonably believes the offeror to be present **in this state** <u>and</u> the acceptance is received at the place **in this state** to which it is directed; <u>and</u> (2) Has not previously been communicated to the offeror, orally or in a record, outside this state."  Ga. Code. Ann. § 10-5-79(d) (emphasis added).

2.  The parties' arguments

The parties agree that Georgia's Blue Sky laws require a sufficient nexus between the SAFE transactions and Georgia to invoke its provisions.  [*See* ECF No. 369 at 3 (arguing sufficient "factual nexus with Georgia"); ECF No. 370 at 8 (arguing "geographical requirements" not met)].

Defendants argue the SAFE transactions do not have a sufficient nexus to Georgia given that "Parallel's Georgia mailing address, standing alone… does not establish that the offer to sell the SAFE originated in Georgia," as required by Section 10-5-79.  [ECF No. 370 at 4 (citing *Beranger v. Harris*, No. 1:18-CV5054-CAP, 2021 WL 4254940, at *6 (N.D. Ga. Feb. 12, 2021); *Rasmussen v. Thomason & McKinnon Auchincloss Kohlmeyer, Inc.*, 608 F.2d 175, 177–78 (5th Cir. 1979); *Miles v. Lawrence*, No. 10-CV-104, 2011 WL 13086566, at *27 (D. Wyo. Apr. 15, 2011); *Eurofins Panlabs, Inc. v. Ricera Biosciences*, LLC, No. CIV.A. 8431-VCN, 2014 WL 2457515, at *18 (Del. Ch. May 30, 2014); *Singer v. Magnavox Co.*, 380 A.2d 969, 981 (Del. 1977), *overruled on other grounds by Weinberger v. UOP, Inc.*, 457 A.2d 701 (Del. 1983))].  Defendants further maintain the summary judgment record reflects the SAFE transactions originated in Florida, not in Georgia.  [ECF No. 370 at 5 (citing Compl. ECF No. 59 ¶ 31, alleging Parallel is a Delaware corporation and that Defendants "transacted business relating to the causes of action alleged herein within the State of Florida, and/or committed tortious acts in the State of Florida, and/or committed tortious acts causing injury to persons[]or property in the State of Florida"; the August 2021 Deck (reflecting Parallel's headquarters in Florida); ECF No. 272-17 at 17; and other evidence)].

Plaintiffs supplemented the record with an April 10, 2021, Form D filed with the Securities and Exchange Commission reflecting Parallel's principal place of business as Atlanta, Georgia, and of which the Court takes judicial notice.  [*See* ECF No. 369-2].  "[C]ourts may take judicial notice of public records," for the purpose of establishing what the documents contain but "not the veracity of their contents."  *Navarro v. City of Riviera Beach*, 192 F. Supp. 3d 1353, 1364 (S.D. Fla. 2016) (citing

*Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1278 (11th Cir. 1999)); *Universal Express, Inc. v. U.S. SEC*, 177 F. App'x 52, 53 (11th Cir. 2006).

Relying on the Form D exhibit, Plaintiffs chiefly argue Parallel's "being headquartered in, and operating in, Atlanta, Georgia… alone creates a 'factual nexus' with Georgia that is sufficient to warrant application of Section 10-5-50 of Georgia's Uniform Securities Act" or, at the very least, creates an issue of fact sufficient to withstand summary judgment on Counts III and IV of the Complaint.  [ECF No. 369 at 3, 11].  As an alternative theory, Plaintiffs advance the position that the "individual Defendants' misconduct enabled and facilitated Parallel's fraudulent sale of the SAFE from and within Georgia, and Georgia therefore has the same interest in enforcing securities laws against the individual Defendants as it does against Parallel."  [ECF No. 369 at 10].

3.  Analysis

At summary judgment, Plaintiffs failed to rebut Defendants' evidence that the SAFE transactions had no nexus with Georgia beyond Parallel's principal place of business in Atlanta (which is not enough).  Plaintiffs cite no case that supports their argument that a corporation's principal place of business *alone* is sufficient to create a territorial nexus between a securities transaction and the state under Georgia's Blue Sky laws.  Indeed, Plaintiffs themselves argue a party's physical presence in the state is expressly not required under the plain language of Section 10-5-79 (qualifying "whether or not either party is then present in this state").  [*See* ECF No. 369 at 3].

The only evidence showing a nexus between the SAFE transactions and the State of Georgia is Parallel's principal place of business in Atlanta, Georgia, which address is also set forth in Defendant James Whitcomb's unexecuted signature block on the SAFE Agreements.  [*See* ECF Nos. 272-26 & 272-27 at 10].  Otherwise, the core documentary evidence regarding the SAFE transactions cited by both parties at summary judgment includes (1) the August 2021 Deck [ECF No. 272-17]; (2) the SAFE

Agreements [ECF Nos. 272-26 & 272-27]; and (3) the Risk Factors [ECF No. 272-42].  None of these core documents creates a nexus to Georgia.

(a) The August 2021, Deck refers to Parallel as a **Delaware** corporation with its headquarters in **Florida**.  [*See* ECF No. 272-17 at 4 & 17].  Georgia is not mentioned anywhere in the 77-page deck except one appearance of the state colored green (along with other states colored green) within a map of the entire United States to indicate "momentum for additional medical[-use]… legalization" of marijuana [*id.* at 47].

(b) The SAFE Agreements state that Parallel is a **Delaware** corporation.  The SAFE Agreements do not mention Georgia, except for the Atlanta mailing address contained in James Whitcomb's unexecuted signature block.  [*See* ECF Nos. 272-26 & 272-27 at 10].  The SAFE Agreements also contain a choice-of-law provision, selecting **Delaware** law. [*Id.* ¶ 5(f)].

(c) The Risk Factors provide, in relevant part: "You are receiving these risk factors because you are considering an investment in securities (the "SAFE Securities") of SH Parent Inc., a **Delaware** Corporation (the "Company"), pursuant to the terms of a draft simple agreement in future equity (the "SAFE Agreement") provided to you with or prior to the delivery of these risk factors."  [ECF No. 272-46 at 16].  Georgia is not mentioned in the Risk Factors document.

Next, the Court briefly summarizes the authority cited by Plaintiffs to underscore the point that none of the cases stands for the rule Plaintiffs advocate—a party's principal place of business in the state alone creates a nexus between the securities transaction and the state of Georgia to satisfy Section 10-5-79.

Both parties cite *Beranger* from the Northern District of Georgia, which lends no support for Plaintiffs' position; that court held the defendant's residence in and of itself was not enough to create

a nexus with Georgia to support the plaintiff's Georgia securities fraud claims. *See* 2021 WL 4254940, at *7. The only other case cited by Plaintiff which applied Georgia's securities laws is *Seale v. Miller*, 698 F. Supp. 883 (N.D. Ga. 1988). However, the district court in that case found the following contacts (not present here) sufficient to create the required nexus to the state: "the plaintiff-purchaser negotiated and finalized the contract during the December 13, 1985 telephone call with [the defendant]… while plaintiff was in Atlanta. During the conversation, [the defendant] solicited a cash downpayment from plaintiff as part of the contract. Plaintiff caused the deposit to be transferred to defendants from plaintiff's Georgia bank account. Moreover, defendants had sent plaintiffs letters, brochures, and other materials and had advertised in national publications knowing they would be distributed in Georgia." *Id.* at 897. This Court has no such evidence before it.

The other cases relied on by Plaintiffs apply the securities laws of states other than Georgia. In *Jain v. Nexgen Memantine, Inc.*, No. 8:20-cv-2263-VMC-JSS (M.D. Fla. July 20, 2022), the district court concluded that, in addition to Defendant's principal place of business in Florida, "as it relates to the purchases of the securities at issue, each check was deposited into [Defendant's] bank account in Tampa, Florida" and "Florida is the place where all the funds from the transactions were deposited" such that Florida was "the place where the relationship between the parties [was] centered." *Id.* at *10 (citations omitted) (cleaned up).[86] So while the court considered the defendant's principal place of business as a factor, the court based its ruling on the nexus between the transaction and Florida to support a Florida securities fraud claim. *Id.*

In *Barneby v. E.F. Hutton & Co.*, 715 F. Supp. 1512 (M.D. Fla. June 19, 1989), the district court construed claims brought under the Oklahoma Securities Act, listing three factors to be considered

---

[86] The Court notes that Florida's Blue Sky laws do not contain the same exclusionary provision as Ga. Code. Ann. § 10-5-79(a). *See* Fla. Stat. § 517.211. So finding a nexus in Florida does not mean a nexus would be found in Georgia under the same facts.

when determining the applicability of a state's Blue Sky laws: (1) the extent of activity which occurred in the state in question and conversely the fact that a portion of the transaction occurred in another state was not *per se* sufficient to prevent application of the statute; (2) the use of an out-of-state agent to make offers to out-of-state purchasers; (3) the offer originates in the owner's state and that state's securities law applies; and (4) if a portion of a securities transaction occurs in a state, even if aimed at non-residents, that state has a legitimate interest in applying its securities laws to the transaction. *Id.* at 1540 (citations omitted) (cleaned up). Here, Plaintiff has not cited record evidence showing any *activity related to the SAFE transactions taking place in Georgia*, except a few e-mail exchanges with other SAFE investors and PSQ that contain an Atlanta mailing address and Whitcomb's unexecuted signature block on Plaintiffs' SAFE Agreements. [*See* ECF No. 369 at 6].

*A.S. Goldmen & Co. v. N.J. Bureau of Sec.,* 163 F.3d 780 (3d Cir. 1999), involved the question of whether New Jersey's securities laws applied to securities issued by New Jersey companies to out-of-state buyers, which the court held they did. *Id.* at 788. It is undisputed that Parallel is a Delaware (not a Georgia) corporation. Had Parallel been a Georgia corporation, this case might carry some weight. The same is true with *Simms Inv. Co. v. E.F. Hutton & Co.*, 699 F. Supp. 543 (M.D.N.C. 1988), which considered "whether the questioned transaction has a sufficient territorial nexus with Colorado so as to permit the application of its securities laws." *Id.* at 546. In *Simms*, "the offer, acceptance, or both offer and acceptance occurred in Colorado;" thus, when ruling on the defendant's motion to dismiss, the court found "a sufficient territorial nexus between the questioned transaction and the state of Colorado" to withstand dismissal of the plaintiff's Colorado securities fraud claims. *Id.* In this case, Plaintiff has not shown either that the offer, acceptance, or sale of the SAFE Investments occurred in Georgia.

Finally, in *Lintz v. Carey Manor Ltd.*, 613 F. Supp. 543 (W.D. Va. 1985), the district court explained:

> If the allegations of the Complaint are true, then the Defendants, operating from Roanoke, Virginia, sold securities to non-residents without registering them and through fraud and misrepresentation…. It cannot be disputed that Virginia has a legitimate interest in applying its securities laws to operations conducted within the state, even if aimed at non-residents.

*Id.* at 551 (citations omitted). In that case, two of the defendants were Virginia limited partnerships: Mark Partners 1980-A and Carey Manor Ltd. *Id.* at 544–45. The other two defendants—Gulf Partners Ltd. and Timberbridge Associates Ltd.—were based in Mississippi and West Virginia, respectively. The plaintiffs asserted claims against all four defendants under the securities laws of Virginia, New Jersey, Florida, and Pennsylvania. The issue before the court was whether the plaintiffs were entitled to seek an award of attorney's fees allowed by the Virginia Securities Act, but disallowed by the other securities laws under which the plaintiffs had sued. *Id.* at 546. In resolving that question, the court determined that traditional conflict of laws principles should not apply with respect to the Blue Sky law claims. *Id.* at 551. Such claims should, instead, be considered as capable of being brought in multiple jurisdictions if the elements of the applicable state statute are satisfied and there was no double recovery. *Id.* So, *Lintz* is not on point. Plaintiffs have not asserted claims under several state's Blue Sky statutes. Counts III and IV arise only under Georgia law. Accordingly, the Court's task (which all the cases cited by Plaintiffs seem to agree on) is to decide whether Plaintiffs have rebutted Defendants' evidence to create a genuine issue of fact as to whether the SAFE Investments were offered or sold within the state of Georgia as defined by Section 10-5-79.

Before the Court answers that question, the Court briefly addresses Plaintiffs' alternative theory that "the individual Defendants' misconduct enabled and facilitated Parallel's fraudulent sale of the SAFE from and within Georgia, and Georgia therefore has the same interest in enforcing securities laws against the individual Defendants as it does against Parallel." [ECF No. 369 at 10]. For starters, Plaintiffs cite no record evidence to support the statement. Conclusory assertions cannot defeat summary judgment. *See Avirgan v. Hull*, 932 F.2d 1572, 1577 (11th Cir. 1991) (noting that a

"nonmoving party, opposing a motion for summary judgment" cannot defeat summary judgment "by simply relying on legal conclusions" and further explaining that "the evidence presented cannot consist of conclusory allegations or legal conclusions"); *Maddox-Jones v. Bd. of Regents of Univ. Sys. of Ga.*, 448 F. App'x 17, 19 (11th Cir. 2011) ("[A nonmovant] cannot defeat summary judgment by relying upon conclusory assertions." (citation omitted)).

Moreover, the two cases cited by Plaintiffs on this alternative theory are unavailing. *In re Nat'l Century Fin. Enters., Inc. Inv. Litig.*, 755 F. Supp. 2d 857 (S.D. Ohio 2010), applied Ohio law, holding the Ohio Securities Act "reaches a securities transaction between a non-Ohio seller and a non-Ohio buyer, so long as the issuer is from Ohio and the seller has 'significant contacts' with the issuer." *Id.* at 875. Again, the issuer in this case (Parallel) is a Delaware corporation with its principal place of business in Atlanta, Georgia. For the Court to apply *In re Nat'l Century*, it would have to rewrite both the case and Section 10-5-79. That, the Court will not do.

Plaintiffs' second case, *Benjamin v. Cablevision Prog. Invs.*, 499 N.E.2d 1309 (Ill. 1986), has similar problems. In *Benjamin*, the court applied the statutory definition of the term "sale" under the securities laws of Illinois to find that the "sale" at issue in the case took place "within Illinois." *Id.* at 1316. This Court cannot rewrite the Georgia statute by borrowing from another state's statutory definitions. The Georgia statute is very clear on what is covered and what is not covered. Notably, Plaintiffs did not even attempt to analyze the applicable statutory provisions. [*See* ECF No. 369].

Based upon the summary judgment evidence, the Court finds Plaintiffs failed to create an issue for a jury as to whether the SAFE Investments had a sufficient connection with the State of Georgia to rebut Defendants' evidence. They did not. Georgia's Blue Sky laws (like the federal securities laws) do not reach extraterritorial claims. Accordingly, Defendants are entitled to summary judgment on Counts III and IV.

    **C.**    <u>**Count V (common law fraud)**</u>

Plaintiffs' remaining claim for common law fraud arises solely under state law. [*See* Compl., ECF No. 59 ¶¶ 135–164]. The parties have not seriously addressed this claim at summary judgment, so the Court declines to exercise supplemental jurisdiction over the claim and dismisses it without prejudice.[87]

Where a district court has original jurisdiction over an action, the court "shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a). However, a district court "may decline to exercise supplemental jurisdiction over a claim… [if] the district court has dismissed all claims over which it has original jurisdiction[.]" 28 U.S.C. § 1367(c)(3). "Section 1367(c) gives a court *discretion* to dismiss a supplemental claim or party when "the district court has dismissed all claims over which it has original jurisdiction." *Palmer v. Hosp. Auth. of Randolph Cnty.,* 22 F.3d 1559, 1568 (11th Cir. 1994) (emphasis in original); *see also West v. City of Albany*, 830 F. App'x 588, 596 (11th Cir. 2020) (per curiam) (noting that a "district court's decision to either retain or reject" supplemental jurisdiction over state law claims is "purely discretionary" and "not a jurisdictional matter." (citation omitted)).

The Eleventh Circuit has "encouraged district courts to dismiss any remaining state claims when … the federal claims have been dismissed prior to trial." *Raney v. Allstate Ins. Co.*, 370 F.3d 1086, 1089 (11th Cir. 2004) (per curiam). As announced in *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715 (1966), a district court should consider the factors of judicial economy, convenience, fairness, and comity before doing so. *Id.* at 726; *West*, 830 F. App'x at 597 (citations omitted). The *Gibbs* factors

---

[87] Even though Defendants did not ask the Court to decline supplemental jurisdiction over Plaintiffs' state-law claims in their summary judgment briefing, the Court may raise the issue *sua sponte*. *See, e.g., Estate of Owens v. GEO Grp., Inc.*, 660 F. App'x 763, 774–77 (11th Cir. 2016) (affirming district court that raised *sua sponte* the issue of supplemental jurisdiction and declined to retain supplemental jurisdiction).

"may, by their presence or absence, influence the court in its decision concerning the exercise of such discretion" to retain or reject supplemental jurisdiction. *Palmer*, 22 F.3d at 1569.

After considering the § 1367(c) and *Gibbs* factors, which weigh in favor of dismissal of Count V, the Court declines to continue exercising supplemental jurisdiction over Plaintiffs' remaining state law claim. Concerns of comity weigh heavily in favor of dismissal. This case now consists entirely of one state cause of action that would be more appropriately resolved by a state court. *See Ameritox, Ltd. v. Millennium Labs., Inc.*, 803 F.3d 518, 540 (11th Cir. 2015) ("state courts, not federal courts, should be the final arbiters of state law in our federalist system") (alteration adopted; citation and internal quotation marks omitted)). And, given that the parties have litigated this case in Florida for some time now, Florida does not seem to be an inconvenient forum, especially since both sides are highly sophisticated entities and individuals.

While this case has been pending in this Court since March 8, 2022, Plaintiffs filed this action knowing there was a risk of dismissal of their supplemental claims. *See Ameritox, Ltd.*, 803 F.3d at 539 ("every litigant who brings supplemental claims in [federal] court knowingly risks the dismissal of those claims") (citations omitted). Finally, Plaintiffs are free to refile their remaining claim in state court. *See Zen Grp., Inc. v. Harris*, No. 1:20-CV-23218, 2021 WL 6802922, at *2 (S.D. Fla. Dec. 29, 2021) (first citing *Espinoza v. Galardi S. Enterprises, Inc.*, No. 14-CIV-21244, 2018 WL 1729757, at *11 (S.D. Fla. Apr. 10, 2018) ("However, the question of whether [p]laintiffs could timely bring its state law claims in state court is a non-issue. This is because § 1367(d) tolls the statute of limitations for state claims during the period in which they have been pending in federal court and for 30 days after an order of dismissal."; then citing 28 U.S.C. § 1367(d)); *see also*, *Charles v. Johnson*, 18 F.4th 686, 691 (11th Cir. 2021) (affirming district court's decision to decline exercise of supplemental jurisdiction over pendent state law claims at summary judgment); *Silas v. Sheriff of Broward Cnty.*, 55 F.4th 863, 866 (11th Cir. 2022) (noting that the district court's discretion to exercise supplemental jurisdiction

34

"continues throughout the proceeding") (quoting *L.A. Draper & Son v. Wheelabrator-Frye, Inc.*, 735 F.2d 414, 427 (11th Cir. 1984)).  Accordingly, the Court DISMISSES Count V WITHOUT PREJUDICE. *See Crosby*, 187 F.3d at 1352.

## V.     CONCLUSION

In view of the foregoing, it is hereby **ORDERED AND ADJUDGED** as follows:

1.  Defendants' Motion for Summary Judgment [**ECF No. 272 (SEALED) & ECF No. 274 (REDACTED)**] is **GRANTED IN PART.**

2.  The Motion is GRANTED on Counts I, II, III and IV of the Complaint [ECF No. 59] for the reasons set forth in this Order.

3.  Count V of the Complaint [ECF No. 59] is DISMISSED WITHOUT PREJUDICE.

4.  All deadlines are TERMINATED, and all pending motions are DENIED AS MOOT.

**DONE AND ORDERED** in the Southern District of Florida on July 6, 2026.

DAVID S. LEIBOWITZ
UNITED STATES DISTRICT JUDGE

cc:     counsel of record